# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-02342-WYD-MJW

NIDAL A. AYYAD,

     Plaintiff,

v.

ERIC H. HOLDER, JR., Attorney General of the United States;
HARLEY LAPPIN, Director of the Federal Bureau of Prisons;
MICHAEL NALLEY, Regional Director, North Central Region;
RON WILEY, Warden, United States Penitentiary-Administrative Maximum; and
JOHN DOES 1 THROUGH 5,
sued in their official capacities,

     Defendants.

---

Civil Action No. 05-cv-02653-WYD-MJW

MAHMUD ABOUHALIMA,

     Plaintiff,

v.

ERIC H. HOLDER, JR., Attorney General of the United States;
HARLEY LAPPIN, Director of the Federal Bureau of Prisons;
MICHAEL NALLEY, Regional Director, North Central Region;
RON WILEY, Warden, United States Penitentiary-Administrative Maximum; and
JOHN DOES 1 THROUGH 5,
sued in their official capacities,

     Defendants.

---

## THIRD AMENDED AND CONSOLIDATED COMPLAINT

---

     Plaintiffs Nidal A. Ayyad and Mahmud Abouhalima, through their undersigned counsel,

state as follows:

2061253_1.doc

**INTRODUCTION**

Plaintiffs Nidal A. Ayyad ("Ayyad") and Mahmud Abouhalima ("Abouhalima") were convicted of conspiracy and other charges related to the February 1993 bombing of the World Trade Center in New York City.  They have been in the custody of the Federal Bureau of Prisons (the "Bureau") since March 1993 and are each serving sentences in excess of 100 years.

For the first eight-and-one-half years of their incarceration, Ayyad and Abouhalima were assigned to general population confinement at maximum security United States penitentiaries.  In the immediate wake of the September 11, 2001 terrorist attacks on New York City and Washington, D.C., Ayyad and Abouhalima were placed into highly restrictive "administrative segregation" pending the outcome of an investigation into whether they had any ties to or prior knowledge of the events of that day.

In late 2002 and early 2003, respectively, Ayyad and Abouhalima were transferred to the United States Penitentiary-Administrative Maximum, in Florence, Colorado (the "ADX").  The ADX is the highest security facility operated by the Bureau, with the most restrictive conditions of confinement, and designed specifically for inmates "who have demonstrated an inability to function in a less restrictive environment without being a threat to others or to the secure and orderly operation of the institution."  As of the dates of their respective transfers to the ADX, neither Ayyad nor Abouhalima had done or been accused of doing anything while in the custody of the Bureau to merit such a designation, nor have they ever been provided notice or an opportunity to be heard with regard to their transfers to the ADX.

In March 2005, both Ayyad and Abouhalima were transferred to one of the most restrictive and severe security units within the ADX – H-Unit – and placed under Special

Administrative Measures ("SAMs") at the direction of the United States Attorney General. SAMs are authorized only when "there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons or substantial damage to property that would entail the risk of death or serious bodily injury to persons." Neither Ayyad nor Abouhalima had done anything while in the custody of the Bureau to merit a transfer to H-Unit or imposition of SAMs, nor have they ever been provided notice or a meaningful opportunity to be heard with regard to their transfer to H-Unit or the imposition of SAMs.

Ayyad and Abouhalima have been confined in the ADX, under conditions of confinement that constitute an atypical and significant hardship, since approximately October 2002 and March 2003, respectively.  They have been confined in H-Unit at the ADX, subject to the annual renewal of the SAMs placed on them, under conditions of confinement that constitute an atypical and significant hardship since March 2005.  By virtue of the maintenance of the SAMs, Ayyad and Abouhalima have been and continue to be denied access, as a matter of Bureau policy, to the institutional Step-Down Unit Program at the ADX that provides the sole means by which inmates placed at that facility may be transferred out.  All of this has occurred without notice, explanation, or a meaningful opportunity to be heard as to the reasons why Ayyad and Abouhalima were originally transferred to the ADX, why the SAMs were imposed in the first place, and why they are being renewed on an annual basis.

For the reasons summarized above, Ayyad and Abouhalima have been and continue to be deprived of their liberty interest in avoiding confinement under conditions posing an atypical and

significant hardship, with such deprivation being imposed upon them without due process of law as guaranteed by the Fifth Amendment to the United States Constitution.

Additionally, during the course of their confinement in H-Unit, Ayyad and Abouhalima have been subjected and continue to be subjected to restrictions upon their outgoing correspondence, as well as upon their ability to receive incoming correspondence and publications, to a degree that constitutes an unjustifiable violation of their rights under the First Amendment to the United States Constitution.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), 2201, and 2202 and also pursuant to the Administrative Procedure Act, 5 U.S.C. § 702.

2.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (e), as a substantial part of the events or omissions giving rise to the claims herein occurred in this district, Plaintiffs are located in this district, and this is a civil action brought against officers and employees of the United States acting under color or legal authority of the United States.

## PARTIES

3.     Plaintiff Nidal A. Ayyad ("Ayyad") is a prisoner in the custody of the Bureau and has been continuously confined at the ADX since approximately October 2002.

4.     Plaintiff Mahmud Abouhalima ("Abouhalima") is a prisoner in the custody of the Bureau and has been continuously confined at the ADX since approximately March 2003.

5.     Defendant Eric H. Holder, Jr. ("Holder") is the Attorney General of the United States.  At all relevant times, Holder and his predecessors as Attorney General have had decision

making authority regarding the placement, transfer, and treatment of prisoners within the system operated by the Bureau, as well as the power to direct the imposition, renewal, and maintenance of SAMs affecting prisoners within the custody of the Bureau pursuant to 28 C.F.R. § 501.3.

