**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 05-cv-02342-WYD-MJW
         (as consolidated with Civil Action No. 05-cv-02653-WYD-MJW)

NIDAL A. AYYAD, et al.,

         Plaintiff,

v.

ERIC H. HOLDER, JR., Attorney General of the United States;
HARLEY LAPPIN, Director of the Federal Bureau of Prisons;
MICHAEL NALLEY, Regional Director, North Central Region;
RON WILEY, Warden, United States Penitentiary - Administrative Maximum; and
JOHN DOES 1 THROUGH 5,
sued in their official capacities,

         Defendants.

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

        Pursuant to Fed. R. Civ. P. 56, Defendants, in their official capacities,[1] move for

summary judgment on all claims asserted by plaintiffs Nidal Ayyad and Mahmud Abouhalima in

their Third Amended and Consolidated Complaint ("Complaint").  Doc. 216.

---

        [1]  The term "the government" is used throughout this motion interchangeably with
"Defendants" — all of whom are officials within the United States Department of Justice, an
agency of the Executive Branch.  By separate motion, the government also moves to seal all or
portions of Exhs. A-1, A-3 to A-30, Exh. C-2, Exh. C-3, Exh. E-3, Exh. E-4 and Exh. G,
referenced in this motion for summary judgment.

**TABLE OF CONTENTS**

Page

SUMMARY OF THE LEGAL BASES FOR SUMMARY JUDGMENT. . . . . . . . . . . . . . . . . . 1

MOVANT'S STATEMENT OF MATERIAL FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.      PLAINTIFFS ARE CONVICTED TERRORISTS... . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.      Plaintiffs bombed the World Trade Center.. . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.      The bombing was carried out by affiliates of Islamic Group, under the spiritual
                leadership of the "Blind Sheikh." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        C.      Plaintiffs are currently incarcerated at the ADX with SAMs.. . . . . . . . . . . . . . 4

II.     PLAINTIFFS COMMUNICATED FROM THE ADX WITH MEMBERS OF A
        FOREIGN TERRORIST CELL... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.      In August 2004, the FBI began investigating Plaintiffs' correspondence with the
                "Martyrs for Morocco.". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        B.      Plaintiffs communicated with the Martyrs and other terrorists and affiliates... . . . 7

                1.      Before the SAMs were imposed, Ayyad communicated with terrorists... . 8

                2.      Before the SAMs were imposed, Abouhalima communicated with
                        terrorists.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III.    PLAINTIFFS ENGAGED IN DANGEROUS COMMUNICATIONS WITHIN THE
        PRISON BEFORE THE SAMs.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        A.      Before the SAMs were imposed, Ayyad engaged in disruptive
                communications.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        B.      Before the SAMs were imposed, Abouhalima engaged in disruptive
                communications.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.     THE GOVERNMENT HAS LEGITIMATE INTERESTS IN PREVENTING
        TERRORIST ATTACKS AND PRESERVING RESOURCES TO FIGHT
        TERRORISM.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

V.    THE SAMs PROMOTE THE GOVERNMENT'S LEGITIMATE INTERESTS. . . . . . 14

      A.    The SAMs inhibit communications that could threaten national security.. . . . . . 14

      B.    The SAMs inhibit communications that could threaten prison security.. . . . . . . 16

      C.    The SAMs review by counterterrorism professionals promotes security.. . . . . . . 17

      D.    The specific SAMs promote these interests.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            1.    Limits on correspondence, visits and telephone calls reduce the risk that
                  Plaintiffs could communicate dangerous messages or communicate with
                  terrorists.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            2.    The attorney affirmation requirement limits avenues for confidential
                  communications to attorneys aware of the limitations.. . . . . . . . . . . . . . 19

            3.    The prohibition on contact with the media reduces the risk of
                  communications with other terrorists.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

            4.    Removing classified advertisements and letters to the editor prevents
                  dissemination of messages from terrorists.. . . . . . . . . . . . . . . . . . . . . . . . 20

VI.   THE SAMs PERMIT A PLETHORA OF COMMUNICATIONS.. . . . . . . . . . . . . . . . 21

      A.    The SAMs allow Plaintiffs to correspond with others.. . . . . . . . . . . . . . . . . . . . 21

      B.    The SAMs allow Plaintiffs to receive visits from others. . . . . . . . . . . . . . . . . . . 22

      C.    The SAMs allow Plaintiffs to regularly talk with others by telephone.. . . . . . . . 23

      D.    The SAMs allow broad access to reading materials, mass communications and
            educational programs.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      E.    The SAMs allow Plaintiffs to communicate with others on a daily basis.. . . . . . 26

VII.  BEFORE IMPOSING OR RENEWING THE SAMs, THE GOVERNMENT FOLLOWS
      A COMPREHENSIVE REVIEW PROCESS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      A.    The multi-level review preceding the imposition of SAMs.. . . . . . . . . . . . . . . . 28

      B.    The multi-level review preceding the renewals of SAMs. . . . . . . . . . . . . . . . . . . 31

            1.    The inmate can submit written comments.. . . . . . . . . . . . . . . . . . . . . . . . 32

2.      The inmate can meet with FBI and BOP personnel.. . . . . . . . . . . . . . . 32

3.      After the information is gathered, a decision is made... . . . . . . . . . . . . 33

4.      In some circumstances, the information gathered leads to the SAMs not being renewed... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

VIII.   THE BOP'S ADMINISTRATIVE REMEDY PROGRAM PROVIDES SAMs INMATES WITH A MEANS TO CHALLENGE SAMs DECISIONS... . . . . . . . . . . . . 34

        A.      Administrative challenges to imposition or renewals of SAMs. . . . . . . . . . . . . 35

        B.      Administrative challenges resulting in SAMs modifications. . . . . . . . . . . . . . 35

        C.      SAMs modifications may also be obtained through informal means. . . . . . . . . 37

IX.     THE ADX SPECIAL SECURITY UNIT PROGRAM IS THE COUNTERPART TO THE ADX STEP-DOWN PROGRAM FOR SAMs INMATES... . . . . . . . . . . . . . . . . . 37

        A.      An inmate's success in the Program provides information to the SAMs decisionmakers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

        B.      Inmates receive regular reviews that determine placement in the H Unit Program... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

        C.      Ayyad and other inmates have advanced to Phase Three... . . . . . . . . . . . . . . . 41

X.      THE LIVING CONDITIONS IN H UNIT ARE NEARLY IDENTICAL TO THOSE IN THE ADX GENERAL POPULATION AND STEP-DOWN PROGRAM CELLS.. . . . . 42

XI.     PLAINTIFFS RECEIVED PROCESS TO ADDRESS THEIR TRANSFERS TO THE ADX.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

        A.      A multi-step review preceded Plaintiffs' referrals to the ADX in 2002 and 2003. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

        B.      Plaintiffs recently were given hearings to address their placement at ADX... . . . 47

                1.      Overview of the hearing process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

                2.      The hearings for Ayyad and Abouhalima. . . . . . . . . . . . . . . . . . . . . . . 49

        C.      In addition to the specific reviews associated with SAMs, Plaintiffs continue to receive other reviews.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

XII.    ALL BOP INMATES ARE SUBJECT TO COMMUNICATIONS LIMITATIONS
        AND MONITORING.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

THE SUMMARY JUDGMENT STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

I.      DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE FIRST
        AMENDMENT CLAIMS... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

        A.    Legal framework. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

              1.    Limiting communications is constitutional if it is rationally connected to a
                    governmental interest.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

              2.    Governmental decisions about how best to further government interests
                    receive deference... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

        B.    The evidence on each *Turner* factor shows that the SAMs are rational.. . . . . . . . 61

              1.    Factor no. 1:  The SAMs are rationally connected to the interests.. . . . . . 61

                    a.    There are three critical interests.. . . . . . . . . . . . . . . . . . . . . . . 62

                    b.    Plaintiffs are dangerous terrorists whose communications create
                          risks... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

                    c.    The connection between the SAMs and the interests is valid and
                          rational.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

              2.    Factor no. 2:  The SAMs allow a plethora of means to communicate and
                    receive information... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

              3.    Factor no. 3:  Removal of SAMs would adversely affect the interests... . 69

              4.    Factor No. 4:  There are no easy alternative monitoring schemes that
                    show that the scheme chosen is irrational. . . . . . . . . . . . . . . . . . . . . . . . 70

II.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS'
        PROCEDURAL DUE PROCESS CLAIMS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

        A.    Summary of the legal deficiencies of the claims. . . . . . . . . . . . . . . . . . . . . . . 73

B.    Legal framework. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

1.    Plaintiffs must show a deprivation of a liberty interest distinct from
their incarceration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

2.    Minimal procedures satisfy due process, even if there is a liberty
interest... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

C.    Plaintiffs have no liberty interest in avoiding confinement in ADX.. . . . . . . . . 76

1.    Courts have never found a liberty interest in any ADX unit... . . . . . . . . . 76

2.    Plaintiffs received process to address their confinement in ADX.. . . . . . 76

D.    Confinement in H Unit with SAMs does not create a liberty interest.. . . . . . . . 77

1.    There are legitimate penological interests... . . . . . . . . . . . . . . . . . . . . . 77

2.    Neither H Unit nor the SAMs are legally extreme.. . . . . . . . . . . . . . . . . 77

a.    H Unit conditions are like those in the ADX general
population.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

b.    The SAMs are not an atypical restriction on inmate
communications.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

3.    The SAMs do not impact Plaintiffs' length of confinement. . . . . . . . . . 82

4.    The conditions are not indefinite. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

E.    Plaintiffs received sufficient process because the SAMs are reviewed. . . . . . . . 83

1.    There is a reasoned examination of the need for SAMs.. . . . . . . . . . . . . 83

2.    Plaintiffs receive notice and an opportunity to respond.. . . . . . . . . . . . . 84

a.    They received notice.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

b.    They received an opportunity to respond. . . . . . . . . . . . . . . . . . . 84

3.    Safety and security concerns are weighed... . . . . . . . . . . . . . . . . . . . . . 85

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

## SUMMARY OF THE LEGAL BASES FOR SUMMARY JUDGMENT

Plaintiffs are convicted terrorists who played crucial roles in the 1993 bombing of the World Trade Center, an attack that killed six people, injured more than a thousand others, and caused hundreds of millions of dollars in damage.  A decade after the bombing, Plaintiffs continued to attract attention from the terrorist network outside the prison.  While they were incarcerated in federal prisons, including the United States Penitentiary - Administrative Maximum ("ADX"), both Ayyad and Abouhalima communicated with members of a terrorist cell who were plotting to execute a suicide bombing of Spain's highest court.  Plaintiffs are now subject to limitations on their communications in the form of special prison restrictions called Special Administrative Measures, or "SAMs."  SAMs are imposed upon direction of the Attorney General where they are determined to be "reasonably necessary to protect persons against the risk of death or serious bodily injury."  28 C.F.R. § 501.3(a).

Plaintiffs bring two categories of claims.  They assert that the SAMs violate the First Amendment by limiting their outgoing correspondence [Doc. 216 at ¶¶ 148-153], their incoming correspondence, and their access to publications.  *Id.* at ¶¶ 154-159.  These First Amendment claims fail because the SAMs bear a rational nexus to legitimate government interests, including its important interests in national and institutional security.  The SAMs are a rational means to limit Plaintiffs' communications, given that they are convicted terrorists whose actions culminated in a high-profile, successful strike against the United States.  And the SAMs nevertheless afford Plaintiffs a wide range of opportunities to communicate with others and to access information.  Plaintiffs may dislike the SAMs, but there is no genuine dispute that the SAMs bear a rational nexus to governmental interests.

1

The second category of claims is based on an alleged violation of procedural due process. Plaintiffs assert that they were deprived of a constitutional liberty interest when they were transferred to the ADX, and that they also were deprived of a constitutionally-protected liberty interest by their continued confinement at the ADX. Plaintiffs claim they received insufficient process in connection with those deprivations. *Id.* at ¶¶ 131, 136, 141, 146. The due process claims also fail, for multiple reasons. This Court has repeatedly held that incarceration in the ADX does not implicate a liberty interest. To the extent the due process claims may potentially be construed as specifically based on Plaintiffs' confinement in the ADX Special Security Unit (the "H Unit" where all ADX SAMs inmates are housed), or the imposition and renewals of the SAMs themselves, the claims also lack merit. There is no significant difference between the conditions of confinement in H Unit and those other ADX units this Court has found do not deprive inmates of a constitutionally-protected liberty interest.

To the extent Plaintiffs focus on the SAMs, their claims also fail. The SAMs restrictions are not atypical of monitoring regimens for other dangerous prisoners. The government does not create a liberty interest when it limits some of Plaintiffs' communications.

Finally, even if Plaintiffs had a liberty interest in avoiding confinement in the ADX, in H Unit specifically, or in being subject to SAMs, they have received and continue to receive constitutionally sufficient process to address each of those alleged deprivations. The decision to transfer Plaintiffs to the ADX was thoroughly reviewed, and Plaintiffs have received hearings concerning their placement. SAMs are imposed following a multi-level review by Department of Justice personnel with counterterrorism experience, and Plaintiffs can provide input. Plaintiffs can seek administrative review of all decisions concerning SAMs. *See* 28 C.F.R. § 501.3(e).

2

## MOVANT'S STATEMENT OF MATERIAL FACTS

Plaintiffs cannot raise a genuine dispute as to any of these facts:[2]

## I.   PLAINTIFFS ARE CONVICTED TERRORISTS.

### A.   Plaintiffs bombed the World Trade Center.

1.      Ayyad and Abouhalima were part of the group of criminal associates who were convicted in connection with a plot to bomb the World Trade Center in 1993, resulting in the deaths of six people, injuries to over a thousand others, and hundreds of millions of dollars in damage. *See, e.g., United States v. Salameh*, 152 F.3d 88, 107-08, 147 (2d Cir. 1998); *see also United States v. Salameh*, 54 F. Supp. 2d 236, 247 (S.D.N.Y. 1999).

2.      Ayyad and Abouhalima were each convicted after a jury trial of multiple felonies in connection with the bombing and are each serving sentences of more than 100 years. Declaration of Louis J. Milusnic, Exh. B-1, Att. 6 at US 10795-96, Amended Judgment in a Criminal Case, *United States v. Ayyad*, No. 1:93CR00180-002; Exh. B-1, Att. 7 at USAB 4942-43, Amended Judgment in a Criminal Case, *United States v. Abouhalima*, No. 1:93CR00180-003.

### B.   The bombing was carried out by affiliates of Islamic Group, under the spiritual leadership of the "Blind Sheikh."

3.      The FBI has information showing that both Ayyad and Abouhalima were associated with an Egyptian terrorist organization, al-Gama'a al-Islamiyya, also known as the Islamic Group.  Declaration of Donald R. Shannon, Jr., Exh. A-1 at ¶ 6.

4.      Islamic Group was designated as a foreign terrorist organization by the Secretary

---

[2]  The statement of facts is lengthy because Plaintiffs' claims encompass several decisions concerning their confinement, and each claim must be evaluated under different multi-part legal standards involving different facts.  Defendants have attempted to be concise.

of State in 1997 pursuant to 8 U.S.C. § 1189 and retains that designation today.  *See* Notices, Designation of Foreign Terrorist Organizations, Department of State, Office of the Coordinator for Counterterrorism, 62 Fed. Reg. 52650 (Oct. 8, 1997); Foreign Terrorist Organizations, Fact Sheet, Department of State, Office of the Coordinator for Counterterrorism (Nov. 24, 2010), available at http://www.state.gov/s/ct/rls/other/des/123085.htm.

     5.     Based on Plaintiffs' successful participation in the 1993 World Trade Center bombing, the government considers Plaintiffs to have been important Islamic Group operatives. *See* Exh. A-1 at ¶ 8.

     6.     The FBI has information showing that the "Blind Sheikh" Omar Abdel Rahman, who has called for violent jihad against the United States, was the spiritual leader of Islamic Group.  Exh. A-1 at ¶ 7; *see also, e.g., United States v. Rahman*, 189 F.3d 88, 107 (1999); *United States v. Stewart*, 590 F.3d 93, 101 (2d Cir. 2009) (noting Abdel Rahman's conviction for conspiracy to bomb the World Trade Center and for numerous other terrorism-related crimes, including solicitation of the murder of former Egyptian president Hosni Mubarak; solicitation of an attack on American military installations; and conspiracy to bomb bridges, tunnels and the federal building housing the New York office of the FBI), *cert. denied*, 130 S. Ct. 1924 (2010).

     7.     The terrorist attacks executed by Abdel Rahman and his followers are among the most significant terrorist attacks carried out on American soil.  *See* Exh. A-1 at ¶ 7.

**C.    Plaintiffs are currently incarcerated at the ADX with SAMs.**

     8.     Ayyad was transferred to the ADX on October 4, 2002.  Exh. B-1 at ¶ 5; *see also* Inmate History Quarters for Ayyad, Nidal, Exh. B-1, Att. 1 at US 15080.

     9.     The Attorney General has imposed Special Administrative Measures on Ayyad. These SAMs were most recently renewed on March 11, 2011.  Exh. B-1 at ¶ 8; *see also*

Notification of Extension of Special Administrative Measures for Ayyad, Nidal, *id.* at Att. 3.[3]

10.     Abouhalima was transferred to the ADX on March 23, 2003.  Exh. B-1 at ¶ 6; *see also* Inmate History Quarters for Abouhalima, Exh. B-1, Att. 2 at USAB 14927.

11.     SAMs also have been imposed on Abouhalima.  His SAMs were most recently renewed on March 11, 2011.  Exh. B-1 at ¶ 8; *see also* Notification of Extension of Special Administrative Measures for Abouhalima, Mahmud, *id.* at Att. 4.

## II.     PLAINTIFFS COMMUNICATED FROM THE ADX WITH MEMBERS OF A FOREIGN TERRORIST CELL.

1.     The government has information showing that, as recently as 2004, while incarcerated at the ADX, Plaintiffs were in contact with members of an overseas terrorist cell. Exh. A-1 at ¶ 9.

### A.     In August 2004, the FBI began investigating Plaintiffs' correspondence with the "Martyrs for Morocco."

2.     In August 2004, the FBI received information from its legal attaché in Madrid that Mohammed Salameh, one of Plaintiffs' convicted co-conspirators in the 1993 World Trade Center bombing, had corresponded with Mohamed Achraf, the leader of the Salafist Spanish terrorist cell known as the "Martyrs for Morocco" (or "Martyrs").  Exh. A-1 at ¶ 10; *see also* August 17, 2004 Electronic Communication from Legat Madrid, Exh. A-3 at US 4984-86; Background on Terrorist Cell in Spain: "Martyrs for Morocco," Exh. A-4 at USAB 649.

3.     The information the FBI received in August 2004 indicated that Achraf was planning to execute a terrorist attack.  *See* Exh. A-3 at US 4984.

4.     In August 2004, the FBI began an investigation which revealed that Plaintiffs, like

---

[3]  References to individuals who are not parties to this litigation are redacted from the copies of Plaintiffs' SAMs attached to this motion.

Salameh, had corresponded with Achraf and other persons who were linked to the Martyrs and were incarcerated in Spanish prisons. Exh. A-1 at ¶ 10; *see also* March 2, 2005 Correspondence Between Abderrahmane Tahiri aka Mohammed Achraf and 1993 TRADEBOM Inmates Produced by the [FBI] Counterterrorism Analysis Section, Exh. A-5 at USAB 646-48; FBI document listing domestic and international contacts of Nidal Ayyad, Exh. A-6 at US 5560; FBI document listing domestic and international contacts of Mahmoud Abouhalima, Exh. A-7 at USAB 650.