6.      Defendant Harley Lappin ("Lappin") is the Director of the Bureau.  At all relevant times, Lappin and his predecessors as Director have had senior supervisory and decision making authority over the operations of the Bureau and the placement, transfer, and treatment of prisoners in the custody of the Bureau, as well as the authority to implement SAMs.

7.      Defendant Michael Nalley ("Nalley") is the Director of the North Central Region of the Bureau.  At all relevant times, Nalley and his predecessors as Regional Director have had senior supervisory and decision making authority over the operations of the facilities located within the North Central Region, including the ADX, and the placement, transfer, and treatment of prisoners in the custody of institutions located within the North Central Region.

8.      Defendant Ron Wiley ("Wiley") is the Warden of the ADX facility.  At all relevant times, Wiley and his predecessors as Warden have had senior supervisory and decision making authority over the operations of the ADX facility, including the institutional Step-Down Unit Program operated therein, and the treatment of prisoners incarcerated at the ADX facility, including the authority to implement SAMs with regard thereto.

9.      Defendants John Does 1 through 5 ("John Does") are one or more individuals, agencies, offices, or task forces associated, upon information and belief, with the United States Department of Justice, federal law enforcement agencies, or agencies of the United States intelligence community with authority to implement or direct the implementation of SAMs pursuant to 28 C.F.R. § 501.3.

## STATEMENT OF FACTS

**A.**     <u>**Conviction and Sentencing.**</u>

10.    Plaintiffs Ayyad and Abouhalima were convicted of conspiracy and other charges related to the February 1993 bombing of the World Trade Center in New York City, New York. Ayyad is serving an approximately 117 year sentence, Abouhalima is serving an approximately 108 year sentence, and both have been in the custody of the Bureau since approximately March 1993.

**B.**     <u>**Conditions of Confinement Prior to September 11, 2001.**</u>

11.    In the wake of their convictions, Ayyad and Abouhalima were designated by the Bureau to various United States penitentiaries to serve their sentences, where they were placed in high security general population units.

12.    Prior to September 11, 2001, neither the sentencing courts, the United States Department of Justice, the Bureau, nor any other governmental agent or agency imposed any special restrictions or conditions of confinement upon Ayyad or Abouhalima not applicable to other inmates confined at the same United States penitentiaries.

13.    While Ayyad and Abouhalima were incarcerated and serving their sentences at the Bureau facilities described in paragraph 11, above, their conditions of confinement provided for daily contact with staff and other inmates for approximately sixteen hours each day, with their restriction to their individual cells being for a maximum of approximately twelve hours per day.

14.    While incarcerated and serving their sentences at the Bureau facilities described in paragraph 11, above, Ayyad and Abouhalima were assigned to, and successfully participated

in, prison program activities to include, without limitation, working at prison jobs, participating in group sports, walking free of restraints to inmate dining areas, dining with other inmates, and associating with Bureau staff and other inmates.

15.     While incarcerated and serving their sentences at the Bureau facilities described in paragraph 11, above, Ayyad and Abouhalima were permitted to engage in religious practices important to their Islamic faith, such as group prayer and calls to prayer (*adhan*), and were provided access to religious texts and publications.

16.     While incarcerated and serving their sentences at the Bureau facilities described in paragraph 11, above, Ayyad and Abouhalima were permitted and encouraged to engage in individual and group exercise and sports activities seven days a week in large yard areas, with access to a variety of exercise equipment.

17.     While incarcerated and serving their sentences at the Bureau facilities described in paragraph 11, above, Ayyad and Abouhalima were permitted to correspond with their families, friends, their attorneys, the general public, and the media, and to order and receive publications, without special restrictions and in accordance with general Bureau policies and procedures.

18.     While incarcerated and serving their sentences at the Bureau facilities described in paragraph 11, above, Ayyad and Abouhalima were permitted to receive regular, contact visitation with family, friends, and attorneys in accordance with standard Bureau policies.

C.     **Transfer to Administrative Detention.**

19.     According to a memorandum issued by Bureau Assistant Director Michael B. Cooksey ("Cooksey") to "all chief executive officers," dated October 1, 2001 (the "First Cooksey

Memorandum"), in the immediate wake of the terrorist attacks in New York City and Washington, D.C. on September 11, 2001, the Bureau was directed to place all inmates in its custody who, in the estimation of some or all of the Defendants, were "in any way linked to terrorist activities" into administrative detention as part of an "immediate national security endeavor."

20.     On September 11, 2001, Ayyad and Abouhalima were removed from general population at the facilities in which they were then confined and placed in administrative detention pursuant to the national security endeavor described in paragraph 19, above.

21.     The First Cooksey Memorandum purported to "provide[ ] guidance regarding the continuing management and monitoring of" the inmates placed in administrative detention on September 11, 2001, as described in paragraph 19, above.

22.     This guidance with respect to particular inmates such as, on information and belief, Ayyad and Abouhalima, included that:  they "be housed in the Special Housing Unit under the tightest restrictions allowed by our Administrative Detention policy"; Bureau staff "review each piece of [outgoing] mail carefully … to determine whether there is anything contained that would be detrimental to the institution or the public prior to mailing the item"; and "live monitoring should take place for all their social calls."

23.     The First Cooksey Memorandum categorized "inmates with identified links to international terrorist organizations possibly involved in recent events," including, on information and belief, Ayyad and Abouhalima, as individuals for whom "[w]e anticipate that some or all of these inmates will have SAMs approved in the near future."