5.      As one component of the investigation, the FBI monitored Plaintiffs' correspondence and analyzed their prior correspondence for the purpose of collecting intelligence. Exh. A-1 at ¶ 11.

6.      The FBI provided information obtained from its investigation to Spanish authorities, who were simultaneously investigating Achraf and other members of the Martyrs terrorist cell in connection with a suicide bomb plot to destroy the National Justice Building in Madrid. *Id.*

7.      In the course of the FBI's investigation, the FBI learned that, by approximately March 2004, Federal Bureau of Prisons ("BOP") personnel at the ADX had become aware that Plaintiffs were corresponding with inmates incarcerated in Spanish prisons. *Id.* at ¶ 12.

8.      The government did not learn until the FBI investigation began in August 2004 that the inmates in Spanish prisons with whom Plaintiffs had been corresponding, as well as Achraf, were affiliated with international terrorism. *Id.*

9.      The FBI determined that Plaintiffs should not be alerted to the ongoing FBI investigation and the investigation being conducted by Spanish authorities. *Id.* at ¶ 13; *see also* October 25, 2004 email from Leyman, Daniel T., Exh. A-8 at US 5038.

10.     The FBI investigation and the concurrent investigation by Spanish authorities were ongoing in late January 2005 when the FBI received information that MSNBC planned to air a report about Plaintiffs' and Salameh's correspondence with Achraf and other terrorists. Doc. A-1 at ¶ 14.

11.     The FBI was concerned that this broadcast would jeopardize the progress of the continuing investigations by the FBI and Spanish authorities, in that it would alert the inmates, their correspondents, and others who may have been involved in the Spanish bombing plot that United States and Spanish authorities had possession of and were analyzing the correspondence. *Id.*; *see also* February 25, 2005 email from Stearns, J.A., Exh. A-9 at USAB 670.

12.     The FBI determined that any benefit to the investigations from not alerting Plaintiffs and others to the existence of the investigations was lost once the MSNBC report aired in late February 2005.  Doc. A-1 at ¶ 15.

13.     In March 2005, the government imposed SAMs on Plaintiffs.  *Id.* at ¶ 15; *see also* March 7, 2005 Origination of Special Administrative Measures for Federal Inmates Mahmoud Abouhalima, Nidal Ayyad, and Mohammad Amin Salameh, Exh. A-10 at USAB 641-45; Request for Special Administrative Measures (SAMs) Pursuant to 28 C.F.R. § 501.3 for Nidal Ayyad, Exh. A-11 at US 14623-27; Request for Special Administrative Measures (SAMs) Pursuant to 28 C.F.R. § 501.3 for Mahmoud Abouhalima, Exh. A-12 at USAB 14484-87.

**B.      Plaintiffs communicated with the Martyrs and other terrorists and affiliates.**

14.     The FBI learned that the Martyrs group was composed primarily of Spanish North Africans, including prisoners and former prisoners believed to have been recruited by Achraf while Achraf was imprisoned in Spain, including Hoari Jera, Abdel Karim Benismail and Addila Mimon, an aide to Achraf.  Exh. A-1 at ¶ 17.

7

15.     In letters to Achraf, both Ayyad and Abouhalima indicated that they knew and had

met Achraf.  Exh. A-1 at ¶ 18; FBI Translation of February 13, 2003, letter from Nidal Ayyad to

Achraf, included in letter to Addila Mimon, Exh. A-13 at US 14493 (Ayyad wrote to Achraf:

"Man, I miss you very much and your interesting conversations.  I still remember those few days

we spent together.  It is true that a person is nothing without his brethren."); Exh. A-1 at ¶ 27;

FBI Translation of December 9, 2002 letter from Mahmoud Abouhalima to Mohamed Achraf,

Exh. A-21 at USAB 14419 (Abouhalima wrote to Ayyad:  "We will meet again, God willing...").

### 1.     Before the SAMs were imposed, Ayyad communicated with terrorists.

16.     The investigations by the FBI and Spanish authorities showed that Ayyad

corresponded directly with "Martyr" Adilla Mimon, Achraf's aide, and, through Mimon,

attempted to correspond with Achraf.  *Id.* at ¶¶ 18-19; *see also* FBI Organizational Message

summarizing letters exchanged between Ayyad and Mimon, Exh. A-15 at US 4802-04; FBI

summary translations of letters exchanged between Ayyad and Mimon, Exh. A-16 at US 4991-

95.

17.     The FBI determined that Mimon served as a go-between for Ayyad and Achraf by

facilitating the exchange of contact information between the two and by informing Ayyad of

Achraf's whereabouts following Achraf's release from prison.  Exh. A-1 at ¶¶ 18-19; Exh. A-11

at US 14624; Exh. A-13 at US 14490, 14493-14494; *see also* FBI Translation of March 26, 2003

letter from Addila Mimon to Nidal Ayyad, Exh. A-14 at US 14495.

18.     In one letter to Ayyad, Mimon wrote that he had discussed Ayyad with Achraf and

that Achraf indicated that he wanted to contact Ayyad:  "I spoke to brother Muhammad Ashraf

about you and he asked me for your address."  Exh. A-1 at ¶ 18; *see also* FBI Translation of

March 26, 2003 letter from Addila Mimon to Nidal Ayyad, Exh. A-14 at US 14495.

19.     Before SAMs were imposed on Ayyad, Ayyad also corresponded with Kamel

Bourgass, who was convicted in connection with a ricin terrorist plot in the United Kingdom.

Exh. A-1 at ¶¶ 20-21; *see also* FBI summary translation of March 16, 2003 letter from Bourgass

to Ayyad, Exh. A-17 at US 4605; Exh. A-11 at US 14624, 14626.

20.     In March 2003, approximately two months after his arrest, Bourgass wrote to

Ayyad and referred to having read an article by Ayyad published in *Al Quds al Arabi*, an Arabic-

language publication.  Exh. A-1 at ¶ 21; *see also* Exh. A-5 at USAB 644; Exh. A-17 at US 4605;

*see also* September 28, 2010 Deposition Transcript of Nidal Ayyad (excerpts), Exh. H at 46:10-

47:13 (referencing Ayyad's poetry about Palestine published in *Al Quds*).

21.     Ayyad wrote back to Bourgass, referring to Bourgass as his "virtuous brother";

stating that he had read Bourgass's letter "several times for it contained lessons and reminders";

inquiring about the charges "the oppressive government" had brought against Bourgass;

discussing the "oppression" of Palestine and Jerusalem by the "Jewish extortionists," and praying

for the destruction of "enemies of the faith."  Exh. A-1 at ¶ 21; *see also* FBI translation of April

27, 2003 letter from Nidal Ayyad to Kamel Bourgass, Exh. A-18 at US 14498-14499.

22.     Prior to the imposition of SAMs, Ayyad corresponded with other individuals

linked to terrorism, including a close associate and avid supporter of Abdel Rahman who

maintains extensive contacts with Abdel Rahman's family and former associates.  Exh. A-1 at ¶

22; *see also* Exh. A-11 at US 14624.[4]

23.     The government has determined that Ayyad has familial connections that enhance

his ability to communicate with other terrorists.  Exh. A-1 at ¶¶ 23-24 (discussing family member

---

[4]  These individuals are identified by name in the sealed version of Mr. Shannon's
declaration.

who has been in communication with other known terrorists, including other conspirators in the 1993 World Trade Center bombing).

24.     Prior to the imposition of SAMs, Ayyad corresponded with his cousin, Mustafa Badra, who was imprisoned in Austria for his participation in the attack on Israel's El Al Airlines in the Vienna International Airport in December 1985 – an attack that killed three and wounded almost forty others.  Exh. A-1 at ¶ 23; *see also* Exh. A-11 at US 14625.

25.     In one letter from Badra to Ayyad, Badra stated that he had decided not to "play these dogs' games" in order to obtain his freedom, by declining to express sorrow for his crime and declining to apologize for the deaths he caused; discussed terrorist attacks in the Israeli-Palestinian conflict, referring to those who attacked Israelis as "heroes" and expressing regret that one attack had missed its target; and forwarded to Ayyad the original declaration of the "Fatah" movement of the Palestinian Liberation Organization, which includes the statement that Fatah fighters will strike back at anyone who tries to help the "Zionists."  Exh. A-1 at ¶ 23; *see also* FBI translation of December 22, 2002 letter from Mustafa Badra to Nidal Ayyad, Exh. A-19 at US 14496-14497.

>   **2.     Before the SAMs were imposed, Abouhalima communicated with terrorists.**

26.     While incarcerated by the BOP, Abouhalima corresponded with the Martyrs.  Exh. A-1 at ¶¶ 26, 29 (noting that Abouhalima and Achraf exchanged at least five letters, Abouhalima and Benismail at least seven, and Abouhalima and Jera at least five).

27.     Abouhalima praised Achraf for gaining religious converts in prison and told him that he was "impressed" with Achraf's "words that are coming from a true hear[t]".  Exh. A-1 at ¶¶ 26-27; translation of October 30, 2002 letter from Abouhalima to Achraf, Exh. A-20 at USAB 9000; *see also* Exh. A-21 at USAB 14449.

10

28.    Abouhalima stated in one letter that Achraf had read an article that was written by Abouhalima and that was published in an Arab newspaper.  Exh. A-1 at ¶ 27; *see also* Translation of December 29, 2002 letter from Abouhalima to Benismail, Exh. A-22 at USAB 9006.

29.    The government has determined that Abouhalima's letters to the Martyrs convey Abouhalima's respect for individuals associated with violent jihad.  Exh. A-1 at ¶¶ 28-29.

30.    In letters he wrote to Achraf and other Martyrs, Abouhalima discussed individuals known to be advocates of violent jihad, including Abdalla Azzam.  Exh. A-1 at ¶ 28; *see also* Exh. A-21 at USAB 14419; Translation of March 18, 2003 letter from Abouhalima to Jera, Exh. A-23 at USAB 9014; September 29, 2010 Deposition Transcript of Mahmud Abouhalima (excerpts), Exh. G at 93:25-94:9 (discussing Azzam).

31.    The government has information that Azzam and his protégé, Usama bin Laden, co-founded both al Qaeda and the Mektab al Khidmat, a militia formed during the Soviet war in Afghanistan.  Exh. A-1 at ¶¶ 28, 29; *see also* Exh. A-12 at USAB 14485.

32.    Prior to the imposition of SAMs, Abouhalima corresponded with other individuals linked to terrorism, including an individual who described himself in an interview in 1999 as a member of the inner-circle of Islamic Group in New York.  Exh. A-1 at ¶¶ 30, 31; Exh. A-12 at USAB 14486; Exh. A-7 at USAB 650; FBI translation of December 9, 2003 letter from Abouhalima, Exh. A-24 at USAB 14420; Translation of August 20, 2002 letter from Abouhalima to Jera, Exh. A-25 at USAB 8998 (referencing Abouhalima's likely correspondence with Samar Alami, convicted of conspiracy to detonate a car bomb outside the Israeli embassy in London in July 1994).

33.    The FBI has determined that some of Abouhalima's post-SAMs correspondence

has been intended to radicalize the recipient, which indicates that his communications could continue to compromise national security and the safety of others.  Exh. A-1 at ¶¶ 48-53; *see also* Exh. G at 165:9-13; 166:7-20; March 1, 2010 FBI Letterhead Memorandum, Exh. A-30 at USAB 14121-23.

### III.    PLAINTIFFS ENGAGED IN DANGEROUS COMMUNICATIONS WITHIN THE PRISON BEFORE THE SAMs.

### A.    Before the SAMs were imposed, Ayyad engaged in disruptive communications.

1.    The government has information showing that Ayyad became the imam for the inmates at the United States Penitentiary ("USP") in Terre Haute, Indiana, and was able to exert influence over other inmates.  Exh. A-1 at ¶ 34.

2.    The government has information showing that Ayyad, while incarcerated at USP Terre Haute, attempted to organize a disturbance in which staff members were to be taken hostage as a cover for a possible escape attempt by Ayyad.  Exh. A-1 at ¶ 35; *see also* Exh. A-10 at USAB 644; Exh. A-6 at US 5560; Exh. A-11 at US 14626.

3.    After an inmate assaulted Ayyad while he was incarcerated at USP Terre Haute, that inmate had to be placed in protective custody at his next four institutions because of threats from Muslim inmates.  Exh. A-1 at ¶ 35; *see also* Exh. A-10 at USAB 644; Exh. A-6 at US 5560; Exh. A-11 at US 14626.

### B.    Before the SAMs were imposed, Abouhalima engaged in disruptive communications.

4.    The government has determined that, prior to the imposition of SAMs, Abouhalima promoted the conversion of BOP inmates to a radical interpretation of Islam.  Exh. A-1 at ¶ 35; *see also* Translation of July 16, 2002 letter from Abouhalima to Hoari Jera, Exh. A-

29 at USAB 8995 ("We practiced our Shari'ah, and declared there is no God but Allah; prayed and called for prayers with a loud voice, until Islam became a prominent and clear feature, and a sure sign in all the prisons of America.").

5.      Abouhalima was identified as an influential member of the Sunni Muslim community while he was incarcerated at USP Lompoc.  Exh. A-1 at ¶ 35; *see also* Exh. A-7 at USAB 650; Exh. A-10 at USAB 643; Exh. A-12 at USAB 14486.

6.      Abouhalima has been known as an inmate with knowledge of Islam who answered questions about Islam for other inmates, including while he was incarcerated at USP Lompoc.  Exh. G at 100:20-101:8; 107:19-22.

7.       The government has information showing that Abouhalima played a role in the 1997 murder of a correctional officer at USP Lompoc carried out by inmate Roy Green, a.k.a. Haneef Abdullah Bilal, by preparing inmate Green for the attack.  Exh. A-1 at ¶ 35; *see also* Exh. A-7 at USAB 650; Exh. A-10 at USAB 643; Exh. A-12 at USAB 14486.

8.      The BOP investigation following the investigation of the murder of the correctional officer concluded that "Abouhalima's defined leadership role and responsibility among the inmates in the Muslim Community and his ability to plan and execute violent acts presents a significant threat to the staff at [USP Lompoc]."  Exh. A-1 at ¶ 35; *see also* June 13, 1997 Request for Redesignation, Exh. A-26, USAB 351.

9.      The BOP determined that the safety and security of staff at USP Lompoc required that Abouhalima be transferred to another institution following the murder of the correctional officer.  Exh. A-1 at ¶ 35; *see also* June 13, 1997 Request for Redesignation, Exh. A-26, USAB 351; *see also* May 22, 1997 Recommendation for Transfer (excerpt), Exh. A-27, USAB 358-59; July 31, 1997 Close Supervision Transfer Request, Exh. A-28, USAB 5272-73.

IV.     **THE GOVERNMENT HAS LEGITIMATE INTERESTS IN PREVENTING TERRORIST ATTACKS AND PRESERVING RESOURCES TO FIGHT TERRORISM.**

1.      The government has an interest in protecting national security, including preventing acts of terrorism against the United States and its interests.  Exh. A-1 at ¶ 36; Exh. B-1 at ¶¶ 34, 47-48; Declaration of Paul M. O'Brien, Exh. C-1 at ¶¶ 5, 6, 19.

2.      The government has an interest in promoting the security of its prisons, including the safety of correctional personnel and inmates.  Exh. A-1 at ¶ 54; Exh. B-1 at ¶ 9, 11, 21, 34, 47-48; Exh. C-1 at ¶¶ 5, 19; Declaration of Mark Collins, Exh. D-1 at ¶¶ 26, 30; Declaration of Warden Jeffery Keller, Exh. E-1 at ¶¶ 7, 8.

3.      The government has an interest in promoting the effective operation of its law enforcement agencies by establishing practices designed to efficiently allocate resources for fighting terrorism, including resources necessary to ensure the integrity of the review of communications for SAMs inmates and resources required for counterterrorism operations that extend beyond the ADX.  Exh. A-1 at ¶ 66; *see also id.* at ¶¶ 59-65 (describing resources dedicated to review of communications for SAMs inmates).

V.      **THE SAMs PROMOTE THE GOVERNMENT'S LEGITIMATE INTERESTS.**

   A.     **The SAMs inhibit communications that could threaten national security.**

1.      The government has determined that Plaintiffs' SAMs help to ensure that Plaintiffs do not engage in communications that could jeopardize national security, and that without SAMs, there would be an increased risk that Plaintiffs' communications could jeopardize national security.  Exh. A-1 at ¶¶ 36, 58.

2.      Plaintiffs are in a position to inspire and radicalize others to carry out a terrorist agenda because they are among only a handful of people who have executed and survived a high-

14

profile terrorist attack, elevating them to hero status and the top rank of the Sunni extremist hierarchy.  Exh. A-1 at ¶¶ 37-39.

3.      The government has determined that communications from terrorists of Plaintiffs' reputation can reinforce an aspiring terrorist's resolve and assuage doubts about carrying out an attack, even where the communications themselves do not discuss operational planning for a specific attack and might appear superficially benign.  *Id.* at ¶¶ 41-43.

4.      The government has determined that Plaintiffs' ability to connect with the Martyrs and other terrorists demonstrates that they retain the ability to attract the attention of and to motivate other terrorists, and that without SAMs, their connections to the terrorist network may be resurrected.  *Id.* at ¶¶ 40, 44.

5.       Plaintiffs' SAMs facilitate the government's interest in protecting national security because they sever Plaintiffs' connections to the jihadist network and deprive other terrorists and would-be terrorists from the affirmation derived from communicating with terrorists of Plaintiffs' status.  *Id.* at ¶¶ 44, 60.

6.      The possibility of active terrorists connecting with Plaintiffs is of heightened concern because Plaintiffs have previously communicated with other terrorists from prison.  *Id.* at ¶ 45.

7.      The government has determined that individuals, like Plaintiffs, who have a history of committing terrorist acts or who have expressed adherence to a radical Islamic ideology that manifests itself in acts of violence, are likely to attempt to engage in future acts that advance the goals of jihad and threaten the security of the United States and the safety of individuals outside the prison.  *Id.* at ¶ 46.

8.      Incarceration provides no guarantee that a terrorist will be unable to continue to

participate in terrorist plots. *Id.* at ¶ 47; *see also United States v. Salameh*, 152 F.3d at 107-08 (while incarcerated, Ahmed Ajaj transmitted coded telephone messages to his co-conspirators in the 1993 World Trade Center bombing); *United States v. Rahman*, 189 F.3d at 105-06 (El Sayyid Nosair, while imprisoned on murder charges, continued to provide suggestions for terrorist attacks to his associates; Ayyad and Abouhalima were among his visitors); *United States v. Stewart*, 590 F.3d at 108 (Abdel Rahman circumvented SAMs to transmit messages to terrorists in Egypt).

### B.   The SAMs inhibit communications that could threaten prison security.

9.   The government has determined that Plaintiffs' SAMs help to ensure that Plaintiffs do not engage in communications that could jeopardize institutional security, and that without SAMs, there would be an increased risk that Plaintiffs' communications may jeopardize prison security. Exh. A-1 at ¶¶ 54, 58.

10.   Plaintiffs' SAMs promote institutional security by lowering the risk of dissemination of communications to Plaintiffs that could lead to violence or disruption within the prison. *Id.* at ¶ 60.

11.   The government has determined that Plaintiffs, having successfully executed the 1993 World Trade Center bombing, have a significant status within the network of terrorists and would-be terrorists. *Id.* at ¶ 56.

12.   The government has determined that Plaintiffs have the ability to exert influence among the prison population and have done so in a manner that has compromised the safety and security of their fellow inmates and correctional personnel. *Id. See also, supra*, Facts III.1-9.