24.     Neither Ayyad nor Abouhalima was in fact approved for SAMs at that time, or at any time prior to approximately March 2005.

25.     Neither Ayyad nor Abouhalima was provided a hearing or other opportunity to address their placement in administrative detention prior to such placement.

26.     Neither Ayyad nor Abouhalima was ever informed of the results of the investigations forming the basis for their removal from United States penitentiary general population confinement and their placement and retention in administrative detention.

27.     Neither Ayyad nor Abouhalima was ever informed of any evidence or conclusion that either of them had any knowledge of terrorist events or activities or ties with terrorist organizations subsequent to the activities for which they were convicted in 1993, nor, on information and belief, do any such evidence or conclusions exist.

28.     Neither Ayyad nor Abouhalima was ever informed of any evidence or conclusion that either of them had any knowledge of or involvement in the terrorist events of September 11, 2001, nor, on information and belief, do any such evidence or conclusions exist.

29.     Prior to their removal from United States penitentiary general population confinement and placement in administrative detention on September 11, 2001, neither Ayyad nor Abouhalima had received any incident reports that would have warranted a transfer to disciplinary segregation or long-term administrative detention.

**D.      Transfer to ADX.**

30.     According to a memorandum issued by Cooksey to "all regional directors," dated March 28, 2002 (the "Second Cooksey Memorandum"), the individuals placed in administrative

detention on September 11, 2001 were "inmates with *possible* knowledge of terrorist events or ties," and "[t]wenty-four of these inmates remain in Administrative Detention as of this date."

31.     The Second Cooksey Memorandum further stated that, "[b]ased on discussions with the FBI," it was believed that certain of the inmates listed therein, including, on information and belief, Ayyad and Abouhalima, were "appropriate for transfer to the United States Penitentiary, Administrative/Maximum (ADX) in Florence, Colorado, and in fact, most have already been referred for such transfer."

32.     The reason that placement of the particular inmates referred to in the Second Cooksey Memorandum at the ADX was considered appropriate was that, at that time, the ADX was considered the only facility operated by the Bureau wherein inmates could be subjected to 100 percent communications monitoring.

33.     On or around October 2002, Ayyad was transferred to the ADX and ultimately placed in a "general population" segregation cell there.

34.     On or around March 2003, Abouhalima was transferred to the ADX and ultimately placed in a "general population" segregation cell there.

35.     On information and belief, for the entirety of their time in the ADX, both Ayyad and Abouhalima have been subjected to 100 percent communications monitoring.

36.     The ADX is entirely a segregation facility and, notwithstanding its "administrative" classification, is the highest security and most restrictive facility operated by the Bureau, with conditions of confinement that are significantly more restrictive than Bureau facilities with a "high" security classification.

37.     The only non-segregation units at the ADX are the step-down units, designed for inmates progressing through the program that is the sole means by which inmates who are not in protective custody or in the Control Unit may be transferred out of the facility.  Neither Ayyad nor Abouhalima has ever resided in an ADX step-down unit.

38.     According to the Bureau's Program Statement PS 5100.07, in effect at the time of the transfers of Ayyad and Abouhalima referenced above, the ADX's "general population" units are designed for male inmates who have "demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution."

39.     Program Statement PS 5100.07 further states that the United States Penitentiary-Marion "is reserved for inmates who have demonstrated an inability to adjust satisfactorily to general population units in other secure facilities."

40.     Program Statement PS 5100.07 requires that, "[p]rior to referring an inmate to USP Marion or ADX Florence, redesignation to another high security institution should be considered first."  On information and belief, no such alternative placement was considered for either Ayyad or Abouhalima.

41.     Prior to their placement in segregation at the ADX, neither Ayyad nor Abouhalima had demonstrated an inability to function in a less restrictive environment without being a threat to others or to the secure and orderly operation of the institution, nor had they demonstrated an inability to adjust satisfactorily to general population units in the secure facilities where they had been housed, nor had they engaged in disruptive or assaultive behavior.

42.     Neither Ayyad nor Abouhalima was provided any meaningful information regarding the reasons for their transfer to the ADX.

43.     Neither Ayyad nor Abouhalima was provided prior notice, a hearing or other opportunity to address their transfer to the ADX prior to such transfer.

44.     The only mechanism by which Ayyad and Abouhalima were and are able to challenge their placement or retention at the ADX, and learn the reasons therefore, is the administrative remedy procedure available for all inmate grievances other than those alleging individual staff misconduct.

45.     On information and belief, no inmate in the history of the ADX has ever successfully overturned the decision to place or retain him at the ADX through the administrative remedy process.

46.     Inmates at the ADX, other than those in the step-down units therein, are only able to converse with other inmates by yelling through the closed doors of their segregation cells, which is not permitted, or during outdoor recreation, from their separate cages.

47.     The "general population" segregation cells at the ADX are approximately 87 square feet, contain a shower and toilet, and have both a barred metal door and a separate solid metal door, beside which is a narrow window through which an inmate can see the wall of the outside hallway, but no other cells or people, other than those who pass by the window.

48.     The "general population" segregation cells at the ADX have a smaller window to the outside, through which the inmate can see neither the sky nor the surrounding land.

49.     The conditions of confinement in "general population" segregation units at the ADX consisted of Ayyad and Abouhalima being confined to their individual cells for up to 23 hours a day for at least five days a week and the other two days being confined 24 hours a day.

50.     The conditions of confinement in "general population" segregation units at the ADX consisted of Ayyad and Abouhalima being fed their meals alone in their cells.