13.   The government has determined that institutional practices of jihad that threaten prison security include attacks against prison personnel and other inmates, and manipulation of

correctional and legal resources by activities such as concerted hunger strikes.  Exh. A-1 at ¶¶ 55, 80.

14.     Convicted terrorists have continued to collaborate in ways that endanger security in the prison.  *Id.* at ¶ 57; *see also United States v. Salim*, 287 F. Supp. 2d 250, 279, 294-95 (S.D.N.Y. 2003) (co-conspirators in 1998 East African embassy bombings collaborated while in federal prison in New York to brutally assault a correctional officer), *cert. denied*, 130 S. Ct. 325 (2009); *United States v. Salim*, 549 F.3d 67, 71 (2d Cir. 2008).

**C.     The SAMs review by counterterrorism professionals promotes security.**

15.     The government has determined that analyzing the communications of terrorists of Plaintiffs' stature requires different tools than would be sufficient for analyzing the communications of non-terrorist inmates.  Exh. A-1 at ¶ 59.

16.     In the absence of a specialized review of Plaintiffs' communications designed to detect terrorist connections, Plaintiffs could more readily make additional connections with other terrorists.  *Id.* at ¶ 64.

17.     One aspect of monitoring communications of terrorists of Plaintiffs' stature is the evaluation of their communications by FBI counterterrorism personnel, including FBI Joint Terrorism Task Force ("JTTF") case agents and translators.  *Id.* at ¶¶ 61, 62.

18.     Plaintiffs' communications were not reviewed by FBI agents with training in counterterrorism and FBI translators during the period between 2002 and March 2004 when Plaintiffs successfully connected with other terrorists without the government's knowledge.  *Id.* at ¶ 63.

19.     The government has determined that, in order to prevent transmittal of communications that could jeopardize the government's interests in national and prison security,

due diligence requires a piece-by-piece review of every communication generated by a SAMs inmate. *Id.* at ¶ 61.

20.     The government has determined that reasonable limitations on the quantity of communications for the twenty-one terrorism SAMs inmates at the ADX and USP Florence are necessary to assure the effectiveness and integrity of the SAMs review and to ensure that the JTTF has sufficient resources to staff all components of the mission of combating terrorism. *Id.* at ¶¶ 65-66.

21.     Expanding the scope of communications currently permitted under the SAMs would decrease the amount of time case agents and translators could dedicate to their analysis and increase the potential for missing dangerous messages. *Id.* at ¶ 65.

**D.     The specific SAMs promote these interests.**

**1.     Limits on correspondence, visits and telephone calls reduce the risk that Plaintiffs could communicate dangerous messages or communicate with terrorists.**

22.     Limiting approved non-legal contacts (for correspondence, visits and telephone calls) to immediate family members lessens the risk that Plaintiffs could connect with other members of the terrorist network or act as a conduit in that network. *Id.* at ¶¶ 68, 69, 71, 75, 79, 81.

23.     The government has determined that Plaintiffs are subject to being inspired and further radicalized by incoming communications from devotees outside the prison. *Id.* at ¶ 79.

24.     Limiting approved non-legal contacts to immediate family members reduces the potential for "fan mail" from terrorists that could encourage Plaintiffs to engage in acts of jihad within the prison, including hunger strikes or attacks against correctional officers or other inmates. *Id.* at ¶¶ 79, 80.

25.     Limiting approved non-legal contacts to immediate family members helps to maintain quality analysis of Plaintiffs' communications, by taking into account limits on the FBI's resources for review, translation and threat assessment.  *Id.* at ¶¶ 68, 75.

26.     The 14-business-day (English) and 60-business-day (foreign language) review periods for review of correspondence by the FBI allow sufficient time to thoroughly translate and analyze the large volume of correspondence generated by SAMs inmates and their correspondents.  *Id.* at ¶ 70.

27.     The speed of transmission of real-time communications during visits and telephone calls increases the opportunity for an inmate to circumvent SAMs and requires increased vigilance on the part of the FBI JTTF agent or, in the case of foreign language calls and visits, the translator monitoring the conversations.  *Id.* at ¶ 75.

28.     The number and length of telephone calls for SAMs inmates reflects the availability of JTTF resources including, in the case of foreign language communications, the capacity of FBI translation services.  *Id.*

## 2.     The attorney affirmation requirement limits avenues for confidential communications to attorneys aware of the limitations.

29.     The government has information showing that communications between SAMs inmates and their legal counsel create an avenue for transmitting potentially dangerous communications outside the prison.  *Id.* at ¶ 73; *see also United States v. Stewart*, 590 F.3d at 108.

30.     The attorney affirmation requirement helps to ensure that Plaintiffs communicate confidentially only with attorneys who are apprised of the SAMs prohibition on disseminating the inmates' communications to third parties.  Exh. A-1 at ¶ 73.

### 3. The prohibition on contact with the media reduces the risk of communications with other terrorists.

31. The SAMs prohibition on contact with the media reduces Plaintiffs' ability to connect with others in the global terrorist network who may derive inspiration for a terrorist attack from Plaintiffs or dedicate an attack to them.  Exh. A-1 at ¶ 77.

32. Both Plaintiffs have, in the past, attracted the attention of other terrorists through the media.  *Id.* at ¶ 76; *see also* II.20, *supra* (article by Ayyad published in *Al Quds* prompted correspondence from Bourgass); II.28, *supra* (Achraf read an article Abouhalima submitted to an "Arab newspaper").

### 4. Removing classified advertisements and letters to the editor prevents dissemination of messages from terrorists.

33. With the gradual lessening of emotions attendant on the passage of time since 9/11, the government determined that SAMs restrictions could be revised to allow extensive access to mass communications, including periodicals, books and television.  Exh. A-1 at ¶¶ 82-83.

34. The government has determined that national and institutional security interests could be jeopardized if SAMs inmates are allowed access to critically-timed or coded information through the medium of mass communications.  *Id.* at ¶ 83.

35. Under the SAMs, classified advertisements and letters to the editor are removed from periodicals to eliminate the ability of outside agents to transmit messages that could pose a threat to national or institutional security, such as messages concerning terrorist plots, coordinated hunger strikes or attacks against correctional officers or other inmates.  Exh. B-1 at ¶ 57.

## VI.    THE SAMs PERMIT A PLETHORA OF COMMUNICATIONS.

### A.    The SAMs allow Plaintiffs to correspond with others.

1.     Plaintiffs are allowed to write at least one letter each week (that "may" be limited to six pages in length) to a member of their immediate families.  Exh. B-1, Att. 3, § 3.g.i. at US 15014; *see also id.* at Att. 4 at USAB 14949.

2.     The ADX Warden has imposed no limitation on the number or length of letters a SAMs inmate can send to his approved non-legal correspondents.  Exh. B-1 at ¶ 31; *see also* Exh. A-1 at ¶ 67.

3.     Ayyad's immediate family includes his parents, three brothers, two sisters and his son.  Exh. A-1 at ¶ 72.

4.     The government granted a modification of Ayyad's SAMs to allow him to communicate with his grandmother.  *See id.*; *see also* Exh. B-1, Att. 3, §3.a.i. at US 15702.

5.     Abouhalima's immediate family includes his parents, his sister, three brothers, three sons and one daughter.  Exh. A-1 at ¶ 72.

6.     The government granted a modification of Abouhalima's SAMs to allow him to communicate with his ex-mother-in-law.  *See id.*; *see also* Exh. B-1, Att. 4, § 3.a.i. at USAB 14947.

7.     Plaintiffs' requests to communicate with a total of four non-immediate family members (in addition to their immediate family) is currently being assessed.  Exh. A-1 at ¶ 72.

8.     Plaintiffs may receive an unlimited amount of written correspondence from their approved non-legal correspondents.  *See* Exh. B-1, Att. 3, § 3.g. at US 15104; *see also id.* at Att. 4 at USAB 14949.

21

9.      The SAMs place no limits on the volume or frequency of Plaintiffs' correspondence with "U.S. courts, federal judges, U.S. Attorney's Offices, members of U.S. Congress, BOP, and other federal law enforcement entities."  *See* Exh. B-1, Att. 3, § 3.g.ii. at US 15105; *see also id.* at Att. 4 at USAB 14950.

10.     The SAMs place no limits on Plaintiffs' correspondence with attorneys who have signed an affirmation acknowledging receipt of the SAMs.  Exh. B-1, Att. 3, § 2.a. at US 15098; *see also id.* at USAB 14944.

11.     Ayyad has been represented by at least nine attorneys since the date of his arrest through the present.  Exh. H at 185:11-13; 187:9-14.

12.     Abouhalima has been represented by at least eight attorneys since the date of his arrest through the present, and has requested and received permission to contact at least ten additional attorneys or legal societies since he has been on SAMs.  Exh. G at 134:17-135:24, 137:3-20.

13.     Written correspondence, with the exception of correspondence to attorneys who have signed an affirmation acknowledging receipt of the SAMs, is subject to FBI analysis and approval within fourteen business days for correspondence written in English and sixty business days for correspondence written in a foreign language.  Exh. B-1, Att. 3, § 3.g.iv. at US 15015; *see also id.* at Att. 4 at USAB 14950.

14.     The FBI is in compliance with these time frames with respect to Plaintiffs' correspondence.  Exh. B-1 at ¶ 70.

**B.      The SAMs allow Plaintiffs to receive visits from others.**

15.     The SAMs allow Plaintiffs to receive visits from their immediate families, as well

22

as Ayyad's grandmother and Abouhalima's ex-mother-in law, or an attorney or paralegal who has signed a SAMs affirmation.  Exh. B-1, Att. 3, §§ 2.c., e., 3.f.i. at US 15099, 15104; *see also id.* at Att. 4 at USAB 14945, 149546, 14949.

16.    The SAMs place no limits on the number of legal or non-legal visits Plaintiffs may receive.  *See* Exh. B-1, Att. 3, §§ 2.f., 3.f. at US 15100, 15104; *see also id.* at Att. 4 at USAB 14946, 14949.

17.    Non-legal visits and telephone calls are contemporaneously monitored by the FBI. Exh. B-1, Att. 3, § 3.d.i. at US 15103-15104; *see also id.* at Att. 4 at USAB 14948-14949.

18.    Both Ayyad and Abouhalima have received non-legal visitors and visits from their attorneys since they have been on SAMs.  Exh. G at 131:15-19, 22-132:8, 12-18; 134:1-5; Exh. H at 61:16-25; 163:24-164:14.

**C.    The SAMs allow Plaintiffs to regularly talk with others by telephone.**

19.    SAMs inmates are permitted to receive at least one telephone call per month to their approved non-legal contacts.  Exh. B-1, Att. 3, § 3.a.ii. at US 15102; *see also id.* at Att. 4 at USAB 14947.

20.    Ayyad, who is in Phase Three of the Special Security Unit Program, *see* section IX, *infra*, currently receives four, 15-minute telephone calls per month.  Exh. A-1 at ¶ 74.

21.    Abouhalima, who is in Phase Two of the Special Security Unit Program, currently receives three, 15-minute telephone calls per month.  *Id.*

22.    The SAMs place no limits on the number of telephone calls Plaintiffs can make to attorneys who have signed an affirmation acknowledging receipt of the SAMs.  Exh. B-1, Att. 3, § 2.g. at US 15100; *see also id.* at Att. 4 at USAB 14946.

23

**D.     The SAMs allow broad access to reading materials, mass communications and educational programs.**

23.     The SAMs afford Plaintiffs access to any periodical and newspaper "determined not to facilitate criminal activity or be detrimental to:  national security; the security, good order, or discipline of the institution; or the protection of the public."  Exh. B-1, Att. 3, § 9.a.i. at US 15107; *see also id.* at USAB 14952.

24.     The SAMs provide that sections of periodicals and newspapers "which offer a forum for information to be passed by unknown and/or unverified individuals," including classified advertisements and letters to the editor, are removed prior to distribution to Plaintiffs. Exh. B-1 at Att. 3, § 9.a.ii. at US 15107; *see also id.* at USAB 14952.

25.     The SAMs afford Plaintiffs access to "all books which do not facilitate criminal activity or present a substantial threat to national security or the security, discipline, or good order of the institution."  Exh. B-1, Att. 3, § 10 at US 15107-15108; *see also id.* at Att. 4 at USAB 14953.

26.     In practice, inmates subject to SAMs are permitted to read an almost unlimited number of books, newspapers and other periodicals.  Exh. A-1 at ¶ 85; *see also* Exh. H at 125:4-18.

27.     Both Ayyad and Abouhalima own their own books, which they keep in their cells. Exh. G at 63:11-64:19; Exh. H at 149:19-150:13.

28.     SAMs inmates have access to hundreds of library books, including leisure titles and books maintained by ADX Religious Services, as well as periodicals.  Exh. B-1 at ¶ 27.

29.     Both Ayyad and Abouhalima check out books from the leisure library.  Exh. G at 65:24-66:6; Exh. H at 152:12-14.

30.     Ayyad subscribes to two Arabic-language publications, as well as other

periodicals.  Exh. H at 40:18-19; 42:6-12, 24-25; 43:14-20, 44:1-5; 95:10-17.

31.      Since approximately June 2008, SAMs inmates have received either the *Denver Post* or *USA Today* on a daily basis, free of charge, which both Ayyad and Abouhalima read. Exh. B-1 at ¶ 56; Exh. G at 73:10-13; Exh. H at 148:10-13.

32.      SAMs inmates are permitted time in a computerized law library that includes access to LexisNexis, which the inmates may use for two-hour periods of time, unless they require more time to meet pending court deadlines.  Exh. B-1 at ¶ 28; *see also* Exh. H at 91:10-17.

33.      The BOP provides Plaintiffs with access to sixty television networks, including networks that transmit news in real-time, such as CNN and CNN Headline News, MSNBC and the Fox News Channel; closed circuit institutional programming, including programming by the ADX Religious Services, Education, Recreation and Psychology departments; and FM radio and digital music channels.   Exh. B-1 at ¶ 58; *see also* Exh. B-1, Att. 3, § 9 at US 15017; *see also id.* at Att. 4 at USAB 14952.

34.      Both Ayyad and Abouhalima watch television, including news, sports, and movies.  Exh. G at 127:21-128:1, 128:12-19; 129:22-25; Exh. H at 70:13-15.

35.      Both Ayyad and Abouhalima listen to the programming broadcast by ADX Religious Services.  Exh. G at 128:20-22; Exh. H at 156:25-157:16.

36.      The SAMs allow Plaintiffs to receive information from the media, but do not permit them to contact the media, either directly or through a third party.  Exh. B-1, Att. 3, § 4 at US 15106; *see also id.* at USAB 14951.

37.      The SAMs allow Plaintiffs to participate in the same education courses offered to other inmates at ADX Florence, including a high-school equivalency course that leads to a

"general education diploma," a course on English as a second language, parenting and recreational courses, and a rotation of Adult Continuing Education classes.  Exh. B-1 at ¶ 26; *see also* Exh. G at 137:24-138:3; Exh. H at 167:18-20.

> **E.     The SAMs allow Plaintiffs to communicate with others on a daily basis.**

38.     The SAMs allow Plaintiffs' to communicate with other SAMs inmates during "certain predesignated times . . . the place and duration to be set" by the BOP.   Exh. B-1, Att. 3, § 1.c.i. at US 15097; *see also id.* at USAB 14943.

39.     SAMs inmates in H Unit have contact with other persons on a daily basis.  Exh. B-1 at ¶ 23.

40.     H Unit cells are side-by-side and allow communication between inmates by speaking in moderate tones, or using the air ventilation as a voice conduit.  *Id.* at ¶ 13.

41.     H Unit inmates may speak with one another while at recreation, which is provided up to seven days per week.  *Id.* at ¶¶ 13, 19; Exh. G at 54:13-24.

42.     Out-of-cell outdoor recreation for H Unit inmates occurs with up to five other inmates in secure, single recreation areas, grouped together on a large, open-air recreation yard with exposure to sunlight.  Exh. B-1 at ¶ 20.

43.     Three sides of the single recreation areas are wire mesh, which allows inmates to talk in close proximity with each other in normal tones.  *Id.*

44.     Both Ayyad and Abouhalima speak with other inmates during recreation and in the housing unit, and Abouhalima talks with Ayyad, who he considers a particular friend, "almost every day."  Exh. G at 41:25-42:16; 44:7-8, 21-23; 45:2-4; 103:21-104:6; Exh. H at 68:5-15; 69:19-23.

45.     It is common in H Unit for the inmates to ask other inmates to pray for them.

Exh. H at 76:3-11.

46.     Abouhalima has observed that there is a spirit of brotherhood among the inmates in H Unit.  Exh. G at 101:16-102:4.

47.     The Warden, Associate Wardens, Captain, and Department Heads perform weekly rounds in H Unit so they can visit with each inmate.  Exh. B-1 at ¶ 23; *see also* Exh. H at 102:2-12, 19-103:4.

48.     Correctional officers perform regular rounds on all three shifts on a daily basis. Exh. B-1 at ¶ 23.

49.     A member of an inmate's Unit Team visits him at least several times each week. *Id.*

50.     Ayyad sees the ADX Warden once a week.  Exh. H at 107:3-12.

51.     Ayyad sees the H Unit Manager, on average, once a week.  *Id.* at 104:17-21.

52.     Ayyad sees officers assigned to the Unit on a daily basis and speaks with an officer two to three times per day.  *Id.* at 80:13-22; at 84:11-16.

53.     Ayyad sees his correctional counsel four times a week.  *Id.* at 88:24-89:1.

54.     Abouhalima talked with the ADX Warden the day before his deposition.  Exh. G at 51:25-52:11.

55.     Abouhalima sees the H Unit Manager at least once a week.  *Id.* at 80:12-19.

56.     Abouhalima sees his correctional counselor four times a week.  *Id.* at 70:11-23.

57.     Abouhalima communicates with H Unit staff on a daily basis, interacting with correctional officers at least three times each day.  *Id.* at 52:19-53:9, 54:7-11.

58.     Ayyad and Abouhalima see ADX Special Investigative Services staff five days a week.  *Id.* at 72:21-73:6; *see also* Exh. H at 91:20-92:19.

27

59.     Ayyad and Abouhalima see two BOP linguists who speak Arabic.  Exh. G at 74:10-24; Exh. H at 98:3-16.

60.     Abouhalima speaks with ADX legal department staff if he has a need they can address.  Exh. G at 80:4-11.

61.     H Unit inmates receive regular visits from medical staff, education staff, religious services staff, and psychology staff when they perform their rounds, and upon request if needed.  Exh. B-1 at ¶ 23.

## VII.    BEFORE IMPOSING OR RENEWING THE SAMs, THE GOVERNMENT FOLLOWS A COMPREHENSIVE REVIEW PROCESS.

1.      The decision whether SAMs are warranted to limit and monitor the communications of a convicted terrorist implicates national security and the security of the institution where the inmate is housed.  Exh. C-1 at ¶ 5.

2.      This decision whether SAMs are warranted involves an analysis and review that draws on the multi-faceted knowledge base of Department of Justice personnel, including the national security expertise of the Counterterrorism Section of the National Security Division ("CTS/NSD") and the FBI, and the in-depth knowledge of the inmate's criminal activity of the United States Attorney's Office that prosecuted the underlying criminal case ("prosecuting USAO").  *Id.* at ¶¶ 5, 6, 17.

3.      The evaluation of whether SAMs are warranted takes into account the totality of the circumstances related to the inmate and the potential dangers associated with his communications.  *Id.* at ¶ 7; *see also* Exh. A-1 at ¶ 32.

4.      Plaintiffs received such a review prior to the initial imposition of their SAMs in March 2005 and the subsequent renewals of the SAMs.  Exh. C-1 at ¶¶ 5, 18.