51.     The conditions of confinement in "general population" segregation units at the ADX required that Ayyad and Abouhalima be strip-searched, cavity searched, placed in hand and leg shackles that are connected to chains circling their waists when leaving their unit, and accompanied by multiple correctional officers whenever they were removed from their cells.

52.     The conditions of confinement in "general population" segregation units at the ADX permitted Ayyad and Abouhalima a maximum of one hour of exercise five days a week, alone, in a confined indoor cell or group recreation in an outdoor cage, from which the sky, but none of the surrounding land, is visible.

53.     The conditions of confinement in "general population" segregation units at the ADX provided that inmates are not to converse with each other through their cell doors or by any other means, including through performance of the Muslim call to prayer (*adhan*).

54.     The conditions of confinement in "general population" segregation units at the ADX, as well as the step-down units, provided that inmates are forbidden from engaging in group prayer, such as the Muslim *Jumu'ah* prayer, the five daily prayers, and special night prayers during the month of Ramadan and two major Muslim holidays.

55.     The conditions of confinement in "general population" segregation units at the ADX provided that inmates could only confer with clergy, such as Muslim *imams*, when both

cell doors were closed and the clergy member was standing in the hall outside, thus requiring Ayyad and Abouhalima to speak in a volume so loud that it rendered private consultations with the imam impossible.  A correctional officer or other ADX security personnel must be present in every instance where a clergy member communicates with an inmate in a "general population" segregation cell with the outer door open.  In no event is the inner barred door ever opened for such communications.

56.    The conditions of confinement in "general population" segregation units at the ADX provided that inmates could make two fifteen minute telephone calls each month.

57.    The conditions to which Ayyad and Abouhalima have been subjected while confined in segregation since September 11, 2001 impose an atypical and significant hardship in relation to the ordinary incidents of prison life.

**E.    <u>Ayyad's and Abouhalima's Correspondence</u>.**

58.    Since their confinement by the Bureau, Ayyad's and Abouhalima's incoming and outgoing mail, both non-English and English, has been subject to review and approval as provided for in Bureau policies regarding inmate communications.  Additionally, all such mail has been subject to monitoring, copying, and translating by SIS (the Bureau's internal intelligence department) and the FBI prior to its being provided to the addressee inmate.

59.    Since their transfer to administrative detention in the wake of the September 11, 2001 attacks, on information and belief, 100 percent of Ayyad's and Abouhalima's outgoing and incoming mail and all other communications has been monitored.  This mail has been reviewed and, at times, rejected or returned in accordance with Bureau policies regarding inmate communications.

60.     Beginning in approximately July 2002, Ayyad and Abouhalima, with the express permission of Bureau personnel, commenced corresponding with inmates in a Spanish prison.

61.     This correspondence continued with the knowledge and permission of the Bureau and the FBI through late 2003.

62.     Upon information and belief, all correspondence initiated or received by Ayyad or Abouhalima – and particularly all correspondence from or to overseas prisoners – was temporarily detained, read, copied, translated, and monitored by the Bureau and/or FBI personnel.

63.     Upon information and belief, all communications involving Bureau inmates with suspected terrorist ties are shared with the FBI, the National Joint Terrorism Task Force, local joint terrorism task forces, and other government intelligence agencies.

64.     In approximately January 2004, the Bureau ordered Ayyad and Abouhalima to stop corresponding with the Spanish inmates.

65.     ADX staff advised Ayyad and Abouhalima at that time that there would be no adverse actions taken against them, as the Bureau and the FBI had known about the correspondence with the Spanish prisoners, had copies of the letters, and that the letters had not raised any security issues.

66.     Ayyad and Abouhalima immediately complied with the order to stop corresponding with the Spanish inmates.

67.     Since their transfer to administrative detention in the wake of the September 11, 2001 attacks, neither Ayyad nor Abouhalima has been charged with or disciplined for abusing

any aspect of their correspondence privileges, nor have they or their families ever abused their correspondence privileges.

68.     Since their transfer to administrative detention in the wake of the September 11, 2001 attacks, neither Ayyad nor Abouhalima has been issued any incident reports related to their correspondence with anyone.

69.     On February 28, 2005, more than a year after both Ayyad and Abouhalima had ceased corresponding with the Spanish inmates at the direction of Bureau personnel, the national news media broadcast a report regarding Ayyad and Abouhalima, and one other ADX inmate, stating that they had been permitted by the Bureau to correspond with "terrorists" in a Spanish prison.

70.     On March 1, 2005, the same network broadcast a second report about the investigation into how Bureau inmates had been able to correspond with imprisoned "terrorists" abroad.  In this broadcast, United States Senator Charles Schumer (D-NY) called for the firing of "those [Bureau personnel] who allowed this lapse to take place."

71.     Then-United States Attorney General Alberto Gonzales assured the public and a Senate committee that he would investigate this issue and take action.

**F.      Transfer to H-Unit and Imposition of Special Administrative Measures (SAMs).**

72.     On March 18, 2005, Ayyad and Abouhalima were removed from the "general population" segregation units at the ADX and transferred to H-Unit, the Special Security Unit within the ADX.

73.     Neither Ayyad nor Abouhalima was provided a hearing or other opportunity to address the reasons for their transfer to H-Unit prior to such transfer.

74.     The conditions of confinement in H-Unit at the ADX are identical to the conditions in the "general population" segregation units described in paragraphs 47 through 57, above, except that the H-Unit cells in which Ayyad and Abouhalima have been confined are approximately 75.5 square feet, do not contain a shower and do not have sallyports. Additionally, access to books from the ADX education department, library access, commissary access, television and radio access, and restrictions upon family and legal visitations are subject to significantly greater restrictions in H-Unit.   Since approximately May 2008, Ayyad and Abouhalima been permitted to walk unshackled to the shower five times a week, though they are placed in leg shackles and belly chains with black boxes during social and legal visits and when being escorted within the unit.