### A.      The multi-level review preceding the imposition of SAMs

5.      The deliberative process preceding the imposition of SAMs typically begins with the prosecuting USAO consulting with both CTS/NSD and the FBI.  *Id.* at ¶ 8.

6.      Throughout the SAMs evaluation process, all components – the prosecuting USAO, FBI and CTS/NSD –  engage in informal discussions concerning matters relevant to the SAMs decision, including the inmate's conduct, the possible dangers associated with his communications, which measures are appropriate for the inmate, and, if appropriate, information about the inmate's conduct while in BOP custody.  *Id.* at ¶ 16; *see also* Exh. C-2 at US 14626 (discussing information about Ayyad's ability to incite others and disrupt the prison environment); Exh. C-3 at USAB 14486 (discussing information about Abouhalima's role in the 1997 murder of a correctional officer at USP Lompoc); *see also* Exh. A-1 at ¶ 32 (noting that Plaintiffs' institutional conduct was considered in the SAMs analysis, regardless of whether it led to a formal disciplinary sanction).

7.      The FBI typically makes the initial assessment as to whether SAMs should be imposed.  Exh. C-1 at ¶ 9.

8.      There are multiple relevant factors related to the inmate's circumstances that are considered during the SAMs analysis, including, but not limited to, whether the inmate has previously communicated, or attempted to communicate, information that could cause bodily injury; whether there is any indication that the inmate might communicate in code or have other ways to avoid detection of illicit communications, including the use of a foreign language; whether the inmate is a leader of a terrorist group, or is otherwise in a position to inspire or command others; and whether the inmate belongs to a vital and strong terrorist group or network. *Id.* at ¶ 7.

9.      The FBI prepares and forwards to the prosecuting USAO an initial written

assessment, including a description of the inmate's background and connection to terrorism, a discussion of why SAMs should be implemented, and a description of what SAMs should be imposed.  *Id.*

10.     The FBI prepared written assessments concerning Plaintiffs.  *Id.*; *see also* Exh. A-10, March 7, 2005 Origination of Special Administrative Measures for Federal Inmates Mahmoud Abouhalima, Nidal Ayyad, and Mohammad Amin Salameh.

11.     Following the prosecuting USAO's evaluation of the FBI's assessment, if the prosecuting USAO concludes that SAMs are warranted, it prepares a memorandum directed to the Office of Enforcement Operations ("OEO") (a component of the Criminal Division of the Department of Justice), with a copy to CTS/NSD.  Exh. C-1 at ¶ 10.

12.     In Plaintiffs' cases, the memoranda to the OEO reflected a collaborative effort between the prosecuting USAO and CTS/NSD, with the prosecuting USAO and CTS/NSD involved in the preparation of the memoranda.  *Id.*; *see also* Exh. C-2 at US 14623; Exh. C-3 at USAB 14484.

13.     OEO evaluates the written memorandum from the prosecuting USAO and can request additional information from the prosecuting USAO or FBI, as it deems necessary.  Exh. C-1 at ¶ 11.

14.     The government has concluded that OEO can rely on the information provided by the prosecuting USAO and the FBI because those entities have an in-depth understanding of the inmate's case, direct access to critical information about the inmate and his communications, experience in conducting investigations, and expertise in national security and terrorism-related matters to evaluate the information obtained.  *Id.*

15.     OEO staff attorneys work with the prosecuting USAO to determine which

measures are appropriate for the inmate and to prepare an initial draft of the SAMs for review by the prosecuting USAO.  *Id.* at ¶ 13.

16.     Based on information obtained by the OEO during the review process, the Assistant Attorney General for the Criminal Division makes a formal written recommendation to the Attorney General, discussing the request that SAMs be imposed.  *Id.* at ¶ 14.

17.     The Attorney General can request that the OEO obtain any additional information for his review before proceeding with the imposition of SAMs.  *Id.* at ¶ 14.

18.     If the Attorney General decides to proceed with the imposition of SAMs, a memorandum from the Attorney General is forwarded to the BOP, directing that SAMs be imposed and setting forth the measures to be implemented.  *Id.*

19.     Notice of the basis for the SAMs is provided to the inmate by the BOP.  *Id.* at ¶ 15.

20.     The notice of SAMs to the inmate may be limited, in the interest of preserving prison security or safety, national security, or to protect against acts of violence or terrorism.  *See id*; *see also* 28 C.F.R. § 501.3(b).

**B.     The multi-level review preceding the renewals of SAMs**

21.     Another review process – involving the prosecuting USAO, FBI, OEO and BOP – precedes the expiration of an inmate's SAMs to determine whether SAMs continue to be warranted and should be renewed.  Exh. C-1 at ¶¶ 18, 19.

22.     With the assistance of BOP personnel, inmate input is solicited and considered in connection with the pre-renewal review.  *Id.* at ¶ 8.

23.     SAMs inmates who are incarcerated at the ADX, like Plaintiffs, have the opportunity to submit information in writing and in person that is transmitted to the components

31

of the SAMs decisionmaking process before the expiration of their SAMs.  Exh. D-1 at ¶ 16.

### 1.    The inmate can submit written comments.

24.    Approximately 120 days before the SAMs expire, ADX staff solicit written comments from the SAMs inmate.  *Id.* at ¶ 17.

25.    The inmate may use these written comments to present any issues of concern regarding his SAMs, including to explain his position concerning renewal; to provide information that he believes demonstrates that his communications do not present a danger; and to suggest possible modifications to his SAMs, should renewal be found to be warranted.  *Id.*

26.    Both Ayyad and Abouhalima provided written comments during the annual review of their SAMs.  Exh. G at 142:19-143:3; Exh. H at 141:20-24.

### 2.    The inmate can meet with FBI and BOP personnel.

27.    The scope of the annual SAMs renewal review for ADX inmates currently includes an in-person meeting with the inmate approximately 90 days prior to the SAMs expiration date.  Exh. D-1 at ¶¶ 18-19.[5]

28.    ADX personnel and the FBI case agent assigned to the inmate's case attend the meeting with the inmate, which gives the inmate an additional opportunity to provide information concerning possible renewal and/or modification of the SAMs and to discuss any other issues concerning the SAMs.  *Id.* at ¶ 19.

29.    Following the meeting with the inmate, ADX staff prepare a memorandum summarizing the discussion with the inmate, which is then routed to ADX personnel who are in a position to provide additional input about the inmate.  *Id.* at ¶ 20.

---

[5]  There is no requirement for an in-person interview of the inmate.  The SAMs regulation designates the BOP's Administrative Remedy Program, which does not require such an interview, as the procedural mechanism to challenge SAMs decisions.  *See* 28 C.F.R. § 501.3(e).

30.     Information obtained from the meeting with the inmate, along with the inmate's written comments and the memorandum summarizing the discussion with the inmate, is then forwarded directly to the prosecuting USAO, the FBI and the OEO for evaluation in connection with the annual SAMs review.  *Id.* at ¶ 21.

31.     An in-person meeting with Ayyad was held on January 6, 2011, with the Unit Manager of the Special Security Unit and the FBI Special Agent assigned to Ayyad's case attending the meeting.  *Id.* at ¶ 22.

32.     Following the meeting with Ayyad, the information described in paragraph 30, above, was forwarded to the prosecuting USAO, the FBI and the OEO.  *Id.*

33.     An in-person meeting with Abouhalima was held on January 6, 2011, with his Correctional Counselor and the FBI Special Agent assigned to his case attending the meeting.  *Id.* at ¶ 23.

34.     Following the meeting with inmate Abouhalima, the information described in paragraph 30, above, was forwarded to the prosecuting USAO, the FBI and the OEO.  *Id.*

**3.     After the information is gathered, a decision is made.**

35.     The non-exhaustive list of factors described in paragraph 8, above, as well as all other factors that are deemed relevant by Department of Justice personnel, are considered in the renewal assessment.  Exh. C-1 at ¶ 19.

36.     The FBI provides a written assessment to the prosecuting USAO of the FBI's analysis of the possible renewal of SAMs.  *Id.* at ¶ 20.

37.     Approximately 45 days prior to the expiration of the SAMs, the prosecuting USAO, in consultation with the FBI, determines whether continued imposition of SAMs is warranted.  *Id.*

38.     Approximately thirty days prior to the expiration of the SAMs, the prosecuting USAO provides a written recommendation concerning renewal to the OEO.  *Id.*

39.     As in the imposition process, the decisionmaking components engage in frequent communications with each other while renewal is under consideration.  *Id.* at ¶ 21.

40.     If the decision is to renew the SAMs, renewals are approved by the Assistant Attorney General for the Criminal Division, with approval authority delegated to the Deputy Assistant Attorney General.  *Id.* at ¶ 22.

41.     OEO prepares a memorandum from the Assistant Attorney General to the BOP, setting forth the SAMs to be imposed.  *Id.*

42.     Notice of the basis for the renewal of SAMs is provided to the inmate.  *Id*; *see also* 28 C.F.R. § 501.3(b).

### 4.     In some circumstances, the information gathered leads to the SAMs not being renewed.

43.     The SAMs of eleven inmates who have been incarcerated at the ADX have been removed, with six of those non-renewals occurring since January 1, 2009.  Exh. D-1 at ¶ 24.

44.     Information provided by the inmates during the annual pre-renewal review process described above was taken into account in the non-renewal decisions for those inmates.  *Id.* at ¶ 25.

45.     Inmates whose SAMs are removed may be placed in any BOP institution consistent with their security and custody classification level.  *Id.* at ¶ 24.

## VIII.   THE BOP'S ADMINISTRATIVE REMEDY PROGRAM PROVIDES SAMs INMATES WITH A MEANS TO CHALLENGE SAMs DECISIONS.

1.     The SAMs regulation (*see* 28 C.F.R. § 501.3(e)) designates the BOP's four-tiered Administrative Remedy Program as the means for inmates to challenge decisions concerning

SAMs.  Exh. D-1 at ¶¶ 7, 9; *see also* 28 C.F.R. §§ 542.10-19 (Administrative Remedy Program

regulations).

### A.      Administrative challenges to imposition or renewals of SAMs

2.      When ADX inmates use the administrative remedy process to challenge the

imposition or renewal of SAMs, steps are taken to ensure that the information concerning the

remedy requests reaches all entities involved in the SAMs decision.  Exh. D-1 at ¶ 10.

3.      ADX legal department staff review the inmate's request for administrative

remedy, then notify the appropriate prosecuting USAO and the FBI's Southern Colorado Joint

Terrorism Task Force (or the appropriate FBI field office or other federal law enforcement

agency), that the inmate has challenged the SAMs.  *Id.*

4.      ADX legal personnel forward the inmate's administrative remedy request to the

prosecuting USAO and FBI for review to determine whether the information submitted by the

inmate alters the decision concerning the imposition or renewal of SAMs.  *Id.*

5.      If Ayyad or Abouhalima choose to utilize the administrative remedy process to

challenge the March 2011 renewal of their SAMs, the information they submit will be forwarded

to the prosecuting USAO and FBI, as described above.  *Id.* at ¶ 11.

### B.      Administrative challenges resulting in SAMs modifications

6.      The Director of the OEO has the authority to modify an existing SAMs (that is,

after a SAMs is imposed and before the renewal date), provided that the modification does not

create a more restrictive SAMs; the modification does not conflict with any request from

CTS/NSD, the prosecuting USAO, the FBI, the BOP or applicable regulations; and the

modification is not objected to by CTS/NSD, the prosecuting USAO, the FBI or the BOP.  Exh.

C-1 at ¶ 23; *see also* Exh. B-1, Att. 3, §1.b. at US 15097 (describing interim SAM modification

authority of the Director of the OEO).

7.      When an inmate utilizes the Administrative Remedy Program to request a
modification to the SAMs, the process operates in much the same way as when the inmate
challenges the imposition or renewals of SAMs.  Exh. D-1 at ¶ 12.

8.      While the four steps of the administrative remedy process are moving forward,
ADX legal staff transmit the information submitted by the inmate to the prosecuting USAO and
FBI.  *Id.*

9.      If either the prosecuting USAO or FBI requests additional information concerning
the proposed modification, ADX legal staff provide that information.  *Id*. at ¶ 13.

10.     In appropriate cases, ADX legal staff may make independent efforts to obtain
additional information that might assist the prosecuting USAO and FBI in evaluating the request
for modification, such as in cases where a SAMs inmate has requested the opportunity to
communicate with additional persons.  *Id.* at ¶ 13.

11.     Modification requests in which the prosecuting USAO, the FBI and CTS/NSD
concur are forwarded to OEO.  Exh. C-1 at ¶ 25.

12.     In evaluating a request for modification of SAMs, all relevant information,
including information submitted by the inmate, is considered.  *Id.* at ¶¶ 7, 25.

13.     Modifications that relax an inmate's SAMs are made frequently.  *Id.* at ¶ 24.

14.     Inmates with SAMs have used the administrative remedy process to achieve a
number of SAMs modifications, including permitting the inmate to engage in non-legal
communications with a larger group of individuals; allowing the inmate to communicate with
prospective attorneys with whom he has no existing attorney-client relationship; facilitating
faster receipt of books and periodicals; and modifying the mass communications provisions of

36

SAMs to expand access to publications and television networks.  Exh. D-1 at ¶ 14.

### C.     SAMs modifications may also be obtained through informal means

15.     Inmates on SAMs can initiate the SAMs modification process by making a request to a BOP staff member without filing a formal administrative remedy request.  *Id.* at ¶ 15.

16.     Once the request for modification is made known, information concerning the proposed modification is forwarded to the prosecuting USAO and FBI for review and consideration.  *Id.*

17.     Information obtained from the annual SAMs pre-renewal review process has also led to modifications to SAMs for certain ADX inmates without the inmate filing a formal administrative remedy request.  *Id.* at ¶ 14.

## IX.     THE ADX SPECIAL SECURITY UNIT PROGRAM IS THE COUNTERPART TO THE ADX STEP-DOWN PROGRAM FOR SAMs INMATES.

### A.     An inmate's success in the Program provides information to the SAMs decisionmakers.

1.     SAMs inmates incarcerated in H Unit have the opportunity to participate in a three-phase program called the Special Security Unit Program ("H Unit Program"), designed specifically for SAMs inmates to ensure that national and institutional security are protected. Exh. B-1 at ¶¶ 33, 34.

2.     The success of the inmate's participation in the H Unit Program provides information that is considered in the evaluation of whether SAMs continue to be warranted for that inmate.  *Id.* at ¶ 35.

3.     The H Unit Program is the Special Security Unit counterpart to the Step-Down Program for ADX general population inmates.  *Id.* at ¶ 33.

4.     An inmate's advancement to the next phase of the H Unit Program is a

classification decision as to whether the inmate can function with additional privileges without posing a risk to institutional security and good order; posing a risk to the safety and security of staff, inmates or others, including the inmate himself; and/or posing a risk to public safety. *Id.* at ¶ 36.

5.      The government has determined that, because of the national and institutional security concerns associated with the communications of SAMs inmates, there must be a careful assessment of whether a SAMs inmate can function in a less-restrictive setting that permits unrestrained physical contact with other inmates and correctional staff. *Id.* at ¶ 47.

6.      Phase One is the baseline phase of the H Unit Program, in which all H Unit inmates are assigned unless and until they are advanced to another phase. *Id.* at ¶ 37.

7.      Phase One inmates are permitted two non-legal telephone calls per month, access to a commissary list and art and hobby craft items, escorted shower time on the inmate's range[6] three times each week, and access to a minimum of ten hours of out-of-cell recreation per week. *Id.*

8.      In Phase Two, inmates are allowed three non-legal telephone calls per month and access to an expanded commissary list and additional art and hobby craft items, unescorted showers five times each week, and access to a minimum of ten hours of out-of-cell recreation per week. *Id.* at ¶ 38.

9.      Phase Three provides SAMs inmates the opportunity to function in an environment where they are permitted to have physical contact with others. *Id.* at ¶ 39.

10.     Phase Three inmates are permitted a minimum of one and one-half hours per day

---

[6] The "range" refers to areas of housing units that include cells, showers and the common area outside the cells. A reference to an inmate being "on the range" means that he is in the common area outside his cell. *See generally* Exh. B-1 at ¶¶ 39-40.

on the range in a group of as many as four inmates, five days a week, where they are not restrained or escorted by BOP staff.  *Id.*

11.     The inmates in Phase Three eat one meal together and engage in recreational activities, including exercising, watching television, reading, and playing cards and other games, and may shower at any time they are on the range.  *Id.*

12.     Changes have been made to one range of H Unit where Phase Three inmates are allowed to gather outside their cells.  These changes include the installation of a new flat screen television, a table where the inmates can eat together, and, at Ayyad's request, an exercise bicycle.  *Id.* at ¶ 40.

13.     Phase Three inmates receive a minimum of 10.5 hours of out-of-cell recreation per week, which is in addition to their out-of-cell time on the range, giving them approximately 20 hours per week of out-of-cell time.  *Id.* at ¶ 41.

14.     Phase Three inmates have access to the expanded art and hobby craft list referenced in paragraph 8, above, and a further expanded commissary list that is the same as that available to ADX general population inmates, with the exception of hot sauce.  *Id.*

**B.     Inmates receive regular reviews that determine placement in the H Unit Program.**

15.     A SAMs inmate is evaluated for possible advancement in the H Unit Program at least two times per year, at his six-month program reviews conducted by his Unit Team, which consists of his correctional counselor, his case manager, the Unit Manager, and the Unit secretary.  *Id.* at ¶ 42.

16.     At the six-month program reviews, the inmate may present issues concerning his advancement through the phases of the H Unit Program and is encouraged to ask questions and discuss concerns.  *Id.*

39

17.     The inmate's Unit Team determines whether the inmate meets four eligibility factors for consideration for advancement to the next phase of the H Unit Program, including a minimum of twelve months of clear conduct, active participation in and completion of all programs recommended by his Unit Team, positive behavior and respectful conduct towards staff and other inmates, and positive overall institutional adjustment. *Id.* at ¶ 43.

18.     An inmate who meets the minimum eligibility factors is then considered for advancement by a Program Screening Committee, consisting of the ADX Warden, Associate Warden, Captain, Special Investigative Agent, Case Management Coordinator, Unit Manager and Psychologist. *Id.* at ¶ 44.

19.     The Program Screening Committee evaluates, on a case-by-case basis, whether the inmate can safely function with additional privileges without posing a risk to institutional security and good order; the safety and security of staff, inmates or others; and public safety. *Id.* at ¶¶ 45, 46.

20.     The Program Screening Committee conducts an evaluation of the inmate, considering all factors the Committee deems relevant, which factors include, but are not limited to:  the inmate's conduct while housed at the ADX; his participation in and completion of programs recommended by his Unit Team; his behavior and conduct towards, and interaction with, staff and other inmates; his overall institutional adjustment; his criminal history and involvement with criminal organizations, and the potential safety and security threats implicated by his involvement with those organizations; and the safety and security needs of staff, the inmate, other inmates, and the public. *Id.* at ¶ 45.

21.     The fact that an inmate meets the minimum eligibility requirements for advancement to the next phase of the H Unit Program does not mean that he is appropriate for

advancement.  *Id.* at ¶ 46.

22.     The Program Screening Committee may defer advancement to the next phase of the H Unit Program if it determines that additional time is needed to assess an inmate's compliant behavior to ensure that, when placed in the next phase, the inmate will not pose a risk to institutional security and good order; the safety and security of staff, inmates or others; and/or public safety.  *Id.*

23.     When a SAMs inmate is under consideration for advancement to Phase Three, the Program Screening Committee makes an initial recommendation, which is then evaluated by the FBI and the prosecuting USAO to determine whether a SAMs modification that permits physical contact can be implemented without jeopardizing national or institutional security.  *Id.* at ¶¶ 47, 48.