75.     On March 18, 2005, the ADX Warden issued a memorandum to Ayyad and Abouhalima notifying them that, as a result "of [their] proclivity for violence," they were being placed under SAMs, as directed by the Attorney General.

76.     Pursuant to 28 C.F.R. § 501.3, SAMs may be imposed only at the direction of the Attorney General and, upon that direction, authorization to the Warden by the Director of the Bureau, upon written notification "that there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons."

77.     Pursuant to 28 C.F.R. § 501.3, SAMs "may include housing the inmate in administrative detention and/or limiting certain privileges including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the

telephone, as is reasonably necessary to protect persons against the risk of acts of violence or terrorism."

78.    Pursuant to 28 C.F.R. § 501.3, SAMs may not be imposed for a period of longer than one year, though they may be extended in one-year increments thereafter by the Bureau Director upon receipt of written notification from the Attorney General or, at the Attorney General's direction, from the head of a federal law enforcement agency or the head of a member agency of the United States intelligence community, "that there continues to be a substantial risk that the inmate's communications or contacts with other persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons."

79.    The SAMs imposed upon both Ayyad and Abouhalima have been continually renewed on an annual basis since their imposition in March 2005.

80.    Neither Ayyad nor Abouhalima has ever been apprised or provided meaningful notice of the reasons for their initial placement under SAMs or the reasons for their renewal.

81.    Neither Ayyad nor Abouhalima was provided a hearing or other opportunity to address the imposition of SAMs prior to their imposition.

82.    While Ayyad and Abouhalima have been availed the opportunity to provide comments in connection with at least some of the annual renewals of the SAMs, their requests for modification or removal of the SAMs have uniformly been rejected and denied without meaningful explanation.

83.    As a result of the imposition of the SAMs restrictions, Ayyad and Abouhalima are not permitted contact with any individuals, including prospective counsel, prior to those

individuals requesting and receiving security clearance from the United States Attorney's Office for the Southern District of New York.  On information and belief, the decisions reached regarding these SAMs security clearances cannot be appealed by either Ayyad, Abouhalima, or the individuals seeking clearance and have never been successfully reconsidered or overturned.

84.    Neither Ayyad nor Abouhalima has ever received SAMs clearances for the entirety of their respective family members for whom clearance was requested, nor have any of those clearance decisions ever been successfully reconsidered or overturned.

85.    As a result of the imposition of the SAMs restrictions, Ayyad and Abouhalima have experienced continued, extreme, and unjustifiable difficulties and delays obtaining publications, communicating and corresponding with family members and friends, communicating with attorneys, and arranging for visitations from family members.

86.    Notwithstanding the availability of interpreters at the ADX, Ayyad and Abouhalima are experiencing delays in the receipt of mail in English of three to four weeks and mail in Arabic of up to three months.

87.    Since their initial confinement in March 1993, neither Ayyad nor Abouhalima has shown any proclivity for violence.

88.    Since their initial confinement in March 1993, neither Ayyad nor Abouhalima has engaged in "communications or contacts with persons [that] could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons."

89.    Since their initial confinement in March 1993, neither Ayyad nor Abouhalima has been advised of the identity of any "communications or contacts with persons" in which they

have engaged that "could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons."

90.     Neither Ayyad nor Abouhalima has ever been charged with any violations to justify or substantiate the implementation or renewal of the SAMs designations.

91.     Neither Ayyad nor Abouhalima has ever been found to have had any prior knowledge of or involvement in the events of September 11, 2001 or any other terrorist activity subsequent to the activities for which they were originally convicted.

92.     Neither Ayyad nor Abouhalima has ever been advised or instructed, despite requests for such information, regarding the steps they need to take, actions from which they must refrain, or programs they need to complete for the purpose of mitigating the reasons for the imposition of the SAMs restrictions, so as to merit removal or modification of the SAMs restrictions.

**G.      Denial of Access to the Step-Down Program.**

93.     At the direction and with the approval of the Bureau, the ADX operates a Step-Down Unit Program that purports to encourage appropriate inmate behavior and is the sole means by which inmates who are not in protective custody or in the Control Unit may transfer out of the ADX and into less restrictive facilities.

94.     The following specific factors are set forth in Bureau policies as the factors to be considered in determining whether an inmate is eligible for entry into the ADX Step-Down Unit Program and, ultimately, for transfer out of ADX and into less restrictive Bureau facilities:

(a)     whether the inmate has actively participated in and completed programs recommended by his unit team;

(b)      the inmate's overall institutional adjustment, personal hygiene, and cell sanitation;

(c)      the inmate's interaction with staff; and

(d)      whether the factors which led to placement in ADX have been successfully mitigated.

95.      The factors described above are only assessed after an ADX inmate has completed one year in a "general population" segregation unit without any incident reports. Inmates in "general population" segregation units without a year of clear conduct, and all other inmates not already in the step-down program at the ADX, such as those in H-Unit, are not eligible for entry into the Step-Down Unit Program.

96.      Bureau personnel additionally consider other factors, not set forth in any Bureau policies or communicated to inmates, in determining whether an inmate otherwise eligible for entry into the Step-Down Unit Program will in fact be recommended for such entry.   On information and belief, inmates at the ADX are routinely informed that they are eligible for entry into the step-down program, but are denied such entry for reasons that are never specified to them.