24.     If an inmate is not advanced to the next phase of the H Unit Program following a review, ADX staff communicate the reasons for that decision to the inmate.  *Id.* at ¶ 52.

25.     A decision not to advance the inmates to the next phase does not preclude the Program Screening Committee from exercising its discretion to advance the inmate at a future review, or from recommending the inmate for advancement to Phase Three following a future review.  *Id.*

26.     The inmate may appeal all decisions concerning his participation in phases of the H Unit Program, including his removal from the H Unit Program for disciplinary or security reasons, through the BOP's Administrative Remedy Program.  *Id.*

**C.     Ayyad and other inmates have advanced to Phase Three.**

27.     In September 2010, the first group of SAMs inmates was selected to advance to Phase Three of the H Unit Program.  *Id.* at ¶ 49.

41

28.     Ayyad was one of the four inmates initially selected for Phase Three and whose

SAMs were modified to allow them to have physical contact in a group setting.  *Id.* at ¶ 50;

*compare* Exh. B-1, Att. 3, § 1.c.ii. at US 15097 *with* Att. 4 at USAB 14943.

29.     Abouhalima, who is in Phase Two, was not one of the four inmates advanced to

Phase Three in September 2010 because there are concerns related to certain communications

between Abouhalima and his immediate family members that the government determined

evidenced Abouhalima encouraging radicalized behavior in one of those family members.  *Id.* at

¶ 51.

## X.     THE LIVING CONDITIONS IN H UNIT ARE NEARLY IDENTICAL TO THOSE IN THE ADX GENERAL POPULATION AND STEP-DOWN PROGRAM CELLS.

1.     The ADX is the most secure prison in the federal system with special security and

control procedures to control inmates and to enhance the safety of staff, inmates, and visitors.

Exh. D-1 at ¶ 26; *see also* Exh. B-1 at ¶ 9.

2.     Inmates at the ADX who are subject to SAMs are housed together in a single

ADX unit, H Unit, to ensure that they are not able to transmit unauthorized communications

through other inmates who are not subject to similar communications restrictions.  Exh. B-1 at ¶

10.

3.     An inmate's placement at the ADX, including in H Unit, does not impact the

duration of his sentence; his parole eligibility, if applicable; or his good-time credits.  *Id.* at ¶ 12;

*see also* Exh. D-1 at ¶ 28.

4.      The imposition of SAMs on an inmate similarly does not affect his sentence; his

parole eligibility, if applicable; or his good-time credits.  Exh. B-1 at ¶ 12.

5.     Like all ADX inmates, H Unit inmates are single-celled (one inmate per cell).  *Id.*

at ¶ 13; *see also* Exh. D-1 at ¶ 31.

6.      Each cell in H Unit has 75.5 square feet of living space, identical in size to the

cells for inmates who are in the ADX general population Step-Down Program,[7] with

approximately the same amount of living space as the cells in ADX general population units.

Exh. B-1 at ¶ 14; Exh. D-1 at ¶¶ 33.a.-c.

7.      Showers for both H Unit and the Step-Down Program units are located on the

range, with no in-cell showers.  ADX general population units have in-cell showers, which

accounts for the difference in cell size.  Exh. B-1 at ¶ 14.

8.      Like the cells in the ADX Step-Down Program units, each cell in H Unit

has a solid outer door with a window that looks out onto the range.  Exh. B-1 at ¶ 15; Exh. D-1 at

¶¶ 33.b-c.

9.      Like the cells in the ADX Step-Down Program units, the cell doors in H Unit are

configured in a manner that allows sound to travel, permitting inmates to converse with passers

by.  Exh. B-1 at ¶ 15.

10.     Like the cells in the ADX general population units and the ADX Step-

Down Program units, each cell in H Unit has a window that looks outside, providing the inmate

with natural lighting.  *Id.* at ¶ 16; Exh. D-1 at ¶¶ 33.a.-c.

11.     Like the cells in the ADX general population and ADX Step-Down

Program units, each cell in H Unit has a light with three settings (dim, medium, and bright),

which the inmate controls from his cell and may turn on and completely off as needed.  Exh. B-1

at ¶ 17; Exh. D-1 at ¶ 35.

---

[7] The Step-Down Program for ADX general population inmates is described in the
declaration of ADX Executive Assistant Mark Collins.  Exh. D-1 at ¶¶ 52-66.

12.     Like inmates in the ADX general population units, H Unit inmates consume their meals in their cells (with the exception of inmates who have advanced to Phase Three of the H Unit Program, described above).  Exh. B-1 at ¶ 18; Exh. D-1 at ¶ 33.a.

13.     Legal and social visits for H Unit inmates and for all ADX general population inmates are non-contact (no physical contact is allowed).  Exh. B-1 at ¶ 32; Exh. D-1 at ¶ 40.

14.     While the SAMs impose no limits on the number of social visits (from visitors outside the prison) an inmate may receive, ADX general population and ADX Step-Down Program inmates may receive five social visits per month.  *See* Exh. B-1, Att. 4, § 3.f. at USAB 14949; Exh. D-1 at ¶ 33.

15.     H Unit inmates, like all inmates at the ADX, can participate in both indoor recreation and outdoor recreation with access to sunlight and fresh air.  Recreation is scheduled up to seven days per week.  Exh. B-1 at ¶ 19; Exh. D-1 at ¶ 34; *see also* Exh. G-1 at 55:6-15.

16.     Inmates in Phase One and Phase Two of the H Unit Program, as described above, receive the same amount of recreation as ADX general population unit inmates, *i.e.*, a minimum of ten hours of out-of-cell recreation per week.  Exh. B-1 at ¶ 20; Exh. D-1 at ¶ 33.a.

17.     Out-of-cell outdoor recreation for both H Unit inmates and ADX general population inmates occurs with up to five other inmates in secure, single recreation areas that measure 10 feet by 20 feet, grouped together on a large recreation yard.  Exh. B-1 at ¶ 20; Exh. D-1 at ¶ 33.a.

18.     The recreation yard is located on the same level as the building containing the inmates' cells.  Exh. B-1 at ¶ 20.

19.     Recreation logs for H Unit from August 6, 2009, through March 1, 2011, show that recreation was cancelled only three times during that nineteen-month period, one morning

because of foggy weather conditions, and two days when institutional security reasons required that it be cancelled.  Exh. B-1 at ¶ 22.

20.     Both Ayyad and Abouhalima go to outdoor and indoor recreation and do cardiovascular workouts.  Exh. G at 46:5-12, 18-48:8; Exh. H at 65:19-66:12; 68:16-69:8.

21.     H Unit inmates, like all ADX inmates, may talk with each other while in their cells or during out-of-cell recreation.  Exh. B-1 at ¶ 24; Exh. D-1 at ¶¶ 33.a.-b.  *See also* § VI.38-46, *supra*.

22.     Like all ADX inmates, H Unit inmates are restrained and searched when they are moved outside their cells, but H Unit inmates have the option of a body-scanner image rather than a visual search.  Exh. B-1 at ¶ 25; Exh. D-1 at ¶ 42.

23.     Like other ADX inmates, including inmates in the ADX general population and Step-Down Program units, H Unit inmates have individual black-and-white televisions in their cells.  Exh. B-1 at ¶ 30; Exh. D-1 at ¶ 36.

24.     Plaintiffs have access to the same approximately 60 television and radio networks as the inmates in the ADX general population and Step-Down Program units.  Exh. B-1 at ¶¶ 30, 58; Exh. D-1 at ¶¶ 36.

25.     Like the inmates in the ADX general population and ADX Step-Down Program units, inmates in H Unit can check the date and time on one of the available television channels.  Exh. B-1 at ¶ 58; Exh. D-1 at ¶ 36.

26.     H Unit inmates may participate in the same education courses, wellness programs and games offered to other inmates at ADX Florence.  Exh. B-1 at ¶¶ 26, 29; *see also* Exh. G at 138:25-139:4.

27.     As previously described, H Unit inmates, like all ADX inmates, have access to

media and reading materials through multiple libraries, including a computerized law library.
Exh. B-1 at ¶¶ 27-28; Exh. D-1 at ¶ 39.

28.     H Unit inmates, like all ADX inmates, may hold paid jobs as Unit orderlies.  Exh.
B-1 at ¶ 29.  Abouhalima has been a unit orderly for several years.  Exh. G at 139:5-140:15.

## XI.     PLAINTIFFS RECEIVED PROCESS TO ADDRESS THEIR TRANSFERS TO THE ADX.

### A.     A multi-step review preceded Plaintiffs' referrals to the ADX in 2002 and 2003.

1.     The decision to place an inmate at the ADX is a classification decision
made using the BOP's classification system, which provides basic objective criteria and
individual factors for assessing the security needs of each individual inmate.  Exh. E-1 at ¶ 9.

2.     At the time inmates Ayyad and Abouhalima were designated to the ADX, the
"Program Statement" (BOP policy) that generally governed an inmate's transfer to the ADX was
Program Statement 5100.07, Security Designation and Custody Classification Manual, Chapter
10.  Id. at ¶ 12; see also Exh. E-2.

3.     Before transferring Plaintiffs to the ADX, the BOP conducted multi-level regional
reviews.  Exh. E-1 at ¶¶ 13, 16, 22.

4.     In Ayyad's case, because he was incarcerated at an institution outside the BOP's
North Central Region at the time of his transfer, the review process involved an evaluation by the
institution, by the BOP's Regional Office for Ayyad's institution, and by the North Central
Regional Office, where the ADX is located.  Id. at ¶¶ 13.a., 16-21; see also referral packet for
Ayyad, Exh. E-3.

5.     Following that review, the BOP's North Central Regional Director determined
that placement in the ADX was appropriate, and Ayyad was transferred to the ADX.  Exh. E-1 at

¶ 21.

6.      In Abouhalima's case, because he was incarcerated at an institution located within the North Central Region at the time of his transfer, the review process involved an evaluation by the institution and the North Central Regional Office. *Id.* at ¶¶ 13.b., 22-28; *see also* referral packet for Abouhalima, Exh. E-4.

7.      Following that review, the North Central Regional Director determined that placement in the ADX was appropriate, and Abouhalima was transferred to the ADX. Exh. E-1 at ¶ 27.

8.      Upon arrival at the ADX, Plaintiffs had the opportunity to raise any concerns about or challenges to their transfers, both during their initial and subsequent Program Reviews and also through the BOP's Administrative Remedy Program. *Id.* at ¶ 28.

**B.      Plaintiffs recently were given hearings to address their placement at ADX.**

**1.      Overview of the hearing process**

9.      Since Plaintiffs' transfers to the ADX, the BOP's procedures for designating inmates to the ADX have changed. In Program Statement 5100.08, <u>Inmate Security Designation and Custody Classification</u>, Chapter 7, the BOP has provided the basic objective criteria for designating inmates to the ADX. *See* Declaration of E. Alexander, Exh. F-1 at ¶ 5.

10.      In addition to the guidance provided by Program Statement 5100.08, the Regional Director for the Bureau's North Central Region, in which the ADX is located, issued a memorandum in February 2009 directing that inmates designated to the ADX must meet certain criteria. *Id.* at ¶ 5; *see also id.* at Att. 1, February 13, 2009, memorandum issued by the Regional Director, North Central Region, re: ADX Referrals, with attachments ("Nalley Memorandum").

11.      In accordance with the Nalley Memorandum, the inmates designated to the ADX

must meet one or both of two basic criteria: (1) the inmate's placement in other correctional facilities creates a risk to institution security and good order, or poses a risk to the safety of any individual; and/or (2) as a result of the inmate's status, either before or after incarceration, the inmate could not be safely housed in the general population of another institution.  Exh. F-1 at ¶ 8; *see also id.* at Att. 1, US 14714.

12.     The Nalley Memorandum identifies factors to be used to determine whether inmates meet the above criteria, including, but not limited to, "that the inmate was convicted of, charged with, associated with, or in any way linked to terrorist activities, and as a result, presents national security management concerns which cannot adequately be met in an open population institution."  Exh. F-1 at ¶ 9; *see also id.* at Att. 1, US 14714.

13.     The Nalley Memorandum provides instructions for the referral of an inmate for possible placement at the ADX.  Exh. F-1 at ¶¶ 10-21; *see also id.* at Att. 1, US 14715-14717.

14.     In November 2009, the North Central Regional Director directed the Discipline Hearing Administrator for the North Central Region to provide "retroactive" ADX placement hearings, following the procedures and applying the criteria outlined in the Nalley Memorandum, to all inmates housed at the ADX who had not previously received such a hearing.  Exh. F-1 at ¶ 22.

15.     There are no differences in the criteria for placement and no substantive differences in procedures when ADX placement hearings are conducted retroactively.  *Id.* at ¶ 24.

16.     When conducting the ADX placement hearings, whether retroactive hearings or those for inmates who are not currently incarcerated at the ADX, the Hearing Administrator makes a recommendation as to whether the inmate meets the criteria for placement in any non-control unit in the ADX.  *Id.* at ¶ 25.

17.     The only ADX unit that is not covered by the placement hearing process is the Control Unit, which is governed by separate procedures established by federal regulations.  *See id.*; *see also* 28 C.F.R. §§ 541.40-541.50.

18.     If the outcome of the retroactive ADX placement hearing is that ADX placement is not appropriate for an inmate currently incarcerated at the ADX, arrangements would be made for the inmate's transfer from the ADX to an appropriate institution.  Exh. F-1 at ¶ 26.

19.     In the case of at least one inmate incarcerated at the ADX who received a retroactive ADX placement hearing, the Regional Director determined that ADX placement was not appropriate, and that inmate was transferred to another institution.  *Id.* at ¶ 27.

### 2.     The hearings for Ayyad and Abouhalima

20.     Inmates Ayyad and Abouhalima were identified as inmates incarcerated at the ADX who had not received an ADX placement hearing.  *Id.* at ¶ 23.

21.     E. Alexander, a Discipline Hearing Officer in the North Central Regional Office who has correctional experience and familiarity with BOP policy and operations, was designated as the Hearing Administrator to conduct retroactive placement hearings concerning the appropriateness of the ADX placements for Ayyad and Abouhalima.  *Id.* at ¶¶ 1-4.

22.     The Hearing Administrator did not have any personal involvement in any previous disciplinary action involving Plaintiffs.  *Id.* at ¶ 4.

23.     In accordance with the Nalley Memorandum, Plaintiffs each received a "Notice of Hearing on Referral for Transfer to ADX Florence General Population" ("Notice") at least 24 hours prior to their hearings.  Exh. F-1 at ¶ 30 and Att. 2 (Ayyad received the Notice on December 2, 2009); Exh. F-1 at ¶ 45 and Att. 5 (Abouhalima received the Notice on December 2, 2009); *see also* Exh. F-1 at ¶ 12.e.

24. The Notices were prepared using documentation provided by the institution and BOP database documents that reflected Plaintiffs' criminal convictions and/or misconduct. Exh. F-1 at ¶ 13.

25. In accordance with the Nalley Memorandum, each Notice informed each Plaintiff individually of the specific conduct or evidence that formed the basis for the recommendation to designate him to the ADX. Exh. F-1 at ¶ 34 and Att. 2 (noting that Ayyad had participated in terrorist activities, specifically, the 1993 bombing of the World Trade Center); Exh. F-1 at ¶ 49 and Att. 5 (noting that Abouhalima is considered a terrorist based on his participation in the 1993 bombing of the World Trade Center).

26. Each Notice also informed each Plaintiff that he was being referred for a hearing before a hearing administrator to determine if he should be housed in the ADX general population; the hearing would be held on the next available docket; the hearing could be conducted by videoconferencing, teleconference, or in person; he would be afforded the opportunity to have a written summary of the specific behavior or situation that formed the basis for the placement recommendation; he had the opportunity to be present throughout the hearing; he had the opportunity to make an oral statement to the hearing administrator; he had the opportunity to submit documentary evidence; and he had the opportunity to be advised of the Hearing Administrator's recommendation. Exh. F-1 at ¶ 33 and Att. 2; Exh. F-1 at ¶ 48 and Att. 5.

27. Ayyad's hearing took place by teleconference on December 4, 2009. Exh. F-1 at ¶ 35.

28. Ayyad was present for the hearing and made an oral statement, but declined to present documentary evidence. *Id.*

29.     Abouhalima's hearing took place by teleconference on December 4, 2009.  *Id.* at ¶ 50.

30.     Abouhalima was present for the hearing and made an oral statement, but declined to present documentary evidence.  *Id.*

31.     In accordance with the Nalley Memorandum, the Hearing Administrator prepared a written recommendation ("Report") at the conclusion of each hearing that addressed whether Plaintiffs' placement at the ADX was appropriate.  Exh. F-1 at ¶¶ 18, 36, 50; *see also id.* at Att. 3 and Att. 6.

32.     On December 17, 2009, the Hearing Administrator completed Ayyad's Report, in which she recommended that Ayyad remain at the ADX because he meets both criteria for ADX placement, based on the fact that he received five incident reports; that he participated in terrorist activities, *i.e.*, the 1993 bombing of the World Trade Center; and that his communications are limited by the Attorney General pursuant to SAMs.  Exh. F-1 at ¶ 38 and Att. 3.

33.     In evaluating whether Ayyad met the criteria for ADX placement, the Hearing Administrator relied on Ayyad's Presentence Investigation Report; a November 2, 2001 memorandum from the Warden at the United States Penitentiary in Lewisburg, Pennsylvania, to the BOP's Northeast Region, requesting a transfer for Ayyad; an October 21, 2002 ADX H Unit Classification Summary for Ayyad; a BOP Inmate History; a BOP Inmate Profile; a BOP Inmate Discipline Data Chronological Disciplinary Record; and other relevant BOP database documents for Ayyad.  Exh. F-1 at ¶ 37.

34.     In accordance with the Nalley Memorandum, the Report was provided to Ayyad by ADX staff on December 28, 2009.  *Id.* at ¶¶ 20, 39; *see also id.* at Att. 1, US 14716-14717.

35.     On December 17, 2009, the Hearing Administrator completed Abouhalima's

51

Report, in which she recommended that Abouhalima remain at the ADX because he meets both criteria for ADX placement based on information that he is considered a terrorist because of his participation in the 1993 bombing of the World Trade Center and information concerning his receipt of twelve incident reports.  Exh. F-1 at ¶ 53 and Att. 6.

36.     In evaluating whether Abouhalima met the criteria for placement at the ADX, the Hearing Administrator relied on Abouhalima's Presentence Investigation Report; an April 1, 2003, ADX H Unit Classification Summary for Abouhalima; a BOP Inmate Profile; a BOP Inmate Discipline Data Chronological Disciplinary Record; and other relevant BOP database documents for Abouhalima.  Exh. F-1 at ¶ 52.

37.     In accordance with the Nalley Memorandum, the Report was provided to Abouhalima by ADX staff on December 28, 2009.  *Id.* at ¶ 54 and Att. 6.

38.     In accordance with the Nalley Memorandum, the Reports for Ayyad and Abouhalima, along with all supporting documentation, were provided to the North Central Regional Director for his review.  Exh. F-1 at ¶¶ 19, 40, 55.

39.     The North Central Regional Director decided that Ayyad's placement in the ADX was appropriate.  *See* December 18, 2009 Notice of ADX General Population Placement for Ayyad, Exh. F-1 at Att. 4, US 14270; *see also id.* at ¶ 40.

40.     In accordance with the Nalley Memorandum, Ayyad was provided a copy of the North Central Regional Director's decision on December 29, 2009.  Exh. F-1 at Att. 4; *see also id.* at ¶ 41.