97.      Both Ayyad and Abouhalima were denied entry into the Step-Down Unit Program on multiple occasions between the dates of their respective placements at the ADX and March 2005, on the basis that they had not sufficiently mitigated their reason for placement at the ADX, despite that they were never meaningfully informed of what that reason was or how it could be mitigated.

98.    In approximately May 2008, after the inception of this litigation, the ADX promulgated a separate internal step-down program for H-Unit, which provides for three one-year "phases" through which an inmate, through good behavior, may earn greater privileges and less restrictive conditions of confinement within H-Unit.

99.    Consideration for advancement within the H-Unit step-down program includes such factors as "safety concerns, length of sentence, disciplinary record, history of assaultive/disruptive behavior, and escape potential."  In addition, "sanitation, willingness to participate in or cooperate with institutional programs or procedures, interaction with other inmates as well as positive rapport with staff are elements that will be used to evaluate placement in each phase."

100.    Based upon the factors described in paragraph 99, above, the H-Unit Review Committee makes an annual evaluation as to whether each inmate within the H-Unit step-down program is qualified to advance to the next step down level.

101.    The H-Unit Review Committee is not empowered to authorize the removal of an inmate from H-Unit.  Inmates in H-Unit are not eligible for entry into the ADX Step-Down Unit Program that is available to inmates in ADX "general population" segregation cells with one year of clear conduct.

102.    Advancement to phase three of the H-Unit step-down program is conditioned upon the granting of a request by the participating inmate and the H-Unit Review Committee to the Office of General Counsel of the Bureau for a modification of the SAMs imposed upon that inmate consistent with the greater privileges allowed in phase three of the program.   No

individual within the Bureau has the power to modify or remove the SAMs restrictions on Ayyad and Abouhalima.

103.    Ayyad has participated in levels one and two of the H-Unit step-down program and has satisfied all requirements for progression to level three of that program except modification of the SAMs.

104.    Abouhalima has participated in levels one and two of the H-Unit step-down program and has satisfied all requirements for progression to level three of that program except modification of the SAMs.

105.    Neither Ayyad nor Abouhalima has been able to obtain a modification of his SAMs despite annual requests therefore.

106.    Neither Ayyad nor Abouhalima has been able to obtain an explanation of why their requests for modification of their SAMs cannot be approved, other than that the reasons for their initial placement under SAMs have not been mitigated.

107.    Neither Ayyad nor Abouhalima has ever been apprised or provided meaningful notice of the reasons for their initial placement under SAMs.

108.    Not having been provided meaningful notice of the reasons for their initial placement under SAMs, nor the reasons for the annual denials of their requests for removal or modification of their SAMs, Ayyad and Abouhalima are being wholly prevented from mitigating, or addressing the adequacy of their attempts to mitigate, the reasons for their placement under SAMs.

109.    Upon information and belief, the initial decision to place Ayyad and Abouhalima under SAMs restrictions, as well as the decision each year to renew the SAMs, were and are

23

made by one or more individuals, groups of individuals, agencies, offices, or task forces associated with the United States Department of Justice, federal law enforcement agencies, or agencies of the United States intelligence community, whose identities are unknown to the Plaintiffs.  These individuals are joined in this action as Defendants John Does 1 through 5.

110.    The interposition of a requirement for modification of the SAMs, under the circumstances described above, as a precondition for advancement to phase three of the H-Unit step-down program renders the H-Unit step-down program unavailable and a sham as applied to Ayyad.

111.    The interposition of a requirement for modification of the SAMs, under the circumstances described above, as a precondition for advancement to phase three of the H-Unit step-down program renders the H-Unit step-down program unavailable and a sham as applied to Abouhalima.

112.    The interposition of a requirement for modification of the SAMs, under the circumstances described above, as a precondition for advancement to phase three of the H-Unit step-down program, and under circumstances where the existence of the SAMs effectively blocks entry into the general ADX Step-Down Unit Program, renders the ADX Step-Down Unit Program unavailable and a sham as applied to Ayyad.

113.    The interposition of a requirement for modification of the SAMs, under the circumstances described above, as a precondition for advancement to phase three of the H-Unit step-down program, and under circumstances where the existence of the SAMs effectively blocks entry into the general ADX Step-Down Unit program, renders the ADX Step-Down Unit Program unavailable and a sham as applied to Abouhalima.

114.    The consideration of whether the factors which led to placement in the ADX have been successfully mitigated as a precondition to completion of the general ADX Step-Down Unit Program, under the circumstances described above, whereby those factors are neither meaningfully disclosed nor subject to mitigation, renders the ADX Step-Down Unit Program unavailable and a sham as applied to Ayyad.

115.    The consideration of whether the factors which led to placement in the ADX have been successfully mitigated as a precondition to completion of the general ADX Step-Down Unit Program, under the circumstances described above, whereby those factors are neither meaningfully disclosed nor subject to mitigation, renders the ADX Step-Down Unit Program unavailable and a sham as applied to Abouhalima.

116.    As of the filing of this Third Amended and Consolidated Complaint, Ayyad and Abouhalima have each continuously been confined in segregation or at the ADX for over seven years.  This calculation is based upon their being confined in segregation since September 11, 2001.

117.    This continuous confinement of Ayyad and Abouhalima creates an atypical and significant hardship in comparison to the ordinary incidents of prison life to which they and other inmates with comparably clear conduct records were subjected prior to September 11, 2001.

118.    Ayyad's and Abouhalima's confinement in segregation at the ADX is indefinite, in that Plaintiffs cannot be transferred from the ADX to another Bureau facility until they have demonstrated that they can be managed in a less restrictive prison setting.