41.     The decision informed Ayyad of his right to appeal the decision directly to the BOP Office of General Counsel.  Exh. F-1 at Att. 4; *see also* Exh. F-1 at ¶¶ 21, 40; *id.* at Att. 1, US 14717.

42.     On January 9, 2010, Ayyad appealed the North Central Regional Director's

decision to the Office of General Counsel.  Exh. F-1 at ¶ 42.

43.     The final decision on the appeal was that Ayyad is appropriate for placement at the ADX.  *Id.*

44.     After the North Central Regional Director issue the Decision, the Hearing Administrator received information that Ayyad was not subject to SAMs at the time of his transfer to the ADX, as the Report had indicated.  *Id.* at ¶ 43; *see also id.* at Att. 3, US 14273.

45.     The Hearing Administrator excluded consideration of the SAMs, and submitted a revised Report and supporting documentation to the North Central Regional Director for his review and a Decision.  Exh. F-1 at ¶ 43; *see also id.* at Att. 8, Referral for Transfer to ADX Florence General Population Hearing Administrator's Report, dated March 16, 2011 (Amended Report).

46.     The Hearing Administrator's recommendation remained the same because, even without the SAMs, Ayyad met the criteria for ADX placement under the Nalley Memorandum because he has been convicted of terrorism.  Exh. F-1 at ¶ 43.

47.     The North Central Regional Director decided that Ayyad's placement in the ADX was appropriate.  Exh. F-1 at Att. 9, Notice of ADX General Population Placement, dated March 17, 2011; *see also* Exh. F-1 at ¶ 44.

48.     The North Central Regional Director decided that Abouhalima's placement in the ADX was appropriate.  *See* December 18, 2009 Notice of ADX General Population Placement for Abouhalima, Exh. F-1 at Att. 7, USAB 14077; *see also id.* at ¶ 55.

49.     In accordance with the Nalley Memorandum, Abouhalima was provided a copy of the North Central Regional Director's decision on December 29, 2009.  Exh. F-1 at Att. 7; *see also id.* at ¶ 56.

50.     The decision informed Abouhalima of his right to appeal the decision directly to the BOP Office of General Counsel.  Exh. F-1 at Att. 4; *see also* Exh. F-1 at ¶¶ 21, 45; *id.* at Att. 1, US 14717.

51.     On January 14, 2010, Abouhalima appealed the North Central Regional Director's decision to the Office of General Counsel.  Exh. F-1 at ¶ 57.

52.     The final decision on the appeal was that Abouhalima is appropriate for placement at the ADX.  *Id.*

53.     After the North Central Regional Director issued the Decision, the Hearing Administrator became aware that only nine of the twelve incident reports were issued after Abouhalima's transfer to the ADX.  *Id.* at ¶ 58.

54.     The Hearing Administrator excluded consideration of the three incident reports issued before Abouhalima was transferred to the ADX, and submitted a Report and supporting documentation to the North Central Regional Director for his review and decision.  Exh. F-1 at ¶ 58; *see also id.* at Att. 10, Referral for Transfer to ADX Florence General Population Hearing Administrator's Report, dated March 16, 2011 (Amended Report).

55.     The Hearing Administrator's recommendation remained the same because, even when the three incident reports were excluded, Abouhalima met the criteria for ADX placement under the Nalley Memorandum because he has been convicted of terrorism.  Exh. F-1 at ¶ 59.

56.     The North Central Regional Director decided that Abouhalima's placement in the ADX was appropriate.  Exh. F-1 at Att. 11, Notice of ADX General Population Placement, dated March 17, 2011; *see also* Exh. F-1 at ¶ 60.

**C.     In addition to the specific reviews associated with SAMs, Plaintiffs continue to receive other reviews.**

57.     The BOP reviews the status of all inmates, including non-SAMs inmates, in three

54

ways: Classification, Program Reviews and Progress Reports.  Exh. D-1 at ¶ 45.

58.    Classification and Program Reviews are the procedures by which an inmate's case is formally reviewed by the Unit Team and are known as "team meetings."  *Id.* at ¶ 46.

59.    Classification is the initial team meeting in which an inmate's case and history are carefully reviewed and relevant programs are recommended.  *Id.* at ¶ 47.

60.    Generally, the initial classification occurs within four weeks of an inmate's arrival at his designated institution.  *Id.*

61.    After the initial classification, later team meetings are referred to as Program Reviews.  *Id.* at ¶ 48.

62.    The purpose of a Program Review is to monitor and evaluate the inmate's progress in all program areas.  *Id.*

63.    Team meetings are documented in a Program Review Report, which includes references to all recommendations and discussions at team meetings and notes any decisions made.  *Id.* at ¶ 49.

64.    Ayyad received his initial classification on June 2, 1994, approximately one week after his arrival at USP Terre Haute.  Exh. D-1 at ¶ 68; *see also id.* at Att. 4, Inmate Activity Record for Ayyad, at US 12189; *id.* at Att. 1 at US 15083.

65.    Ayyad received his first ADX Program Review on October 17, 2002, less than two weeks after his transfer to the ADX.  Exh. D-1 at ¶ 69; *see also id.* at Att. 4 at US 11540; *id.* at Att. 1 at US 15080.

66.    Ayyad had the opportunity during his first ADX Program Review to raise concerns about his transfer.  Exh. D-1 at ¶ 69.

67.    Ayyad has had 19 additional Program Reviews since his arrival at the ADX.  *Id.* at

55

¶ 70 (listing dates); *see also id.* at Att. 5 (October 6, 2010 Program Review Report for Ayyad).

68.     Abouhalima received his initial classification on June 23, 1994, approximately one month after his arrival at USP Lompoc on May 25, 1994.  Exh. D-1 at ¶ 77; *see also id.* at Att. 7, Inmate Activity Record for Abouhalima, at USAB 5379; *id.* at Att. 2 at USAB 14929.

69.     Abouhalima received his first ADX Program Review on March 28, 2003, three days after his transfer to the ADX.  Exh. D-1 at ¶ 78; *see also id.* at Att. 7 at USAB 5373; *id.* at Att. 2 at USAB 14927.

70.     Abouhalima has had 17 additional Program Reviews since his arrival at the ADX. Exh. D-1 at ¶ 79 (listing dates); *see also id.* at Att. 8 (January 26, 2011 Program Review Report for Abouhalima).

71.     During each of these Program Reviews, Ayyad and Abouhalima had the opportunity to raise concerns about their ADX confinement, including participation in the H Unit Program.  Exh. B-1 at ¶ 42; Exh. D-1 at ¶¶ 71, 80.

72.     Another way the BOP reviews the status of inmates is through the preparation of a Progress Report.  Exh. D-1 at ¶ 51.

73.     The Progress Report is ordinarily prepared every three years and is a comprehensive account of the inmate's history, including past and current status.  *Id.* at ¶¶ 51-53.

74.     The inmate is provided a copy of the Progress Report.  *Id.* at ¶ 53.

75.     Plaintiffs have received Progress Reports.  *Id.* at ¶¶ 73-74 and Att. 6 (September 21, 2010 Progress Report for Ayyad); *see also id.* at ¶¶ 82-83 and Att. 10 (October 27, 2009 Progress Report for Abouhalima).

## XII.    ALL BOP INMATES ARE SUBJECT TO COMMUNICATIONS LIMITATIONS AND MONITORING.

1.      Each piece of incoming general correspondence directed to a BOP inmate is

56

subject to reading and inspection by BOP staff.  *See* 28 C.F.R. § 540.14(a) ("Incoming general correspondence may be read as frequently as deemed necessary to maintain security or monitor a particular problem confronting an inmate."); *see also id.* at § 540.12(b) (staff in each BOP institution has authority to open and read all inmate general correspondence).

2.      Each piece of outgoing general mail from a sentenced inmate incarcerated in a medium or high security institution is subject to reading and inspection by BOP staff.  *See id.* at § 540.14(c)(2) ("[O]utgoing mail from a sentenced inmate in a medium or high security level institution, or an administrative institution may not be sealed by the inmate and may be read and inspected by staff.").

3.      A Warden is authorized to reject correspondence "if it is determined detrimental to the security, good order, or discipline of the institution, to the protection of the public, or if it might facilitate criminal activity."  *Id.* at § 540.14(d).

4.      A Warden may place an inmate on Restricted General Correspondence Status, which may limit the inmate's written communications to members of his immediate family, defined to include his "spouse, mother, father, children, and siblings," or to his "former business associates."  *See id.* at § 540.15(a), (d)(1), (3).

5.      When an inmate is on Restricted General Correspondence Status, additional restrictions on the inmate's communications may be imposed by the Warden if the recipient was involved in the violation of any correspondence regulations, or if the correspondence would be a threat to the security or order of the institution or would result in criminal activity.  *See id.* at § 540.15(d)(1), (3).

6.      A Warden may place an inmate on Restricted Special Mail Status, which includes inspection requirements for outgoing special mail that is not otherwise subject to inspection.  *See*

28 C.F.R. § 540.18(c)(2); *see also id.* at § 540.12(b) (mail from federal government officials, state courts and consular officials typically opened only in inmate's presence and checked for contraband).

7.      When an inmate is on Restricted Special Mail Status, the intended recipient of the special mail may request that mail items from the inmate be opened and inspected at the institution prior to distribution to the recipient.  *See* 28 C.F.R. § 540.18(c)(2)(iii).

8.      All BOP inmates may be subject to limitations and conditions on telephone privileges.  *See* 28 C.F.R. § 540.100(a) ("[I]nmate telephone use is subject to those limitations which the Warden determines are necessary to ensure the security or good order, including discipline, of the institution or to protect the public.").

9.      The telephone calls of all BOP inmates are subject to monitoring.  *See* 28 C.F.R. § 540.102 (BOP Warden required to "establish procedures that enable monitoring of telephone conversations on any telephone located within the institution, said monitoring to be done to preserve the security and orderly management of the institutions and to protect the public").

10.      All ADX non-SAM general population inmates are limited to five social visits per month.  Exh. D-1 at ¶ 33.

11.      A Warden may reject a publication requested by any BOP inmate if it is determined that its introduction into the institution would be "detrimental to the security, discipline, or good order of the institution or if it might facilitate criminal activity."  28 C.F.R. §§ 540.70, 540.71(b).

## THE SUMMARY JUDGMENT STANDARD

A Rule 56 motion should be granted if the Court concludes "that no trial is necessary

because there is no issue of material fact for a jury to determine." *In re Ribozyme Pharm., Inc.*

*Sec. Litig.*, 209 F. Supp. 2d 1106, 1112 (D. Colo. 2002).  The material facts are those that tend to

prove or disprove an element of a claim or defense.  *Id.* at 1110.  The moving party meets its

burden by showing that there is an absence of evidence to support the nonmoving party's case.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

## ARGUMENT

I.     **DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE FIRST AMENDMENT CLAIMS.**

Plaintiffs challenge the SAMs on their outgoing correspondence (Doc. 216 at ¶¶ 148-153)

and incoming correspondence and publications (*id.* at ¶¶ 154-159).

A.     **Legal framework**

1.     **Limiting communications is constitutional if it is rationally connected to a governmental interest.**

A regulation that inhibits an inmate's exercise of constitutional rights can be

constitutional.  A prison restriction is unconstitutional only if "the logical connection between the

regulation and the asserted goal is so remote as to render the policy arbitrary or irrational."

*Turner v. Safley*, 482 U.S. 78, 89-90 (1987) (upholding a ban on inmate-to-inmate

communications).  The government does *not* act irrationally when it monitors and limits – but

does not eliminate – the communications of convicted terrorists who subsequently communicated

with other terrorists from prison.  Plaintiffs' SAMs rationally advance important government

interests when evaluated under *Turner*.

*Turner* identified four factors to be considered in evaluating whether a prison restriction

was rational.  "First, there must be a valid, rational connection between the prison regulation and

the legitimate governmental interest put forward to justify it.... A second factor relevant in

determining the reasonableness of a prison restriction...is whether there are alternative means of exercising the right that remain open to prison inmates.... A third consideration is the impact accommodation of the asserted right will have on guards and other inmates, and the allocation of prison resources generally.... [Fourth], the absence of ready alternatives is evidence of the reasonableness of a prison regulation."  482 U.S. at 89-90.

Plaintiffs have a "heavy burden" to establish the absence of a rational connection between the SAMs and the government's interests.  *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it."); *Shaw v. Murphy*, 532 U.S. 223, 232 (2001) (under *Turner*, court must decide whether inmate has met his "heavy burden" to "overcome the presumption that the prison officials acted within their broad discretion") (quoting *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989)).

### 2. Governmental decisions about how best to further government interests receive deference.

In applying *Turner*, deference to the government's decision that SAMs are warranted is required for two reasons.  First, prison officials are given deference in operating their institutions. *See Beard v. Banks*, 548 U.S. 521, 528 (2006) (holding that, with respect to "matters of professional judgment," a court "must accord deference to the views of prison authorities").

Second, the Court must accord the Executive Branch the additional deference to which it is entitled when addressing matters that impact national security.  Here, the SAMs are imposed to limit the communications of convicted terrorists who have ties to a foreign terrorist organization, who successfully executed a large-scale terrorist attack against the United States, and who continued to generate interest from the international terrorist network more than a decade after the bombing.  The decision about how to monitor these individuals' communications to avoid

60

future acts of terrorism is a decision implicating national security.  Such decisions relating to

national security are reserved to the Executive Branch and are rarely proper subjects for judicial

intervention.  *See Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2728 (2010) (holding

that "Congress and the Executive are uniquely positioned to make principled distinctions

between activities that will further terrorist conduct and undermine United States foreign policy,

and those that will not").  The *government's* assessment concerning how to protect national

security is entitled to "special deference."  *See, e.g., Citizens for Peace in Space v. City of Colo.

Springs*, 477 F.3d 1212, 1221 (10th Cir. 2007) (courts "have historically given special deference

to other branches" in matters relating to national security "even when constitutional rights are

invoked").[8]

**B.      The evidence on each *Turner* factor shows that the SAMs are rational.**

**1.      Factor no. 1:  The SAMs are rationally connected to the interests.[9]**

The first *Turner* factor is whether there is a rational connection between the SAMs and

the interests.  *See Turner*, 482 U.S. at 89 ("First, there must be a valid, rational connection

between the prison regulation and the legitimate governmental interest put forward to justify

---

[8]  *See also, e.g., Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988) ("unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude on the authority of the Executive in military and national security affairs"); *Haig v. Agee*, 453 U.S. 280, 292 (1981) (national security matters "are rarely proper subjects for judicial intervention"); *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 852 (10th Cir. 2007) (noting "the constitutional order, recognized in *Egan*, that gives the Executive Branch the responsibility to make national security determinations"); *Merida Delgado v. Gonzales*, 428 F.3d 916, 920 (10th Cir. 2005) ("It is rarely appropriate for courts to intervene in matters closely related to national security.").

[9]  *Turner* does not require that each factor favor the government in order for the regulation to pass constitutional muster.  *See Klein v. Skolnik*, No. 3:08-CV-177-ECR (RAM), 2010 WL 745418, *5 (D. Nev. Jan. 22, 2010) (recommendation to grant summary judgment on state inmate's First Amendment challenge to mail policy where three of four *Turner* factors favored prison).

it...."). The first factor is the "paramount inquiry under *Turner*" and is often determinative in

conducting the *Turner* analysis. *Freeman v. Texas Dep't of Criminal Justice*, 369 F.3d 854, 861

(5th Cir. 2004); *see also*, *e.g.*, *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010)

(recognizing that "the first [factor] can act as a threshold factor"). This factor strongly favors the

government.

### a.     There are three critical interests.

The first and most critical interest is the preservation of national security by preventing

acts of terrorism. IV.1.[10] Second, the government also has a strong interest in maintaining the

security of its prisons, including the safety of staff and inmates. IV.2. Third, the government has

an interest in efficiently operating its law enforcement agencies, and must allocate resources not

only to implementing the SAMs, but also to all other terrorism operations. IV.3.

### b.     Plaintiffs are dangerous terrorists whose communications create risks.

The evidence establishes that Plaintiffs are not only terrorists, but singularly dangerous

ones who have demonstrated appeal to others in the global terrorist network and whose

communications outside the prison raise significant security concerns. They were successful

participants in one of the most significant terrorist attacks carried out on American soil. I.7.

They have connections with the Islamic Group and the "Blind Sheikh" Abdel Rahman, its

spiritual mentor. I.3-6.

Plaintiffs remained dangerous after their arrest and incarceration. From the confines of

the ADX, the most secure facility in the federal prison system (X.1), Plaintiffs communicated

with members of the "Martyrs for Morocco," a foreign terrorist cell that was planning to execute

---

[10]   References to the statement of facts are by roman numeral and paragraph number,
*i.e.*, "IV.1" refers to fact number 1 in section IV of the statement of facts.

a bombing of the National Justice Building in Madrid.  II.2-3, 6, 14, 16-18, 26-30.

Both Plaintiffs also corresponded with other terrorists and persons affiliated with terrorism before the SAMs were imposed — including a close associate of the "Blind Sheikh" and a self-described member of the Islamic Group's inner-circle in the United States.  II.19-22, 32; *see also* II.23-25 (describing Ayyad's familial connections with terrorism); II.32 (describing Abouhalima's likely correspondence with Samar Alami, convicted in the 1994 bombing of the Israeli embassy in London).  Ayyad's correspondence with Kamel Bourgass, who was convicted in connection with a ricin bioterrorism plot in the United Kingdom, illustrates Plaintiffs' power to attract the attention of the international terrorist network.  II.19.  Within two months of his arrest, Bourgass reached out to Ayyad, after reading one of Ayyad's articles published in *Al Quds*.  II.20.  Ayyad responded with a letter laden with inflammatory rhetoric, inquiring about the charges "the oppressive government" had brought against Bourgass, and praying for the destruction of "enemies of the faith."  II.21.

Plaintiffs also have exerted dangerous influence within the prison — Ayyad among his fellow inmates at USP Terre Haute in connection with an escape and hostage-taking scheme, and Abouhalima in connection with his role in inciting another inmate to execute the murder of a correctional officer at USP Lompoc.  V.12; *see also* III.1-9.  Abouhalima's conduct was of particular concern to the BOP.  An investigation concluded that "Abouhalima's defined leadership role and responsibility among the inmates in the Muslim Community and his ability to plan and execute violent acts presents a significant threat to the staff" at USP Lompoc, and resulted in his transfer to another institution.  III.8-9.

Since the imposition of the SAMs, Abouhalima has engaged in some communications that the government has determined have been intended to radicalize the recipient.  II.33.  The

government has determined that, without SAMs, Abouhalima's communications could continue to compromise national security and the safety of others.  *Id.*

        **c.**        **The connection between the SAMs and the interests is valid and rational.**

The government does not act irrationally when it concludes that some limits on Plaintiffs' communications are warranted.  The government assessed Plaintiffs' dangerousness and determined that SAMs reduce the risk that their communications could inspire future acts of terrorism outside the institution.  V.1-8.  There is information showing that Plaintiffs have hero status in the international terrorist network.  V.2.  Their ability to inspire other like-minded terrorists is manifested in the desire of other terrorists to communicate with Plaintiffs.  V.4.

The government has concluded that, even if Plaintiffs were unaware of the Martyrs' plot or the content of the communications they exchanged appears superficially benign, the danger to national security remains significant.  V.3.  The communications themselves, irrespective of the content, are critical.  Communications with successful terrorists, however benign in content, can reinforce an aspiring terrorist's resolve and assuage the recipient's doubts about carrying out a terrorist attack, particularly where a suicide operation is contemplated.  *Id.*  The government acts rationally when it makes informed predictions based on Plaintiffs' past conduct and implements proactive measures like the SAMs to carefully scrutinize their communications to reduce the risk of additional terrorist strikes.