119.    Ayyad and Abouhalima have fully cooperated with their unit team to participate in all educational, recreational, religious, and psychology programs as required by the unit team for a normal ADX inmate to advance to the next step down level.

120.    Notwithstanding their cooperation with their unit team, Ayyad and Abouhalima are being denied the right of access to programs and processes through which they can demonstrate that they can be managed in a less restrictive prison setting as a result of the maintenance of the SAMs restrictions.

121.    Ayyad and Abouhalima are being denied the right of access to programs and processes through which they can demonstrate that they can be managed in a less restrictive prison setting without adequate notice or a meaningful opportunity to be heard.

122.    Since neither Ayyad nor Abouhalima has ever been provided notice as to why they were placed in segregation, transferred to the ADX, transferred to the ADX H-Unit, or placed under SAMs, they have not been able to effectively challenge any of these actions or their removal from general population to their continued confinement in segregation since September 11, 2001 or to demonstrate why the reasons for their placement in the ADX or placement under SAMs have been mitigated.

123.    Since neither Ayyad nor Abouhalima was placed in the ADX for being assaultive or disruptive, they have no way of demonstrating to Defendants or their agents that they have mitigated such behavior.

124.    During their confinement in segregation and at the ADX, Ayyad and Abouhalima have demonstrated good behavior and the ability and motivation to reintegrate into an open population setting and eventually transfer into a general population prison.

125.     Ayyad has been incarcerated in the ADX since approximately October 2002 and has never been placed or meaningfully considered for placement in the ADX Step-Down Unit Program.

126.     Abouhalima has been incarcerated in the ADX since approximately March 2003 and has never been placed or meaningfully considered for placement in the ADX Step-Down Unit Program.

127.     The conditions of confinement to which Ayyad and Abouhalima have been subjected are extreme when compared to the conditions to which they were subjected when confined in general population prior to September 11, 2001.

**FIRST CLAIM FOR RELIEF**
**[Fifth Amendment:  Deprivation of Liberty Interest Without Due Process of Law]**

128.     Paragraphs 1 through 127, above, are incorporated herein by reference.

129.     The conditions of confinement to which Ayyad has been and is being subjected at the ADX constitute an atypical and significant hardship.

130.     Ayyad has a liberty interest in avoiding indefinite confinement under the conditions to which he is being subjected at the ADX, which interest is protected by the Fifth Amendment to the United States Constitution.

131.     Ayyad's transfer to the ADX without notice and an opportunity to be heard constituted a deprivation of a liberty interest without due process of law in violation of the Fifth Amendment to the United States Constitution.

132.     Ayyad is entitled to immediate transfer from the ADX to another facility with less restrictive and severe conditions of confinement within the custody of the Bureau, according to reasonable specified criteria consistent with the legitimate penological interests of the Bureau.

## SECOND CLAIM FOR RELIEF
**[Fifth Amendment:  Deprivation of Liberty Interest Without Due Process of Law (Alternative)]**

133.    Paragraphs 1 through 127, above, are incorporated herein by reference.

134.    The conditions of confinement to which Ayyad has been and is being subjected at the ADX constitute an atypical and significant hardship.

135.    Ayyad has a liberty interest in avoiding indefinite confinement under the conditions to which he is being subjected at the ADX, which interest is protected by the Fifth Amendment to the United States Constitution.

136.    Ayyad has been and is being deprived by Defendants of any opportunity to avoid indefinite confinement under the conditions to which he is being subjected at the ADX, such deprivation being without due process of law in violation of the Fifth Amendment to the United States Constitution.

137.    Ayyad is entitled to implementation of and assignment to a step down or other program through which he has a reasonable prospect of earning and advancing to less restrictive conditions of confinement within the custody of the Bureau, according to reasonable specified criteria consistent with legitimate penological interests, such advancement not to be denied or delayed without adequate and reasonable notice of and opportunity to be heard regarding the reasons for such denial or delay.

## THIRD CLAIM FOR RELIEF
**[Fifth Amendment:  Deprivation of Liberty Interest Without Due Process of Law]**

138.    Paragraphs 1 through 127, above, are incorporated herein by reference.

139.    The conditions of confinement to which Abouhalima has been and is being subjected at the ADX constitute an atypical and significant hardship.

140.     Abouhalima has a liberty interest in avoiding indefinite confinement under the conditions to which he is being subjected at the ADX, which interest is protected by the Fifth Amendment to the United States Constitution.

141.     Abouhalima's transfer to the ADX without notice and an opportunity to be heard constituted a deprivation of a liberty interest without due process of law in violation of the Fifth Amendment to the United States Constitution.

142.     Abouhalima is entitled to immediate transfer from the ADX to another facility with less restrictive and severe conditions of confinement within the custody of the Bureau, according to reasonable specified criteria consistent with the legitimate penological interests of the Bureau.

## FOURTH CLAIM FOR RELIEF
## [Fifth Amendment:  Deprivation of Liberty Interest Without Due Process of Law (Alternative)]

143.     Paragraphs 1 through 127, above, are incorporated herein by reference.

144.     The conditions of confinement to which Abouhalima has been and is being subjected at the ADX constitute an atypical and significant hardship.

145.     Abouhalima has a liberty interest in avoiding indefinite confinement under the conditions to which he is being subjected at the ADX, which interest is protected by the Fifth Amendment to the United States Constitution.

146.     Abouhalima has been and is being deprived by Defendants of any opportunity to avoid indefinite confinement under the conditions to which he is being subjected at the ADX, such deprivation being without due process of law in violation of the Fifth Amendment to the United States Constitution.