Incarceration provides no guarantee that a terrorist will be unable to continue to participate in terrorist plots.  V.8.  One of the conspirators in the 1993 World Trade Center bombing helped to orchestrate that attack from prison.  *United States v. Salameh*, 152 F.3d at 107-08 (while incarcerated, Ajaj transmitted coded telephone messages to his co-conspirators).  Convicted terrorist El Sayyid Nosair, while imprisoned for the murder of Rabbi Meir Kahane,

continued to provide suggestions for terrorist attacks to his associates on the outside.  *United States v. Rahman*, 189 F.3d at 105-06.  Nosair also transmitted his suggestions for attacks during prison visits with his associates – two of his visitors being Ayyad and Abouhalima.  *Id.* at 105.  And even with SAMs in place, Abdel Rahman successfully transmitted messages to other terrorists outside the prison.  *See United States v. Stewart*, 590 F.3d at 108.

The SAMs promote institutional security in Plaintiffs' case in two primary ways.  V.9-13.  First, they inhibit Plaintiffs' ability to exert a radicalizing influence on other inmates.  V.10.  Plaintiffs' proven ability to exert influence over their fellow inmates – particularly Abouhalima's role in preparing his fellow inmate to murder a correctional officer at USP Lompoc – supports the government's conclusion that their institutional communications pose significant risks that do not diminish simply because they are in prison.  Even with SAMs in place, two co-conspirators in the 1998 East African embassy bombings, Khalfan Khamis Mohammed and Mamdouh Salim (who are also incarcerated at the ADX with Plaintiffs), collaborated to brutally assault a correctional officer while they were incarcerated at the Metropolitan Correctional Center in New York.  *See United States v. Salim*, 287 F. Supp. 2d at 294-95; *United States v. Salim*, 549 F.3d at 71.

Second, the SAMs diminish the risk that Plaintiffs will themselves be further radicalized by communications to them from outside the prison.  Without SAMs, Plaintiffs would have easier access to communications from terrorist devotees outside the prison that could encourage them to engage in acts of institutional jihad – including hunger strikes or attacks against correctional officers.  V.9-13, 22-23.

A specialized review of inmate communications by counterterrorim professionals is warranted for sophisticated terrorists like Plaintiffs.  The SAMs provide monitoring tools that

heighten the government's ability to detect terrorist connections and decrease Plaintiffs' ability to make those connections.  Merely occasional review of their communications by FBI personnel would not be as effective in protecting the government's interests.  V.16; *see also* Exh. A-1 at ¶¶ 61, 62.

The specific provisions in the SAMs advance the government's interests in particular ways.  Limiting correspondence, visits and telephone calls to immediate family members (and other approved persons) lessens the risks that Plaintiffs can connect with other terrorists.  V.22.[11] The immediate family limitation promotes institutional security by severing Plaintiffs' connection with terrorists outside the institution, particularly those who may be inclined to forward radicalizing "fan mail" that could encourage prison violence.  V.23-24.  By restricting the universe of potential contacts, the immediate family limitation also ensures that the quality of analysis can be maintained, giving FBI personnel the opportunity to develop an in-depth familiarity with the inmate and the persons with whom he communicates.  *See* V.17.  Restrictions on the quantity and length of telephone calls allow communications but reflect constraints on the FBI's review, translation and threat assessment resources, which must be allocated among all SAMs inmates.  V.28.  The 14-business day and 60-day review periods for English and foreign-language mail, respectively, ensure sufficient time to thoroughly translate and analyze the large volume of SAMs communications.  V.26.  Translation and analysis of the communications of

---

[11]  The fact that the SAMs limit interaction with non-immediate family members does not violate any constitutional right.  *See Saleh v. Federal Bureau of Prisons*, No. 05-cv-02467-PAB-KLM, 2010 WL 5464295, *11 (D. Colo. Nov. 23, 2010 ) (evaluating a Fifth Amendment procedural due process claim and noting that difficulties for ADX inmates in engaging in "meaningful interactions with family . . . are a part of the penalty Plaintiffs must pay for their crimes and are certainly not atypical of the ordinary limitations Plaintiffs may experience in interacting with their families were they incarcerated elsewhere in the United States"), *order adopting recommendations*, 2010 WL 5464294 (D. Colo. Dec. 29, 2010).

convicted terrorists can be complicated, and sufficient time is required to ensure that dangerous communications are not missed.

Like the immediate family restriction, the SAMs prohibition on contact with the media prevents Plaintiffs from establishing potential connections with the entire global terrorist network.  V.31.  Before the SAMs, both Ayyad and Abouhalima attracted the attention of other terrorists through published articles.  V.32; *see also* II.20, 28.

The SAMs attorney affirmation provision permits contact with attorneys, but safeguards against the potential for dissemination of dangerous communications from terrorist inmates through their legal counsel.  V.29-30.[12]  The attorney affirmation requirement has not hindered Plaintiffs in obtaining representation by attorneys in both their criminal and civil cases.  VI.11-12.

The SAMs permit broad access to mass communications, prohibiting only those communications that are determined to facilitate criminal activity or be detrimental to "national security; the security, good order, or discipline of the institution; or the protection of the public." V.33, VI.23-25.  This standard is substantially the same as that which limits some access to publications for all federal inmates.  *See* 28 C.F.R. §§ 540.70, 540.71(b) (permitting rejection of publications where they are determined to be "detrimental to the security, discipline, or good order of the institution or [that] might facilitate criminal activity").  The additional limitation on

---

[12]  One attorney's breach of the SAMs led to the transmission of messages to terrorists in Egypt.  *See United States v. Sattar*, 395 F.Supp.2d 79, 85 (S.D.N.Y. 2005) (notwithstanding acknowledgment of SAMs, attorney smuggled messages from her client, "Blind Sheikh" Omar Abdel Rahman, to terrorists in Egypt); *United States v. Stewart*, 590 F.3d at 111-12 (noting that "[w]e have no basis upon which to entertain a doubt as to the authority of the Attorney General of the United States to ensure that reasonable measures [SAMs] are designed and implemented in an attempt to prevent imprisoned criminals who are considered dangerous despite their incarceration from engaging in or facilitating further acts of criminality from their prison cells").

access to publications contained in the SAMs is that classified advertisements and letters to the editor are removed from periodicals.  VI.24.  This restriction diminishes Plaintiffs' opportunity to receive messages from other terrorists.  V.34-35.

Overall, the reasonable limits in the SAMs allow FBI case agents and translators to conduct a comprehensive review of Plaintiffs' communications that maximizes the government's ability to reduce the risk of acts of terrorism and institutional violence resulting from those communications.  These limits also promote the government's interest in effectively allocating FBI review, translation and threat assessment resources by ensuring that resources are available not only for SAMs reviews, but also for other terrorism operations.  IV.3.

## 2.   Factor no. 2:  The SAMs allow a plethora of means to communicate and receive information.

The second *Turner* factor is "whether there are alternative means of exercising the right that remain open to prison inmates...."  *See Turner*, 482 U.S. at 90.  The SAMs allow Plaintiffs to retain numerous means to transmit and receive communications and information.  The second factor thus strongly favors the government.

Plaintiffs may desire even more opportunities to communicate, but the government is not obliged to select the least restrictive means of monitoring their communications.  *Turner* expressly disavowed any "least restrictive alternative" test.[13]  Only the absence of *all* alternative means of expression would mean that the SAMs violate the Constitution.  *See Turner*, 482 U.S. at 92 (regulation is constitutional where it does "not deprive prisoners of *all means of expression*") (emphasis added); *see also Thornburgh*, 490 U.S. at 417-18 ("*Turner* did not

---

[13]   *See Turner*, 482 U.S. at 90-91 ("[P]rison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint.").

require that prisoners be afforded other means of communicating with inmates at other institutions.... [I]t was sufficient if other means of expression (not necessarily other means of communicating with inmates in other prisons) remained available...."). The SAMs do not deprive Plaintiffs of "all means of expression." Rather, they provide extensive opportunities to interact with others and receive information.

Plaintiffs can write to and receive correspondence from others. VI.1-10, 13. They can visit with others, and both have received visitors at the ADX. VI.15-18. They speak with others by telephone. VI.19-22. Ayyad receives four non-legal telephone calls per month, and Abouhalima receives three. VI.20-21. They can talk with other inmates and numerous BOP personnel on a daily basis, and both do talk with others. VI.38-61. Abouhalima has observed that there is a spirit of brotherhood among the inmates in H Unit. VI.46.

Plaintiffs have access to the mass media, including more than sixty television and radio networks. VI.33-35. They can read a vast array of periodicals and newspapers – at least one of which is provided to them free. VI.26, 30-31; *see also* VI.23; VI.30. They can read almost any book in print, with the limited exception of titles that would be deemed to "facilitate criminal activity or present a substantial threat to national security or the security, discipline, or good order of the institution." VI.25-27. They have access to hundreds of library books, including religious and secular titles. VI.28-29. They can use a computerized law library that includes access to LexisNexis, and can gain access to information by participating in the education courses offered to ADX inmates. VI.32, 37.

### 3.   Factor no. 3:  Removal of SAMs would adversely affect the interests.

"A third consideration is the impact accommodation of the asserted right will have on guards and other inmates, and the allocation of prison resources generally." *See Turner*, 482 U.S.

at 90.  Removal of Plaintiffs' SAMs would jeopardize the government's interests – not only the

critical interest of national security, but also important interests in maintaining institutional

security and effectively allocating law enforcement resources.  *See* IV.1-3.  The government has

concluded that a less-comprehensive review would not be as effective for Plaintiffs.  V.17-35

(discussing how SAMs review by counterterrorism professionals and the specific operation of

individual SAMs restrictions promote the government's interests).  This factor strongly supports

the government.

Removing the SAMs would have a negative impact on the "guards and other inmates" in

immediate proximity to Plaintiffs at ADX – the effect that *Turner* held could support a prison

restriction.  But here, the consequences of any error in monitoring Plaintiffs' communications

could be potentially much more serious.  Unlike most inmates, Plaintiffs have the ability to

transmit inspiring communications that could impel aspiring terrorists to carry out an attack.

Were such an attack successful, the result could affect victims both in the United States and

abroad.

The government has determined that SAMs are necessary in Plaintiffs' case to diminish

the potential for such errors, and thus reduce risks not only to "guards and other inmates," but to

persons outside the institution.  This law enforcement judgment is entitled to substantial

deference.  *See Turner*, 482 U.S. at 90 (where accommodating a right could have a negative

"ripple effect" on others, "courts should be particularly deferential to the informed discretion of

corrections officials").

**4.      Factor No. 4:  There are no easy alternative monitoring schemes that show
         that the scheme chosen is irrational.**

The fourth *Turner* factor is whether there are "obvious, easy alternatives" that suggest

that the SAMs are an "exaggerated response" to governmental concerns.  *Turner*, 482 U.S. at 90

("[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation."). Here, the SAMs monitoring regimen bears a direct relationship to the harms it seeks to prevent, and no ready alternatives promote the interests. This factor strongly supports the government.

"When prison officials are able to demonstrate that they have rejected a less restrictive alternative because of reasonably founded fears that it will lead to greater harm, they succeed in demonstrating that the alternative they in fact selected was not an 'exaggerated response' under *Turner*." *See Thornburgh*, 490 U.S. at 419. The government – utilizing the national security and counterterrorism expertise of Department of Justice personnel – has engaged in a comprehensive review of Plaintiffs' circumstances. VII.1-44. Following that extensive review, the government concluded that SAMs monitoring promotes the government's critical interests, including its compelling interest in national security. The decision that Plaintiffs' SAMs are warranted must be accorded special deference. *Beard v. Banks*, 548 U.S. at 528 (holding that, with respect to "matters of professional judgment," a court "must accord deference to the views of prison authorities"); *Citizens for Peace in Space*, 477 F.3d at 1221 (courts "have historically given special deference to other branches" in national security matters "even when constitutional rights are invoked").

Conjecture about different monitoring schemes is not enough to demonstrate that the monitoring the government selected here is exaggerated. Not only does the government have no obligation to select the least restrictive means of communications monitoring, *see Turner*, 482 U.S. at 90-91, but Plaintiffs' history of successfully evading laxer communications restrictions is relevant. When the BOP alone shouldered the task of monitoring Plaintiffs' communications, Plaintiffs successfully transmitted correspondence from the ADX to terrorists located abroad. The fact that, under the BOP review, Plaintiffs were able to communicate with the Martyrs for

nearly two years supports the assessment that SAMs are warranted to prevent such communications.  V.15-21 (facts explaining why SAMs review by counterterrorism professionals is critical to the preservation of the government's interests); *see also* "The Federal Bureau of Prisons' Monitoring of Mail for High-Risk Inmates," U.S. Department of Justice Office of the Inspector General, Evaluations and Inspections Division ("OIG Report") at vi, available at http://www.justice.gov.oig/reports/BOP/e0609/final.pdf.  ("[T]he methods BOP staff use to analyze intelligence for traditional criminal activity are often not sufficient for detecting terrorist activity, which entails analyzing communications in uncommon foreign languages, understanding extremist ideology and radicalization, understanding world-wide terrorism networks, performing link analysis, and overseeing the enforcement of SAMs."); *see also id.* at 29, 37, 44, 47, 48, 68. Careful professional review, with an in-depth understanding of Islamic extremism and world-wide terrorism networks, is precisely what FBI case agents and translators bring to the SAMs review.

A court in this district has evaluated SAMs and found that they are a constitutional means to prevent communications from dangerous terrorists.  In *Al-Owhali v. Holder*, No. 07-cv-02214-LTB-BNB, 2011 WL 288523, *3 (D. Colo. Jan. 27, 2011), the court dismissed a First Amendment claim challenging SAMs nearly identical to those that limit Plaintiffs' communications.  *See also id.* at Doc. 95-1 (Al-Owhali's SAMs) (attached as Exh. I hereto) and Doc. 96-1 (verifying SAMs).  The decision in *Al-Owhali* recognized that the government has "a rational interest in setting the conditions of confinement" for terrorist inmates.  2011 WL 288523, *4.  The government is not obliged to give terrorists yet another opportunity to engage in dangerous communications before it implements restrictions to prevent conduct that could harm its interests. *See Humanitarian Law Project*, 130 S. Ct. at 2728 ("The Government, when

seeking to prevent imminent harms in the context of international affairs and national security, is not required to conclusively link all the pieces in the puzzle before we grant weight to its empirical conclusions.").

## II.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' PROCEDURAL DUE PROCESS CLAIMS.

### A.   Summary of the legal deficiencies of the claims

Plaintiffs' procedural due process claims are that their transfers and alleged "indefinite confinement" in the ADX deprived them of a constitutionally-protected liberty interest, and that they received insufficient process in connection with those deprivations.  Doc. 216 at ¶¶ 131, 136, 141, 146.  The claims further break down into two components.  First, Plaintiffs assert that they cannot transfer out of the ADX because their SAMs would need to be modified before they could progress to the third phase of the H Unit Program, rendering the Program "unavailable and a sham." *Id.* at ¶¶ 110, 111.[14]  Second, they claim that the SAMs block their entry to the ADX Step-Down Program for general population inmates, rendering that program similarly "unavailable and a sham." *Id.* at ¶¶ 112, 113.

These claims fail, for multiple reasons.  Incarceration in the H Unit at the ADX does not deprive them of a protected liberty interest distinct from incarceration in general.  The conditions in H Unit do not vary in any legally significant way from those in the ADX general population units and therefore implicate no liberty interest.  Nor do the SAMs.  Limiting and monitoring a convicted prisoner's communications does not deprive an inmate of a constitutionally protected liberty interest. And, even if there was a deprivation of a protected liberty interest, Plaintiffs received legally sufficient process. *See Zwygart v. Bd. of County Comm'rs*, 483 F.3d 1086, 1093

---

[14]  Ayyad advanced to Phase Three of the Program in September 2010.  IX.27-28.

(10th Cir. 2007) (due process requires evaluation of liberty interest, then of adequacy of process).[15]

## B.     Legal framework

### 1.     Plaintiffs must show a deprivation of a liberty interest distinct from their incarceration.

In *Sandin v. Conner*, 515 U.S. 472, 484, 487 (1995), the Supreme Court held that restrictive prison conditions may implicate a liberty interest protected by the due process clause if they impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005), applied *Sandin* in evaluating whether inmates had a protected liberty interest in avoiding incarceration at a state supermax facility. The inmates in *Wilkinson* were subject to extremely restrictive conditions of confinement consisting of a prohibition on all human contact, including the blocking of cell-to-cell conversations among inmates by solid cell doors; 24-hour illumination of cells; and one hour per day of indoor exercise, with no outdoor exercise whatsoever. *Id.*

But the two factors that tipped the balance in favor of the Court finding a liberty interest were *not* these restrictive conditions alone, but the fact that transfer to the facility resulted in indefinite placement and disqualification from parole eligibility. *Id.* at 224. This potential extension of the length of incarceration was critical in finding that transfer to the prison created a liberty interest. *See id.*

---

[15]  Ayyad's due process claim based on his transfer to the ADX also fails because it is time-barred. The statute of limitations for any civil action against the United States is six years from when the "right of action first accrues." *See* 28 U.S.C. § 2401(a). Ayyad did not file a due process claim challenging his transfer until April 16, 2009, more than six years after his transfer on October 4, 2002. *See* Docs. 3, 14, 47 (no ADX transfer claims in first three complaints); *see also* I.8.

Since *Wilkinson*, courts have found that, where transfer to a supermax facility has no impact on the length of confinement or parole eligibility, there is no liberty interest in avoiding its restrictive conditions. "[A]bsent indefinite placement and disqualification from parole," restrictive conditions of confinement at "supermax" institutions do not deviate from the "ordinary incidents of prison life that inmates have no liberty interests in avoiding." *Townsend v. Fuchs*, 522 F.3d 765, 774 (7th Cir. 2008).

**2.    Minimal procedures satisfy due process, even if there is a liberty interest.**

Even if an inmate can show that he was deprived of a protected liberty interest, he must still show that he did not receive sufficient process. And courts have found that minimal procedures are constitutionally adequate. In *Wilkinson*, the Supreme Court held that such minimal procedures suffice "[w]here the inquiry draws more on the experience of prison administrators, and where the State's interest implicates the safety of other inmates." *Wilkinson*, 545 U.S. at 228-29. *Wilkinson* approved "informal, nonadversary procedures set forth in *Greenholtz*...and *Hewitt v. Helms*..." *Id.* at 228-29 (citing *Hewitt v. Helms*, 459 U.S. 460 (1983), and *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1 (1979)).

In *Greenholtz* and *Hewitt*, the Supreme Court held that inmates receive adequate due process when prison officials "engage in some sort of periodic review" of the decision affecting the inmate. *See Hewitt*, 459 U.S. at 477 n.9. This "periodic review" was found to be sufficient to address a possible transfer to administrative segregation in *Hewitt*, *see* 459 U.S. at 473-76, and, in *Greenholtz*, to address whether the inmate could be released on parole. *See* 442 U.S. at 16. The Supreme Court did *not* require that the inmate be allowed to present statements or other evidence in connection with that review. *See Hewitt*, 459 U.S. at 477 n.9 ("This review will not necessarily require that prison officials permit the submission of any additional evidence or

statements."). The Tenth Circuit has explained that the *Greenholtz/Hewitt* informal review is satisfied by "a relaxed set of procedures":  (1) a sufficient initial level of process, *i.e.*, a reasoned examination of the assignment; (2) the opportunity for the inmate to receive notice and respond to the decision; and (3) safety and security concerns [are] weighed as part of the placement decision." *See DiMarco v. Wyo. Dep't of Corr.*, 473 F.3d 1334, 1344 (10th Cir. 2007) (citing *Wilkinson*, 545 U.S. at 226-27).