147.    Abouhalima is entitled to implementation of and assignment to a step down or other program through which he has a reasonable prospect of earning and advancing to less restrictive conditions of confinement within the custody of the Bureau, according to reasonable specified criteria consistent with legitimate penological interests, such advancement not to be denied or delayed without adequate and reasonable notice of and opportunity to be heard regarding the reasons for such denial or delay.

### FIFTH CLAIM FOR RELIEF
### [First Amendment:  Outgoing Correspondence]

148.    Paragraphs 1 through 127, above, are incorporated herein by reference.

149.    Ayyad and Abouhalima have a right protected by the First Amendment to the United States Constitution to correspond with other persons, including particularly family members and friends, notwithstanding their status as prisoners.

150.    Defendants are censoring and restricting Ayyad's and Abouhalima's outgoing correspondence to a degree not consistent with the restrictions applicable to other high security inmates not placed under SAMs.

151.    Defendants are censoring and restricting Ayyad's and Abouhalima's outgoing correspondence to a degree greater than is necessary or essential to the protection of the governmental interests of security, order, and rehabilitation.

152.    Defendants are censoring and restricting Ayyad's and Abouhalima's outgoing correspondence to a degree greater than is reasonably necessary to protect persons against the risk of acts of violence or terrorism.

153.    Ayyad and Abouhalima are entitled to immediate restoration of their First Amendment rights to engage in outgoing correspondence except to the extent that the

Defendants are able to show that restrictions upon those rights are necessary to protect one or more of the governmental interests described above.

## SIXTH CLAIM FOR RELIEF
### [First Amendment:  Incoming Correspondence and Materials]

154.    Paragraphs 1 through 127, above, are incorporated herein by reference.

154.    Ayyad and Abouhalima have a right protected by the First Amendment to the United States Constitution to receive correspondence and publications from other persons and sources, notwithstanding their status as prisoners.

156.    Defendants are censoring and restricting Ayyad's and Abouhalima's incoming correspondence and publications to a degree not consistent with the restrictions applicable to other high security inmates not placed under SAMs.

157.    Defendants are censoring and restricting Ayyad's and Abouhalima's incoming correspondence and publications to a degree not reasonably related to legitimate penological interests.

158.    Defendants are censoring and restricting Ayyad's and Abouhalima's incoming correspondence and publications to a degree greater than is reasonably necessary to protect persons against the risk of acts of violence or terrorism.

159.    Ayyad and Abouhalima are entitled to immediate restoration of their First Amendment rights to receive incoming correspondence and publications except to the extent that the Defendants are able to show that restrictions upon those rights are necessary to protect one or more of the governmental interests described above.

**PRAYER FOR RELIEF**

WHEREFORE, Ayyad and Abouhalima pray for judgment against Defendants as follows:

A.      For a declaration that Ayyad has been and is being deprived by Defendants of his liberty interest in avoiding indefinite confinement under conditions constituting an atypical and significant hardship, such deprivation being without due process of law in violation and contravention of the Fifth Amendment to the United States Constitution;

B.      For a declaration that Abouhalima has been and is being deprived by Defendants of his liberty interest in avoiding indefinite confinement under conditions constituting an atypical and significant hardship, such deprivation being without due process of law in violation and contravention of the Fifth Amendment to the United States Constitution;

C.      For an order requiring Defendants to immediately transfer Ayyad and Abouhalima from the ADX to another facility with less restrictive and severe conditions of confinement, or, alternatively and at a minimum, implement and assign Ayyad and Abouhalima to a step down or other program through which they will have a reasonable prospect of earning and advancing to less restrictive conditions of confinement within the custody of the Bureau, according to reasonable specified criteria consistent with legitimate penological interests, such advancement not to be denied or delayed without adequate and reasonable notice of and opportunity to be heard regarding the reasons for such denial or delay;

D.      For an order requiring Defendants to remove restrictions upon the ability of Ayyad and Abouhalima to send correspondence to other persons except to the degree Defendants are able to show that such restrictions are in fact reasonably necessary to protect one or more of

the governmental interests of security, order, rehabilitation, or protecting persons against the risk of acts of violence or terrorism.

     E.     For an order requiring Defendants to remove restrictions upon the ability of Ayyad and Abouhalima to receive incoming correspondence and publications except to the degree Defendants are able to show that such restrictions are in fact reasonably related to legitimate penological interests or reasonably necessary to protect persons against the risk of acts of violence or terrorism.

     F.     For an order requiring Defendants to report to this Court for review of the adequacy of the programs and responses implemented in response to this Court's direction;

     G.     For such fees and costs as this Court may determine that they are entitled by law to recover; and

     H.     For such further relief as the Court may deem appropriate.

Respectfully submitted this 13th day of April, 2009.

   _s/ Edward T. Ramey_
Edward T. Ramey
Laura L. Rovner, Of Counsel
Rajasimha Raghunath, Of Counsel
Isaacson Rosenbaum P.C.
633 17th Street, Suite 2200
Denver, Colorado 80202
Telephone:  (303) 256-3978
Fax:  (303) 292-3152
E-mail:  eramey@ir-law.com; lrovner@law.du.edu;
rraghunath@law.du.edu

ATTORNEYS FOR PLAINTIFFS
NIDAL A. AYYAD
and MAHMUD ABOUHALIMA

## CERTIFICATE OF SERVICE (CM/ECF)

I HEREBY CERTIFY that on this 13th day of April, 2009, I electronically filed the foregoing **THIRD AMENDED AND CONSOLIDATED COMPLAINT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

**Susan Prose**
Susan.Prose@usdoj.gov


_s/ Jayne Wills_
Jayne Wills