**C.      Plaintiffs have no liberty interest in avoiding confinement in ADX.**

**1.      Courts have never found a liberty interest in any ADX unit.**

"[E]very court that has addressed ADX conditions on summary judgment has unanimously found that such conditions are not atypically restrictive." *Saleh*, 2010 WL 5464295, *7 (citing *Jordan v. Federal Bureau of Prisons*, 191 F. App'x 639, 652 (10th Cir. 2006)).  An inmate placed in an ADX general population unit is not deprived of a protected liberty interest.  *See, e.g.*, *Saleh*, 2010 WL 5464295, *16; *Georgacarakos v. Wiley*, No. 07-cv-01712, 2010 WL 1291833, *11-13 (D. Colo. Mar. 30, 2010); *Matthews v. Wiley*, __ F. Supp. 2d __, 2010 WL 3703357, *8-10 (D. Colo. Sept. 13, 2010); *Rezaq v. Nalley*, No. 07-cv-02483-LTB-KLM, 2010 WL 5157313, *8-11 (D. Colo. Dec. 14, 2010); *Muhammed v. Hood*, 100 F. App'x 782, 783 (10th Cir. 2004).  The conditions in ADX administrative segregation also do not deprive inmates of a protected liberty interest.  *See, e.g.*, *Jordan*, 191 F. App'x at 652-53; *Muhammad v. Finley*, 74 F. App'x 847, 849 (10th Cir. 2003).

**2.      Plaintiffs received process to address their confinement in ADX.**

Even if the ADX conditions created a liberty interest, Plaintiffs received constitutionally sufficient process to address their transfers under the *Greenholtz/Hewitt* informal review criteria approved by the Supreme Court in *Wilkinson*.  *See DiMarco*, 473 F.3d at 1344.  Plaintiffs

76

received multiple levels of review prior to their transfers.  XI.1-8.  They recently were given

hearings to address their placement at the ADX, in which they participated and gave statements.

XI.9-56.  They have received classification reviews and continue to receive Progress Reports and

semi-annual Program Reviews.  XI.57-75.  And, as discussed below, Plaintiffs receive additional

reviews in connection with the annual evaluation of their SAMs.  VII.1-44.

**D.**     **Confinement in H Unit with SAMs does not create a liberty interest.**

Plaintiffs have no protected liberty interest in avoiding either H Unit or SAMs.  *DiMarco*

*v. Wyo. Dep't of Corr.*, 473 F.3d 1334 (10th Cir. 2007), referenced four factors for evaluating the

existence of a liberty interest in the context of an inmate's placement in administrative

segregation.[16]  The *DiMarco* factors provide a framework for the liberty interest analysis here.

There is no genuine dispute that (1) there are legitimate penological interests; (2) neither H Unit

nor the SAMs are legally extreme; (3) placement in H Unit or imposition of SAMs does not

impact length of confinement; and (4) the conditions are not indefinite, but receive frequent

reviews.

**1.**     **There are legitimate penological interests.**

The government has set forth myriad facts showing legitimate penological interests

based on Plaintiffs' past terrorist activity, communications with other terrorists and institutional

misconduct, and the manner in which the SAMs promote the interests.  I.1-11; II.1-33; III.1-9;

IV.1-3; V.1-35.   This factor strongly favors Defendants.  *See DiMarco*, 473 F.3d at 1342-43.

**2.**     **Neither H Unit nor the SAMs are legally extreme.**

---

[16]  *DiMarco* held that non-dispositive "[r]elevant factors might include whether (1) the
segregation relates to and furthers a legitimate penological interest, such as safety or
rehabilitation; (2) the conditions of placement are extreme; (3) the placement increases the
duration of confinement...; and (4) the placement is indeterminate..." *DiMarco*, 473 F.3d at
1342.

The evidence establishes that neither the conditions in H Unit nor the SAMs are extreme. The second *DiMarco* liberty interest factor strongly favors Defendants. *See* 473 F.3d at 1342-43.

### a.      H Unit conditions are like those in the ADX general population.

In contrast to the inmates in *Wilkinson,* H Unit inmates have control over their lights, can participate in outdoor exercise, have regular contact with staff, can converse with other inmates and have social visitors, and have a cell door with a window.   These "key differences" between H Unit conditions and those at issue in *Wilkinson* show that H Unit does not implicate a liberty interest. *See Rezaq*, 2010 WL 5157317, *9; *see also Saleh*, 2010 WL 5464295, *10.  The conditions in H Unit are nearly identical to those in the ADX general population and Step-Down Program units, which no court has found to deprive an inmate of a liberty interest:

- H Unit inmates are singled-celled, just like all other ADX inmates.  X.5.

- H Unit inmates have the same amount of living space as all other ADX inmates.  X.6.

- H Unit cells are configured exactly the same as the cells in the ADX general population Step-Down Program Units, with solid outer doors with windows that look out onto the range.  Inmates can see and converse with persons passing by.  X.8-9.

- H Unit cells, like the cells in the ADX general population and Step-Down Program units, have windows that look outside and provide natural light.  X.10.

- H Unit cells, like the cells in the ADX general population and Step-Down Program units, have lights the inmate controls and can turn completely off.  X.11.

- H Unit inmates have access to the Special Security Unit Program, the counterpart program to the ADX general population Step-Down Program.  IX.3.

- H Unit inmates in Phase One and Phase Two of the Special Security Unit Program receive the same amount of out-of-cell recreation as ADX general population unit inmates:  a minimum of ten hours per week.  X.16.

- H Unit inmates, like ADX general population inmates, have out-of-cell recreation with up to five other inmates in secure single recreation areas grouped together on a large recreation yard.  X.17.

78

- All ADX inmates, including H Unit inmates, have individual black-and-white televisions which provide access to the date and time.  X.23, 25.

- Plaintiffs have access to the same 60 television and radio networks available to ADX general population inmates.  X.24.

- H Unit inmates have access to the same institution-provided education courses, wellness programs and special leisure activities available to all ADX inmates.  X.26.

- H Unit inmates, like all ADX inmates, may work as Unit orderlies.  X.28.

- All ADX inmates, including H Unit inmates, have daily contact with prison staff and other inmates – as well as numerous other opportunities to communicate and receive information.  VI.1-61; X.21; *see also Rezaq*, 2010 WL 5157317, *11.

None of these conditions is objectively "extreme" for inmates incarcerated in high-security settings.  *See Georgacarakos*, 2010 WL 12913833, *13.

Plaintiffs' ineligibility for the Step-Down Program for ADX general population inmates (*see* Doc. 216 at ¶¶ 110-111) also does not show extreme conditions.  The existence of step-down programs does not mean that inmates have a liberty interest in avoiding other units in the prison.  *See, e.g.*, *Bradsha*w v. Lappin, 738 F. Supp. 2d 1143, 1155 (D. Colo. 2010) (no liberty interest associated with loss of access to ADX-down program as a result of inmate's refusal to participate in Inmate Financial Responsibility Program) (no liberty interest associated with loss of access to ADX step-down program); *Muhammad v. Hood*, 100 F. App'x at 783 (removal of inmate from step-down program to more restrictive unit does not create a liberty interest).  And the record does not show that the H Unit Program is a "sham" because Plaintiffs cannot gain access to Phase Three absent a modification to the SAMs.  Ayyad did obtain a modification of his SAMs and is participating in Phase Three.  IX.27-28.  Nor is the Step-Down Program a prerequisite for transfer out of the ADX.  Inmates whose SAMs are removed may be placed in any institution the BOP deems appropriate for their security level.  VII.45.

79

### b.      The SAMs are not an atypical restriction on inmate communications.

The SAMs do not make Plaintiffs' conditions legally extreme compared to other inmates. On the contrary, limitations on unfettered communications between inmates and the outside world are a hallmark of prison life, not a "dramatic departure" from it.  *See Sandin*, 515 U.S. at 485.  Even a complete ban on an entire category of inmate communications does not rise to the level of a protected liberty interest.  *See, e.g., Bazzetta v. McGinnis*, 430 F.3d 795, 802-03 (6th Cir. 2005) (prison regulation banning all visitation for inmates found guilty of two or more major misconduct charges of substance abuse held not to create an enforceable liberty interest); *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 461 (1989) (denial of prison access to particular visitors "is well within the terms of confinement ordinarily contemplated by a prison sentence" and did not create a liberty interest in receiving visitors).  "[F]reedom of association is among the rights least compatible with incarceration...[such that] curtailment of that freedom must be expected in the prison context."  *Overton v. Bazzetta*, 539 U.S. at 131 (internal citation omitted).

To be sure, the SAMs provide additional restrictions required to ensure effective monitoring of the communications of particularly dangerous inmates, such as successful terrorists like Plaintiffs.  But these are differences of degree, not kind, compared with non-SAMs restrictions on inmate communications.  SAMs are simply one form of restrictions on an inmate's ability to communicate and receive information, similar in kind to limitations applicable to all other ADX inmates, especially those who are subject to general correspondence and special mail restrictions pursuant to 28 C.F.R. §§ 540.15 and 540.18(c):[17]

---

[17]   All information contained in this summary table is based on facts referenced in the government's statement of facts.  *See also generally* Exh. B-1 (Declaration of ADX Associate Warden Louis J. Milusnic); Exh. D-1 (Declaration of ADX Executive Assistant Mark Collins); 28 C.F.R. §§ 540.14, 15, 18, 70-72, 100.

| SAMs | ADX GENERAL POPULATION | RESTRICTED GENERAL CORRESPONDENCE/SPECIAL MAIL STATUS (28 C.F.R. §§ 540.15, 540.18(c)) |
|---|---|---|
| Inmates are single-celled | Inmates are single-celled | Inmates are single-celled |
| No group activity with physical contact (except in Phase Three of Special Security Unit Program), including no group worship | No group activity with physical contact (except ADX general population Step-Down Program), including no group worship | No group activity with physical contact (except ADX general population Step-Down Program), including group worship |
| All communications are monitored pursuant to the terms of the SAMs | All communications are subject to monitoring, *see* 28 C.F.R. §§ 540.14, 540.100(a), 540.102 | All communications are subject to monitoring, *see* 28 C.F.R. §§ 540.14, 540.100(a), 540.102 |
| Incoming and outgoing non-legal correspondence reviewed | Incoming and outgoing non-legal correspondence subject to reading and inspection, *see* 28 C.F.R. §§ 540.14(a), 540.12(b), 540.14(c)(2) | Incoming and outgoing non-legal correspondence reviewed |
| Non-legal correspondence limited to immediate family members and other approved individuals | No limitations on non-legal correspondents | Non-legal correspondence limited to immediate family members and former business associates, but additional restrictions are possible if institutional security is at risk |
| No limit on amount of incoming/outgoing non-legal correspondence to immediate family members and other approved individuals | No limit on amount of incoming/outgoing non-legal correspondence | No limit on amount of incoming/outgoing non-legal correspondence to approved individuals |
| Outgoing mail to government entities subject to review/inspection | Mail to and from government entities not inspected | Outgoing mail to government entities subject to inspection |
| Two 15-minute social telephone calls per month for Phase One inmates/three 15-minute social telephone calls per month for Phase Two inmates/four 15-minute social telephone calls per month for Phase Three inmates | Two 15-minute social telephone calls per month | Two 15-minute social telephone calls per month |
| No set limits on social visits with immediate family members and other approved individuals | 5 social visits per month | 5 social visits per month |
| All visits are non-contact | All visits are non-contact | All visits are non-contact |
| Extensive access to publications which are reviewed and approved by BOP (§ 540.70-72) | Extensive access to publications which are reviewed and approved by BOP (§ 540.70-72) | Extensive access to publications which are reviewed and approved by BOP (§ 540.70-72) |

| SAMs | ADX GENERAL POPULATION | RESTRICTED GENERAL CORRESPONDENCE/SPECIAL MAIL STATUS (28 C.F.R. §§ 540.15, 540.18(c)) |
|---|---|---|
| Daily opportunities to interact with other inmates and BOP staff | Daily opportunities to interact with other inmates and BOP staff | Daily opportunities to interact with other inmates and BOP staff |
| Opportunities to participate in educational and recreation programs | Opportunities to participate in educational and recreation programs | Opportunities to participate in educational and recreation programs |
| Access to religious and leisure library materials | Access to religious and leisure library materials | Access to religious and leisure library materials |
| Plaintiffs have access to 60 television networks, including real-time news | Access to 60 television networks, including real-time news | Access to 60 television networks, including real-time news |

In sum, the conditions of confinement for SAMs inmates housed in the ADX H Unit

under SAMs are not legally extreme, but are like restrictions for other ADX inmates.

### 3.     The SAMs do not impact Plaintiffs' length of confinement.

A third crucial factor in determining whether an inmate has been deprived of a liberty

interest is whether the inmate's length of confinement is extended.  Here, neither the SAMs nor

incarceration in H Unit deprives Plaintiffs of parole eligibility and, therefore, does not extend the

length of their incarceration.  X.3-4.  This "crucial factor" thus weighs strongly against finding a

liberty interest in connection with either incarceration in H Unit or the SAMs themselves.  *Saleh*,

2010 WL 5464295, *13; *see also DiMarco*, 473 F.3d  at 1342.

### 4.     The conditions are not indefinite.

In an inmate's deprivation is legally indefinite, that factor can support a finding that the

inmate has been deprived of a liberty interest.  But conditions are not legally "indefinite" if the

inmate receives regular reviews of those conditions.  *See DiMarco*, 473 F.3d at 1343-44

(confinement not indefinite where inmate had regular evaluations with management team who

interviewed her); *see also Rezaq*, 2010 WL 5157317, *12 (holding that status not indeterminate

where ADX inmate received six-month Program Reviews); *Saleh*, 2010 WL 5464295, *14

(same).  This factor supports the government because Plaintiffs receive at least two forms of

reviews.

A comprehensive, multi-level review by Department of Justice personnel precedes the

imposition and annual renewals of the SAMs, and has yielded information considered in

decisions not to renew SAMs.  VII.1-42, 44; *see also* VII.43 (SAMs of 11 former H Unit inmates

have been removed).  Plaintiffs participate by submitting written comments and meeting in

person with government officials.  VII.24-34.  The second form of review is Program Reviews,

which occur at least two times each year and determine Plaintiffs' level of placement in the

Special Security Unit Program.  IX.15-25; XI.61-71.  This additional review gives the inmate an

opportunity to demonstrate positive behavior that officials can take into account in the SAMs

assessment.  IX.2.

In sum, nothing about Plaintiffs' conditions of confinement – including the conditions in

H Unit, the SAMs themselves or a combination of the two – creates a liberty interest.

**E.      Plaintiffs received sufficient process because the SAMs are reviewed.**

Even if Plaintiffs could establish a protected liberty interest in their placement in H Unit

with SAMs, they have been received adequate process.  The *DiMarco* framework shows that the

SAMs surpass the minimal requirements of the *Greenholtz/Hewitt* informal review.  *DiMarco*,

473 F.3d at 1344 (setting forth four-factor framework for evaluating sufficiency of process).

**1.      There is a reasoned examination of the need for SAMs.**

The SAMs procedures satisfy the first *DiMarco* process factor – that there was a

reasoned examination of the need for the restriction.  *See* 473 F.3d at 1344.  A comprehensive,

multi-level review by Department of Justice personnel with counterterrorism expertise and

familiarity with Plaintiffs' criminal background and connections with terrorism, precedes the imposition and annual renewals of SAMs.  VII.1-42, 44.  And, although there is no constitutional requirement that Plaintiffs be allowed to participate in any process connected with the SAMs decision, their input is sought.  VII.24-34; *see also Hewitt*, 459 U.S. at 477 n.9 (due process does not require "submission of any additional evidence or statements" by the inmate).  The fact that Plaintiffs remain on SAMs at this time does not mean that the review was insufficient.  It is axiomatic that due process "does not depend upon the merits of a claimant's substantive assertions" or on a particular outcome.  *See Carey v. Piphus*, 435 U.S. 247, 266 (1978).

### 2. Plaintiffs receive notice and an opportunity to respond.

The SAMs procedures meet the second *DiMarco* process factor – an opportunity to receive notice and respond to the decision.  *See* 473 F.3d at 1344.

### a. They received notice.

It is clear from the SAMs themselves that Plaintiffs have received notice that complies with the *DiMarco* standard.[18]  The SAMs describe the government's concerns about Plaintiffs' dangerousness.  Exh. B-1, Att. 3 at US 15095-96; *id.*, Att. 4 at USAB 14941-42.  They also inform Plaintiffs of the reasons for specific categories of communication restrictions, including the limitations on mail and telephone contact; the mail review periods; the attorney affirmation requirement; and the prohibition on contact with the media.  *Id.*, Att. 3 at US 15108-09; *id.*, Att. 4 at USAB 14953-54.

### b. They received an opportunity to respond.

Plaintiffs have at least two means to address SAMs decisions – before renewal and after

---

[18]  The notices Plaintiffs received comply with the requirements in the SAMs regulation.  *See* 28 C.F.R. § 501.3(b) ("The notice's statement as to the basis may be limited in the interest of prison security or safety or to protect against acts of violence of terrorism.").

renewal.  They can provide input prior to renewal, both in writing and in person.  VII.24-34.

After renewal, they can use the BOP Administrative Remedy Program to challenge the decision.

*See* 28 C.F.R. § 501.3(e); 28 C.F.R. §§ 542.10-19; *see also* VIII.1-5.  An inmate can challenge

SAMs through the Administrative Remedy Program.

The evidence shows that the administrative remedy process can address SAMs decisions.

Administrative remedies filed by inmates have resulted in modifications of SAMs that have

expanded the inmates' opportunities to communicate and receive information.  VIII.6-14; *see*

*also Yousef v. Reno*, 254 F.3d 1214, 1222 (10th Cir. 2001) (noting that "the Attorney General

emphasizes that the BOP can and does evaluate the merits of individual constitutional challenges

and may modify particular conditions of an inmate's confinement").

### 3.     Safety and security concerns are weighed.

The SAMs procedures meet the third *DiMarco* process factor – that safety and security

concerns were weighed as part of the decision.  Officials with counterterrorism expertise have

thoroughly evaluated Plaintiffs' circumstances and have determined that SAMs advance many

legitimate penological interests.  I.1-11; II.1-33; III.1-9; IV.1-3; V.1-35.

In sum, Plaintiffs' due process claims fail because they have not been deprived of a

protected liberty interest.  And, even if such a liberty interest existed, they have received

sufficient process.

**CONCLUSION**

For the reasons stated, Defendants, in their official capacities, request that the Court enter judgment in their favor and against Plaintiffs on all claims set forth in the Third Amended and Consolidated Complaint.  Doc. 216.

Respectfully submitted this <u>25th</u> day of March, 2011.

JOHN F. WALSH
United States Attorney

<u>s/ *Susan Prose*            </u>
SUSAN PROSE
Assistant United States Attorney
1225 Seventeenth Street, Suite 700
Denver, CO  80202
Telephone:  (303) 454-0100
Fax: (303) 454-0407
E-mail: susan.prose@usdoj.gov

Counsel for Defendants

86

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on <u>March 25, 2011</u>, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

eramey@ir-law.com
lrovner@law.du.edu
rraghunath@law.du.edu

and I hereby certify that I have mailed or served the document or paper to the following non-CM/ECF participant in the manner indicated by the non-participant's name:

**Benjamin J. Brieschke** (email)

_s/ Susan Prose_____
United States Attorney's Office

87