# Plaintiffs' Response to Defendants' Motion for Summary Judgment [Doc. 285] (redacted)

## *Ayyad v. Holder*

## No. 05-cv-02342-WYD-MJW

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 05-cv-02342-WYD-MJW
      (as consolidated with Civil Action No. 05-cv-02653-WYD-MJW)

NIDAL AYYAD, et al.,

      Plaintiff,

v.

ERIC H. HOLDER, JR., Attorney General of the United States, et al,

      Defendants.

---

**PLAINTIFFS' RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 259)**

---

      Plaintiffs, through counsel, hereby respond to Defendants' Motion for Summary

Judgment (the "Motion") (Doc. 259).

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................... 1

RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS................ 3

I.   PLAINTIFFS' CRIMES OF CONVICTION ..................................................... 3

   A.   **Plaintiffs were convicted in 1994 of participating in a plot to bomb the
World Trade Center** .......................................................................... 3

   B.   **Defendants' allegations regarding Plaintiffs' affiliations**............................ 3

   C.   **Plaintiffs are currently incarcerated at the ADX with SAMs**....................... 5

II.   DEFENDANTS' INVESTIGATIONS OF PLAINTIFFS'
COMMUNICATIONS WITH SPANISH PRISONERS........................................... 5

   A.   **FBI investigations and media exposure of Plaintiffs' correspondence** ........ 5

   B.   **Defendants' allegations regarding Plaintiffs' correspondence**...................... 7

      1.   **Defendants' allegations regarding Ayyad's pre-SAMs correspondence** . 8

      2.   **Defendants' allegations regarding Abouhalima's pre-SAMs
correspondence**........................................................................... 10

III.   DEFENDANTS' ALLEGATIONS REGARDING PLAINTIFFS' PRE-
SAMs COMMUNICATIONS WITHIN THEIR RESPECTIVE PRISONS ........ 12

   A.   **Defendants' allegations regarding Ayyad's pre-SAMs communications** .. 12

   B.   **Defendants' allegations regarding Abouhalima's pre-SAMS
communications**................................................................................ 12

IV.   DEFENDANTS' GOVERNMENTAL INTEREST..................................... 14

V.   DEFENDANTS' JUSTIFICATIONS FOR IMPOSITION OF THE SAMs. 14

   A.   **Defendants' "national security" concerns** .................................................. 14

   B.   **Defendants' "prison security" concerns** ...................................................... 19

   C.   **Involvement of counterterrorism professionals** ........................................... 23

   D.   **Defendants' justifications for the specific SAMs imposed on the Plaintiffs**
26

      1.   **Inhibiting dangerous messages or communications with terrorists**....... 26

      2.   **Attorney affirmation requirements**............................................................. 29

      3.   **Contact with the media**................................................................................ 29

      4.   **Classified advertisements and letters to the editor** ................................. 30

VI.   WHAT THE SAMs DO NOT PROHIBIT .................................................. 31

   A.   **Permitted correspondence**........................................................................... 31

   B.   **Permitted visits**.......................................................................................... 35

   C.   **Telephone calls** .......................................................................................... 36

    **D.**    **Reading materials, mass communications, and educational programs**..... 36

    **E.**    **Contact with other persons** ...................................................................... 39

  **VII.**    **PROCEDURES FOR IMPOSING AND RENEWING SAMs** ................... 43

    **A.**    **SAMs imposition** ........................................................................................ 44

    **B.**    **SAMs renewals** .......................................................................................... 48

      **1.**    **Prisoner written comments** ................................................................. 50

      **2.**    **Prisoner interviews** ............................................................................. 50

      **3.**    **Renewal decision** ................................................................................. 52

      **4.**    **Non-renewal decisions** ........................................................................ 54

  **VIII.**    **BOP's ADMINISTRATIVE REMEDY PROGRAM** ............................ 54

  **IX.**    **ADX SPECIAL SECURITY UNIT PROGRAM** ..................................... 59

  **X.**    **LIVING CONDITIONS IN H-UNIT** ...................................................... 66

  **XI.**    **PLAINTIFFS' TRANSFERS TO THE ADX** .......................................... 70

    **A. No Meaningful Review Preceded the Plaintiffs' Transfers to the ADX** ........ 70

    **C. Other Reviews of the Plaintiffs** .................................................................. 83

  **XII.**    **GENERAL BOP LIMITATIONS UPON AND MONITORING OF PRISONER COMMUNICATIONS** ................................................................... 85

**PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS** ........................................ 87

  **Background Information** ............................................................................................ 87

  **The Plaintiffs' Conditions of Confinement in United States Penitentiaries before the September 11th Attacks** ............................................................................. 87

  **The Plaintiffs' Institutional Histories** ..................................................................... 89

  **The Plaintiffs' Transfers to Segregation and the ADX After the September 11th Attacks** ............................................................................................ 90

  **The Plaintiffs' Correspondence with Spanish Prisoners** ........................................ 92

  **Imposition of the SAMs on the Plaintiffs** ................................................................ 93

  **The Plaintiffs' Communications with Family Members Under the SAMs** ........... 94

  **The Plaintiffs' Conditions of Confinement** ............................................................. 97

  **The SAMs Themselves** ............................................................................................... 99

**STANDARD FOR CONSIDERATION OF MOTIONS FOR SUMMARY JUDGMENT** ...................................................................................................................... 110

**ARGUMENT** .......................................................................................................................... 111

  **I.**    **First Amendment** ............................................................................................. 111

    **A.**    **There Are Genuine Issues of Material Fact as to Whether the SAMs Restrictions on the Plaintiffs'** *Outgoing* **Communications Are Greater than "Necessary or Essential" to Protect "Important or Substantial" Interests** ..... 112

**1.    The Actual Restrictions on Plaintiffs Do Not Reduce the Risk of Bodily Injury or Violence, As No Such Risk Exists for Either Plaintiff** ................. 114

**2.    The Defendants Cannot Identify Actual Harms That Would Result If Plaintiffs' Communications Were Not Restricted, As None Exist** ............... 115

B.    **There Are Genuine Issues of Material Fact As to Whether the SAMs' Restrictions on Plaintiffs'** *Incoming* **Correspondence Are "Reasonably Related" to "Legitimate Government Interests."** ............................................................... 117

**1.    No Valid, Rational Connection Exists Between Defendants' Asserted Interests and the SAMs Restrictions** ................................................................ 117

**2.    The SAMs Foreclose Any Alternative Means By Which the Plaintiffs May Exercise Their First Amendment Rights** .................................................. 119

**3.    The Effect of Accommodating the Exercise of the Right** ...................... 120

**4.    There are Existing, Ready Alternatives to the SAMs That Can Be Implemented Without Harm to Any Valid Penological Interests** ................ 121

**II.    Due Process** ................................................................................................................ 122

A.    **Plaintiffs' ADX Confinement, Coupled With the SAMs, Gives Rise to a Liberty Interest** ...................................................................................................... 122

**1.    Legitimate Penological Interest** ............................................................... 125

**a.    The Alleged "Legitimacy" of Defendants' Interests Should Be Afforded Only Minimal Weight in the Liberty Interest Analysis** ............ 125

**b.    There Are Multiple Factual Disputes About the Legitimacy of Defendants' Asserted Interests in Imprisoning Plaintiffs at the ADX and Under SAMs** .................................................................................................. 127

**2.    There are genuine issues of material fact about whether Plaintiffs' conditions are "extreme."** ................................................................................. 129

**3.    The length of Plaintiffs' sentences, coupled with the elimination of federal parole, renders the third** *DiMarco* **factor irrelevant** ......................... 133

**4.    Plaintiffs' Conditions of Confinement Are Indefinite** .......................... 134

B.    **The Plaintiffs Have Not Been and Are Not Being Accorded Due Process** 139

**1.    The Private Interest Being Affected** ........................................................ 139

**2.    Risk of Erroneous Deprivation and Value of Substitute Procedures** ... 140

**a.    The Plaintiffs' Original Transfers to the ADX** ................................. 141

**b. The Absence of Process For the Imposition of the SAMs** ..................... 143

**c.    The Absence of Meaningful Periodic Review of Either ADX** ......... 144

**3.    The Government's Interest Does Not Outweigh the First Two** *Mathews* **Factors** ............................................................................................................... 147

**CONCLUSION** ................................................................................................................ 148

## **INTRODUCTION**

Plaintiffs Nidal Ayyad and Mahmud Abouhalima are federal inmates incarcerated at the United States Penitentiary – Administrative Maximum ("ADX") in Florence, Colorado. They have brought this case asserting claims under the First and Fifth Amendments to the Constitution of the United States regarding (1) restrictions upon their incoming and outgoing communications at the ADX and (2) the imposition and maintenance of extreme conditions of confinement at the ADX without constitutionally mandated access to due process of law. Both of the Plaintiffs are subject to Special Administrative Measures ("SAMs") imposed by the Defendants under the authority of the Attorney General.

The Plaintiffs were convicted of crimes associated with the bombing of the World Trade Center in New York City in 1993. Since late 2002 and early 2003, respectively, Mr. Ayyad and Mr. Abouhalima have been incarcerated in the ADX under the most extreme and restrictive conditions existing in the federal prison system. These conditions have been exacerbated and rendered indeterminate by the imposition of the SAMs in 2005.

While this case does not involve a facial attack upon the validity of the SAMs, the Plaintiffs would present evidence at trial to demonstrate that the imposition and maintenance of the SAMs – especially at the level of severity involved – was and is both unwarranted by the facts particular to these Plaintiffs and motivated in large part by political embarrassment of various public officials. This has resulted in a violation of Mr. Ayyad's and Mr. Abouhalima's First Amendment rights with regard to both incoming and outgoing correspondence while in prison, and has effectively blocked their ability to

earn their way out of the extreme conditions of confinement to which they are being improperly and indeterminately subjected. The evidence at a trial would further demonstrate that neither of the Plaintiffs have been or are being accorded an opportunity to address these issues consistent with the basic requirements of due process.

As set forth below, there are numerous and substantial disputed issues of material fact in this case. Entry of summary judgment as requested by the Defendants would be neither proper nor appropriate under Fed.R.Civ.P. 56.

## RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

I.     **PLAINTIFFS' CRIMES OF CONVICTION.**

**A. Plaintiffs were convicted in 1994 of participating in a plot to bomb the World Trade Center.**

1.     Both of the Plaintiffs maintain their innocence of the charges for which they are incarcerated. Declaration of Mahmud Abouhalima ("Abouhalima Decl"), Ex. 1 at ¶¶ 21-35, 47, and 50; Declaration of Nidal Ayyad ("Ayyad Decl."), Ex. 2 at ¶¶ 8-22.

2.     Undisputed.

**B.     Defendants' allegations regarding Plaintiffs' affiliations.**

3.     Disputed.  Plaintiffs are not now and never have been associated with al-Gama'a al-Islamiyya (Islamic Group).  Ex. 2 at ¶¶ 21-22; Ex. 1 at ¶¶ 26-30 and 49; AB014741, Ex. 3 (███████████████████████████████);
AB014766, Ex. 4 (████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████). See also US010828-31, Ex. 5 (███████
█████████████████████████████████████████████)
and US10832-US10837, Ex. 6 (███████████████████████████).

4.     Undisputed.

5.     Partially disputed.  At no time during its prosecution of Mr. Ayyad and Mr. Abouhalima did the government ever assert that either of them was an "Islamic Group operative," let alone "important" ones. See United States v. Salameh, 152 F.3d 88 (2d Cir. 1998); and United States v. Salameh, 54 F. Supp. 2d 236 (S.D.N.Y. 1999) (no

---

[1] While adhering to Defendants' organization and categorization, Plaintiffs have been compelled to re-state the more argumentative and very much contested headings utilized in the Motion.

mention of Islamic Group); Ex. 2 at ¶ 21; Ex. 1 at ¶ 27.  Depo. of FBI Agent Donald

Shannon, Ex. 7 at 74:4-10 (acknowledging that Plaintiffs were "participants/

coconspirators" but not "leaders" in the plot).  Additionally, Defendants' own documents

demonstrate that the government does not consider them to be "important Islamic Group

operatives."  See AB014502 – AB14505 (H-Unit Classification Summary for

Abouhalima), Ex. 8 -

); US010825 (H-Unit Classification

Summary for Mr. Ayyad), Ex. 9 - (

).

    6.    Partially disputed. The citation provided does not state that Rahman was

"the spiritual leader of the Islamic Group," nor is such a fact material to the claims at

issue in this case.  See United States v. Rahman, 189 F.3d 88, 107 (2d Cir. 1999) (no

mention of the "Islamic Group").

    7.    Disputed as to the implication that Plaintiffs are followers of Rahman.

Neither of the Plaintiffs were ever "followers" of Rahman, or members of any group

under his leadership in the manner described in their original criminal convictions. Ex. 1

at ¶¶ 21-25; Ex. 2 at ¶¶ 21-22.

### C.  Plaintiffs are currently incarcerated at the ADX with SAMs.

8.      Undisputed.

9.      Undisputed.

10.     Undisputed.

11.     Undisputed.

## II.  DEFENDANTS' INVESTIGATIONS OF PLAINTIFFS' COMMUNICATIONS WITH SPANISH PRISONERS.

1.      Disputed.  Plaintiffs were corresponding with Muslim prisoners incarcerated in Spain, not knowing that those prisoners were "members of a terrorist cell."  Ex. 1 at ¶¶ 121-127; Ex. 2 at ¶¶ 89-97.  In February 2004, Plaintiffs were told by ADX staff to stop corresponding with the Spanish prisoners, and both immediately complied. Ex. 1 at ¶ 127; Ex. 2 at ¶ 97.

### A.  FBI investigations and media exposure of Plaintiffs' correspondence.

2.      Undisputed.

3.      Plaintiffs are not in a position to confirm or dispute this assertion.

4.      Disputed.  Mr. Ayyad did not correspond with Mohammed Achraf.  Ex. 2 at ¶¶ 93-94, 96.

5.      Undisputed.

6.      Plaintiffs are not in a position to confirm or dispute this assertion.

7.      Partially disputed. The Motion states that "Plaintiffs were corresponding," but both Plaintiffs had ceased their correspondence with those prisoners at the request of the BOP by approximately March 2004.  See FBI Memo, Ex. 10 at US004952 ("Effective 3/23/04, the BOP halted all correspondence from Achraf to inmates . . . "); see also Ex. 1 at ¶ 127.

8.      Plaintiffs are not in a position to confirm or dispute this assertion.[2]

9.      Partially disputed.  Plaintiffs were aware at all relevant times that their mail was being monitored and reviewed by the BOP.  See Ex. 11 - US004996 (memo from FBI re translations of Mr. Ayyad's letters to Spanish prisoners) ("it is clear that he is quite aware of the fact that all of his correspondence is inspected by the prison officials.  And he tells all those that he corresponds with of this fact.  So the likelihood of either he or those writing him of slipping him any sensitive information is remote").  In February 2004, Plaintiffs were told by the BOP to stop corresponding with Spanish prisoners. The Plaintiffs complied with the order to stop immediately after it was given. Ex. 1 at ¶¶ 121-127; Ex. 2 at ¶¶ 97.  At the time of the Leyman email (October 25, 2004), all correspondence with the Spanish prisoners had stopped.  See Ex. 10.

Additionally, it was also in or around October 2004 that *Al-Hayat*, one of the most widely-read Arabic newspapers, see http://en.wikipedia.org/wiki/Al-Hayat, reported that the European authorities who had arrested Achraf had found letters in his possession indicating that he had corresponded with some of the men from the 1993 World Trade Center bombing case, which the Plaintiffs read about in copies of the newspaper that came to them via the Defendants. Ex. 1 at ¶ 128.

10.      Partially disputed.  By January 2005, Plaintiffs' correspondence with the Spanish prisoners had been halted by the Plaintiffs at the Defendants' request for nearly a year.  Ex. 1 at ¶¶ 121-127; Ex. 2 at ¶¶ 97, 112.

---

[2] Many of the documents produced in this case have been heavily (sometimes completely) redacted, making it difficult to determine what information was in the possession of the Defendants and when.

11.     Partially disputed.  See response to ¶ 9, supra.  Additionally, the FBI could not credibly have been concerned that the NBC report would alert either of the Plaintiffs that the "authorities had possession of and were analyzing the correspondence," as Plaintiffs were already aware that all of their incoming and outgoing mail was being reviewed and they had already stopped corresponding with the Spanish prisoners a year earlier, after the BOP told them to do so.  Ex. 1 at ¶¶ 121-127; Ex. 2 at ¶ 97; Ex. 10 (showing that BOP had stopped Plaintiffs' correspondence with Spanish prisoners in 2004); Ex. 12 - US004820 (same, and stating, "Among the key points of the proposed NBC story will be 'how could the BOP let this happen.'  Actually, the BOP eventually detected that the correspondence was addressed to other inmates and it was stopped").

12.     Partially disputed.  The FBI could not credibly have made such a determination, where there had already been an earlier media report about this correspondence in the widely-read Arabic-language newspaper *Al-Hayat*, which Mr. Abouhalima had read, and which the FBI had also read, as that copy of the newspaper passed through the FBI's hands during the pendency of its claimed investigation.  Ex. 1 at ¶ 128.

13.     Undisputed that in March 2005, the government imposed the SAMs on Plaintiffs.  As set forth in detail throughout this response, the accuracy of the facts and the conclusions contained in the imposition memo are heavily disputed.

**B.  Defendants' allegations regarding Plaintiffs' correspondence.**

14.     Plaintiffs are not in a position to confirm or dispute this assertion.

15.     Disputed.  The letter authored by Nidal Ayyad that Defendants rely upon to support this fact was not a letter to Mohammed Achraf.  It is an attachment to a letter

that Ayyad wrote to Mimon, requesting that it be sent to "Mohammed."  See Ex. 13 - US014493.  The intended recipient was Mohammed Salameh, Mr. Ayyad's co-defendant, with whom Mr. Ayyad had been approved to correspond following their convictions in 1994 until 2002.  Ex. 1 at ¶¶ 93-94, 96, 102-106.  After they were transferred to ADX, the approval was revoked though Mr. Ayyad and Mr. Salameh were in the same unit together.  In the letter to "Mohammed"  Mr. Ayyad is reminding Mohammad Salameh of the time they spent together in H-unit– not Achraf (see Ex. 14 – US014628 - Inmate History Quarters showing Ayyad move on 11/14/02) and Ex. 2. at ¶ 94.  The BOP was aware that Mr. Ayyad was referring to Mr. Salameh because their staff wrote on the July 2003 letter/envelope, "MAIL DROP FOR AYYAD & SALAMEH."  Ex. 15 - US004646.  Additionally, the interpretation of Abouhalima's words that is presented here is incorrect.  Abouhalima had never known or met Achraf prior to this time.  Ex. 1 at ¶¶ 123-126.

### 1. Defendants' allegations regarding Ayyad's pre-SAMs correspondence.

16.     Disputed.  See response to ¶ 15.  Additionally, Mr. Ayyad did not know that Mimon was a "martyr" or a "terrorist."  Ex. 2 at ¶ 92, 98.

17.     Disputed.  See response to ¶¶ 15-16.

18.     Undisputed.

19.     Undisputed as to the fact that Mr. Ayyad corresponded with Mr. Bourgass; disputed as to the implication that Mr. Ayyad was aware of Mr. Bourgass's crime at the time that they exchanged letters.  Ex. 2 at ¶¶ 91-92, 98, 107-109; Ex. 16 - US004603 (FBI summary translation of letter from Mr. Ayyad to Mr. Bourgass:  "seems to have gotten name and address from personal ad").

20.     Partially disputed.  Ayyad did not write an article for *Al Quds*; rather, he wrote the newspaper seeking the help of human rights and prison advocates, not correspondence from anyone.  *Al Quds* decided to publish his letter, along with his address.  Ex. 2 at ¶¶ 88-89.

21.     Disputed. "Lessons and reminders" refer to the verses of the Qur'an and the sayings of the Prophet. As the letter indicates, what Ayyad is referring to as "lessons and reminders" is the following:  "The Prophet said:  When light enters the heart it expands and opens up.  He asked, "what is the sign of that oh messenger of God?"  He said:  "turning to the House of Eternity and turning away from the House of Deception and preparing for death before it arrives."  Ex. 2 at ¶¶ 107-109.  In referring to Bourgass as "virtuous brother," Ayyad was not complimenting him on his crime, as he did not know why Bourgass was in prison.  Id. at ¶ 107-108.  Also, regarding Mr. Ayyad's supplication to God by writing "O Lord destroy the enemy of the faith," he did not use the "enemy of the faith" to refer to a specific nation or individuals.  "What I am referring to is a general term directed toward whoever considers the Islamic faith as an enemy and seeks its destruction.  I'm praying (supplicating) to God to return the destruction on the transgressor, this "enemy of faith" could be an idea, another Muslim, a person, a group, etc."  Id. at ¶ 109.

22.     Partially disputed.  The individual referenced in this paragraph is ▮▮▮▮▮▮ ▮▮▮▮▮▮. ▮▮▮▮▮▮▮ worked as a paralegal and translator in Mr. Ayyad's criminal case for his co-defendant. Ex. 17 - Abouhalima Supp. Decl. at ¶ 3; Ex. 2 at ¶ 24. Mr. Ayyad observed that ▮▮▮▮▮▮▮ visited prisoners at MCC in his capacity as a paralegal and translator.  Mr. Ayyad did not and does not know ▮▮▮▮▮▮▮'s political beliefs.  Mr.

Ayyad's correspondence with ▮▮▮▮▮▮ was very minimal and never went beyond

social pleasantries.  Id.

     23.    Disputed. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ Mr. Ayyad has never used his mother to communicate

with "other terrorists," nor has she passed information to him from "terrorists."  Ex. 18 –

Decl. of Fatmeh Badra ("Badra Decl.") at ¶ 31-32; Ex. 2 at ¶ 24.

     24.    Undisputed that Ayyad corresponded with his cousin, Mustafa Badra,

because he is a relative.  Mr. Ayyad does not agree with most of his cousin's views.  Ex.

2 at ¶ 86.

     25.    See response to ¶ 24.

**2.  Defendants' allegations regarding Abouhalima's pre-SAMs
correspondence.**

     26.    Partially disputed. At no point in their correspondence was Abouhalima

aware of his correspondents being "Martyrs" or involved in terrorism. Ex. 1 at ¶ 124.

     27.    Disputed. Abouhalima disputes the selective, and uniformly negative,

characterizations given by the Defendants to what are actually innocuous words and

phrases in his letters. Ex. 1 at ¶¶ 123-124 and 126.

     28.    Disputed. Id.

     29.    Disputed. Abouhalima's letters convey respect for all individuals. Ex. 1 at

¶ 124.

     30.    Disputed. Abouhalima's letters did not discuss any individuals for the

reason that they were "advocates of violent jihad," as such a topic was not any part of

those letters. See Ex. 1 at ¶¶ 18-20 (describing limited knowledge of Abdallah Azzam)

and ¶¶ 124-126 (the "entire exchange of correspondence was generic, casual, religious, and even personal").

31.     Plaintiffs are not in a position to confirm or dispute this assertion.

32.     Disputed. Mr. Abouhalima does not recall ever corresponding with Samar Alami.  Ex. 17 at ¶ 4.

33.     Disputed. Mr. Abouhalima has repeatedly and at length refuted the incorrect characterizations of his correspondence with ██████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████ Ex. 1 at ¶¶ 176-202. ████████████████████████ ████████████████████████████████████████████████ ████████████████ Id. at ¶¶ 198-202; Ex. 19 - Azza Abouhalima Decl. at pp. 4-5; Ex. 20 - Eman Mahmud Abouhalima Decl. at pp. 1-2. Mr. Abouhalima is an observant Muslim, not a "radical" one. The FBI's struggles with appropriately training its personnel to understand the distinction have recently been well-documented. See, e.g., "FBI Chided for Training That Was Critical of Islam," *NewYork Times*, Sept. 16, 2011, available at http://www.nytimes.com/2011/09/17/us/fbi-chided-for-training-that-was-critical-of-islam.html (describing training materials that included a "chart correlat[ing] a steady level of violence with 'adherence by pious and devout' to the Koran. In contrast, the chart showed violence decreasing with 'adherence by pious and devout' to the Bible or to the Torah.").

### III.  DEFENDANTS' ALLEGATIONS REGARDING PLAINTIFFS' PRE-SAMs COMMUNICATIONS WITHIN THEIR RESPECTIVE PRISONS

#### A.  Defendants' allegations regarding Ayyad's pre-SAMs communications.

1.      Partially disputed.  Mr. Ayyad did not become "the imam" at Terre Haute; he only led the congregation prayer at the chapel once a day.  At the time Mr. Ayyad was at Terre Haute, the chaplain there allowed inmates to lead other inmates in prayer in an area designated for that purpose inside the chapel department.   Ex. 2 at ¶ 35.

2.      Disputed.  Ex. 2 at ¶¶ 49 – 52.  If these allegations had been substantiated, the BOP could have issued Mr. Ayyad an incident report.  See 28 C.F.R. § 541.3, Table 3 – prohibited acts (greatest severity).  Mr. Ayyad was not charged by Terre Haute staff with any incidents.  Ex. 2 at ¶ 52.  Mr. Ayyad was transferred to USP Lewisburg, where he was put in the general population.  Id.  Additionally, Ex. 21 (US0014539) is a memo to the North Central Regional Director dated June 1997, requesting that Mr. Ayyad be sent to Marion as a result of this allegation.  Apparently, the BOP determined that the allegation was not a sufficient reason to send Mr. Ayyad to Marion; instead the BOP sent him to USP–Lewisburg, the same security level as USP–Terre Haute.

3.      Partially disputed.  Mr. Ayyad was assaulted in Terre Haute.  Mr. Ayyad does not know Muslim prisoners in other BOP facilities, especially since Terre Haute was his first federal prison after being sentenced in 1994.  Nor did he know which prison the person who assaulted him was sent to.  Ex. 2 at ¶¶ 46-48.

#### B.  Defendants' allegations regarding Abouhalima's pre-SAMS communications.

4.      Disputed.  At no point did Abouhalima "promote[ ] the conversion of BOP inmates to a radical interpretation of Islam." The only citation provided by the Defendants is their characterization of one sentence from Abouhalima's letters as evidence of such, and the characterization is incorrect. See Ex. 1 at ¶ 97 (explaining that the "word 'Sharia' in general means the religion itself," and that it would be "silly to think that anyone in prison would run behind other prisoners…and try to punish them under Sharia law. This is not what I said.").  Additionally, the letter cited for this proposition is not quoted in its entirety; the following sentence, which provides context, states, "Americans by nature are violent.  Their prisons and cities are filled with awful, and painful incidents, and everyone who came to know us could see the forgiveness and the mercy of God, the Lord of all creation."  Ex. 22 - AB008995.

5.      Disputed. Abouhalima was not an "influential member of the Sunni Muslim community" at USP-Lompoc. He led group prayer on occasions when the inmate and the BOP chaplain who would normally do so were absent.  Ex. 1 at ¶¶ 74-75.  It is not a material fact that he is, like the vast majority of all Muslims, Sunni.  See http://en.wikipedia.org/wiki/Sunni_Islam.

6.      Undisputed.

7.      Disputed. Abouhalima played no role in this attack, and the government treated him accordingly.  Ex. 1 at ¶¶ 74-85; see also Ex. 23 - AB004928–AB004931 (7/27/09 Disciplinary History Report – no incidents related to attack on correctional officer).

8.      Partially disputed. Notwithstanding the existence of the cited BOP paperwork, Abouhalima never presented a threat to institutional staff warranting ADX

placement, and was treated accordingly, until September 11, 2001. Ex.1 at ¶¶ 51-65 and 73-103; Ex. 23.

9.      Partially disputed. Notwithstanding the existence of the cited BOP paperwork, Abouhalima never presented a threat to institutional staff warranting ADX placement, and was treated accordingly, until September 11, 2001. See, e.g., Ex. 24 - USAB014440 (Request for Transfer, dated October 25, 2001, stating as "Rationale for Referral": "Due to the nature of Abouhalima's instant offense, he requires greater security than afforded at USP, Leavenworth. We are recommending a transfer to USP, Marion for his safety and the safety of others at this institution. Abouhalima attempted to destroy the World Center Towers [sic] in 1993 by using an explosive device.").

## IV.      DEFENDANTS' GOVERNMENTAL INTEREST.

1.      Undisputed.

2.      Undisputed.

3.      Undisputed.

## V.      DEFENDANTS' JUSTIFICATIONS FOR IMPOSITION OF THE SAMs

### A.   Defendants' "national security" concerns.

1.      Disputed. The FBI's own internal correspondence refers to the government's understanding that the SAMs were actually imposed on the Plaintiffs "based on those bullshit letters," e.g. because of embarrassing coverage in the US media relating to the letters, which the Defendants' own documentation admits did not otherwise present a legitimate security concern. See Ex. 25 - US005059-60; Ex. 26 - US55551-55 (SAMs origination memo) (concluding that "**the FBI does not believe operational planning or guidance**" was involved in the letters) (emphasis added); and

Ex. 27 - AB006163 (BOP grievance response to 2008 SAMs renewal) (stating that "the [NBC] broadcast highlighted the Department's need to closely monitor your communications. . . The need for the SAM may have been influenced by the broadcast, but it was not in retaliation for it").   In addition, the phrase "[t]he government has determined" is so vague that no part of the determination then set forth can be relied upon as a material undisputed fact in this case.

2.      Disputed.  The original government documentation generated by the Defendants to support the imposition of the SAMs on the Plaintiffs notes that, "the FBI does not believe operational or guidance on the part of '93 TRADEBOM inmates was involved."  Ex. 26.  There is additionally no demonstration of Plaintiffs "inspiring" or "radicalizing" others, as no such thing occurred. The fact of Plaintiffs' convictions and sentences were known since 1994, and the 8 ½ years they spent in high-security, open-population prisons did not radicalize or inspire anyone to commit any acts of terror, and they were treated accordingly.  Ex. 1 at ¶¶ 57-98; Ex. 2 at ¶ 42.   The government has presented no undisputed factual evidence that anyone, including "Sunni extremist[s]," regards either Plaintiff as a "hero," and even if this Court were to find this to be a material undisputed fact in this case, it is a factual situation over which they have no influence whatsoever.

3.      Disputed. The government is not entitled to deference on this factual question, which must be established at trial. The phrase "[t]he government has determined" is so vague that no part of the "determination" then set forth can be relied upon as a material undisputed fact in this case. The government has presented no undisputed factual evidence in support of its assertion that "communications from

terrorists of Plaintiffs' reputation can reinforce an aspiring terrorist's resolve and assuage

doubts about carrying out an attack, even where the communications themselves do not

discuss operational planning for a specific attack and might appear superficially benign.".

To the contrary, the Defendants' own documentation, after the FBI and the BOP

discovered the correspondence between Plaintiffs and the Spanish prisoners, states that

the "government," through the FBI, "determined" that Plaintiffs' communications

"should be handled in accordance with established DOJ and BOP policies."  See Ex. 28 -

US004827 and Ex. 29 - US004814.

     4.      Disputed. The Plaintiffs communicated with the Spanish prisoners as pen

pals, not as "terrorist martyrs."  Ex. 2 at ¶ 102; Ex. 1 at ¶¶ 123-126.  Plaintiffs did not and

do not want to communicate with any "terrorist network" or individuals affiliated with

terrorism. Id. The Plaintiffs disclaim any alleged desire to "attract the attention of,"

"motivate," or "resurrect" any "connections to" terrorists, incarcerated or otherwise. Ex.

2 at ¶¶ 10 and13-22; Ex. 1 at ¶¶ 25, 34-35, 50, 124, 175, and 244. In addition, the phrase

"[t]he government has determined" is so vague that no part of the "determination" then

set forth can be relied upon as a material undisputed fact in this case. The Plaintiffs have

testified as to their actual, benign motivations for engaging in the correspondence in

question. Ex. 2 at ¶¶ 90-109; Ex. 1 at ¶¶ 121-127. The undisputed fact that they engaged

in correspondence and had access to media without SAMs for 12 years without

"resurrect[ing]" any "connections to the terrorist network" is not rebutted by any

undisputed factual evidence from the government in support of its assertion to the

contrary. See Ex. 2 at ¶¶ 23-55; Ex. 1 at ¶¶ 51-131. To the contrary, the Defendants' own

documentation states that the FBI "does not believe operational or other guidance on the

part of the '93 TRADEBOM inmates was involved" in Plaintiffs' correspondence with the Spanish prisoners.  Ex. 26 at US005551.

5.      Disputed. That the "SAMs facilitate the government's interest in protecting national security" is a core fact in dispute, with contradictory evidence from both sides.  Abouhalima asserts that no national security interest is facilitated by prohibiting him from calling his brother in Egypt at a work phone number, but being permitted to speak with that same brother, if present where a call is made to another, permitted number.  Ex. 1 at ¶ 171. Nor is any national security interest facilitated by prohibiting him from communicating with his aunt before her death from cancer, id. at ¶ 162, with his children, id. at ¶¶ 176-202, or by any of the other communications restrictions that are actually imposed upon him.  Id. at ¶¶ 147-175.  Similarly, there is no national security interest facilitated by prohibiting Mr. Ayyad from communicating with his niece who is an American citizen living in Washington (denial of requests for contact with her from 2007-2011) or prohibiting his 80-year-old grandmother from visiting him between 2007-2011.  Ex. 2 at ¶¶ 169-174.

6.      Disputed.  The BOP has other mechanisms available to it to ensure this does not occur, including:

- a BOP warden can reject correspondence if "detrimental to security, good order, or discipline of the institution, to the protection of the public, or if it might facilitate criminal activity" 28 C.F. R. § 540.14(d);

- a BOP warden may place inmate on Restricted General Correspondence Status, 28 C.F.R. § 540.15(a);

- a BOP warden may place limitations and conditions on telephone calls ("inmate telephone use is subject to those limitations which the Warden determines are necessary to ensure the security or good order, including discipline, of the institution or to protect the public") 28 C.F.R. § 540.100(a);

- a BOP warden is required to "establish procedures that enable monitoring of telephone conversations on any telephone located within the institution, said monitoring to be done to preserve the security and orderly management of the institutions and to protect the public," 28 C.F.R. § 540.102;

- a BOP warden may reject a publication requested by any BOP inmate if it is determined that its introduction into the institution would be "detrimental to the security, discipline or good order of the institution or if it might facilitate criminal activity," 28 C.F.R. §§ 540.70, 540.71(b).

Additionally, as described above, the Plaintiffs have testified as to the actual, benign circumstances of the instances where they are claimed to have "previously communicated with other terrorists from prison." Ex. 1 at ¶¶ 121-127; Ex. 2 at ¶¶ 90-109. The government has not provided any other undisputed factual evidence in support of its "heightened concern" regarding the "possibility" that "active terrorists" might connect with either of the Plaintiffs, a possibility that is belied by their actual history of confinement by the BOP, and treatment by the government prior to the airing of the embarrassing NBC report. Ex. 1 at ¶¶ 51-131; Ex. 2 at ¶¶ 30-109.

7.    Disputed.  The government does not specify whether it asserts that either of the Plaintiffs "have expressed adherence to a radical Islamic ideology," but this fact is disputed by the actual, innocuous contents of all of the Plaintiffs' correspondence since incarceration, as evidenced by the copies of which that were retained in the Defendants' records and produced in this case. The language quoted in the NBC report was entirely written by an individual not party to this litigation, Mohammad Salameh.  Ex. 1 at ¶ 129. None of the Plaintiffs' correspondence, which is in the possession of the government in their entirety, reflects any "radical Islamic ideology."  Most of Plaintiffs' correspondence, other than with family members, was with pen-pals. From 1993 to the present, Plaintiffs

have not attempted – and will not attempt – to engage in any acts that "advance the goal

of jihad and threaten the security of the United States and the safety of individuals

outside the prison." Ex. 2 at ¶¶ 12-22, 45, 56-59, 88-89, 92, 98, 107-109, 264; Ex. 1 at ¶¶

25-26, 31-35, 47-50, and 244-245.

8.      Disputed. As noted above, the Plaintiffs disclaim the motives that

Defendants ascribe to them here, their conduct since incarceration has been consistent

therewith, and they were treated accordingly, until September 11, 2001. Ex. 2 at ¶¶ 12-

22, 30-55, 264; Ex. 1 at ¶¶ 25-26, 31-35, 47-103, and 244-245. Plaintiffs have been in

prison for 18 years and during that time, they have never participated in any terrorist plots

and never committed or participated in any acts of violence. They were not criminally

charged, or even issued an incident report, for their correspondence with the Spanish

prisoners.  Ex. 30 – at AB006582-83 ("Defendants admit that Abouhalima has not been

charged with any crime or BOP rules or regulations violation relating to his outgoing

mail, phone calls and activities regarding any exchange of correspondence with some

individuals in Spain").  Plaintiffs have additionally testified as to the actual, benign

circumstances of the correspondence that was the express basis for the SAMs imposition.

Ex. 1 at ¶¶ 121-127; Ex. 2 at ¶¶ 90-109.

    **B.      Defendants' "prison security" concerns.**

9.      Disputed.  The assertion that, "without SAMs, there *would* be an increased

risk that Plaintiffs' communications *may* jeopardize prison security," (emphasis added) is

doubly attenuated and not supported by any undisputed factual evidence. The Plaintiffs

have testified that no such risk exists, their conduct since incarceration has been

consistent therewith, and they were treated accordingly, until September 11, 2001. Ex. 1

at ¶¶ 25-26, 31-35, 47-103, and 244-245. They have additionally testified as to the actual, benign circumstances of the correspondence that was the express basis for SAMs imposition. Ex. 1 at ¶¶ 121-127; Ex. 2 at ¶¶ 90-109.  The government has produced no evidence that demonstrates that Plaintiffs' communication posed a risk to institutional security or caused a disruption.  See also Ex. 30 at AB006582-83 ("Defendants admit that Abouhalima has not been charged with any . . . BOP rules or regulations violation relating to his outgoing mail, phone calls and activities regarding any exchange of correspondence with some individuals in Spain").

Additionally, both the BOP and the FBI provided responses to the Office of Inspector General's Report:  *BOP Monitoring of Mail for High-Risk Inmates*, in which they documented multiple strategies put in place between 2006-2008 devoted to ensuring careful monitoring of communications of all prisoners convicted of terrorist crimes.  See Ex. 31 (BOP Response to OIG Report; FBI Response to OIG Report).  In 2006, the BOP reported to the Office of the Inspector General that it was undertaking a variety of measures to improve its review of "terrorist" prisoners' communications, including conducting "Terrorist Management Training" via the Central Office Intelligence Section and training by the FBI on "intelligence gathering and analysis."   Ex. 31 at pp. 104-5. In this same report, the BOP also represented to the OIG that it was in the process of "incorporating a revision to agency policy ensuring all communications for inmates placed on monitoring are properly translated, if applicable, and reviewed by appropriately trained staff," by July 2008.  Id. at 105.  The FBI provided a similar response to the OIG recommendations, noting the development of the Correctional Intelligence Initiative, a program "established to interface with the BOP" and other entities to facilitate "the

coordination of terrorism matters between the Joint Terrorism Task Forces and all correctional agencies through the exchange of intelligence information between the participating agencies." Id. at 120.] The report notes that at the time of its creation (Sept. 2006), "these partnerships have allowed the FBI to detect, deter and disrupt efforts by terrorist or extremist groups to radicalize or recruit among inmate populations." Id. It also states that "[i]nteraction between BOP and FBI involves comprehensive immersion of assigned BOP staff to Joint Terrorist Task Forces as well as the National Joint Terrorism Task Force," and that "BOP representatives are granted full access to FBI Counterterrorism resources, information systems, and infrastructures." Id. at 121.

Finally, Les Smith, Director of the BOP's Counterterrorism Unit, has testified that "Yes, I believe the Federal Bureau of Prisons has the ability to effectively manage Mr. Abouhalima." Ex. 32 - Resp. to Plaintiff's Written Depo. Questions to L. Smith at p. 8.

10.    Disputed. There is no undisputed factual evidence to support the assertion that the "Plaintiffs' SAMs promote institutional security" in the manner described, once again, at two levels of attenuation, "by lowering the *risk* of" communications "that *could* lead to violence…" The Plaintiffs have testified to the contrary, that no institutional security interest is served by prohibiting Abouhalima from calling his brother in Egypt at a work phone number, but being permitted to speak with that same brother, if present where a call is made to another, permitted number. Ex. 1 at ¶ 171. Nor is any institutional security interest facilitated by prohibiting him from communicating with his aunt before her death from cancer, id. at ¶ 162, with his children, id. at ¶¶ 176-202, or by any of the other communications restrictions that are actually imposed upon him by the SAMs. Id. at ¶¶ 147-175. Similarly, no institutional security interest is served by the long delays for

approval of Mr. Ayyad's family correspondence, which have discouraged him and his family from writing, see Ex. 2 at ¶¶ 147-152, ordering him to "stop talking" during a visit with his mother in 2009 when he asks about the safety of his cousin and her children in Gaza during the ongoing conflict there, id. at ¶ 164, or refusing to consider his half-sisters as "immediate family" for purposes of allowing communication with them. Id. at ¶ 146. Finally, regarding the "dissemination of communications to the plaintiffs that could result in violence or disruption within the prison," the BOP's existing policies as described in the Motion would reject such communications. See Motion at pp. 56-58.

11.     Disputed. The only evidence presented in support of the assertion that the Plaintiffs have "a significant status within the network of terrorists" is that the Defendants accorded them such status following the events of September 11, 2001, and imposed greater security restrictions on them as a result.  The Plaintiffs' conduct since incarceration has entirely belied the assertion of such status. Ex. 1 at ¶¶ 51-103; Ex. 2 at ¶¶ 30-55. The fact of Plaintiffs' convictions and sentences were known since 1994, yet the sentencing judge did not impose communications restrictions on them and the BOP did not designate the Plaintiffs to ADX.  Additionally, Defendants themselves have characterized Plaintiffs as "low-level operatives…" See Ex. 3 & Ex. 5.

12.     Disputed. See Plaintiffs' Response to Defendants' Facts III.1-9; see also Ex. 1 at ¶¶ 51-103 and 121-127; Ex. 2 at ¶¶ 30-55.

13.     Disputed. To the extent the Defendants have "determined" that either of the Plaintiffs has engaged in "institutional practices of jihad that threaten prison security," no undisputed factual evidence is presented in support of such a determination. It is further rebutted by the express testimony of the Plaintiffs, their records of

institutional conduct, and their treatment by the Defendants, at least until September 11, 2001. Ex. 1 at ¶¶ 51-103; Ex. 2 at ¶¶ 30 - 55. Additionally, Plaintiffs have never attacked prison personnel or other inmates, nor do they wish to.  See Ex. 2 at ¶¶ 10-22 and 218; Ex. 1 at ¶¶ 47-50 and 88-90; Ex. 23 and Ex. 33.  While both Mr. Ayyad and Mr. Abouhalima have each engaged in hunger strikes to protest their conditions of confinement, these hunger strikes were not "concerted."  Ex. 2 at ¶¶ 114, 252-254; Ex. 1 at ¶ 138.[3]  In any event, the Defendants have presented no undisputed factual evidence that the SAMs reduce the likelihood of either Plaintiff engaging in a hunger strike; to the contrary, each Plaintiff undertook his own hunger strike in response to the imposition of the SAMs.  Ex. 2 at ¶¶ 114, 253; Ex. 1 at ¶ 138.

14.    Disputed.  No undisputed factual evidence has been presented to support the assertion that either of the Plaintiffs has ever "collaborate[d] in ways that endanger security in the prison."  The Defendants' assertion is further rebutted by the express testimony of the Plaintiffs, their records of institutional conduct, and their treatment by the Defendants, until September 11, 2001. Ex. 2 at ¶¶ 30 - 55; Ex. 1 at ¶¶ 51-103.

**C.    Involvement of counterterrorism professionals.**

15.    Disputed.  The Defendants admit, and the Plaintiffs would testify at trial, that not all prisoners convicted of terrorist-related crimes are under SAMs.  Ex. 35 - Resp. to Plaintiff's Written Depo. Questions to L. Braren, No. 26 ("Interrogatory: Are

---

[3] In any event, hunger strikes are recognized as protected activity under the First Amendment, and are regulated by BOP policy.  See Ajaj v. BOP, 2011 WL 902440 (D.Colo.) at *12 ("The Defendants do not appear to dispute that a hunger strike can constitute activity protected by the First Amendment, and the Court agrees that, in certain circumstances, it can. See, e.g., Bruce v. Woodford, 2009 WL 256930 (E.D.Ca. Feb. 3, 2009) (slip op.) (unpublished) (claim stated where prison officials told inmate that 'he was breaking no rules with a hunger strike' called to protest certain restrictions, then later imposed discipline against him for doing so"); Ex. 34 – BOP Program Stmt. 5562.05.

there inmates at ADX who are convicted with Terrorist related cases but are not subjected

to the SAM's imposition or SAM restriction?" "Response:  Yes."). See also Abouhalima

Decl. at ¶ 242 (describing how                                                ).

16.    Disputed.  In the twelve years that they were incarcerated prior to the

SAMs, Plaintiffs never intentionally made a "terrorist connection," and they expressly

disclaim any interest in ever doing so.  Ex. 2 at ¶¶ 45, 89, 98, 107 and 264; Ex. 1 at ¶¶

121-127 and 244.  Additionally, both the BOP and the FBI provided responses to the OIG

Report:  *BOP Monitoring of Mail for High-Risk Inmates*, in which they documented

multiple strategies put in place between 2006-2008 to ensure careful monitoring of

communications of all prisoners convicted of terrorist crimes.  See Ex. 31.

17.    Disputed. The Plaintiffs' "stature" was never given as a reason for

imposing the SAMs, and it is not in fact the reason.  See Ex. 25 (SAMs imposed because

of "those bullshit letters").

18.    Partially disputed.  Between 2002 – March 2004, Plaintiffs' mail was

submitted to ADX staff, open and unsealed, for review and inspection.  In February 2004,

the BOP determined that the correspondence was with prisoners and stopped it.  Ex. 2 at

¶ 97; Ex. 1 at ¶ 127;  Ex. 31 at pp. 98-99 ("In February 2003, the FBI, working through

the National Joint Terrorism Task Force (NJTTF) developed the Correctional Intelligence

Initiative.  This program was established to interface with the BOP . . . The CII facilitates

the coordination of terrorism matters between the JTTF and all correctional agencies

through the exchange of intelligence information. . . These partnerships have allowed the

FBI to detect, deter and disrupt efforts by terrorist or extremist groups . . . Interaction between BOP and FBI involves comprehensive immersion of assigned BOP staff to JTTF. . .   These BOP representatives are granted full access to FBI Counterterrorism resources . . . In return, BOP provides the FBI with vast amounts of intelligence information concerning inmates").  See also Ex. 1 at ¶¶ 118-119 (describing availability of Arabic translators among existing ADX staff).

19.     Disputed. The implication that ADX staff do not, or cannot, review mail "piece by piece" for prisoners convicted of terrorist crimes who are not under SAMs is unsupported by any undisputed factual evidence. To the contrary, the BOP's express policies call for the very type of review that the Defendants maintain is unavailable absent the SAMs.  See Ex. 31; see also Ex. 1 at ¶¶ 118-119.

20.     Disputed. The limitation on quantity of communication is not "reasonable," and the Defendants have presented no undisputed factual evidence in support of a contrary finding. The quantity of permissible communication has vacillated over the almost seven years that the Plaintiffs have had SAMs.  See Ex. 36 - US11146 (2006 modification of SAM to limit volume and frequency of outgoing general correspondence with immediate family to 3 pieces of paper, once per week to a single recipient, at the discretion of the BOP).  Further, as described in greater detail above, the particular restrictions imposed on the Plaintiffs are not necessary to assure the effectiveness and integrity of the SAMs review.  Finally, in his declaration in support of the Motion, FBI Agent Shannon admits that the ADX warden, at his discretion, does not impose a limit on SAMs' inmates' outgoing correspondence (frequency or volume). Defendants' Ex. A-1 (Doc. 259-1) at ¶ 67.

21.     Disputed.  See response to ¶ 20. The Defendants' assertion is speculative and conclusory, especially in light of the facts, as discussed supra, that the Plaintiffs have not "communicated dangerous messages" and that ADX staff already review all correspondence and monitor all telephone calls and social visits.  Ex. 31.  In addition, the potential for misinterpreting Plaintiffs' correspondence is significant, as demonstrated by the mistranslations that have occurred to date.  See Ex. 1 at ¶¶ 73, 97, 126, 177, 191, 194, and 197; Ex. 2 at ¶¶ 94, 100 - 109.

**D.  Defendants' justifications for the specific SAMs imposed on the Plaintiffs.**

**1.     Inhibiting dangerous messages or communications with terrorists.**

22.     Disputed.  The family members and close friends with whom the Plaintiffs seek to communicate are not members of "the terrorist network," nor do they act as "conduit[s] in that network."  See, e.g., Ex. 18 at ¶ 32.  Also, any family or friends who wish to visit Plaintiffs or speak with them via phone must clear a security background check prior to any communication taking place.  This process applies for communications with SAMs or non-SAMs prisoners.  Ex. 37 – ADX Institution Supplement "Visiting Procedures" at p. 4; Ex. 38 – ADX Institution Supplement "Telephone Regulations for Inmates" at pp. 1-2.

23.     Disputed. The Defendants' "determination" is speculative and conclusory. The only evidence provided is the testimony of the Defendants' main declarant, without citation, and this testimony is heavily disputed by the Plaintiffs' testimony. See Ex. 1 at ¶¶ 25, 34-35, 50, 124, 175, and 244; Ex. 2 at ¶¶ 42, 45, 89, 98, 107, 264.

24.     Disputed. The implication that there is a risk of Plaintiffs receiving "'fan mail' from terrorists," and that further such "fan mail" could "encourage Plaintiffs to engage in acts of jihad within the prison, including hunger strikes or attacks against correctional officers or other inmates," is speculative and unsupported by the citation provided. The Plaintiffs have never received "fan mail" from devotees outside the prison, much less "fan mail" that influenced them in their behavior or beliefs. See Ex. 1 at ¶¶ 123-125; Ex. 2 at ¶¶ 41- 42, 114, 252.  Interestingly, one of the two examples given by the Defendants' declarant of inmates who committed institutional misconduct is an H-Unit inmate whose First Amendment challenge to his SAMs was recently allowed to proceed to trial by this Court. See Mohammed v. Holder, Case No. 07-cv-02697-MSK-BNB, 2011 WL 4501959 (D. Colo. September 29, 2011). Further, Plaintiffs engaged in their longest hunger strikes *after* the imposition of the SAMs, illustrating that the SAMs are not effective at reducing the likelihood of Plaintiffs engaging in future hunger strikes. See Ex. 1 at ¶ 138; Ex. 2 at ¶¶ 114, 252-53.

25.     Disputed.  The FBI's analysis of Plaintiffs' communications has been incomplete and inaccurate.  See Ex. 1 at ¶¶ 73, 97, 126, 177, 191, 194, and 197; Ex. 2 at ¶¶ 94, 100-109, 154, 156.  There is no undisputed evidence in the record that the FBI's "quality analysis" is better in any meaningful way than the analysis that would be available with BOP resources, and what evidence does exist supports the opposite conclusion.  For example, Mr. Ayyad was corresponding with his half-sister and the Jordanian embassy for a period of time after the imposition of the SAMs; later, the FBI "realized" that Mr. Ayyad "was not allowed" such correspondence and required him to stop.  Compare Ex. 39 - US13893 (FBI memo approving letter to ▮▮▮▮▮▮▮▮) with

Ex. 40 - US014307 (copout response to Mr. Ayyad from Warden Davis stating "the new FBI agent is rejecting all incoming letters from your half-sister, ████ . . . You are authorized to correspond with immediate family members only.  Half sisters are not considered immediate family members as the FBI must verify the identity of your half sisters.  Once a determination is made, you will be notified of their decision").

26.     Disputed. The implication that these time periods are necessary for translation and analysis of Plaintiffs' correspondence is unsupported by any undisputed evidence. To the contrary, the Plaintiffs have testified about translation decisions made by the Defendants that bear no apparent relationship to any resource concerns. See, e.g., Ex. 1 at ¶¶ 148 (describing being told in January 2011 "that English letters containing transliterations of Arabic words would be treated as Arabic and subject to the longer delays for such letters, even though this had been routinely occurring in English letters to date"); Exh. 35 at pp. 3-4 (estimating 3-4 days for ADX staff to translate and approve non-English mail and 1-2 days to translate and approve English mail).

27.     Disputed. The implication that the Plaintiffs have attempted to circumvent the SAMs in telephone calls or visits is heavily disputed by the Plaintiffs and is incorrect. See, e.g., Ex. 1 at ¶¶ 159-175; Ex. 2 at ¶¶ 164-165, 229-234.

28.     Disputed. The implication that only the FBI is able to provide translation services is heavily disputed by the Plaintiffs and is incorrect. The BOP can and does provide translation services as well.  See, e.g., Ex. 1 at ¶¶ 118-119; Ex. 35 (Response No. 14). Further, since modification of the SAMs in 2009, the BOP has been entrusted to translate Arabic publications (newspapers, magazines, books, etc.).  See Ex. 1 at ¶¶ 155-158; Ex. 41 - 2009 SAMs modification for Mr. Ayyad.  Once again, this modification

came in response to an embarrassing media report about the rejection of the US

President's books for another SAMs inmate because they allegedly contained terrorist

information.  Ex. 1 at ¶ 158; <u>see also,</u> "No Obama Books for Supermax Con," *The*

*Denver Post*, Jul. 10, 2009, available at http://www.denverpost.com/ci_12806180

("prison officials, citing guidance from the FBI, determined that passages in both books

contain information that could damage national security").

### 2.  Attorney affirmation requirements.

29.  Disputed. There is no undisputed evidence to support the implication that,

because one prisoner with SAMs was able to circumvent the SAMs restrictions with

assistance from his lawyer, either of the Plaintiffs would seek, or have sought, to do the

same. Again, the Plaintiffs expressly disclaim the sinister motives ascribed to them by the

Defendants, and their institutional conduct, as well as their treatment by the Defendants

before September 11, 2001, bear this out. <u>See</u> Ex. 1 at ¶¶ 25-26, 31-35, 47-103, and 244-

245; Ex. 2 at ¶¶ 30-55, 263-265.

30.  Undisputed.

### 3.  Contact with the media.

31.  Disputed. The implications that Plaintiffs seek to "connect with others in

the global terrorist network," or that such others "may derive inspiration for a terrorist

attack from Plaintiffs or dedicate an attack to them," are unsupported by any undisputed

evidence. Again, the Plaintiffs expressly disclaim the sinister motives ascribed to them by

the Defendants, and their institutional conduct, as well as their treatment by the

Defendants before September 11, 2001, both bear this out. <u>See</u> Ex. 1 at ¶¶ 25-26, 31-35,

47-103, and 244-245; Ex. 2 at ¶¶ 30-55, 88-89; 263-65.

32.     Disputed.  Mr. Ayyad did not "publish an article" in *Al-Quds*; he sent a letter seeking help from human rights organizations regarding his conditions of confinement.  Ex. 2 at ¶¶ 88-89.  The Plaintiffs do not seek publicity in the media, which is credible given that the result of their last, involuntary media exposure was the imposition of the SAMs.  See Ex. 1 at ¶¶ 69-73 and 128-132.

**4.     Classified advertisements and letters to the editor.**

33.     Disputed. The assertion that Plaintiffs' access to mass communications is now "extensive" is heavily disputed by the Plaintiffs. See Ex. 1 at ¶¶ 155-158; Ex. 2 at ¶¶ 154, 228, 234.  For printed mass communications, the Plaintiffs are not aware of what is prohibited until they order a publication that the government subsequently deems objectionable.  See, e.g., Ex. 42 - US10417 (request from Mr. Ayyad to purchase math book to help his son with math that was later rejected and used as bases for SAMs renewal (see Ex. 47)); Ex. 2 at ¶ 143; and Ex. 1 at ¶ 157.  Additionally, Plaintiffs are not allowed any Arabic channels or stations, unlike Spanish-speaking prisoners who have four channels.  Ex. 2 at ¶ 138, 145; Ex. 43 - US10110-11 (administrative remedy filed by Mr. Ayyad regarding refusal to provide Arabic language channel on television).

34.     Disputed. The Defendants did not provide any undisputed evidence that the Plaintiffs possess the ability, knowledge, or desire to pass "coded information through the medium of mass communication," and the Plaintiffs expressly disclaim any such motivation or ability. See Ex. 1 at ¶¶ 25-26, 31-35, 69-73, 128-132, and 244-245; Ex. 2 at ¶¶ 45, 89, 263-265.

35.     Disputed. The implication that Plaintiffs have or would engage in "coordinated hunger strikes" or "attacks against correctional officers or other inmates" is

unsupported by any undisputed evidence. Both Plaintiffs' prior hunger strikes were undertaken by each of them individually and not as part of any coordinated effort, much less one organized through the media. See Ex. 1 at ¶ 138; Ex. 2 at ¶¶ 41, 252. Neither Mr. Ayyad nor Mr. Abouhalima has ever attacked a correctional officer or another prisoner, and neither man wishes to do so. Abouhalima Decl. at ¶¶ 25-26, 31-35, and 244-245; Ex. 23 and Ex. 33. Interestingly, one of the two individuals named in the Motion as an example of inmates who have attacked correctional officers is an H-Unit inmate whose First Amendment challenge to his SAMs was recently allowed to proceed to trial by this Court. See Mohammed v. Holder, 2011 WL 4501959.

## VI.   WHAT THE SAMs DO NOT PROHIBIT.

### A.   Permitted correspondence.

1.      Partially disputed. The Defendants have rejected a number of these letters for a variety of idiosyncratic reasons, thereby reducing the overall amount of correspondence the Plaintiffs would otherwise have been able to send. See, e.g., Ex. 1 at ¶¶ 147-169; Ex. 44 – AB11795 (rejected correspondence from Abouhalima to his son because he reports ▆▆▆▆▆▆▆▆▆▆▆▆); Ex. 45 - US10476-77 (rejection of letter to Mr. Ayyad from his half-sister, ▆▆▆▆▆); Ex. 46 - US10715 (rejection of letter from ▆▆▆▆▆ because "not confirmed as immediate family"). Also, Plaintiffs' SAMs authorize a *limit* of one letter per week, which was imposed on June 8, 2006, and could be done again at the warden's discretion. Ex. 47 – (2011 Ayyad SAMs Renewal at US15104 (authorizing 3-page/week limit)).

2.      Partially disputed. Nothing in the SAMs prohibits future, different wardens from imposing such limitations and, contrary to the implication in the Motion,

the SAMs expressly contemplate such limitations.  See id.  Also, in case of Plaintiffs'

transfer, for whatever reason, such limitation could be imposed.

3.      Disputed.  Mr. Ayyad also has two half-sisters, ▮▮▮▮▮▮and

▮▮▮▮▮▮▮▮, who are the daughters of his father's second marriage but who he is

sometimes prohibited from communicating with.  Ex. 45, Ex. 46 (response to grievance

re denial of communication with half sisters because they are "not immediate family").

Additionally, consistent with the Islamic faith, Mr. Ayyad also considers as immediate

family his nieces, nephews, uncle, aunts and grandmother.  Ex. 2 at ¶¶ 37-38.

4.      Partially disputed.  After the imposition of the SAMs in March 2005, Mr.

Ayyad began to ask to be allowed to communicate with his grandmother.  Ex. 48 -

US005833 (request to call grandmother denied by FBI because "not immediate family");

Ex. 49 - US006037 (appealing administrative remedy response denying call with

grandmother – "I have no way to appeal to the FBI").  In July 2006, he was finally

permitted to speak with her on the telephone but no visits were allowed.  Mr. Ayyad kept

asking permission to have a visit from his grandmother from 2007 until 2011, when his

request was finally approved.  By that time, his grandmother was too ill and frail to travel

to see him.  Mr. Ayyad's grandmother is illiterate, so no written correspondence was

needed or helpful.  Ex. 2 at ¶¶ 170-173.

5.      Partially disputed.  Mr. Abouhalima was not raised to meaningfully

distinguish between the "immediate family" members described by the Defendants and

his other family members, for the purposes of their interaction, communication, and

mutual participation in religious life. Ex. 1 at ¶¶ 7-10; Ex. 50 - Hamida Elsayed Elgogery

Decl. at ¶¶7-10; Ex. 51 - Ali M. Abouhalima Decl. at ¶¶12-14; Ex. 52 - Sohier Elsayed

Elgogery Decl. at ¶¶13-16; Ex. 53 - Fatima Elasayed Elgogery Decl. at ¶¶12-18; and Ex. 54 at AB001741 (letter from Mr. Abouhalima to his son discussing the importance of family).

6.      Partially disputed.  Notwithstanding this modification, Abouhalima's passing communication with the same individual in German was the basis for deprivation of another phone call and a justification for the most recent renewal of his SAMs, despite assurances to the contrary made to him by agents of the government.  Ex. 1 at ¶¶ 172-173; Ex. 55 - 2011 SAMs renewal (AB15636).  Additionally, a condition of Defendants' recent decision to permit Mr. Abouhalima to correspond with his niece and nephew was that he can no longer communicate with his ex-mother-in-law.  Ex. 1 at ¶ 247.

7.      Partially disputed.  Requests were submitted in 2008.  Ex. 2 at ¶ 170.  Mr. Ayyad's niece was finally approved in December 2011; his two friends were denied without any explanation or reason.  Id. at ¶ 174.  Further, of the 30 total family members with whom Mr. Abouhalima has requested to communicate, only 4 were approved, and one of his existing correspondents (his ex-mother-in-law) was removed as a condition of granting his most recent set of requests. Ex. 17 at ¶ 5; Ex. 1 at ¶ 247.

8.      Partially disputed. The Defendants have rejected a number of incoming letters from approved correspondents for a variety of idiosyncratic reasons, thereby reducing the overall amount of correspondence the Plaintiffs would otherwise have been able to receive. See Ex. 1 at ¶¶ 147-169; Ex. 56 - AB001430 (rejection of letter to Abouhalima from his sister because "it contains letters written by his niece and nephew"); Ex. 44 (FBI memo discussing rejection of letter to son because "the letter contained information that could jeopardize the safety of the institution.  The inmate told

his son that he was ████████████████████████████████████████████); and Ex. 57 - AB009601 (rejection notice for same letter).  Also, due to excessive delays in translating outgoing and incoming mail, Mr. Ayyad's incoming mail has dwindled to almost nothing.  Ex. 2 at ¶¶ 147-152.  Finally, in 2006, Plaintiffs' mail was limited to one letter per week.  Ex. 36.  This could be reinstated at the decision of the warden at any time.

9.   Undisputed.

10.   Partially disputed.  Student attorneys signed the affirmations but were denied the ability to correspond with Plaintiffs. See Ex. 58 - USAB006109 (grievance response from BOP Central Office re denial of communication with student attorneys).

11.   Partially disputed. The implication is that Mr. Ayyad has been under SAMs since the date of his arrest, which is incorrect. Since the imposition of the SAMs, Mr. Ayyad has been represented by his current counsel in this case and two attorneys who formerly represented him in this matter.  See Docket Sheet for *Ayyad, et al., v. Holder, et al.*, 05-cv-02342-WYD-MJW, available at https://ecf.cod.uscourts.gov/cgi-bin/DktRpt.pl?118061891623793-L_1_1-1.

12.   Partially disputed. Defendants are apparently counting student attorneys, who were never permitted to communicate with Abouhalima and ultimately withdrew from representation. Further, the "permission to contact" prospective attorneys that was given was with the proviso that such communications would be monitored, which was not workable as it requires both Mr. Abouhalima and his prospective counsel to waive confidentiality as a condition of their communication. Ex. 1 at ¶¶ 152-154, 165 and 169.

13.   Undisputed.

14.     Disputed.  Mail written in English has sometimes exceeded 21 business days (over a month) and mail written in Arabic has sometimes exceeded 60 business days (over three months).  Ex. 59 - US006086-88 (FBI document noting "delay of inmate mail beyond 14/60 days imposed under SAMs which led to a hunger strike by several of the inmates"); Ex. 2 at ¶ 147 (after the imposition of the SAMs, correspondence in Arabic took more than three months to process); see also Ex. 1 at ¶¶ 148 (describing being told in January 2011 "that English letters containing transliterations of Arabic words would be treated as Arabic and subject to the longer delays for such letters, even though this had been routinely occurring in English letters to date").

**B.     Permitted visits.**

15.     Partially disputed.  Despite requesting permission to visit with his grandmother since 2007, Mr. Ayyad's grandmother was not approved to visit with him until 2011.  By that time, she was too ill and frail to make the trip to visit him.  Ex. 2 at ¶¶ 170-173.  Also, despite signing a SAMs affirmation, Plaintiffs' student attorneys were prohibited from visiting them pursuant to a decision by Defendants.  Ex. 58.

16.     Partially disputed.  While the SAMs themselves do not limit the number of legal or non-legal visits Plaintiffs may receive, they do require that non-legal visits occur in English unless an FBI translator is present.  As a result of this rule, some of Mr. Ayyad's visits with his family have been curtailed due to the unavailability of a translator, requiring he and his mother to speak in English during their visit or to cancel it.  Mr. Ayyad's mother is not fluent in English.  Ex. 2 at ¶ 229; Ex. 60 - US10545-46 (grievance response "You were not provided with a translator due to none being available.  You were still permitted to visit, but had to conduct your visit in English").

Also, ADX policy only allows SAMs prisoners to have visits Mondays – Wednesdays; no weekend or holiday visits are allowed.  Ex. 61 – FLM 5321.07(3)(G) – Special Security Unit Institution Supplement at p. 4.  And ADX policy also permits there to be only one SAMs prisoner in the visiting area at a time, despite the fact that all visits (legal and social) are non-contact and conducted through individual booths where the prisoner and his visitor are separated by glass.  If one SAMs prisoner has a legal or social visit scheduled on a particular day, no other visits can take place, resulting in the need for visitors to wait for weeks for an "open" visiting slot.  Ex. 2 at ¶¶ 166-168. These conditions have resulted in a near-total decline in family visits for Mr. Abouhalima, who had been receiving regular family visits prior to his placement in the ADX. Ex. 1 at ¶¶ 68, 91, and 228-232.

17.     Undisputed.

18.     Undisputed.

**C.     Telephone calls.**

19.     Undisputed.

20.     Undisputed.

21.     Disputed. Abouhalima has been returned to Phase 1 for an incident report that he successfully overturned on appeal. As a result, he is now limited to 2 calls per month.  Ex. 1 at ¶¶ 150 and 221.

22.     Partially disputed.  Plaintiffs cannot initiate calls to their attorneys.  If Plaintiffs ask BOP staff for a call with their attorneys, it is not arranged.  Legal calls are only arranged at the request of the attorney.  Ex. 2 at ¶ 66.

**D.     Reading materials, mass communications, and educational programs.**

23.     Partially disputed. The periodicals and newspapers rejected on these grounds do not meet these criteria, and the Defendants' decision-making on this issue seems to at least in part be driven by external scrutiny, rather than the consistent application of these criteria. See, e.g., Ex. 1 at ¶¶ 155-158; Ex. 2 - AB006290 (response to grievance challenging rejection of *Harpers*, *the Nation* and *Atlantic Monthly* on basis that they "contain articles which could be detrimental to national security, the security, good order and discipline of the institution, or protection of the public").

24.     Partially disputed. The SAMs provide that these sections should be removed.  When these sections are removed, substantial portions of the periodicals and newspapers are removed along with them, notwithstanding their ostensibly inoffensive content. See Ex. 1 at ¶¶ 156-157.

25.     Partially disputed. The books rejected on these grounds do not meet these criteria, and the Defendants' decision-making on this issue seems to at least in part be driven by external scrutiny, rather than the consistent application of these criteria. See, e.g., Ex. 1 at ¶¶ 155-158. For example, the Plaintiffs have been denied the following books, none of which "facilitate criminal activity, present a substantial threat to national security or the security, discipline or good order of the institution":  a math book that Mr. Ayyad requested to be able to help his school-age son with math, see Ex. 63 at US0010324-25 and US10467 (letter to                    attempting to teach math); and the World Almanac. Ex. 65 - AB006240 (rejection notice for World Almanac).

26.     Partially disputed. See supra at ¶¶ 23-25. Again, the Defendants have rejected or significantly redacted a number of books, newspapers, and periodicals for a variety of idiosyncratic reasons, thereby reducing the overall amount of these items that

the Plaintiffs would otherwise have been able to read.  <u>See</u> Ex. 1 at ¶¶ 155-158.  <u>See also</u> Ex. 25 at US005059-60 (email from ▮▮▮▮▮ (Denver FBI) to NY FBI: "there is a list of approved periodicals but for some reason HQ has decided that the list is to be kept secret from the inmates rather then us just telling them what they can have.  Seems nuts to me, but I'm the new guy at this stuff").

27.     Undisputed.  Plaintiffs are limited to 8 books each, including the Qu'ran and a dictionary.  Ex. 17 at ¶ 6.

28.     Partially disputed.  <u>See</u> Ex. 2 at ¶ 228 (noting that the Arabic books in the leisure library have been the same for the past ten years).

29.     Undisputed.

30.     Currently, Mr. Ayyad subscribes to only one newspaper (*Al-Quds*).  He cancelled the rest, finding that he has become unable to read or concentrate in the ten years he has been held in solitary confinement.  Ex. 2 at ¶ 244.

31.     Partially disputed.  Plaintiffs were not permitted to receive newspapers without a 30-day hold until mid-2008.  Ex. 66.

32.     Partially disputed.  The database made available to federal prisoners is a modified version of LexisNexis with limited features, which correspondingly limits their ability to do legal research.  Ex. 2 at ¶ 132.

33.     Partially disputed.  Plaintiffs do not have access to any AM radio stations and can listen to only five FM radio stations.  Ex. 2 at ¶ 133.

34.     Partially disputed.  Over the ten years he has been held in solitary confinement, Mr. Ayyad's ability to concentrate for long periods has waned.  As a result, he rarely watches any movies now.  Ex. 2 at ¶ 236.

35.     Partially disputed.  Most of the religious tapes are in English and the same ones have been played repeatedly since 2002.  Mr. Ayyad has lost interest in watching these religious programs.  Ayyad Decl. at ¶ 138.

36.     Partially disputed. The Plaintiffs cannot watch any media channels that are broadcast in Arabic, their native language. Id.

37.     Partially disputed.  Mr. Ayyad has already graduated from high school and college, so GED courses are useless to him.  Ex. 2 at ¶¶ 3-5, 134.  Even after his transfer to ADX but prior to the imposition of the SAM, the BOP prohibited Mr. Ayyad from participating in college-level correspondence courses.  Ex. 2 at ¶¶ 135-136;  Ex. 67 - US009534 (ADX mail rejection – "these are college courses in Arabic that inmate Ayyad intends on taking which is prohibited per the ADX Institution Supplement"); Ex. 68 - Ayyad copout requesting Arabic correspondence course and response "you may only take classes in the English language due to security concerns").

**E.      Contact with other persons.**

38.     Partially disputed.  Other than in Phase 3 of the H-Unit Program, communication between SAMs prisoners is never directly face-to-face and is always mediated by bars or concrete walls.  Ex. 2 at ¶¶ 122, 190, 192; Ex. 69 - Milusnic Depo. at 23:21 – 24:9 ("what we have out there is individual rec areas to where the inmates don't have the ability to engage one another unless it's through the wire mesh").  Additionally, even the limited, brief exchanges Mr. Ayyad is able to have with the two other prisoners he is allowed to talk to for 1.5 hours per weekday add to his depression.  Some of these other prisoners have been under SAMs for over ten years and are showing signs of mental health issues.  Ex. 2 at ¶ 247 ("[s]ome prisoners tell me to shut off my cell light

and never use it because it emits harmful radiation and the TV screen emits the same.

These prisoners live in dark cells day and night. . . . Some say that hot water is poisonous

and harmful.  Some believe the SAMs will be on us until we die.  That's why I try not to

listen  – I don't want to make my depression worse").

39.     Partially disputed.  The brief interactions that Plaintiffs have with

correctional staff are limited to perfunctory, impersonal exchanges; they are enactments

of institutional routines, not personal interactions.  Ex. 2 at ¶¶ 124-126, 248.  Sometimes,

no words are exchanged at all.  Ex. 2 at ¶¶ 124-126, & 194 (& attached logs).

40.     Disputed.  While in their cells, Plaintiffs must shout in order to be heard

by one another, rendering conversation impossible.  Ex. 2 at ¶¶ 122, 190. See also Ex. 1

at ¶ 112 (describing identical conditions in ADX general population cells).

41.     Partially disputed.  When Plaintiffs are taken to indoor recreation, which

occurs two or three times per week, they exercise alone with no other prisoners nearby.

Outside recreation occurs either two or three times a week; sometimes other prisoners are

present and sometimes Plaintiffs are taken to the cages alone. Ex. 17. at ¶ 7; Ex.2 at ¶

192.  Additionally, staff sometimes put certain inmates who are in conflict outside

together, knowing no conversation will take place. Ex. 2 at ¶ 192. Finally, even during

times when Plaintiffs are with other Muslim prisoners in the rec cages, the content of

Plaintiffs' communications is limited, in that Plaintiffs are not permitted to pray together

while in the cages. Ex. 17 at ¶ 7; Ex. 2 at ¶ 193; Ex. 69 at 28:12 – 28:15.

42.     Partially disputed.  Outdoor recreation occurs in cages, which are not

"large" – they are not big enough for Plaintiffs to take more than a few steps in each

direction.  The cement enclosure in which these cages are placed is not a "yard" in the

usual sense of that word, and the Plaintiffs can only see the sky from inside its high walls. Even then, depending on the time of day that Plaintiffs are taken to the cages, they may not have exposure to direct sunlight during outdoor recreation due to the height of the yard's walls.  Ex. 17 at ¶ 7; Ex. 2 at ¶¶ 128-130.

43.     Partially disputed. <u>See</u> ¶ 41.

44.     Disputed.  Mr. Ayyad and Mr. Abouhalima are now in different housing units, and no longer are taken to the exercise cages at the same time.  Because they are no longer in the same housing unit, their ability to have even limited communication by shouting through the walls no longer exists.  Ex. 1 at ¶ 12.  Now, Mr. Ayyad goes to the outdoor exercise cages with one other prisoner.  If the other prisoner cancels, Mr. Ayyad is alone in the outside cages.  Ex. 2 at ¶ 192.

45.     Undisputed.

46.     Partially disputed. The "spirit of brotherhood" among prisoners in adjacent isolation cells that was observed by Abouhalima does not mitigate the overwhelmingly negative effects of his continued, indefinite confinement in segregation in H-Unit. Ex. 1 at ¶¶ 228-243; Ex. 17 at ¶ 7; <u>see also</u> Ex. 2 at ¶¶ 236-260.

47.     Partially disputed.  Plaintiffs do not receive "visits" from the Warden, the Associate Wardens, the Captain and the Department Heads each week.  Ex. 2 at ¶¶ 125-126, 194 (and attached logs).  These brief exchanges are not social interaction, and often last no longer than thirty seconds.

48.     Undisputed.

49.     Partially disputed.  A "visit" from a member of the unit team often consists of nothing more than a unit staff member peering in at Plaintiffs through their cell doors.  Id.; Abouhalima Supp. Decl. at ¶ 9.]

50.     Undisputed.

51.     Undisputed.

52.     Partially disputed.  There are some days when Mr. Ayyad is not spoken to by anyone.  Ex. 2 at ¶¶ 125-126, 194 (and attached logs).

53.     Undisputed.

54.     Undisputed.

55.     Undisputed.

56.     Undisputed.

57.     Partially disputed. These cursory interactions with guards do not mitigate the overwhelmingly negative effects of Abouhalima's continued, indefinite confinement in H-Unit.  Ex. 1 at ¶¶ 132-158 and 228-243.

58.     Undisputed that Plaintiffs see SIS staff because they are in charge of picking up and delivering mail.

59.     Undisputed that Plaintiffs see prison linguists who are tasked with giving phone calls to Plaintiffs.  Ex. 2 at ¶¶ 125-126, 194 (and attached logs); Ex. 17 at ¶ 2.

60.     Undisputed.

61.     Disputed.  Ex. 2 at ¶ 140-141; Ex. 1 at ¶¶ 143-144 and 240.  See also Ex. 70 - US010317 (February 2009 response to grievance re delay in receiving dental and optometry care) ("the optometrist is currently seeing inmates who were put on the waiting list in September 2007"); Ex. 71 - AB005090 (copout from Abouhalima

requesting dental treatment ("I can't eat") and referencing unanswered request on same issue from two months prior).

## VII.   PROCEDURES FOR IMPOSING AND RENEWING SAMs.

1.      Partially disputed.  See Ex. 25 at US005059-60 (FBI email stating it's "bothersome enough" the SAMs were imposed on Plaintiffs because of "those bullshit letters").   In the Plaintiffs' case, the decision to impose the SAMs was based not on national security but because of embarrassment following the broadcast of a news report that they had corresponded with Spanish prisoners. See Ex. 1 at ¶¶ 121-134. Again, the Plaintiffs expressly disclaim the sinister motives ascribed to them by the Defendants, and their institutional conduct, as well as their treatment by the Defendants before September 11, 2001, bear this out. See id. at ¶¶ 25-26, 31-35, 47-103, and 244-245; Ex. 2 at ¶¶ 45, 89, 98 and 264. Additionally, the fact that the BOP was not involved in initiating a proposal for the imposition of the SAMs suggests that security of the institution is not a meaningful factor.  Ex. 72 - O'Brien dep. 60:5-9.  Finally, the SAMs are not warranted because the BOP has effective mechanisms in place to manage the communications of prisoners convicted of terrorism-related crimes.  See Ex. 31.

2.      Disputed. The phrase "analysis and review that draws on the multi-faceted knowledge base" of the Defendants belies the perfunctory, pre-ordained nature of the Plaintiffs' actual SAMs reviews, and this is an area of extensive factual dispute between the parties. See, e.g., Ex. 1 at ¶ 132 (describing ADX warden stating that, notwithstanding that the communications with Spanish prisoners had ceased, "he was told to impose these restrictions on me, and there were a lot of politicians involved."). Paul O'Brien, the director of the Office of Enforcement Operations (OEO), the agency that

makes the final recommendation regarding the imposition of the SAMs testified that he is unaware of any occasion where OEO has recommended disapproval of a request for SAMs designation or component of the restrictions in the request.  Ex. 72 at 41:12-17; 46:20 – 47:7.  The OEO relies exclusively on information provided by FBI and USAO – no independent investigation is conducted by any other part of DOJ.  Ex. 72 at 56:3 – 57:19; 131:15-22.  OEO relies upon information provided by the investigating agency (the FBI in this case), and neither it or anyone else in chain of review conducts an independent investigation. Ex. 72 at 173:17 – 174:22.

3.      Disputed. <u>See</u> <u>id</u>. In addition, the prisoner has no input in the process of initiating imposition of the SAMs.  Ex. 72 at 70:6-13.  <u>See</u> <u>also</u> Ex. 1 at ¶ 134 ("No one gave me any reason why the SAMs had been imposed on me, other than that some politicians had reacted to the NBC report."); Ex. 2 at ¶ 112.

4.      Disputed. <u>See</u> <u>id</u>. Plaintiffs had no input into the process of initiating the imposition of the SAMs.  Ex. 72 at 70:6-13; Ex. 2 at ¶ 112.  Additionally, the government's acknowledgement that Plaintiffs' SAMs were imposed because of "those bullshit letters" suggests that any "review" was a sham.  Ex. 25 at US005059-60.

**A.      SAMs imposition.**

5.      Undisputed.

6.      Disputed.  Neither BOP nor the inmate himself has any input or involvement in this process.  Ex. 72 at 60:5-9; 70:6-13.  These would be the most knowledgeable sources of information regarding "Plaintiffs' institutional conduct," "inmate's conduct while in BOP custody," and his "ability to incite others and disrupt prison environment."

7.      Partially disputed.  The FBI is the *only* participating agency that does any investigation.  Ex. 72 at 173:17 – 174:22.

8.      Undisputed that the Defendants consider these factors to be relevant to the SAMs analysis, but disputed as to the implication that any of Plaintiffs' communications were presented as capable of "caus[ing] bodily injury" or indicat[ing] use of "code," as the government's own documentation of the Plaintiffs' communications concluded that none of these factors applied to Plaintiffs.  See Ex. 26 at US55551 ("While the writing of [the Plaintiffs and Mohammad Salameh to Spanish inmates] includes many religious references, we assess that this rhetoric does not indicate operational planning or guidance."); and Ex. 11 at US4996 (memo from FBI re translations of Mr. Ayyad's letters to Spanish prisoners) ("it is clear that he is quite aware of the fact that all of his correspondence is inspected by the prison officials.  And he tells all those that he corresponds with of this fact.  So the likelihood of either he or those writing him of slipping him any sensitive information is remote").

9.      Undisputed.

10.     Undisputed that the FBI prepared these assessments; disputed as to the contents and conclusion of the assessments.  See response to ¶ 8.

11.     Undisputed.

12.     Disputed. The use of the phrase "collaborative effort" belies the perfunctory, pre-ordained nature of the Plaintiffs' actual SAMs imposition and renewals, and this is an area of extensive factual dispute between the parties. See, e.g., Ex. 1 at ¶ 132 (stating that political considerations were given to Plaintiff as sole reason for imposition).

13.     Partially disputed.  The OEO relies heavily on the FBI to do the initial assessment.  OEO views its role as compiling information, reviewing it, and "mov[ing] it through the chain of command."  Neither OEO nor anyone senior to it would generally make further inquiry into the bases for conclusions reached by the FBI.  Ex. 72 at 173:17 – 177:10.

14.     Disputed. That the "government has concluded that OEO can rely on the information provided by" other government actors is unsupported by any undisputed evidence. As detailed throughout this response, the Plaintiffs heavily dispute the information and conclusions generated by the FBI, on the basis that they are both incorrect and they obscure the *actual* reasons for imposition and renewal of the SAMs on both Plaintiffs. See, e.g., Ex. 1 at ¶ 132 (stating that political considerations were informally given to Plaintiff as sole reason for imposition). Additionally, the government's own documents show that there is disagreement within the FBI, albeit outside of the review process described in the Motion, about the decision to impose the SAMs.  See Ex. 25 at US005059-60 (characterizing the Plaintiffs' SAMs as resulting from "those bullshit letters").

15.     Partially disputed.  The OEO does not assess additions to or deletions from list of people with whom a SAMs inmate can communicate. Ex. 72 at  79:23 – 81:3.  The Director of the OEO doesn't recall if the OEO's review of restrictions on access to media requires any more specificity than "restrictions upon access to media as deemed appropriate."  Id. at 87:21 – 88:2.  Additionally, the OEO is not involved with reviewing requests for access to particular books (Ex. 72 at 89:12 – 90:3), or reviewing the impact of the SAMs on an inmate's ability to communicate with other inmates, as

compared with inmates not under SAMs.  Id. at 94:6-14.  Neither does the OEO consider

the impact of the SAMs on an inmate's ability to progress through the ADX Step-Down

Program.  Id. at 170:3-19.  The OEO relies heavily on the FBI to do the initial

assessment, and views its role as compiling information, reviewing it, and "mov[ing] it

through the chain of command."  Neither OEO nor anyone senior to it would generally

make further inquiry into the bases for conclusions reached by the FBI.  Id. at 173:17 –

177:10.  The OEO has made no recommendations regarding the appropriateness of any

particular SAMs provision during Director O'Brien's tenure.  Id. at 46:20 – 47:7.

16.     Undisputed.

17.     Partially disputed. The use of the verb "can request" belies the absence of

any undisputed evidence that this has ever actually happened.  In fact, neither the OEO

nor anyone senior to it would generally make further inquiry into the bases for

conclusions reached by the FBI.  Ex. 72 at 173:17 – 177:10.

18.     Undisputed.

19.     Disputed. The Plaintiffs heavily dispute that any meaningful notice of the

basis for the SAMs was ever provided to them. See, e.g., Ex. 2 at ¶¶ 110-111 (describing

SAMs imposition "without providing me with any hearing or explaining any specific

violations I committed") and ¶¶ 207-219 (describing lack of notice of, and meaningful

reasons for, successive SAMs renewals); Ex. 1 at ¶¶ 134 ("No one gave me any reason

why the SAMs had been imposed on me, other than that some politicians had reacted to

the NBC report") and ¶¶ 203-212 (describing lack of notice and opportunities for input

from Plaintiff in SAMs renewal process).  For both Mr. Ayyad and Mr. Abouhalima, the

"notice of the basis for the SAMs" was simply a recitation of the SAMs regulation – 28

C.F.R. § 501.3.  See, e.g., Ex. 73 – AB007521, stating SAMs imposed "based on your proclivity for violence."  Additionally, the SAMs notice is provided to the prisoner only after the SAMs have already been imposed, without giving him the opportunity to see the allegations motivating the SAMs prior to imposition. See Ex. 1 at ¶ 134 ("I was not given prior notice that I had committed an act of violence in my communications with anyone."). The prisoner has no input in the process before this point, and his only recourse after notice is to challenge the imposition of SAMs through the BOP's administrative remedy program – which does not involve the OEO or anyone else actually involved in the imposition of the SAMs.  Ex. 72 - O'Brien dep. 90:10 – 91:12. The BOP was not involved in initiating the proposal for Plaintiffs' SAMs.  Ex. 72 at 60:5-9.

20.     Undisputed that the text of the regulation recites this; however, the Plaintiffs heavily dispute that the notices provided to them of the reasons for imposing SAMs were limited in their contents to preserve prison security or safety, national security or to protect against acts of violence or terrorism, and there is no undisputed evidence that supports these being the reasons for the insufficient notices that were in fact provided.  To the contrary, the *actual* bases for SAMs imposition were not included in any notice because those bases are impermissible.  See, e.g., Ex. 25 at US005059-60 (characterizing the Plaintiffs' SAMs as resulting from "those bullshit letters").

**B.     SAMs renewals.**

21.     Partially disputed.  The involvement of OEO and the BOP in the review process is minimal.  Ex. 72 - O'Brien dep. at 173:17 – 177:10.

22.     Undisputed that Plaintiffs are given a form on which they can write; disputed that they are able to provide "input" in connection with the pre-renewal review because Plaintiffs are not told about any concerns Defendants may have about specific communications so that Plaintiffs could explain or respond to those concerns.  Ex. 2 at ¶¶ 209-210; Ex. 1 at ¶¶ 203-212; and Ex. 74 - October 2011 SAMs input form from Mr. Ayyad ("I cannot provide any meaningful comment and/or recommendation concerning possible SAMs renewal if I don't know what allegations or evidence would be used against me to justify such renewal.  I request to be provided with specific reasons that [are] going to be used by BOP, FBI or AUSA and allow me an opportunity to respond").  Prior to 2010, a prisoner could only submit written comments to BOP in connection with SAMs renewals and/or pursue BOP administrative remedies.  See Ex. 72 - O'Brien dep. 71:4 – 72:23. These comments would only have been further disseminated at the discretion of the BOP's general counsel (and O'Brien recalls no instance when this was done).  Id. at 71:24 – 73:1.  In other words, the undisputed evidence indicates that these written comments were never conveyed to anyone with any authority to do anything.

23.     Partially disputed.  See supra at ¶ 22.  Additionally, while Plaintiffs have been asked to attend a meeting with BOP and FBI staff prior to the renewal of their SAMs, they are not told about any concerns Defendants may have about specific communications so that Plaintiffs could explain or respond to those concerns, despite making repeated requests for this information. Ex. 1 at ¶¶ 203-212 (in response to question from Plaintiff regarding whether "there was anything I could do to mitigate the reasons why they imposed and are renewing the SAMs each year for the last six years," was told "keep doing what you're doing, we can't tell you what else you can do"); Ex. 2

at ¶¶ 214-220 ("I asked whether anyone (the FBI agent and/or ADX staff) could tell me what reasons – if any – would be used against me to support the SAMs renewal.  I was given no answers"); Ex. 75 - US015387 (memo summarizing FBI/BOP meeting with Mr. Ayyad, "he questioned how he could mitigate his SAMs because he is trying to do the right thing.  How could he control incoming publications which are used to continue his SAM. . . .").

### 1.      Prisoner written comments.

24.     Undisputed.

25.     Undisputed that a prisoner may write these things.  Disputed that they have any weight in the review process.  Also, the Plaintiffs are not told about any concerns the government has had about specific communications so that Plaintiffs could explain or respond to them.  Ex. 2 at ¶¶ 214-220, Ex. 1 at ¶¶ 203-212; Ex. 75; Ex. 76 - US015388 (Dec. 2010 "input sheet" from Ayyad) ("I don't know any specific reasons that would be used against me to justify renewal . . . therefore, I cannot have a meaningful input if I don't know such reasons").

26.     Partially disputed.  See supra at ¶ 25.  Additionally, prior to 2010, a prisoner could only submit written comments to BOP in connection with SAMs renewals and/or pursue BOP administrative remedies. Ex. 72 - O'Brien dep. 71:4 – 72:23. These comments would only have been further disseminated at the discretion of the BOP's general counsel (and O'Brien recalls no instance when this was done).  Id. at 71:24 – 73:1.  The undisputed evidence indicates that these written comments were never conveyed to anyone with any authority to do anything.

### 2.      Prisoner interviews.

27.     Partially disputed.  This "in-person meeting" is a new informal procedure instituted by BOP at ADX in 2010 for informal discussions between the inmate and BOP/FBI representatives regarding SAMs renewals. Ex. 72 - O'Brien dep. 73:2-18. This process has not been formalized in a regulation and OEO Director O'Brien was unaware of any experience with it at the time of his deposition (only had conversations about it with members of BOP).  Id. at 73:19 – 74:16.

However, one of the bases used by the government to justify the March 2011 renewal of Mr. Ayyad's SAMs was a four-page religious letter that the government asserted that Mr. Ayyad had received from another prisoner. See Ex. 77 at US015453. This was asserted notwithstanding that the government's own documentation of the January 6, 2011 meeting with Mr. Ayyad states that "the Bureau was able to determine the handwritten message was in fact given to Ayyad by the Bureau's imam and had been given to a number of inmates in the unit." Ex. 75 at US15387.   The inclusion of the four-page letter as a justification for the renewal of the 2011 SAMs nevertheless indicates that the OEO, which makes the ultimate decision of whether to renew the SAMs, does not receive or meaningfully consider information obtained at the "in-person" meeting.

Additionally, at this "in person meeting" with the FBI and ADX staff, nothing is told to the prisoner about the reasons why the government intends to renew the SAMs. Ex. 2 at ¶¶ 214-220.  When Plaintiffs have tried to use these meetings to ask about the government's concerns so that they can try to address them, they are not told of the government's concerns and are instructed only to "just tell us what you want to say."  Id.

28.     Disputed. The attendance of the personnel described belies the meaninglessness of the meeting itself.  See Ex. 1 at ¶¶ 207-212 (stating that Plaintiff was

told by ADX counsel "that I am here today to provide some additional comments, ask questions, or give any recommendations," but that "this was not a formal hearing," and was stopped from asking FBI agent present about misinterpretations of correspondence "because this was not the time or place to discuss such things.").

29.     Undisputed that a memo is prepared, though Plaintiffs are not given the memo.  Ex. 2 at ¶ 219.

30.     The OEO is unaware of any experience with this process as of his 10/15/2010 deposition.  Ex. 72 at 73:19 – 74:16 (Rule 30(b)(6) witness admitted only having conversations about it with members of BOP).  Plaintiffs thus have not been given an opportunity to inquire as to if and how it is working.  Plaintiffs dispute that it is working, and should have an opportunity to conduct discovery on this point prior to consideration of a Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 56(d).

31.     Partially disputed.  Mr. Ayyad was not permitted to meaningfully participate in this meeting.  Ex. 2 at ¶¶ 214-220.

32.     Partially disputed.  See Response to ¶ 30, supra.

33.     Partially disputed. Mr. Abouhalima was not permitted to meaningfully participate in this meeting. Ex. 1 at ¶¶ 207-212.

34.     Partially disputed. Mr. Abouhalima was not permitted to give information on relevant topics related to renewal of his SAMs at this meeting, or afterwards. Id.

**3.     Renewal decision.**

35.     Undisputed.

36.     Partially disputed. Although the FBI provides such an assessment, it does not include the prisoner's input regarding the basis of the FBI's assessment, as he is not

aware that an "assessment" is filed by the FBI, or what the contents of the assessment are. See, e.g., Ex. 1 at ¶ 211 ("Mr. Brieschke said to me that after this meeting they, the ADX, write their report, the FBI would write its report separately, and each would recommend whether the SAMs be extended for one year, modified, or whatever, and then these reports are submitted to the office of the AUSA in New York, and they would decide.").

37. Undisputed.

38. Undisputed.

39. Partially disputed. The OEO relies upon information provided by the investigating agency (the FBI in this case), and neither it nor anyone else in the chain of review conducts an independent investigation. Ex. 72 - O'Brien dep. 173:17 – 174:22.

40. Undisputed.

41. Undisputed.

42. Disputed. The Plaintiffs heavily dispute that any meaningful notice of the bases for either imposition or renewal of the SAMs was ever provided to them. See, e.g., Ex. 2 at ¶¶ 110-111 (describing SAMs imposition "without providing me with any hearing or explaining any specific violations I committed") and ¶¶ 207-219 (describing lack of notice of, and meaningful reasons for, successive SAMs renewals); Ex. 1. at ¶¶ 134 ("No one gave me any reason why the SAMs had been imposed on me, other than that some politicians had reacted to the NBC report.") and ¶¶ 203-212 (describing lack of notice and opportunities for input from Plaintiff in SAMs renewal process). The notices are vague and unspecific. See, e.g., Ex. 78 - US006434, US007560, US10995 (SAMs renewals for Mr. Ayyad); Ex. 79 - AB5029, AB5046, AB5203, AB5418 (SAMs renewals for Mr. Abouhalima).

### 4.    Non-renewal decisions.

43.    Plaintiffs are not in a position to confirm or dispute this assertion as Defendants have not produced this information.  However, of the prisoners Plaintiffs know of who did not have their SAMs renewed, none of these non-renewals was a result of participation in the H-Unit Program.  Ex. 2 at ¶ 222; see also Ex. 1 at ¶ 242 (describing how ████████████████████████████████████████████████████████ ██████████████████████████████████████████).

44.    Disputed.  Mr. Ayyad has information from ██████████, another SAMs prisoner, that the only information he submitted in his "input" sheet was "Leave me alone." ████████ SAMs were removed shortly thereafter.  Ex. 2 at ¶ 223.

45.    Partially disputed.  Plaintiffs are aware of several inmates whose SAMs were not renewed, including H-Unit inmates ████ and ████, as described supra. According to the BOP's Inmate Locator, these inmates are now still at the ADX or are in Communications Management Units (CMU's).  See, http://www.bop.gov/iloc2/LocateInmate.jsp

## VIII.   BOP's ADMINISTRATIVE REMEDY PROGRAM.

1.    Disputed.  While the text of the regulation states this, when Plaintiffs have sought to use the BOP's administrative remedy program to challenge the imposition and renewal of their SAMs, the response they typically receive is that "the BOP does not impose the SAM and has no authority to remove or amend any restrictions imposed." See, e.g., Ex. 80 - AB001171 (response to grievance challenging imposition of SAMs) ("The BOP has no authority to remove or amend any restrictions imposed"); Ex. 81 - AB002038 (BP-11 response re imposition of SAMs) ("SAMs are imposed pursuant to

federal regulation by the Attorney General of the United States.  The BOP does not impose the SAMs, nor does it have the authority to reverse or modify such SAMs"); Ex. 82 - AB004632 (BP-10 response re 2009 SAMs renewal) ("The BOP neither imposes nor rescinds the SAMs but implements the restrictions contained within.  Therefore your SAM will remain in effect until such time the Attorney General determines it is no longer warranted"); Ex. 83 - US007230 (SAMs "are within the jurisdiction of the United States Attorney General and the Bureau of Prisons has no authority to remove or amend the restrictions imposed"); and Ex. 84 - US14021 ("[b]ecause you still pose a threat to national security, your SAM was recently extended for one year")**.**  The BOP's administrative remedy program is not designed to challenge the substance of the OEO/USAO/FBI determination to impose or renew a SAMs designation. OEO Director O'Brien, testifying as a Rule 30(b)(6) designee, confirmed this when he stated that the Administrative Remedy Program did not involve his office "in any way" and that, to his understanding, is exclusively within the BOP.  Nor could he discuss the "mechanics or procedural requirements of the administrative remedy program." Ex. 72 - O'Brien dep. 90:10 – 91:12.

2.      Disputed.  The OEO has no involvement in the administrative remedy process.  Ex. 72 - O'Brien dep. 91:6-8.

3.      Partially disputed.  See para. 1, supra. Further, because the Plaintiffs are not told the specific reasons motivating the imposition or renewal of the SAMs, the information they provide in the administrative remedy cannot address the government's allegations/concerns, and thus cannot be taken into account in considering whether the

decision should be "altered."  Ex. 72 - O'Brien Depo at 91: 6-8; Ex. 2 at ¶ 221; Ex. 1 at ¶¶ 203-212.

4.       Partially disputed.  Because the Plaintiffs are not told the specific reasons motivating the imposition or renewal of the SAMs, the information they provide in the administrative remedy cannot address the government's allegations or concerns, and thus cannot be taken into account in considering whether the decision should be "altered."  Ex. 72 - O'Brien Depo at 91:6-8; Ex. 2 at ¶ 221; Ex. 1 at ¶¶ 203-206.  When Plaintiffs have sought to use the administrative remedy process to learn the reasons for the renewal of their SAMs each year, they receive in response only boilerplate language that does not inform them of the actual reasons for the renewal.  See Ex.'s. 80 – 84.

5.       Disputed.  See para. 3 supra.

6.       Partially disputed.  The Office of the OEO has no involvement in the administrative remedy process.  Ex. 72 - O'Brien dep. 91:6-8.  These modifications are proposed by the USAO working with the FBI, id. at 37:21-25, and can only be approved by the OEO if everyone in the process concurs, i.e., CTS, FBI, US Marshall, BOP, USAO.  Ex. 72 at 38:4 – 39:8.

7.       Disputed. The two processes "operate[ ] in much the same way" only in that they are both perfunctory and have pre-ordained outcomes. The OEO has no involvement in the administrative remedy process.  Ex. 72 - O'Brien dep. 91:6-8.  These modifications are proposed by the USAO working with the FBI, id. at 37:21-25, and can only be approved by the OEO if everyone in the process concurs, i.e., CTS, FBI, US Marshall, BOP, USAO.  Ex. 72 at 38:4 – 39:8.

8.      Partially disputed. The Plaintiffs have also been told to request modifications to the SAMs by submitting names and information via a form (eventually) created by the BOP.  They have submitted these same names over and over and have either had them rejected or receive no response.  Ex. 2 at ¶¶ 169-170, 174; Ex.1 at ¶¶ 204-205; Ex. 85 – 12961 (Abouhalima request with list of names – "I am submitting this list for the third time"); Ex. 86 - US12968 (Ayyad submitting requests on 11/22/07 and 2/10/08).  After years of such requests, Mr. Abouhalima was finally informed in approximately November 2011 that his SAMs were modified to permit him to communicate with four relatives.  At the same time, however, Defendants removed his mother-in-law from his list of approved contacts, citing "resource issues."  Ex. 1 at ¶ 247. Mr. Ayyad has been asking for approval to communicate with family and friends since 2005.  Ex. 2 at  ¶¶ 169-170, 174.

9.      Partially disputed. There is no undisputed evidence to support the contention that this actually occurs. To the contrary, information has been repeatedly provided by Plaintiffs over the years to support their requests to communicate with additional family members; these requests have been denied for years, often with no response provided to Plaintiffs at all. See Ex's 85 & 86; Ex. 17 at ¶ 5; Ex. 2 at ¶¶ 170, 174.

10.     Undisputed that ADX legal staff are not precluded from obtaining such information.  Disputed that they have actually done so for Plaintiffs.  Ex. 2 at ¶ 170;  Ex. 87 - (Abouhalima Requests for emergency phone calls/correspondence – denied).

11.     Partially disputed. The OEO has no involvement in the administrative remedy process.  Ex. 72 - O'Brien dep. 91:6-8.

12.     Partially disputed. The OEO has no involvement in the administrative remedy process.  Ex. 72 at 91:6-8.

13.     Disputed as to the Plaintiffs.  <u>See</u>, <u>e.g.</u>, Ex. 87 at p. 1 (request from Abouhalima to write condolence letter to his cousins upon learning of the death of his uncle "where we lived together and growing up together as one family for 22 years of my life") and Ex. 88 -AB001986 (FBI response to request:  "Inmate requests to write letters of condolence to family of deceased uncle in Egypt.  The FBI is not authorized to amend the conditions or restrictions of the SAMs agreement and regrets to inform inmate Abouhalima that his wishes to write to non-immediate family members cannot be authorized by the FBI"). Ex. 1 at ¶¶ 162-163 and 170-175.

14.     Partially disputed.  Since 2005, Mr. Ayyad has repeatedly filed Administrative Remedies to allow him to correspond with family members and friends. Only his request to correspond with a lawyer (Daniel Manville) was granted via the Administrative Remedy process.  Ex. 2 at ¶ 169.  Mr. Abouhalima has received rejections of a number of requests to contact, or of particular communications with, prospective counsel and various family members, and to receive printed mass communications quicker and without significant portions removed. <u>See</u> Ex. 1 at ¶¶ 152-153 and 155-175.

15.     Undisputed that prisoners can ask for modifications of their SAMs, but disputed that this actually results in an initiation of a "SAMs modification process." Plaintiffs' requests for additional correspondents are made but typically not acted upon, with months or years elapsing with no response.  Ex. 2 at ¶¶ 170, 174 (2008-2011); Ex. 17 at ¶ 5.

16.     Disputed that this occurs for all requests.  See, e.g., Ex. 89 at 13563 (noting multiple requests from Mr. Ayyad and denying all).

17.     Plaintiffs are not in a position to confirm or dispute this assertion as Defendants did not provide this information in discovery.

## IX.     ADX SPECIAL SECURITY UNIT PROGRAM.

1.     Partially disputed.  Prisoners in H-Unit, including Plaintiffs, are not allowed to see the description of this "program" or to know what it is about, what the criteria are for participation in the various phases of the program, or the goal or purpose of the "program."  Ex. 2 at ¶¶ 182-183; Ex. 90 (Ayyad copout/response re request for H-Unit Program Institution Supplement) (the IS "is categorized as LOUO (limited official use only) and will not be distributed").

2.     Disputed.  Phase 2 of the H-unit Program did not become operational until 2008, when it started with two prisoners.  Phase 3 started in September 2010 with four prisoners.  Thus, some of the phases were not even operational when Defendants renewed Plaintiffs' SAMs in 2006, 2007, 2008 and 2009.  If a prisoner is "successful" in the H-Unit program, there is nothing to suggest this has any impact on the decision of whether to renew his SAMs, and much that suggests otherwise.  Ex. 91 - AB14119 (letter from ADX warden to FBI Agent Shannon recommending *against* SAMs modification for Phase 3 but stating that Abouhalima's "behavior and programming have been excellent"); Ex. 1 at ¶¶ 213-227 (describing, inter alia, the FBI blocking Plaintiff's progression to Phase 3 in 2011 because certain "high officials" took "a different interpretation" of a 2009 letter sent to his son, and the "approximately six others" with comparable conduct records to Plaintiff who were approved to Phase 3 from September 2010 to the present);

Ex. 2 at ¶¶ 186-187.  Conversely, the prisoners that Plaintiffs know of whose SAMs were

not renewed were either in Phase 1 or Phase 2 of the "program"; none was in Phase 3.

Ex. 2 at ¶ 222; Ex. 17 at ¶ 10.  See also Ex. 4 at US015095 (Notice of 2011 SAMs

renewal for Ayyad) ("your placement in Phase III does not justify removal of the SAM").

3.      Disputed.  Notwithstanding the similar names given to them, the programs

are completely different from each other in their goals and influence on an inmate's

conditions of confinement. According to BOP policy, the Step-Down Program for ADX

General Population inmates provides that "[a]s inmates at the ADX demonstrate period of

clear conduct and positive institution adjustment, it is possible for the inmate to progress

through [less restrictive units] and be transferred out of the Program to an open-

population institution."  Ex. 92 - ADX Step-Down Institution Supplement at pp. 5-6.  The

H-Unit program, however, has no such purpose - it is not even called a "step-down"

program because there is no expectation that a prisoner can step down to anything outside

of H-Unit.  Prisoners under SAMs cannot work their way out of H-Unit with good

behavior, because there is no way to leave H-Unit so long as the SAMs are on the

prisoner, and the SAMs are not removed because of good behavior.  See Ex. 47 at

US015095; see also Ex. 69 - Milusnic Dep. at 38:25 – 39:14 ("there's different aspects of

H-Unit versus a general population program.  The phases themselves are contained

wholly within H-Unit and progression through the phases does not automatically equate

to transition out of the unit").

4.      Partially disputed.  The term "classification" implies that this is a decision

made by the BOP, which it is not. Progression to Phase 3 of the H-Unit Program requires

modification of the SAMs, and thus is a decision made by the FBI, USAO and/or the

OEO. Ex. 69 - Milusnic Dep. at 111:24 – 113:2.

5. Partially disputed. The only "unrestrained physical contact" that exists is

in Phase 3. Ex. 2 at ¶¶ 187 – 194.

6. Undisputed.

7. Partially disputed. Sometimes both rec and showers are cancelled. Ex. 2

at ¶¶ 127, 130.

8. Partially disputed. Aside from minor differences in quantity of items that

can be purchased, the commissary list is the same for all three phases of the H-Unit

Program. Ex. 2 at ¶ 185.

9. Partially disputed. There are currently a total of seven people in Phase 3.

They are divided into three groups (two groups of 3 prisoners, one group has one

prisoner). Mr. Ayyad's group consists of himself, ▓▓▓▓▓ and ▓▓▓▓▓▓▓. Ex. 2

at ¶¶ 187-190. The "physical contact" referenced by Defendants consists of the ability to

be on the range with up to two other people for purposes of eating a meal or exercising,

though not in close proximity to each other. See Ex. 93 at USAB014736 (H-Unit Phase

III memo stating that only one inmate may use the exercise equipment at a time and no

other inmate may speak with him while he is using it).

10. Partially disputed. Mr. Ayyad is allowed a maximum (not a minimum) of

1.5 hours per weekday (Monday-Friday) on the range with two other prisoners. Ex. 2 at ¶

187; and Ex. 93.

11. The 1.5 hours Mr. Ayyad is allotted permits him time to eat, walk around

a bit, and shower (only one prisoner is allowed to shower at a time) before the time is up.

There is no time for card games, chess, etc.  Ex. 2 at ¶ 187.   Additionally, although Mr.

Ayyad is permitted to eat one meal with the two other people in his group, he has had

difficulty doing so because he has found that after more than 10 years in solitary

confinement, he cannot eat in front of other people anymore.  Id. at ¶ 246.

12.     Partially disputed.  Mr. Ayyad did not request, nor does he use, the

exercise bicycle.  Id. at ¶ 187.

13.     Disputed.  Mr. Ayyad, who is in Phase 3, is out of his cell for 13.5 hours

one week; the next week he is out of his cell for 15 hours per week (the weeks alternate).

Id. at ¶ 128.

14.     Partially disputed.  For the most part, commissary is same for all 3 phases

of the H-Unit Program except for volume of items that can be purchased – e.g., prisoners

can buy 8 bags of chips instead of 6.  In Phase 3, Mr. Ayyad was also permitted to

purchase a comb.  Id. at ¶ 185.

15.     Disputed.  Program reviews are created by case manager and consist of

s/he filling out form and returning it to the prisoner for his signature.  Ex. 2 at ¶¶ 199-

203.  When the case manager fills out the form, s/he notes only whether the prisoner is

"eligible for consideration" for progression to the next phase of the H-Unit Program but

does not undertake any consideration of the prisoner's appropriateness for progression.

See Ex. 94 at AB014973 (July 2010 Program Review for Mr. Abouhalima, on which the

case manager writes, "other issues – requests SAM removal and transfer out of ADX.

Cannot be resolved at unit team level.  Has filed administrative remedies regarding both

issues").

16.     Disputed.  Program reviews are not "reviews" in the sense of a meeting or discussion.  The Plaintiffs do not know when the program reviews are going to occur, and they do not have the opportunity to present information to demonstrate that they should be entitled to progress to the next phase of the H-Unit program, or to know about and address any concerns the BOP may have related to the decision to progress them.  Ex. 2 at ¶¶ 199-203.  Mr. Ayyad and Mr. Abouhalima typically are handed the program reviews at cell front and are directed to sign the form; sometimes the program review is simply slipped under their doors while they are at rec.  Id. at ¶ 201; Ex. 17 at ¶ 11.  It is not an interactive process and it has no impact on progression to the next phase of the program. See Ex. 2 at ¶ 199 ("The six-month 'Program Review' is a process that adds to my confusion. Every federal prisoner has a program review every six months; I used to get them when I was at Lewisburg and Terre Haute, too").

17.     Partially disputed.  This "eligibility" determination, made when the case manager fills out the program review form (which consists of case manager listing the TV programs that the prisoner should watch for the next six months), has no relationship to whether prisoner should be allowed to move to next phase of H-Unit Program. See Ex. 61 at AB14960 (H-Unit Institution Supp., reciting that "eligibility for consideration does not equate to appropriateness for advancement to the next phase of the Program").

18.     Undisputed.

19.     Partially disputed.  Because progression to Phase 3 requires a modification of the prisoner's SAMs, the decision to permit a prisoner to participate in Phase 3 does not rest with the BOP.  See, e.g., Ex. 95 - AB014120 (letter from FBI to ADX Warden opining that Mr. Abouhalima should not progress to Phase 3); and Ex. 91 (following this

letter, Mr. Abouhalima was denied placement in Phase 3 despite Warden's representation

that Mr. Abouhalima "can be effectively managed in Phase 2 where his behavior and

programming have been excellent."). See also Ex. 69 - Milusnic Dep. at 105:11 -15.

20. Partially disputed. The prisoner is not present at this meeting. He does

not know when it occurs or what is considered. He has no opportunity to provide any

input regarding the factors considered by the committee. See Ex. 1 at ¶¶ 203-212. The

entire meeting takes about 10 - 30 minutes for consideration of multiple prisoners. Ex.

69 - Milusnic depo. at 72:20 – 73:2. According to the criteria listed in the H-Unit

Program Institution Supplement, the prisoner's crime of conviction can be dispositive of

the decision whether or not to allow him to progress to the next phase. See Ex. 61 at

14691 (H-Unit Institution Supplement reciting criteria for progression through program

phases); see also Ex. 69 - Milusnic Dep. at 97:4-20 (acknowledging that H-Unit prisoner

could meet all of the eligibility criteria to progress but could spend his entire sentence in

Phase 1).

21. Undisputed that this is the BOP's position; however, the Plaintiffs dispute

the factual bases for this position with respect to them. See Ex. 1 at ¶¶ 217-223

(describing FBI refusal to allow Plaintiff's progression to Phase 3, despite good conduct,

due to "different interpretation" of approved correspondence to son from two years

prior).

22. Undisputed that this is the BOP's position; however, the Plaintiffs dispute

the factual bases for this position with respect to them. See id.

23. Undisputed that the FBI makes a determination; disputed that the

determination is limited to whether "a SAMs modification that permits physical contact

can be implemented without jeopardizing national or institutional security." See Ex. 95 -

(letter from D. Shannon, FBI to ADX Warden reciting alleged "SAMs violations" by Mr.

Abouhalima, but no assertion that such allegations should preclude "physical contact" in

Phase 3 of the H-Unit Program).

24.    Disputed. Ex. 1 at ¶¶ 216 ("…there has been no formal process to let me

know or understand what more has to be done to modify or remove the SAMs provisions,

to advance to the next phase of the step-down program, or even to affect my placement in

the ADX and change my administrative segregation") and ¶¶ 220-223 (describing how

reason for most recent denial of progression to Phase 3 was only explained by ADX staff

as "the FBI had objected"; Plaintiff was required to informally follow up with FBI agent

during visit to H-Unit to learn more, albeit not much more).

25.    Partially disputed.  The Program Screening Committee cannot advance the

inmate to Phase 3 at a future review without the express permission of the FBI and the

prosecuting USAO.  Additionally, if the reason for denial is the prisoner's crime of

conviction, this is, by definition, a factor that cannot change and therefore will have the

practical effect of future denials.  See Ex. 61 at US14961.

26.    Disputed.  Any appeal of the decision through the administrative remedy

program is considered only by the BOP, not by the FBI/USAO/OEO, thus rendering the

appeal meaningless. Ex. 72 at 90:16 – 91:12.

27.    Undisputed.

28.    Undisputed, though the (now seven) H-Unit prisoners are divided into

three groups of two and one group of one.  Groups are not permitted to mix.  Ex. 2 at ¶

189.

29.     Partially disputed. There is no undisputed factual evidence presented that "Abouhalima encourage[ed] radicalized behavior" in his family members, and Abouhalima has testified repeatedly and at length to the contrary.  Ex. 1 at ¶¶ 176-202. Further, Abouhalima is currently in Phase One as a result of an incident report that he successfully overturned on appeal; despite the reversal of the incident report, he has not been returned to Phase 2.  Id. at ¶ 221.

## X.     LIVING CONDITIONS IN H-UNIT.

1.     Undisputed.

2.     Undisputed that prisoners at the ADX who are under SAMs are housed in H-Unit.

3.     Undisputed.  Plaintiffs have sentences of over one hundred years.  Ex. 2 at ¶ 1; Ex. 1 at ¶ 49.   They are not eligible for parole as there is no federal parole.  Even if they earn all of the good time for which they are eligible, they will be in prison for the rest of their lives.

4.     Undisputed. See id.

5.     Undisputed.

6.     Undisputed that H-Unit cells have approximately 75.5 square feet of living space, which is smaller than the ADX "general population" cells.

7.     Undisputed that SAMs prisoners do not have showers in their cells.  The lack of a shower has a significant impact on H-Unit inmates, especially during lockdowns as prisoners are denied the opportunity to shower for days at a time. Ex. 1 at ¶ 137.  The inability to shower is a hardship for Plaintiffs because cleansing oneself is important to performing certain acts of worship in Islam.  Ex. 2 at ¶ 123.

8.      Undisputed that H-Unit cells have solid metal doors with a small window. Looking from their cells through the window in the door, Plaintiffs are able to see a wall and the floor. Id. at ¶ 117.  Upon their arrival at ADX in 2002, a magnetic cover was placed over the window every time another prisoner was moved. Id. at ¶ 77 (Ayyad describing this practice and explaining how "[a]t one point, I wanted to see another human being so badly that I would lay down on my stomach on the floor in hope of glimpsing someone's feet as he passed by my cell).

9.      Partially disputed.  "Passers-by" are ADX staff who walk around and periodically look in the cells, often without saying anything to the prisoner inside.  The range is empty most of the time.  Ex. 2 at ¶¶ 125, 194.  On the limited occasions that prison staff seek to "converse" with H-Unit inmates, they must stand directly next to the solid steel door, with the inmate directly on the other side of the solid steel door. Because of the way the door is configured, Plaintiffs need to speak loudly in order to be heard by, for example, the imam, or mental health personnel such that these "conversations" are not private. See Ex. 1 at ¶ 112 (describing how sound travels in ADX "general population" cell); Ex. 2 at ¶¶ 140-141.

10.      Partially disputed.  The cell window that "looks outside" allows Mr. Ayyad and Mr. Abouhalima to see only a brick wall and some exercise cages.  If they crane their necks, they can barely see the sky.  Ex. 2 at ¶ 117.

11.      Disputed as to the implication that the light switch allows Plaintiffs to escape artificial light.  Some lights in front of the cell are on 24 hours per day, which makes the cell very bright all the time, regardless of the ability to turn off the cell light. Ex. 2 at ¶ 119.

12.     Undisputed.

13.     Undisputed.

14.     Partially disputed.  While H-Unit policy permits 5 visits per month,[4] pursuant to ADX policy, those visits may only occur on Mondays, Tuesdays and Wednesdays.  Ex. 61 at AB14958.  Also, only one H-Unit prisoner is permitted in the visiting area at a time, regardless of whether the visit is legal or social and despite the fact that every prisoner in a social visit is isolated in a small booth in which he can neither see nor hear other prisoners or visitors.  Id.  The result is that scheduling visits is very difficult; if a legal or social visit is already scheduled for a particular day, a different prisoner's family or lawyer will not be allowed to visit.  Also, the fact that social visits are not permitted on weekends or holidays makes it difficult, and sometimes impossible, for family members to visit since they are unable to miss work. Ex. 1 at ¶¶ 228-232; Ex. 2 at ¶¶ 166-168.

Additionally, if for some reason the FBI's translator is unable to attend the visit, Plaintiffs' families are forced to speak in English (in which Mr. Ayyad's mother is not fluent) or forfeit the visit entirely.  Ex. 2 at ¶ 229. This occurs despite the fact that Plaintiffs' families are only able to afford to visit them approximately one time per year. Id. at ¶¶ 168  and 229.

15.     Partially disputed.  Plaintiffs are only able to see the sun if they are taken to the exercise cages after lunch, which occurs once or twice per month.  If they are taken to the cages in the morning, it is often too early for them to see the sun because it is still behind the prison walls.  Ex. 2 at ¶ 129; Ex. 17 at ¶ 7.

---

[4] Plaintiffs are not permitted to see this policy.  Ayyad Decl. at ¶ 183.

16.     Undisputed.

17.     Partially disputed.  There are six exercise cages in the cement enclosure. Depending on the number of prisoners who are taken to the cages, sometimes Mr. Ayyad and Mr. Abouhalima are placed in the cages by themselves or with only one other prisoner.  Ex. 2 at ¶ 192; Ex. 17 at ¶ 7.

18.     The cement enclosure in which the exercise cages are kept has walls that are higher than the walls of the cages.  As a result, when Plaintiffs are in the cages, they can see nothing beyond the cement walls of the enclosure – no grass, trees, or surrounding landscape.  Ex. 2 at ¶ 129; Ex. 17 at ¶ 7.

19.     Undisputed as to number of times recreation was formally cancelled; however, sometimes, the correctional officers will say they did not hear the prisoner asking for rec and will then cancel his rec.  Ex. 2 at ¶ 127.

20.     Partially disputed.  Because of the small size of the exercise cages, Mr. Ayyad and Mr. Abouhalima are only able to take three steps in one direction and five in the other.  As a result, they cannot run or even walk quickly. Ex. 17 at ¶ 7; Ex. 2 at ¶ 128.

21.     Partially disputed.  The configuration of the cells in H-Unit makes it difficult, if not impossible, for Plaintiffs to "talk" with each other.  Plaintiffs can sometimes yell to each other through the cement walls, but this enables only brief exchanges and is not akin to talking or conversation in the way those terms are usually understood.  The only other way to communicate is for the prisoner to put his face into the toilet and yell through the plumbing – which Plaintiffs are unwilling to do.  Ex. 2 at ¶ 122.  Additionally, when Plaintiffs are taken to indoor rec, they are placed alone, in

solitary cells from which they cannot talk to anyone.  And some of the 2-3 days each week when they are taken to outdoor rec, they are taken alone. Ex. 17 at ¶ 7.

22.     Undisputed that the Plaintiffs are fully shackled when they are moved outside of their cells.  Undisputed that the Plaintiffs are subjected to frequent radiation via the x-ray body scanner because stripping naked is considered an Islamic violation. Ex. 2 at ¶ 180.

23.     Undisputed as of March 2011.

24.     Undisputed as of 2009; prior to that date, Plaintiffs had no access to news channels.  Ex. 41.

25.     Undisputed.

26.     Partially disputed.  Mr. Ayyad has been denied permission to take Arabic correspondence courses.  Ex. 2 at ¶¶ 135-136; Ex. 68.

27.     Partially disputed.  Certain legal materials are not accessible via the Lexis program used at the ADX.  Ex. 2 at ¶ 132.

28.     Partially disputed.  The unit orderly position is the only job available to prisoners in H-Unit.  Because there are so few orderly jobs available, only a few H-Unit prisoners can be orderlies at a time.  As a result, those prisoners – such as Mr. Abouhalima – who want to have an orderly job (as this is the only way to earn money) are only able to have it on a rotating basis.  Ex. 17 at ¶ 8.

## XI.     PLAINTIFFS' TRANSFERS TO THE ADX.

### A. No Meaningful Review Preceded the Plaintiffs' Transfers to the ADX

1.     Disputed.  When Plaintiffs were transferred to ADX in 2003 and 2003, their transfers were effectuated not via the BOP's classification system, but rather

pursuant to a memorandum by BOP Assistant Director Michael Cooksey issued after the

September 11th attacks, ordering all federal prisoners convicted of terrorism-related

crimes first to be put in solitary confinement and then to be considered for transfer to the

ADX. See Ex. 96 - US011350 (Memo from M. Cooksey); Ex. 97 – Second Cooksey

Memo; see also Ex. 1 at ¶ 102 (describing being told by FBI agent after September 11th

but before ADX transfer "that everything will change for me and the other federal

inmates like me, who have terrorism-related convictions," and by USP-Leavenworth

warden "that he received a list of names of inmates to be locked up [on 9/11], and that

my name was on that list.").

2.      Undisputed that at the time Plaintiffs were sent to ADX, this Program

Statement was in effect.  Under this Program Statement, ADX Florence and USP Marion

are "Exceptions" to the normal Central Inmate Monitoring procedures.  Ex. 98 at

US015032 ("ADX Florence general population units are used for those inmates who have

demonstrated an inability to function in a less restrictive environment without being a

threat to others, or to the secure and orderly operation of the institution."  Id.

"Prior to referring an inmate to USP Marion or ADX Florence, redesignation to another

high security institution should be considered first."  Id. at US015032.  Disputed that

Plaintiffs were transferred to ADX pursuant to this policy.  See para. XI(A)(1), supra.

3.      Disputed.  These reviews did not follow the guidelines and procedures

required by Program Statement 5100.07.  See id.

4.      Disputed.  ████████████████████████████████

████████████████  Ex. 99 at US014516.  ████████████████████

████████████████████████  Id.  Close Supervision Transfers are

part of the standard CIM transfers – not within the "Exceptions" for ADX Florence and

USP Marion. <u>See</u> Ex. 98 at US015020-21.  Additionally, there is no indication in the

Transfer Packet that "redesignation to another high security institution" was considered.

Ex. 99 at

US014517.  Also, there is nothing in the Transfer Packet (Def. Ex. E-3) to suggest that

Mr. Ayyad had "demonstrated an inability to function in a less restrictive environment

without being a threat to others, or to the secure and orderly operation of the institution."

The only justifying factors cited are:

20).                                    (Ex. 100 at 59:9-14).

(<u>Id</u>. at 96:1 – 98:22),

5

5.      Partially disputed in that Mr. Ayyad's transfer to ADX was not within the parameters of Program Statement 5100.07.  See Ex. 98.

6.      Partially disputed.  There is nothing in the Transfer Packet (Def. Ex. E-3) to suggest that Abouhalima had "demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution." To the contrary, the referral memo recites that, "He receives above average work reports and relates well with staff and inmates.  Abouhalima has made a favorable institutional adjustment." See Ex. 24 at USAB014440; and Ex. 101 - USAB014443 (Progress Report). Instead, the rationale for referral is that, due to the nature of his crime of conviction, "he requires greater security than afforded at USP Leavenworth," and transfer was recommended to USP Marion, not ADX, "for his safety and the safety of others at this institution."  Ex. 24.

7.      Partially disputed. Mr. Abouhalima's transfer to the ADX was not within the parameters of Program Statement 5100.07. See Ex. 98.

8.      Partially disputed.  Neither of the Plaintiffs received a pre-transfer hearing. Both Plaintiffs challenged their transfers to ADX via the administrative remedy program and both asked about the reason for the transfer at every opportunity, including with the case manager who filled out the Program Review form.  Plaintiffs were never given any reason, other than their crimes of conviction, for being sent to ADX, and were not told of

any way to mitigate that situation such that they could be transferred back to their pre-9/11 statuses.  See Ex. 1 at ¶¶ 104-105 ("I wasn't told how long I would have to be in the ADX. I wasn't told of any program to follow to work my way back out of the prison…I requested an opportunity to go through the ADX step-down program to get out of the prison, but all of these administrative remedies were denied, as I expected.").  Ex. 2 at ¶¶ 63-64, 197-198.  See also Ex. 99 at US014517

**B.1. The Hearing Process for ADX Transfers**

9.      Disputed.  Neither the criteria nor procedures for designating inmates to the ADX have materially changed – Program Statement 5100.08 (Sept. 2006) (Ex. 102) is virtually identical to old Program Statement 5100.07 with regard to ADX placement. Program Statement 5100.08 states that USP Marion and ADX Florence general population units "are designed for male inmates who have demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution."  Ch. 7, p. 17.  Program Statement 5100.08 also provides that "Prior to referring an inmate to USP Marion or ADX Florence, redesignation to another high security institution should be considered first."  Id. at pp. 17-18.

10.     To the extent the "Nalley Memorandum" is inconsistent with or expands the criteria for assignment to the ADX as otherwise established by Program Statement 5100.08, or is interpreted in such fashion, the Nalley Memorandum is invalid.  BOP Program Statement Directives Management Manual (Ex. 103) at Ch. 1, pp. 1-2 (manual describing the "types of directives" and noting that "[r]equirements . . . and policy not

issued in conformity with this manual are <u>not enforceable as policy</u> and may not be cited, relied upon, or otherwise used to carry out any Bureau policy or procedure unless an exception is made by the Director in writing" and that "**[i]t is vital that staff, including those who have authority to issue formal directives, not attempt to use less formal communications to change or replace a formal directive"**) (emphasis in original).

11.     To the extent the "Nalley Memorandum" is inconsistent with or expands the criteria for assignment to the ADX as otherwise established by Program Statement 5100.08, or is interpreted in such fashion, the Nalley Memorandum is invalid.  <u>Id</u>. The Hearing Officer understood the hearings she conducted in December 2009 were "to see if they [Mr. Ayyad and Mr. Abouhalima] met the criteria for placement *at the time of their initial placement.*" Ex. 104 - Alexander dep. 19:20-22 (emphasis added).

12.     These factors are materially inconsistent with the criteria under Program Statement 5100.07 existing at the time of the transfers of Mr. Ayyad and Mr. Abouhalima to ADX in 2003-04, as well as the criteria under current Program Statement 5100.08 and the criteria under the Nalley Memorandum itself.  <u>See</u> 13 below.  Consideration of these factors is, therefore, invalid.  The Hearing Officer understood the hearings she conducted in December 2009 were "to see if they [Ayyad and Abouhalima] met the criteria for placement *at the time of their initial placement.*"  Ex. 104 - Alexander dep. 19:20-22.

13.     Partially disputed as the Nalley Memorandum did not exist at the time that Plaintiffs were transferred to ADX.  Ex. 105 - Nalley Memo.

14.     The Hearing Officer understood the hearings she conducted in December 2009 were "to see if they [Ayyad and Abouhalima] met the criteria for placement *at the time of their initial placement*." Ex. 104 at 19:20-22.  The factors provided as guidelines

for consideration of placement at the ADX in the Nalley Memorandum (*e.g.*, placement under SAMs, conviction or charge of terrorist activities, national security management concerns) are inconsistent with Program Statement 5100.07 and Program Statement 5100.08 – application of these factors is therefore invalid.

15.     Disputed.  There are material differences between the *guidelines* for placement at ADX under the Nalley Memorandum, on the one hand, and the *criteria* for such placement stated in the Nalley Memorandum itself and both Program Statement 5100.07 and Program Statement 5100.08.

16.     Undisputed that the hearing officer makes this recommendation, though the recommendation is made on the basis of criteria not in effect at the time that the Plaintiffs were transferred to ADX.  See Resp. to Facts at ¶¶ 11-15 supra.

17.     Undisputed.

18.     Under the criteria for placement at ADX as expressed in Program Statement 5100.07 (in effect at the time of the transfers), Program Statement 5100.08 (in effect at the time of the retroactive hearings), and the Nalley Memoradum itself, placement of Ayyad and Abouhalima at ADX would not be appropriate or subject to authorization.  See Resp. to Facts at ¶¶ 11-15 supra.

19.     Undisputed that this occurred for one prisoner out of the hundreds of retroactive hearings conducted.

**B.2. The Hearings Provided to the Plaintiffs Came Years After Their Transfers**

20.     Undisputed.

21.     Undisputed.

22.     Undisputed.

23. The Notices recited the criteria expressed in the Nalley Memorandum, and are thus invalid and insufficient to the extent they are inconsistent with Program Statement 5100.07 and Program Statement 5100.08. See ¶ 10-11 supra.

24. Undisputed.

25. These bases for a recommendation for transfer to ADX – i.e., the crime of conviction – do not bear upon the criteria for designation to ADX under Program Statement 5100.07 or Program Statement 5100.08 – i.e., whether Ayyad or Abouhalima "have demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution." The Notices were therefore inaccurate and invalid under the applicable Program Statements. See ¶ 10-11 supra.

26. Partially disputed. The Notices were provided approximately 48 hours before the teleconference hearings, and thus did not allow reasonably sufficient time for preparation.

27. Partially disputed. At the hearing, Mr. Ayyad asked to be able to call witnesses. Mr. Ayyad was not allowed to present witnesses at the hearing. Ex. 104 - Alexander dep. 50:18-25. The Hearing Officer told him he was not allowed to have witnesses and that he should just say what he wants. Ex. 2 at ¶ 77. Additionally, Mr. Ayyad was not allowed to have assistance of an attorney or BOP staff at the hearing. Ex. 104 at 57:8-22. There is no record of the hearing proceedings other than the Hearing Officer's notes, which were shredded after she prepared her report. Id. at 58:2-14.

28.      Disputed.  Ex. 2 at ¶ 68 ("I also asked to offer my BOP central file (FOIA exempt section) as evidence to show the SIS reports on me while I was at Lewisburg. The hearing officer also denied that request without explanation").

29.      Partially disputed.  Mr. Abouhalima was not allowed to present witnesses at the hearing.  Ex. 104 at 50:18-25.  Mr. Abouhalima was not allowed to have assistance of an attorney or BOP staff at the hearing.  Id. at 57:8-22.  There is no record of the hearing proceedings other than the Hearing Officer's notes, which were shredded after she prepared her report.  Id. at 58:2-14.

30.      Partially disputed.  Mr. Abouhalima was not permitted to meaningfully participate in this hearing, its outcome was pre-ordained, and it was expressly not intended to meaningfully address any of the actual reasons for his placement in his present conditions of confinement.  Ex. 1 at ¶¶ 106-111.

31.      Partially disputed. The hearing by its express terms did not meaningfully address whether Mr. Abouhalima's placement was appropriate. Id.

32.      Partially disputed.  The Hearing Officer understood the hearings she conducted in December 2009 were "to see if they [Mr. Ayyad and Mr. Abouhalima] met the criteria for placement *at the time of their initial placement.*" Ex. 104 - Alexander dep. at 19:20-22.   The Referral for Transfer after the "hearing" recites (as noted above) that one of the factors considered for "transfer" was "The United States Attorney General has limited the inmate's communication pursuant to a Special Administrative Measure order."[6]  Mr. Ayyad was not under SAMs at the time of the transfer.  The Hearing Officer amended her referral on March 16, 2011, deleting this factor, followed by an amended

---

[6] Mr. Abouhalima is also currently under a SAMs order – just like Ayyad – but this factor does not appear on his referral.

Placement Notice by the Regional Director on March 17, 2011 – well over a year after

the "hearings" and after the initial referral and placement notice, without an additional

"hearing" or opportunity for a hearing, contemporaneously with the submission of the

Hearing Officer's declaration and days before the filing of the Motion for Summary

Judgment.  There is no indication or explanation that any of the five incident reports (or

which if any) "demonstrated an inability to function in a less restrictive environment

without being a threat to others, or to the secure and orderly operation of the institution"

– per the applicable and controlling Program Statements then and now – or even

demonstrate that "the inmate's placement in other correctional facilities creates a risk to

institution security and good order, or poses a risk to the safety of any individual" or that

the inmate "could not be safely housed in the general population of another institution"

per the criteria in the questionably valid Nalley Memorandum.  None of the incident

reports were factors in the initial placement at ADX – see above.  So these are now an

invalid *post-hoc* justification not related to the initial transfers.  Additionally, there is no

indication or explanation as to why the crime of conviction "demonstrated an inability to

function in a less restrictive environment without being a threat to others, or to the secure

and orderly operation of the institution" – per the applicable and controlling Program

Statements then and now – or even demonstrates that "the inmate's placement in other

correctional facilities creates a risk to institution security and good order, or poses a risk

to the safety of any individual" or that the inmate "could not be safely housed in the

general population of another institution" per the criteria in the questionably valid Nalley

Memorandum.  Inclusion of the crime of conviction – which is a permanent factor that

cannot be mitigated – strongly implies that placement at the ADX is permanent.

33.     Undisputed.

34.     Undisputed.

35.     Partially disputed.  The Hearing Officer understood the hearings she conducted in December 2009 were "to see if they [Mr. Ayyad and Mr. Abouhalima] met the criteria for placement at ADX *at the time of their initial placement.*" Ex. 104 - Alexander dep. at 19:20-22 (emphasis added).  The Hearing Officer stated that she did not consider whether Mr. Abouhalima should remain at ADX, but, rather, whether "at the time he was transferred to the ADX, he was appropriate for placement based on his criminal convictions and/or misconduct when he was transferred." Id. at 68:4-9.  There is no indication or explanation that any of the twelve incident reports (or which if any) "demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution" – per the applicable and controlling Program Statements then and now – or even demonstrate that "the inmate's placement in other correctional facilities creates a risk to institution security and good order, or poses a risk to the safety of any individual" or that the inmate "could not be safely housed in the general population of another institution" per the criteria in the questionably valid Nalley Memorandum.  Mr. Abouhalima's initial referral memo recites "He receives above average work reports and relates well with staff and inmates. Abouhalima has made a favorable institutional adjustment" (Ex. 24 at USAB014440; Ex. 101 at USAB014443).  There is no indication or explanation as to why the crime of conviction "demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution" – per the applicable and controlling Program Statements then and now – or even

demonstrate that "the inmate's placement in other correctional facilities creates a risk to institution security and good order, or poses a risk to the safety of any individual" or that the inmate "could not be safely housed in the general population of another institution" per the criteria in the questionably valid Nalley Memorandum.  Inclusion of the crime of conviction – which is a permanent factor that cannot be mitigated – strongly indicates that placement at the ADX is permanent.

36.     Undisputed.

37.     Undisputed.

38.     Undisputed.

39.     Undisputed.

40.     Undisputed.

41.     Undisputed.

42.     Undisputed.

43.     Undisputed that this was the BOP's decision.

44.     Undisputed that the Hearing Officer received this information; disputed that this information was not available to her at the time she created the first hearing notice and recommendation. See Def's Mtn., Ex. E-3 (Transfer Packet).

45.     Undisputed.

46.     Undisputed that the Hearing Administrator's recommendation remained the same.

47.     Partially disputed.  This decision was incompatible with the transfer criteria of both Program Statement 5100.07 and Program Statement 5100.08, inconsistent

with the criteria in his own "Nalley Memorandum," and inconsistent with the rationale actually stated for the initial transfer at the time of the initial transfer.

48.     Partially disputed.  This decision was incompatible with the transfer criteria of both Program Statement 5100.07 and Program Statement 5100.08, inconsistent with the criteria in his own "Nalley Memorandum," and inconsistent with the rationale actually stated for the initial transfer at the time of the initial transfer.

49.     Undisputed.

50.     Undisputed.

51.     Undisputed.

52.     Partially disputed.  This decision was incompatible with the transfer criteria of both Program Statement 5100.07 and Program Statement 5100.08, inconsistent with the criteria in his own "Nalley Memorandum," and inconsistent with the rationale actually stated for the initial transfer at the time of the initial transfer.

53.     Undisputed that Ms. Alexander later became aware that three of the incident reports on which she relied for her recommendation that Mr. Abouhalima was appropriate for ADX placement occurred after he had been sent to ADX; disputed that this information was not available to her at the time she wrote the notice and conducted the hearing.  Additionally, of the nine incident reports that were issued *before* Mr. Abouhalima's transfer to ADX, none were found to be relevant to the initial transfer. Abouhalima's initial referral memo recites, "He receives above average work reports and relates well with staff and inmates.  Abouhalima has made a favorable institutional adjustment."  Ex. 24; Ex. 101 at USAB014443.

54.     Undisputed that Ms. Alexander created new hearing notices that did not recite the three incident reports that occurred *after* Mr. Abouhalima was transferred to ADX.

55.     Partially disputed.  This decision was incompatible with the transfer criteria of both Program Statement 5100.07 and Program Statement 5100.08, inconsistent with the criteria in his own "Nalley Memorandum," and inconsistent with the rationale actually stated for the initial transfer at the time of the initial transfer.

56.     Undisputed that the Regional Director decided that Abouhalima's placement at ADX was appropriate; however, this decision was incompatible with the transfer criteria of both Program Statement 5100.07 and Program Statement 5100.08, inconsistent with the criteria in his own "Nalley Memorandum," and inconsistent with the rationale actually stated for the initial transfer at the time of the initial transfer.

**C. Other Reviews of the Plaintiffs**

57.     Undisputed that the BOP has these three procedures; disputed as to the implication that these procedures are used to determine whether Plaintiffs' SAMs should be renewed from year to year and/or whether they should remain in ADX.  Ex. 2 at ¶¶ 199-206.

58.     Partially disputed.  Program reviews are conducted by the case manager. At ADX, this consists of the case manager filling out the program review form and directing the inmate to watch particular programs on his television, such as "Legends of the Silver Screen," "Animals of the World," and "Sparta."  Ex. 106 - AB014981; Ex. 2 at ¶¶ 199-204.

59.     Undisputed.

60.     Undisputed.

61.     Partially disputed.  Program reviews are not "team meetings" in the sense that the prisoner's entire unit team meets to review him, nor does he participate in any such "meetings."  Ex. 2 at ¶¶ 199-204.

62.     Partially disputed.  Plaintiffs' "program reviews" do not provide an evaluative process by which they are considered for progression to and through the ADX Step-Down Program, which is the typical way that ADX prisoners are able to ultimately transfer out of the ADX.  See Ex. 107 at US12779 (administrative remedy response stating "you are currently assigned to the Special Security Unit" and "you are ineligible to participate in the general population stepdown program; however, you are eligible to participate in the Special Security Unit stepdown program").

63.     Disputed as to Mr. Ayyad and Mr. Abouhalima.  There is no evidence in the Program Reviews that a "team meeting" occurs.  Ex. 106.

64.     Undisputed.

65.     Undisputed.

66.     Disputed.  The "program review" consisted of Mr. Ayyad's case manager filling out a form and giving it to him.  There was not a process available to him to raise concerns about his transfer with anyone who had the ability to address that decision.  Ex. 2 at ¶¶ 63-64, 199-201.

67.     Undisputed.

68.     Undisputed.

69.     Undisputed.

70.     Undisputed.

71.     Disputed.  The "program review" consisted of Plaintiffs' case manager filling out a form and giving it to them or sliding it under their doors.  There is no "process" available to Plaintiffs to raise concerns about their confinement at ADX, including their confinement in H-Unit, with anyone who has the ability to address those decisions.  Ex. 2 at ¶¶ 199-204.

72.     Partially disputed.  BOP policy provides that "progress reports" are created for each federal prisoner every three years.  The progress reports do not have any effect on a prisoner's eligibility for transfer out of ADX or removal or modification of the SAMs.[7]  Ex. 2 at ¶¶ 204-205; Ex. 1 at ¶ 217 and 219 (describing lack of progress notwithstanding positive progress reports).

73.     Id.

74.     Disputed.  Ex. 2 at ¶ 205.

75.     Id.

## XII.   GENERAL BOP LIMITATIONS UPON AND MONITORING OF PRISONER COMMUNICATIONS.

1.     Undisputed.

2.     Undisputed.

3.     Undisputed.

4.     Undisputed.

5.     Undisputed.

6.     Undisputed.

---

[7] Oddly, Mr. Ayyad's most recent progress report (September 2010) advises him to "maintain community ties via visits, written correspondence and phone calls" and rates his "active participation in a faith group" as "sometimes" and his "connect[ion] to outside spiritual/religious community" as "never."  US15068-79.

7.      Undisputed.

8.      Undisputed.

9.      Undisputed.

10.      Undisputed; however, ADX "general population" prisoners may receive visits from family members every weekend and on holidays, unlike prisoners under SAMs, who may only receive visits on Mondays, Tuesdays and Wednesdays and only when no other inmate is having a visit of any kind.  Ex. 2 at ¶¶ 166-168. Additionally, if for any reason an FBI translator is not available, even for a visit that has been scheduled months in advance, the visit may be cancelled without notice.  Ex. 108 at US10544-46.

11.      Undisputed.

## PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS

**Background Information**

1.      Neither of the Plaintiffs is eligible for parole, as there is no federal parole. See Comprehensive Crime Control Act of 1984, Ch. II (Sentencing Reform Act of 1984), Pub. L. 98–473, October 12, 1984 (abolishing parole for inmates sentenced after 1987). They are serving sentences well in excess of their remaining natural lives, and therefore they will die in prison. See Ex. 1 at ¶ 49 ("In July 1994, I was sentenced to two hundred and forty years."); Ex. 2 at ¶ 1.

2.      Neither of the Plaintiffs wishes any harm to the United States or its citizens, nor do they consider themselves enemies of either.  Ex. 2 at ¶¶ 12-18; Ex. 1 at ¶¶ 31-35, 50, and 244.

3.      The "government," whose "determin[ations]" regarding the Plaintiffs comprise the bulk of the Motion, did not "determine" that SAMs should be imposed on either of them prior to March 2005, despite explicitly contemplating doing so at least once, following the September 11th attacks. See Ex. 96 - Cooksey Memorandum #1 (October 1, 2001) at 2 (noting with respect to the Plaintiffs, among others, that "[w]e anticipate that some or all of these inmates will have SAMs approved in the near future."); and Motion at 7 ("In March 2005, the government imposed SAMs on Plaintiffs.").

**The Plaintiffs' Conditions of Confinement in United States Penitentiaries before the September 11th Attacks**

4.      The Plaintiffs spent eight years, from 1994 to 2001, in general population housing units at United States Penitentiaries (USP), which are high-security prisons. See generally Ex. 102 - BOP Program Statement 5100.08, Inmate Security Designation and

Custody Classification (September 12, 2006), Ch. 1 at 1 (describing five security levels of BOP institutions). During this time, they held laundry, orderly, maintenance, printing, and food service jobs alongside other inmates; ate their meals in a dining hall, at a table with other inmates; were able to walk freely inside their housing units and on the prison yard, alone or with other inmates; and were allowed to play sports or join sports teams with other inmates. Ex. 2 at ¶¶ 31-34; Ex. 1 at ¶¶ 57-59, 63, 88-90, 94-95, and 98.

5.      During their eight years in USP general population units, the Plaintiffs also: communicated with family in the United States and abroad on a daily basis using phones that were available in their housing units at any time, without prior permission; experienced delays of only a few days for prison staff to read, translate, and release incoming and outgoing mail, whether in English or Arabic; prayed in congregation; had contact visits with their families at tables in the main prison visiting room when other inmates with visitors were also present; were allowed to communicate with the news media; at USP-Leavenworth, had copies of their mail reviewed by the FBI agent assigned to the prison; and, at USP-Leavenworth, were given approximately twenty phone calls per month. Ex. 2 at ¶¶ 35-42; Ex. 1 at ¶¶ 64, 66-68, 70, 91, 92-93, and 96. See also Ex. 109 - US010883 (visiting list from USP-Lewisburg for Mr. Ayyad); Ex. 18 - Badra Decl. at ¶¶ 9-10, 12-15; Ex. 110 - Decl. of Basem Salem at ¶¶ 2-3; Ex. 111 - Decl. of Khalil Badra; Ex. 112 - Decl. of Majeda Ayeshalmoutey; Ex. 113 - Decl. of Abdel Rahim Reziq; Ex. 114 - Decl. of Abderrahman Ayyad (Mr. Ayyad's father) at ¶ 5 ("I used to regularly visit my son when he was imprisoned in Pennsylvania and New York.  I was able to touch my son during these visits.  I would like to touch my son again before I die").

6.      During their eight years in USP general population units, the Plaintiffs had permission to correspond directly with each other. See Ex. 115 - USAB005880-81 (granting permission for the Plaintiffs to correspond with each other).

7.      The conditions of confinement in which the Plaintiffs have been held in the ADX and under SAMs are more restrictive than the conditions in federal death row. See Ex. 116 – Decl. of M. O'Donnell at ¶¶ 4 -16.

**The Plaintiffs' Institutional Histories**

8.      Mr. Ayyad has had no incident reports since 1998. Ex. 33; Ex. 2 at ¶ 206.

9.      Mr. Ayyad was neither an imam in either USP-Lewisburg or USP-Terre Haute, nor did he have "influence" over other Muslims in those facilities. Ex. 2 at ¶ 35.

10.     Mr. Ayyad was never given an incident report for attempting escape, causing a disturbance, or rioting in any way.  Ex. 2 at ¶¶ 51 and 206.

11.     Mr. Abouhalima had no involvement with the killing of the correctional officer in USP-Lompoc.  Ex. 1 at ¶¶ 74-85.

12.     Mr. Abouhalima was never given an incident report or criminally charged for involvement in the killing of the correctional officer in USP-Lompoc, and he was treated by the BOP in a way that led him to understand that the BOP did not believe he was involved. See Ex. 1 at ¶¶ 85 (warden of USP-Leavenworth, the "chief investigator in the murder case" from USP-Lompoc, subsequently stated to Plaintiff that "if it had been found that I'd had any kind of role in that incident," Plaintiff would not be residing in the general population unit in which they were speaking).

**The Plaintiffs' Transfers to Segregation and the ADX After the September 11th Attacks**

13.　　On the morning of September 11, 2001, Plaintiffs were removed from their open population units and put into solitary confinement in the Special Housing Units (SHU) of their respective prisons.  Ex. 2 at ¶¶ 56-57; Ex. 1 at ¶ 99; Ex. 117 - US012312 (administrative detention order for Mr. Ayyad, issued 9/11/01 at 9:30 a.m.) ("you are being placed in administrative detention for investigation"); and Cooksey Memorandum #1 (October 1, 2001) at 1 ("Following the tragic events of September 11, 2001, all inmates in the custody of the Bureau of Prisons (BOP) who were convicted of, charged with, associated with, or in any way linked to terrorist activities were placed in Administrative Detention as part of an immediate national security endeavor.").

14.　　Neither of the Plaintiffs was told the reason for being placed in segregation, nor given the opportunity to rebut those reasons. See Ex. 2 at ¶ 57; Ex. 1 at ¶¶ 100 and 102 (describing summary placement in SHU, and later being told by FBI agent that "everything will change for me.").

15.　　The segregation cell in the SHU at Leavenworth where Mr. Abouhalima was housed was approximately twelve feet by six feet, with a solid steel door in the front wall and a narrow window on the back wall that looked out at the prison's fifty-foot outer wall. There was a shower in the cell, he was required to eat all meals in the cell, and was not allowed to have contact with any other inmates. Ex. 1 at ¶ 103.

16.　　In the segregation cell at Lewisburg where Mr. Ayyad was housed for a little over a year, his visits and phone calls were suspended for the first three months, and he was given one 15-minute call per month after that. He was placed in total isolation, all day every day, with neither radio nor TV allowed, and taken to recreation alone. He was

allowed only one non-contact visit a month, limited to two hours, and only with immediate family.  Ex. 2 at ¶ 62.

17.     The Plaintiffs were subsequently transferred to the ADX pursuant to a broad-based determination made for inmates with terrorism convictions following the September 11th attacks. See Ex. 97 - Cooksey Memorandum #2 (March 28, 2002) at 1 (stating that the Plaintiffs, among others, were "appropriate for transfer to the United States Penitentiary, Administrative/Maximum (ADX) in Florence, Colorado, and in fact, most have already been referred for such transfer."); Ex. 2 at ¶¶ 63-64 (describing only reason for transfer given as "security reasons"); and Ex. 1 at ¶ 104 ("I was told by the first unit team to interview me there that the reason for my transfer to the ADX was 9/11, and that the BOP had transferred some other inmates like me to the ADX as well.").

18.     Neither Plaintiff was given notice, nor an opportunity to be heard, prior to his transfer to the ADX.  Ex. 2 at ¶ 63 ("I learned about my transfer to ADX on the same day it happened…"); Ex. 1 at ¶ 104 ("Without warning or prior notice, on March 24, 2003, I was transferred to the ADX…").

19.     After their arrival at the ADX, prison staff expressly contemplated that the Plaintiffs "be housed in ADX . . . for an indeterminate amount of time." Ex. 9 at US010825.  See also Ex. 1 at ¶ 104 ("I wasn't told how long I would have to be in the ADX. I wasn't told of any program to follow to work my way back out of the prison.").

20.     In the ADX general population, the Plaintiffs were in housed in single cells. Each cell contained a shower, a cement bed, and two gates at the front. The inner gate had a slot for meal trays, and was locked at all times, except when meals were provided through another slot in the cell's outer, solid door, or they were removing the

inmate from the cell. All meals were consumed in the cells. When the cell doors were closed, it was almost impossible for the Plaintiffs to communicate with other inmates. Ex. 2 at ¶¶ 83-84; Ex. 1 at ¶¶ 112 and 114. Outside recreation occurred in groups for three hours, two or three times per week, and on the other days inside recreation, which was individual, was provided.  Id. at ¶ 113.

21.     The Plaintiffs were not provided with hearings regarding their transfers to the ADX until seven years after those transfers occurred, and the hearings did not address the SAMs or the Plaintiffs' specific placement in H-Unit of the ADX. Ex. 2 at ¶¶ 65-72 (describing hearing and outcome); Ex. 1 at ¶¶ 106-110 (same). New hearing documentation was inexplicably provided to the Plaintiffs months after the hearings themselves. Ex. 1 at ¶ 111.

**The Plaintiffs' Correspondence with Spanish Prisoners**

22.     After transfer to the ADX, all of the Plaintiffs' incoming and outgoing mail in both English and Arabic was reviewed, or subject to review and approval, by BOP staff, and the Plaintiffs knew this to be the case. See Ex. 1 at ¶¶ 118-119 and 122; Ex. 118 - (envelopes showing review and approval of letters by ADX staff) (AB07409, AB07416, AB07613).

23.     The Plaintiffs did not know the crimes of conviction of the persons with whom they corresponding, nor had the Plaintiffs previously corresponded with or met them.  Ex. 2 at ¶¶ 91-92 and 98; Ex. 1 at ¶¶ 121 and 123-125.

24.     The Plaintiffs stopped the correspondence with the Spanish prisoners immediately upon being told to do so by BOP staff.  Ex. 2 at ¶ 97; Ex. 1 at ¶ 127. Neither Plaintiff received an incident report for this correspondence.  Ex. 2 at ¶ 99; Ex. 1

at ¶ 127. See also Ex. 10 at US004952 (indicating that BOP had stopped Plaintiffs' correspondence with Spanish prisoners in 2004); and Ex. 12 (stating that, "[a]mong the key points of the proposed NBC story will be 'how could the BOP let this happen.' Actually, the BOP eventually detected that the correspondence was addressed to other inmates and it was stopped.").

25.     The government has never asserted that any terrorist acts occurred as a result of the Plaintiffs' correspondence. To the contrary, the Defendants' own documentation states that the FBI "does not believe operational or other guidance on the part of the '93 TRADEBOM inmates was involved" in Plaintiffs' correspondence with the Spanish prisoners. Ex. 26 at US005551.

26.     Of all the letters exchanged between the Plaintiffs, Mr. Salameh and the Spanish prisoners, "only three reference jihad and martyrdom," all of which are from Mohammed Salameh, who is not a party to this case. Ex. 26 at US005551.  Even with respect to those particular letters, the FBI concluded that "taken in context, none of these passages appear to reference a threat or terrorist operation." Id. Mr. Salameh's letters are also the only ones quoted in the NBC media broadcast. Abouhalima Decl. at ¶ 129.

27.     Ramzi Yousef and Mr. Ayyad's mother never exchanged correspondence. Ex. 18 at ¶ 31.

28.     Mr. Ayyad never corresponded with Jera or Binismail.  Ex. 2 at ¶ 93.

**Imposition of the SAMs on the Plaintiffs**

29.     The Defendants' principal interest in preventing the airing of the NBC broadcast about the correspondence between the Plaintiffs and the Spanish prisoners, as indicated by the Defendants' internal email communications, arose from their concern

that "among the key points of the proposed NBC story will be 'how could the BOP let this happen?'"  Ex. 12 at US4820.

30.     The Defendants were not actually concerned with whether the Plaintiffs knew the government was aware of the correspondence in question, as demonstrated by Defendants' allowing a copy of the *Al-Hayat* newspaper that contained a story about the correspondence to pass into one of the Plaintiff's hands.  Ex. 1 at ¶ 128.

31.     Prior to the airing of the NBC broadcast, the FBI "determined" that the Plaintiffs' communications "should be handled in accordance with established DOJ and BOP policies." Ex. 28 at US004827 and Ex. 29 at US004814.  See also Ex. 119 – MSNBC News Report (US004779 – 81) ("…federal officials tell NBC that the Department of Justice failed to restrict communications to and from the three bombers because key officials didn't consider them all that dangerous.").

32.     The SAMs were imposed on the Plaintiffs because of political pressure resulting from embarrassment at the NBC broadcast about the Plaintiffs, rather than any actual security concerns relating to their correspondence. See Ex. 1 at ¶ 132 (ADX warden stated to Plaintiff that "he knew" that Plaintiff had already ceased writing letters at the staff's direction, "but that he was told to impose these restrictions on me, and there were a lot of politicians involved."); Ex. 27 at AB06163.

33.     Neither of the Plaintiffs was given notice, nor an opportunity to be heard, prior to the imposition of SAMs.  Ex. 2 at ¶¶ 110-112; Ex. 1 at ¶¶ 133-134.

**The Plaintiffs' Communications with Family Members Under the SAMs**

34.     Since imposition of the SAMs, Mr. Abouhalima has requested permission to communicate with approximately 30 total individuals, and approximately 4 of those

requests have been granted (in 2011), although one German-speaking individual, ▮▮▮▮ ▮▮▮ was removed due to "resource issues." Months or years elapsed between the dates when Mr. Abouhalima made these requests and when he was notified that they had been approved or denied. Ex. 1 at ¶ 247; and Ex. 17 at ¶ 5. See also Ex. 85 at US12961-65 (letter from Mr. Abouhalima to ADX Attorney C. Synsvoll enclosing for the third time a list of names, phone numbers and addresses of family members he wishes to correspond with, "especially after a couple of my family members died within one month.").

35.     Mr. Ayyad has made repeated requests over a period of years to communicate with other family friends; until two months ago, all of those requests (with the exception of his grandmother) had been rejected. See, e.g., Ex. 86 (rejection notices). In 2011, his request to see his grandmother was granted years after he had made it, but by that time, his grandmother was too old and sick to travel to Colorado. Ex. 2 at ¶¶ 170-173; Ex. 18 at ¶ 30.

36.     Mr. Ayyad's request for approval for his four-year-old niece to be permitted to visit him along with his mother, because his mother has custody of the child and could not leave her alone, was denied. See Ex. 120 at US011732 (request); and US11731 (denial).

37.     Defendants periodically have prohibited Mr. Ayyad from communicating with the Jordanian embassy because of the SAMs, despite the fact that he has dual Jordanian and American citizenship.  Ex. 2 at ¶¶ 175-176.

38.     Prior to the imposition of the SAMs, Mr. Ayyad corresponded with his father in Arabic, and they exchanged letters/calls approximately every month.  Ex. 2 at ¶ 38.

39.     Due to the far greater amount of time it takes for the Defendants to pass along letters from Mr. Ayyad's father that are written in Arabic, he writes his letters in English, but because Mr. Ayyad's father is not fluent in English, his letters are very difficult to understand and are sometimes incomprehensible to Mr. Ayyad.  Ex. 2 at ¶ 257; Ex. 121 (US009826-27) (letter from Mr. Ayyad's father attempting to describe in English the progression of his cancer and pain); and US13032 (same); and Ex. 114 at ¶¶ 7-8.

40.     After Mr. Ayyad's father was diagnosed with cancer, he wrote to the BOP to request a one-time contact visit with his son. The government denied his request. Ex. 2 at ¶ 151; Ex. 114 at ¶¶ 3-4; Ex. 121 at US007550 (letter from Mr. Ayyad's father, "I wish they allowed me to visit you face to face.  Last hope, last wish to me in this life.  Maybe the jail manager feel with me.  I am a father.  For 12 years never seen you.  Told him that").

41.     Due to excessive delays in translating their mail, even those family members with whom the Plaintiffs are approved to correspond have dramatically curtailed their writing. Ex. 1 at ¶¶ 164 and 239; Ex. 2 at ¶ 152.

42.     The Defendants' decision-making regarding the Plaintiffs' approved correspondents does not seem to include an assessment of the particular security risk of any of the Plaintiffs' requested additional correspondents. See, e.g., Ex. 1 at ¶¶ 159-175 (describing various inexplicable rejections of correspondence and individual correspondents); Ex. 122 - AB003627 (letter from Mr. Abouhalima to his sister after learning of the death of his cousin "and what is really hurtful is that I can't speak or write even a short note or letter to our cousins in condolence of Mona's death").

**The Plaintiffs' Conditions of Confinement**

43.     The BOP houses approximately 209,754 people, with the largest number, 75,046, held in medium-security Federal Correctional Institutes (FCI), and a significant number, 27,143, held in USPs. See BOP Weekly Population, available at: http://www.bop.gov/locations/weekly_report.jsp (as of 2/13/11). By contrast, the ADX holds only 434 individuals. Id.  This constitutes one-third of 1% of all federal prisoners. Keller Decl. at ¶ 8, Exh. E-1 to Def's Motion.

44.     As of March 22, 2011, there were a total of 44 prisoners on SAMs in the entire country.  Collins Decl. at ¶ 3.  The percentage of the BOP inmate population that is on SAMs is .02%.

45.     The conditions of confinement in which Plaintiffs have been held for the past eight years are vastly more restrictive than the conditions in the FCIs or the USPs, and are even more restrictive than federal death row.  Ex. 116; see also Ex. 123 (Inmate Handbook at Federal Correctional Complex at Lompoc, CA).

46.     The Plaintiffs' cells in the ADX allow them a walking distance of eight feet, within which they must eat, read, write, sleep, walk, urinate, and defecate at all times, except when they are permitted to walk around in a comparably-sized outdoor cage or indoor recreation room. Ex. 1 at ¶ 235; Ex. 17 at ¶ 7; and Ex. 2 at ¶¶ 116-117.

47.     What the government describes as "Adult Continuing Education classes" are institutional television  programs about topics such as "Sparta," "Legends of the Silver Screen," "Animals of the World," and "Robert E. Lee and His High Command." Plaintiffs are required to watch these shows in order to be eligible for consideration for additional "privileges" in the H-Unit Program.  See Ex. 1 at ¶ 217 (describing Mr.

Abouhalima's "excellent participation in education," among other areas); Ex. 2 at ¶ 134; and Ex. 61 (H-Unit Institution Supplement).

48.     The interaction that Mr. Ayyad has with prison staff on a daily basis is typically less than one minute a day.  Ex. 2, Attach. I.

49.     Most of these interactions involve perfunctory exchanges, such as providing him with cleaning supplies or delivering mail.  Ex. 2, Attach. N.

50.     Mr. Ayyad's most recent visit with an imam was December 20, 2011 at his cell door.  The visit lasted approximately one minute.  Id.

51.     The cells in H-Unit, unlike an ADX general population cell have no shower and are accordingly smaller. Ex. 1 at ¶ 137. The Plaintiffs' commissary privileges are also more limited than in general population. Ex. 2 at ¶ 185.

52.     The psychological effects of his confinement at the ADX and in H-Unit on Mr. Ayyad include depression, weight loss, loss of memory and concentration, and persistent sadness.  Ex 2. at ¶¶ 238-251; Ex. 124 - US011455 (pre-ADX 1997 mental health report for Mr. Ayyad noting that "he has not presented any signs or symptoms of psychopathology" and "has reported no problems and requested no psychology services" while housed at Terre Haute). See also Ex. 2 at ¶¶ 238-250 ("I'm losing my memory, am unable to concentrate and am taking antidepressants…When I started in Phase III and was allowed to eat one meal each day with two other people, I noticed that I did not feel comfortable eating in front of others anymore …Five years ago, if someone told me some of the things I hear in H-Unit, I would have thought they were crazy and wouldn't have listened to them.  Now I'm listening.…Some days, I try to come up with a daily "to do" list…[t]his routine falls apart before it starts.").

53.     The psychological effects of his confinement at the ADX and in H-Unit on Mr. Abouhalima include depression, anxiety, fear, paranoia, loss of sleep, and loss of appetite. Ex. 1 at ¶¶ 147-150 (describing "devastating" effects of initial SAMs imposition) and 233-240 (describing ongoing effects).

**The SAMs Themselves**

54.     There is a dispute within "the government" itself about whether Plaintiffs' SAMs were warranted or appropriate.  In an email from New York FBI Agent ▮▮▮▮▮▮ ▮▮▮▮▮▮ to Colorado FBI agents regarding the types of reading material Plaintiffs could receive, ▮▮▮▮▮▮▮▮ stated, "When it comes to the books . . . again, I have no objection to these guys reading what they want. **The fact that they were all put under these SAMs based on those bullshit letters is bothersome enough**. . . ." Ex. 25 at US005059-60 (emphasis added).

55.     Even the government's SAMs origination memo for Mr. Abouhalima concludes that, "upon initial review of the brief summaries of the letters, the FBI does not believe operational planning or guidance on the part of the 1993 TRADEBOM inmates was involved."  Ex. 26.

56.     Subsequent translations of the letters in question similarly did not give the Defendants any cause for concern, despite the FBI's encouragement to staff to find "something more nefarious."  Ex. 125 at AB00767.

57.     After the FBI learned of Plaintiffs' correspondence with the Spanish prisoners (which had already ceased by the time the FBI learned of it), but prior to the airing of the NBC broadcast, the FBI saw no apparent need to impose SAMs on Plaintiffs, noting in a memo that "though SAMs are not in place on these three inmates,

this particular facility [ADX] houses many high priority international terrorism subjects and restricts their communication; consequently, the opportunities that they would have to recruit other inmates is limited." Ex. 126 at AB00773.

58.     The Defendants' own documents admit that the determination to impose SAMs was "influenced by the broadcast." Ex. 27 (BOP grievance response to 2008 SAMs renewal, stating that "the [NBC] broadcast highlighted the Department's need to closely monitor your communications. . . The need for the SAM may have been influenced by the broadcast, but it was not in retaliation for it.").

59.     The BOP and the FBI disagree as to the level of restrictions necessary for Mr. Abouhalima. Ex. 1 at ¶¶ 220-225 (describing how BOP and FBI disagreement over Plaintiff's advancement to Phase 3 of H-Unit program was resolved in favor of FBI position against advancement, and "member of the ADX executive staff" stated that BOP had "no problem approving me to Phase 3, and that everything they are told by the FBI about my letters to my children are absolutely irrelevant…"); see also Ex. 94 (favorable program review); Ex. 129 (ADX warden approving additional call for Mr. Abouhalima based on positive conduct); Ex. 91 (FBI recommending against Phase 3 placement for Mr. Abouhalima).

60.     The Defendants have, and continue to, make significant errors in the translation and interpretation of Plaintiffs' correspondence, as demonstrated by the mistranslations that have occurred to date, and there is no effective mechanism by which the Plaintiffs can learn of these errors by the Defendants in a timely fashion, and therefore potentially address them. See Ex. 1 at ¶¶ 73, 97, 126, 177, 191, 194, and 197; Ex. 2 at ¶¶ 100-109 and 260.

61.     Since their transfers to the ADX in 2002 and 2003, Plaintiffs have never known how long they would be held there or what (if anything) they can do to leave ADX, because there is no fixed end date to either the Plaintiffs' ADX confinement or their SAMs. Ex. 2 at ¶ 75 (describing how, upon arrival, the ADX warden "informed me that I may spend the rest of my sentence in the same cell I was in at that very moment"); Ex. 1 at ¶¶ 104-105 (this information not given upon arrival at the ADX) and ¶¶ 207-212 (told to "keep doing what you're doing, we can't tell you what else you can do" by staff in response to question from Plaintiff about how to mitigate reasons for SAMs).

62.     The government believes that "due to the gravity of offenses and length of sentences regarding ADX SAMs inmates, it is likely that SAMs measures will be in place for many of them for a number of years." Ex. 127 at AB11769.

63.     In memoranda generated pursuant to the SAMs renewal process, the FBI recites various "SAMs violations" by the Plaintiffs as justifications for renewal of the SAMs. The Plaintiffs are not given copies of these memoranda, nor do they have the opportunity to rebut the allegations of these "violations." See Ex. 128 - AB011791 & US013333.

64.     In 2009, the FBI deemed the following actions to be "SAMs violations," see Ex. 128 at AB011791, and used them to justify renewal of Mr. Abouhalima's SAMs for another year:

    a)  Letters sent to Mr. Abouhalima that he did not request, including magazine renewal offers;

    b)  Letters sent to Mr. Abouhalima from non-immediate family members that they did not request and have no control over;

    c)  Letters that are too long; and

     d)  A letter from Mr. Abouhalima to his son in which he described ▆▆▆▆▆

    ▆▆▆▆▆▆▆▆▆▆▆▆▆.

65.    During this same time period (January 2009), the BOP considered Mr. Abouhalima's behavior to be sufficiently positive as to warrant the privilege of a third telephone call each month. Ex. 129 - AB011796.

66.    In 2009, the FBI deemed the following actions to be "SAMs violations," see Ex. 128 at US013333, and used them to justify renewal of Mr. Ayyad's SAMs for another year:

    a)  11 incoming letters were rejected because they were from non-immediate family members, and two outgoing letters were rejected because they were to non-immediate family members;

    b)  two periodicals were rejected because they were not approved periodicals;

    c)  one incoming book was rejected because it was purchased and sent by an unidentified person; and

    d)  during a July 2008 visit with his youngest son and sister, Mr. Ayyad, after having the visit specified as English-only due to the lack of a qualified Arabic linguist, was admonished repeatedly for speaking Arabic during the visitation.

67.    The "eleven incoming letters" were sent by people and organizations over whom Mr. Ayyad has no control. Because he is not permitted to communicate with them, he is not even able to contact them to instruct them not to write to him. Ex. 2 at ¶ 227.

68.    The "two periodicals" referenced were not requested by Mr. Ayyad. Ex. 2 at ¶ 234.

69.    The "incoming book sent by an unidentified person" was sent by Mr. Ayyad's mother, Fatmeh Badra. Mrs. Badra provided a copy of the receipt for the book to

the ADX, but Mr. Ayyad was still not permitted to receive it and the FBI deemed the sending of it to be a "SAMs violation."  Id. at ¶ 228.

70.     The FBI's description of the July 2008 visit omits important information that Mr. Ayyad has repeatedly provided to the government in an effort to explain the relevant circumstances. Right before the visit began, ADX staff informed Mr. Ayyad that, due to the last-minute unavailability of the FBI translator, he and his family members would be required to speak to each other in English, despite the fact that his mother had arranged the visit two months in advance and notified them of their need to speak in Arabic during the visit. Mr. Ayyad's fifteen year-old son complied, apart from a few times when he used an Arabic word unintentionally. The FBI labeled him in later reports as "an uncooperative teenage son," as another basis for renewing the SAMs. Id. at ¶ 229.

71.     The ultimate decision about whether or not to renew the Plaintiffs' SAMs is made by OEO, which does not communicate or interact with the Plaintiffs at any point before, after, or during the renewal process. See Ex. 72 - O'Brien depo. at 173:17-177:10 (OEO relies on FBI's investigation and conclusions) and 90:10 – 91:12 (OEO has no involvement in BOP administrative remedy process, sole formal mechanism by which inmates can learn of bases for SAMs decisions). The Plaintiffs have never spoken to anyone from OEO. Ex. 17 at ¶ 13. See also Ex. 2 at ¶ 197.

72.     The H-Unit Program is not a "stepdown" program in that there is nothing/no place to step down to.  There is no way to get out of Phase III of the H-Unit Program absent removal of the SAMs.  Ex. 69 - Milusnic depo at 97:4-20.

73.     The ADX Step-Down Program, according to BOP policy, states that "[a]s inmates at the ADX demonstrate period of clear conduct and positive institution

adjustment, it is possible for the inmate to progress through [less restrictive units] and be transferred out of the Program to an open-population institution." Ex. 92 - ADX Step-Down Institution Supplement at pp. 5-6. In contrast, the stated purpose of the H-Unit Program is only to "receive increased privileges."  Ex. 61 at AB014955.

74.     H-Unit inmates, including Ayyad and Abouhalima, could spend the rest of their sentences in H-Unit at the ADX if their SAMs are not removed.  Ex. 69 - Milusnic Depo at 97:4-20; Ex. 130 - AB007990 (response to grievance requesting transfer from ADX to prior status at an open-population prison:  "you have a SAM; accordingly, you are not eligible for transfer at this time); Ex. 131 - AB012706 (response to grievance requesting transfer from ADX:  "a SAM has been implemented in order to restrict your access to the mail, the media, the telephone and visitors.  Accordingly, you are not eligible for transfer at this time"); Ex. 132 - AB006070 (response to 2008 grievance that Abouhalima is not able to participate in the ADX Step-Down Program:  "although no stepdown program currently exists for your unit, staff indicate that a modified one is in the process of being implemented . . . However, due to the SAMs imposed in your case, you will not be eligible to transfer to an open facility"); and Ex. 133 - US010370 (response to grievance from Mr. Ayyad requesting transfer from ADX:  "a SAM has been implemented . . . therefore you are appropriately designated to the ADX and housed in the Special Security Unit to ensure your SAM is sufficiently monitored").

75.     Defendants admit that Mr. Abouhalima cannot participate in the ADX Step-Down Program and eventually transfer out of ADX to an open penitentiary as long as he is subject to SAMs. Ex. 134 at AB004185.

76.     Defendants admit that Mr. Ayyad is not eligible to participate in the ADX Step-Down Program because he is "currently assigned to the Special Security Unit." Ex. 135 at US010000. See also Ex. 135 at US0010369 (response to administrative remedy: "as indicated in the warden's response, you are currently assigned to the Special Security Unit . . . You are ineligible to participate in the general population Step-Down Program").

77.     Decisions about whether Plaintiffs are able to move to the second or third phase of the H-Unit Program are made by the H-Unit Program Review Committee (though approval for Phase 3 cannot be granted solely by the committee or the BOP). See Ex. 61 - AB014955 (H-Unit Program Institution Supplement).

78.     No notice is given to Plaintiffs before meetings of the H-Unit Program Review Committee meetings, and there is no opportunity for Plaintiffs to provide input to the H-Unit Review Committee prior to or during the committee's meeting to determine whether they should be eligible to progress to the next phase of the H-Unit program.  Ex. 2 at ¶¶ 186 and 195-198.

79.     The BOP admits that a good indicator of future behavior is institutional conduct.  Ex. 69 - Milusnic depo, 81:4-82:12.

80.     Both Mr. Ayyad and Mr. Abouhalima have had positive institutional conduct and good institutional adjustment according to the BOP.  See, e.g., Ex. 94 (Abouhalima Program Review), Ex. 33 (Ayyad Disciplinary History).

81.     Despite Mr. Abouhalima's positive institutional conduct, in 2010 he was denied the ability to progress to Phase 3 of the H-Unit Program based on a memorandum from the FBI to the ADX Warden. See Ex. 91 at AB014119 (letter from Warden Davis to FBI Agent Shannon: "based upon the information you provided, Abouhalima should not

be advanced from Phase II to Phase III of the stepdown [sic] program; however, we do feel he is appropriately housed and can be effectively managed in Phase II where his behavior and programming have been excellent"). <u>See</u> <u>also</u> Ex. 1 at ¶¶ 220-223 (describing conversation with FBI agent Shannon regarding denial, and subsequent return to Phase 1 for an incident report that was successfully overturned on appeal).

82.     The "information" referenced in the Warden's letter above was a memorandum from FBI Agent Shannon, citing the following conduct as justification for prohibiting Mr. Abouhalima from moving to Phase 3 of the H-Unit Program:

a) 

b)

The FBI approved both of these letters at the time they were sent by Mr. Abouhalima to his son.

83.     Plaintiffs have repeatedly requested to speak directly to the individuals who control their conditions of confinement, but they have never been allowed to talk with any such person, or anyone at OEO. Ex. 2 at ¶¶ 186 and 195-198; Ex. 17 at ¶ 13.

84.     The ADX warden – and the wardens of all BOP facilities – have the ability to impose restrictions on the incoming and outgoing mail of prisoners.  <u>See, e.g.</u>, 28 C.F.R. § 540.14(d); § 540.15(a).

85.     BOP policy also authorizes the agency to monitor the non-legal mail of federal prisoners.  Ex. 137 – Program Statement 5800.16 – Mail Management Manual.

86.     ADX local policy authorizes prison staff to monitor the non-legal mail of all ADX prisoners. Ex. 138 – ADX Institution Supplement – Correspondence.

87.     On March 8, 2005, prior to the imposition of the SAMs, the ADX warden imposed a mail restriction on Plaintiffs.  Ex. 139 at AB005636.

88.     The BOP has translators on staff at the ADX and at other BOP facilities who are capable of monitoring and translating Plaintiffs' mail and telephone calls. See Ex. 1 at ¶¶ 119 and 150 (describing available translation resources at the ADX); and Ex. 17 at ¶¶ 1-2.; Ex. 32 at p. 8 - Smith Written Depo. Answers; Ex. 35 at pp. 5-6 - Braren Written Depo Answers.

89.     In 2008, the FBI generated a list of approved and non-approved periodicals for SAMs prisoners at the ADX.  All Arabic language publications were disapproved with the note "the decision regarding the aforementioned periodicals will be used as a standard by the FBI for all future requests." Ex. 140 at AB012080.

90.     The basis of the government's rejection of some of Plaintiffs' incoming publications is content that the government disapproves of or disagrees with.  See, e.g., Ex. 141 - AB013958 (rejection of ).

91.     Examples of periodicals that Defendants have rejected on the grounds that it has determined that they "facilitate criminal activity or be detrimental to national security, the security, good order or discipline of the institution; or the protection of the public" include "crochet and sports magazines," *Harpers*, the *Atlantic Monthly*, *FHM*, *Maxim*, and *Arbor Day Foundation*. Ex. 1 at ¶ 156; Ex. 62 at AB06290.

92.     Under the SAMs, Mr. Ayyad is permitted to receive certain publications, but prohibited from receiving bills or renewal notices from those same publications. See Ex. 142 at US012759 (response to administrative remedy stating that, "although you are authorized to receive the above-mentioned publications, you are not authorized to receive bills or renewal notices from various magazines.").

93.     Members of both Plaintiffs "non-immediate" families were close to Plaintiffs and involved in their lives prior to the imposition of the SAMs.  They want very much to be in communication with Plaintiffs, and would write, speak on the telephone, and even visit Plaintiffs but for the SAMs.  See, e.g., Ex. 110 - Salem Decl.; Ex. 111 - Khalil Badra Decl.; Ex. 112 - Majeda Ayeshalmoutey Decl. (Mr. Ayyad's sister, referencing prohibition on communication with her children); Ex. 113 - Reziq Decl.; Ex. 143 – Decl. of Sarah Elalem; Ex. 50 – Hamida Elgogery Decl.; Ex. 51 – Ali Abouhalima Decl.; Ex. 52 – Sohier Elgogery Decl.; Ex. 53 – Fatima Elgogery Decl.

94.     ADX staff have testified that prior to the imposition of the SAMs, it is a true and fair statement to say that "Mr. Abouhalima's mail was focused in its majority on his family and relatives," and that since his arrival at the ADX in March 2003, neither Mr. Abouhalima nor his family "abused their correspondence."  Ex. 35 - Braren Written Depo. Responses at pp. 4-5.

## STANDARD FOR CONSIDERATION
## OF MOTIONS FOR SUMMARY JUDGMENT

In considering a motion for summary judgment, the Tenth Circuit "repeatedly has emphasized that [courts] must draw all inferences in favor of the party opposing summary judgment." *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1096 (10th Cir. 1999). The non-movant is given 'wide berth to prove a factual controversy exists.'" *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 966 (10th Cir. 2002). The "moving party carries the burden of showing beyond a reasonable doubt that it is entitled to summary judgment." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002) (internal quotation omitted).

As set out above, there are multiple disputes of material fact, as well as additional material facts not included in the Defendants' Motion for Summary Judgment (the "Motion"), that are relevant to Plaintiffs' First and Fifth Amendment claims. Accordingly all of the claims in this litigation should proceed to trial. *See Mohammed v. Holder*, Case No. 07-cv-02697-MSK-BNB, 2011 WL 4501959 at *6 (D. Colo. September 29, 2011) ("When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial.") (citing *Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002)). In addition, for the reasons set out below, even under the version of material facts adopted by the Defendants, summary judgment is not appropriate for any of the Plaintiffs' claims.

Defendants argue that they are entitled to deference with respect to their determinations of the facts set forth in the Motion. Motion at 61. However, any deference due to prison officials by a fact finder *at trial* does not override the summary judgment standard that "all justifiable inferences are to be drawn in [the non-movant's] favor."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Any due process claim based on an inmate's segregation is highly-fact dependent and the factors should be 'viewed in their totality.'" *Horton v. Zavaras*, No. 09-cv-02220-REB-KMT, 2010 WL 3341259, at *8 (D. Colo. June 11, 2010) (quoting *Dodge v. Shoemaker*, 695 F. Supp. 2d 1127, 1140 (D. Colo. 2010)). *See also Allmon v. Bureau of Prisons*, No. 08-cv-01183-ZLW-CBS, 2010 WL 2163773, at *5-6 (D. Colo. May 26, 2010).

## ARGUMENT

### I.      First Amendment.

In Claims 5 and 6, Plaintiffs assert that the SAMs infringe on their First Amendment rights of speech and association.  Third Amended and Consolidated Complaint, Doc. 216 at 30-31.   It is well established that prisoners retain First Amendment Rights.  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *Pell v. Procunier*, 417 U.S. 817, 822 (1974) ("a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system").  Plaintiffs do not assert a facial challenge to the lawfulness of the SAMs themselves.  Rather, they challenge the extreme nature of the specific SAMs imposed on each of the Plaintiffs, in light of the absence of a reasonable relationship between these restrictions and Defendants' asserted justifications therefor.

### A.      There Are Genuine Issues of Material Fact as to Whether the SAMs Restrictions on the Plaintiffs' *Outgoing* Communications Are Greater

**than "Necessary or Essential" to Protect "Important or Substantial" Interests.**

Defendants do not distinguish between the SAMs restrictions they have imposed on the Plaintiffs' incoming and outgoing correspondence, Motion at 59-60, although this is a distinction of singular importance under the Constitution. *See Thornburgh v. Abbott*, 490 U.S. 401, 411-13 (1989) (noting that the "implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials.") (citations omitted); and *Davis v. Goord*, 320 F.3d 346, 351 (2nd Cir. 2003) (noting that "courts have consistently afforded…greater protection to outgoing mail than to incoming mail.") (citations omitted).

The constitutional standard governing the restrictions imposed by the Defendants upon the Plaintiffs' *outgoing* correspondence is that such restrictions cannot be greater than "necessary or essential" to protect "important or substantial" interests. *Procunier v. Martinez*, 416 U.S. 396, 413-14 (1974). The Supreme Court has specifically rejected the application to outgoing prisoner mail of the somewhat more deferential standard that is applied to restrictions upon *incoming* mail under *Turner v. Safley*, 482 U.S. 78 (1987). *Thornburgh v. Abbott*, 490 U.S. 401, 413-14 (1989).

With respect to outgoing correspondence, the Supreme Court has held that "[t]he limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Martinez*, 416 U.S. at 413.  Here, Defendants identify three "critical interests" to justify the particular SAMs restrictions imposed upon the Plaintiffs' outgoing (and incoming) communications: the "preservation of national security by preventing acts of terrorism;" "maintaining the

security of its prisons, including the safety of staff and inmates;" and "efficiently operating its law enforcement agencies." Motion at 62.

The evidence that the Plaintiffs would present at trial would show that none of these asserted interests are actually furthered by the particular restrictions at issue in this case, which are "greater than is necessary or essential to the protection of" those stated interests, even after according appropriate deference to Executive Branch prerogatives and expertise.  Indeed, the ease with which the Defendants can meet their proclaimed interests with less arbitrary severity – far short of a "least restrictive alternative" – causes the particular restrictions imposed in this case to fail, even under the somewhat less stringent standard of constitutional infirmity set out in *Turner*.

As a threshold matter, the Defendants invoke the "impact" of the instant case on "national security" to argue that the Court must accord them an "additional deference to which [they are] entitled" in such matters, beyond the expansive deference the Defendants already enjoy in the prison context. Motion at 60.  Such "additional deference" must not be permitted to nullify this Court's ability to review the particular restrictions in question under established constitutional standards.

At a trial, the Plaintiffs would demonstrate that the severity of the particular restrictions imposed upon them is driven by the immutable nature and notoriety of their crimes of conviction and the embarrassment to government officials resulting from adverse media attention, rather than any basis that would be permissible under the Constitution. The "additional deference" sought by the Defendants should not prevent this Court from considering that evidence.

      **1.**      **The Actual Restrictions on Plaintiffs Do Not Reduce the Risk of Bodily Injury or Violence, As No Such Risk Exists for Either Plaintiff**

Crucially, the Defendants concede that, although the express function of the

SAMs is to prevent "the risk of death or serious bodily injury," 28 C.F.R. § 501.3(a), the

Plaintiffs' outgoing correspondence has not demonstrated such a risk. Motion at 64 ("The

government has concluded that, even if Plaintiffs were unaware of the Martyrs' plot or

the content of the communications they exchanged appears superficially benign, the

danger to national security remains significant.").

Defendants do not assert that either Plaintiff intended (or intends) to commit or

inspire future terrorist attacks,[8] and both Plaintiffs dispute any such contention. AF-2.[9]

Rather, the Defendants only assert that "individuals, *like* Plaintiffs, who have a history of

committing terrorist acts or who have expressed adherence to a radical Islamic ideology

that manifests itself in acts of violence, are *likely* to attempt to engage in future acts that

advance the goals of jihad." Motion at 15 (emphasis added). The Court is not required to

believe either of the Plaintiffs' versions of the events surrounding their original criminal

convictions to accept that this asserted governmental interest does not reflect any actual

acts or intentions of either Plaintiff. In the Defendants' view, because of *who* the

---

[8] Interestingly, the only example the Defendants provide of "[c]onvicted terrorists [who] have continued to collaborate in ways that endanger security in the prison," Motion at 17, involves an inmate in the same facility as the Plaintiffs whose SAMs restrictions were recently held by this Court to violate the less stringent *Turner* standard. *See Mohammed*, 2011 WL 4501959 at *7-10.

[9] References to Plaintiffs' Response to Statement of Undisputed Material Facts are by Roman Numeral and paragraph number, with the preface "R", *e.g.*, "R-I.3" refers to Plaintiffs' response to Section I, paragraph 3 of Defendants' Statement (adopting Defendants' paragraph format). When reference is made directly to a statement by Defendants, it adopts their format, e.g., "I.3." References to Plaintiffs' Statement of Additional Facts are by paragraph number, *e.g.*, "AF-63" refers to paragraph 63.

Plaintiffs are – and *what* they are said to have done almost twenty years ago that put them in prison – their every utterance is fraught with peril, and there is nothing either Plaintiff can say or do in the present day to convince the Defendants otherwise.

The restrictions at issue in this case fail to meet the *Martinez* standard for restriction of outgoing communications. The justifications listed by the Defendants to support the restrictions, Motion at 5-13, did not cause the Defendants, prior to the airing of the embarrassing NBC media report in March 2005, to impose any restrictions on the Plaintiffs that were greater than what was merited by their status as prisoners and their conduct while incarcerated. AF-4-6. Indeed, even after the September 11th attacks, when the Plaintiffs and other inmates with terrorism convictions were uniformly swept into solitary confinement and ultimately transferred to the ADX, SAMs were apparently specifically considered and rejected for both Plaintiffs.  AF-3.  Nothing has changed since that time.

> **2.      The Defendants Cannot Identify Actual Harms That Would Result If Plaintiffs' Communications Were Not Restricted, As None Exist**

In support of the SAMs restrictions, the Defendants have offered a series of speculative dangers presented by who the Plaintiffs are, rather than anything they have done.  First, they argue the Plaintiffs "have connections" with persons or groups of whom the Defendants apparently disapprove. Motion at 62.  Plaintiffs strongly dispute any such connections and will testify at trial that they do not exist as the Defendants describe them. R-I.3, 5-7. In addition, the Defendants do not mention that the BOP is free at any time to restrict either Plaintiff from corresponding with a known, particular individual of concern, without imposing a blanket prohibition at the level currently in effect.  Second, the Defendants cite an exchange of letters in 2003 and 2004 between the incarcerated

Plaintiffs and persons incarcerated in Spain for committing terrorist acts or known to have terrorist connections, all of which letters were read, copied, approved and released by the Defendants. Motion at 62-63 and 71-72. The Defendants can, and did, end such correspondence, with the cooperation of both Plaintiffs, without the imposition of any SAMs restrictions whatsoever. AF-24. Third, the Defendants cite unsubstantiated – and, the Plaintiffs submit, unsupportable – suspicions that the Plaintiffs "exerted dangerous influence" with other inmates within the prisons where they were incarcerated prior to being transferred to the ADX. Motion at 63. Not only are these assertions disputed, R-II.19-22, 23, 32, 33; R-III.1-9; R-V.12; AF-2; AF-8-12, they have no bearing on either Plaintiff's repeated requests to communicate with members of their families on the outside by way of pre-screened letters.

Finally, Defendants state that the Plaintiffs "have hero status in the international terrorist network," thus making *any* communication potentially dangerous. Motion at 64. The Defendants have offered nothing to support the assertion that allowing either Plaintiff to write pre-screened letters to members of their own families would expose the United States to such danger.

The balance of the Defendants' justifications focus upon generic concerns regarding the radicalization of other inmates (not relevant to external communications), further radicalization of the Plaintiffs themselves (not relevant to outgoing mail), the need for specialized review (not questioned), a completely unsupported invocation of "constraints on the FBI's review, translation and threat assessment resources" (with *no* evidence offered to suggest those resources are or would be inappropriately strained), media and attorney communications (not at issue), and access to mass communications

(not relevant to outgoing mail). Motion at 65-67. Neither separately, nor in sum, do these justifications warrant the severe restrictions at issue on outgoing mail.

> **B.      There Are Genuine Issues of Material Fact As to Whether the SAMs' Restrictions on Plaintiffs' *Incoming* Correspondence Are "Reasonably Related" to "Legitimate Government Interests."**

Defendants' assertion that summary judgment is appropriate as to Plaintiffs' First Amendment claim for incoming correspondence similarly fails due to the existence of genuine issues of material fact.  The standard for evaluating the imposition of restrictions upon incoming correspondence and materials in a prison context was set forth by the Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987), as follows: "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it…A second factor relevant in determining the reasonableness of a prison restriction…is whether there are alternative means of exercising the right that remain open to prison inmates…A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." 482 U.S. at 89-90.

> **1.      No Valid, Rational Connection Exists Between Defendants' Asserted Interests and the SAMs Restrictions.**

Defendants invoke the same governmental interests in support of their restrictions upon the Plaintiffs' incoming mail as they do with regard to the Plaintiffs' outgoing correspondence. Motion at 62.  As with the outgoing correspondence, none of these interests are uniquely dependent upon the SAMs for their authority, nor does invocation of these generalized interests nullify the First Amendment considerations addressed in *Turner*.  And, similar to the *Martinez* requirement that the restrictions – at the level of severity at which they are imposed – actually "further" an important governmental

interest, they must have a rational connection at that level of severity with the governmental interests invoked.

The Defendants assert that the "government does *not* act irrationally when it monitors and limits – but does not eliminate – the communications of convicted terrorists who subsequently communicated with other terrorists from prison." Motion at 59 (emphasis in original).[10]  Rather, as the severity of the restrictions at issue increase, the rationality of their connection to the purposes offered to justify them must necessarily be more closely examined.  *See Mohammed*, 2011 WL 4501959 at *8 ("…the question is not whether SAMs, generally, are rationally related to a penological objective, but instead whether the Government has shown that there is a rational connection between the particular SAMs applied to [plaintiff] and a penological objective.").

Here, in addition to the restrictions imposed upon their outgoing correspondence, *see supra*, the Plaintiffs are only permitted to receive letters from members of what the Defendants define as their "immediate families," and even those are subject to inexplicable rejections, interdictions, and delays. Def. Exh. B-1, Att. 3, §3.g (USO15104); R-V.8; AF-34-41. Neither of the Plaintiffs, who are foreign-born, was raised in a culture where the Defendants' definition of "immediate family" has any meaning. R-VI.3-5, 7; AF-93. Nevertheless, their repeated requests to be permitted to communicate with close relatives in the same manner as they are with "immediate family" have been refused. AF-34-36, 42. The result has been that both Plaintiffs have become even more isolated, AF-34-42, and have lost contact with valued relatives. R-

---

[10] The implication of this assertion is that the Defendants would *only* be acting irrationally if they completely "eliminate[d]" both Plaintiffs' contacts with the outside world. Anything short of that is "monitor[ing] and limit[ing]" the Plaintiffs, and immune to scrutiny from this Court.

V.1, 3-5, 7-8; AF-34-36, 38-42. Nowhere in the Motion do the Defendants explain how this state of affairs has served any legitimate penological interest, either inside the prison or outside.

While limiting an inmate's correspondence from the outside world can, as a general proposition, further the interests invoked by the Defendants, the severity of the restrictions in this case – arbitrarily preventing one of the Plaintiffs from communicating a last time with a dying elder relative, R-VI.4; AF-35 – is not a rational, or even civilized, exercise of governmental power.  The Defendants have offered no rational justification for the extreme nature of these restrictions, other than perhaps to note that the fewer number of correspondents and fewer number of letters permitted, the fewer government resources would be required for their review – a proposition that could as well support allowing *no* correspondence whatsoever.  No evidence has been offered to suggest that the Defendants' resources have been, or are in danger of being, strained. To the contrary, the Plaintiffs are prepared to present evidence at trial that the more efficient method of monitoring their communications would simply be to allow the BOP to do so in compliance with its own regulations.

> **2.     The SAMs Foreclose Any Alternative Means By Which the Plaintiffs May Exercise Their First Amendment Rights**

The second Turner factor examines whether Plaintiffs have alternative means to exercise their First Amendment rights. *Turner*, 482 U.S. at 90.  In the context of communications with family members and close friends, the Plaintiffs quite obviously have no alternative means to exercise their First Amendment rights.  Visits are limited to a small group of "immediate family" members, and are further restricted by scheduling, logistical, and financial exigencies. R-VI.15-16; AF-36, 40. Telephone calls are again

restricted to the same select group, and limited to only one to four per month. VI.19-21; R-VI.21. Mr. Ayyad and Mr. Abouhalima have literally no other means of contact with the outside world, and each of the individuals with whom they are permitted to communicate under the SAMs restrictions are themselves sworn not to further communicate the information communicated to them by the Plaintiffs.

The Defendants point to a "plethora" of sources of information available to the Plaintiffs, from television to books to periodicals to conversations with other inmates and Bureau personnel. Motion at 68-69. Yet these largely non-interactive sources of information cannot substitute for personal communications from family and friends who personally value and cherish the Plaintiffs, and are valued and cherished in turn. A newspaper or television show cannot substitute for an aunt's news about her family, or a childhood friend's news about his new job.

### 3.      The Effect of Accommodating the Exercise of the Right

The Defendants have offered no undisputed facts in support of their argument that allowing the Plaintiffs to receive correspondence from a broader selection of their relatives and close friends would have any realistic, negative impact upon prison staff, other inmates, or the allocation of prison – or government – resources.  Conversely, the undisputed facts show that prior to the SAMs, Plaintiffs' correspondence was not restricted to a defined list of "immediate" family members and that the government successfully monitored that correspondence.  AF-5, 6. The BOP realized that Plaintiffs had corresponded with Spanish prisoners, told them to stop, and they did.  R-II.15-18, 26-30; AF-22-28. Additionally, between 2006 and 2008 the Defendants adopted an entirely

new and more sophisticated set of interagency procedures precisely for the purpose of monitoring, and interdicting if so determined, inmate communications. R-V.B.9.

All of this suggests that, at a minimum, there is a genuine issue of material fact as to whether permitting Plaintiffs to exercise their First Amendment rights consistent with general prison regulations will have a negative impact upon prison staff, other inmates, or the allocation of prison/government resources.. Defendants' only assertions in this regard are general references to "national security," "maintaining institutional security," and "effectively allocating law enforcement resources." Mtn. at 70. As the Court found when presented with a similar argument by the government in *Mohammed*, "[t]he Defendants' evidence is general and conclusory regarding this factor, with no specifics regarding the actual impact of such a change, and so there is an issue of fact in this regard." *Mohammed*, 2011 WL 4501959 at *8.

### 4.     There are Existing, Ready Alternatives to the SAMs That Can Be Implemented Without Harm to Any Valid Penological Interests.

While the Defendants are not required to adopt the "least restrictive alternative" means of accomplishing their legitimate ends, they may not simply impose the most restrictive alternatives for the sake of convenience. "[O]bvious, easy alternatives" readily suggest themselves – allowing a manageably wider circle of correspondents, allowing sufficient (though not leisurely excessive) time for monitoring and censoring, and allowing reasonable flexibility over time.

These alternatives can be achieved through policies, procedures and resources that Defendants have established over the last several years, in response to recommendations made by the Office of the Inspector General's Report regarding the BOP's Monitoring of Mail for High-Risk Inmates. R-V.B.9. Both the BOP and the FBI have reported to the

Office of the Inspector General on a variety of initiatives to ensure that the communications of those, like Plaintiffs, who have been convicted of terrorist crimes are monitored, and that information obtained from and about those communications is made available to the various law enforcement entities responsible for national security.  R-V.B.9.

In sum, both the *Martinez* and *Turner* standards are fact specific and factually focused.  As discussed above, the Plaintiffs dispute the factual assertions offered by the Defendants in defense of the extreme restrictions they have imposed upon the Plaintiffs outgoing and incoming communications. The Defendants claim these restrictions are factually rational, warranted, and necessary; the Plaintiffs submit they are factually arbitrary and unjustifiable at the level of severity imposed.  The Plaintiffs respectfully submit that they should be afforded the opportunity to demonstrate the merit of their factual assertions at trial.

## II.      Due Process

### A.       Plaintiffs' ADX Confinement, Coupled With the SAMs, Gives Rise to a Liberty Interest.

The Fifth Amendment's prohibition against government deprivations of life, liberty, or property without due process of law, *see* U.S. CONST. amend. V, applies with equal force to people living within and without prison walls. *Wolff v. McDonnell*, 418 U.S. 539, 555 (1974) ("…a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime."). Prison inmates, such as the Plaintiffs, specifically possess a liberty interest in avoiding restraint that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The touchstone inquiry in determining whether an

inmate possesses a liberty interest in avoiding particular conditions of confinement is the nature of the conditions themselves. *See Wilkinson v. Austin*, 545 U.S. 209, 223 (2005). Rather than precluding the government from imposing any particular condition, even one that is harsh or atypical, the Due Process Clause requires only that procedures be put in place to ensure that inmates are not subjected to such conditions in error or without sufficient justification, and deprived of their liberty thereby. *Id.* at 224-26.

In *Sandin,* the Supreme Court found that placement in solitary confinement for thirty days did not give rise to a liberty interest. 515 U.S. at 485. Ten years later, in *Wilkinson*, the Court examined whether placement in a state "supermax" facility, the Ohio State Penitentiary ("OSP"), imposed an atypical and significant hardship on the facts of that case, thereby creating a liberty interest in avoiding such placement. 545 U.S. at 224.  The Court recognized in this context that, in order to determine whether a condition was "atypical" as required by *Sandin*, it was necessary to identify "the baseline from which to measure what is atypical and significant *in any particular prison system*." *Id.* at 223 (emphasis added).  The Court found that conditions at OSP, which were "more restrictive than any other form of incarceration in Ohio," *id.* at 214, included "especially severe limitations on all human contact," indefinite placement that was reviewed only annually, and disqualification from parole consideration. *Id.* at 224. The Court further held that even though "any of these conditions standing alone might not be sufficient to create a liberty interest," taken together they imposed an atypical and significant hardship under "any plausible baseline." *Id.* at 223-24. The Tenth Circuit set forth its own standard for determining an inmate's claim of deprivation of a liberty interest two years later, in *Estate of DiMarco v. Wyoming Dept. of Corr., Div. of Prisons*, 473 F.3d 1334 (10th Cir.

2007).  The plaintiff in that case, a transgendered prisoner, did not contest her initial placement into segregation, which was primarily for her own protection. *Id.* at 1337, 1339, and 1342. She did, however, challenge the decision to place her into the "most severe classification" without an adversarial hearing or right to appeal, and Wyoming's failure to "give her the opportunity" to improve her placement. *Id.* at 1339.

Noting the availability of several alternative approaches to attempting to define a "baseline" from which to measure whether a condition of confinement is "atypical and significant," the Tenth Circuit opined that "[r]elevant factors might include whether (1) the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) the conditions of placement are extreme; (3) the placement increases the duration of confinement, as it did in *Wilkinson*; and (4) the placement is indeterminate (in *Wilkinson* the placement was reviewed only annually)." *Id.* at 1341-42. The Tenth Circuit further clarified this past year that these so-called *DiMarco* factors are "relevant, albeit non-dispositive" to the liberty interest inquiry.  *Toevs v. Reid*, 646 F. 3d 752, 756 (10th 2011).

Applying these suggested factors to the facts of that case, the Tenth Circuit in *DiMarco* concluded that "[t]aken together, these factors do not weigh in favor of finding that DiMarco has an enforceable liberty interest." 473 F.3d at 1344. However, in sharp contrast to the conditions of confinement of the prisoners in *Wilkinson* and the Plaintiffs in this case, Ms. DiMarco "had access to library, recreational, and religious facilities," "participated in out-of-cell time of at least five-and-one-half hours a day," "was part of small group counseling sessions with other inmates, had weekly individual psychiatric sessions, and monthly visits from a psychiatric specialist," "met regularly [with her

caseworker] to discuss her concerns about her conditions and placement," and "was released after serving 14 months of a two-to-four-year sentence." *Id.* at 1343. Importantly, Ms. DiMarco herself "conceded that segregation was a reasonable placement decision" in her unique situation. *Id.* at 1344. Even so, the Tenth Circuit noted "it is hard to believe the prison could not make better accommodations for her long term [14 months] placement." *Id.* at 1343.

In analyzing Plaintiffs' claims here, it is critical to note that their conditions of confinement are determined not only by their incarceration in the most restrictive facility and under the most restrictive conditions in the federal prison system, but also by the additional restrictions and impact on the indeterminate nature of that confinement by the imposition of the SAMs. This combination creates a set of conditions that are so "atypical and significant" as compared to the "ordinary incidents of prison life," that they give rise to a protected liberty interest. As set forth below, application of the *DiMarco* factors to Plaintiffs' conditions demonstrates that each factor either weighs in favor of Plaintiffs. At a minimum, there are genuine issues of material fact that preclude a finding in favor of Defendants as a matter of law.

1.    **Legitimate Penological Interest.**

    a.    **The Alleged "Legitimacy" of Defendants' Interests Should Be Afforded Only Minimal Weight in the Liberty Interest Analysi**s.

The Defendants argue that they have "set forth myriad facts showing legitimate penological interests" in confining Plaintiffs at the ADX and imposing the SAMs on them. Motion at 77. However, the existence of a legitimate penological interest, one of four "relevant, albeit non-dispositive" factors, *Toevs*, 646 F. 3d at 756, is at most

marginally relevant to a determination of whether Plaintiffs' conditions of confinement give rise to a liberty interest.  As emphasized by the Supreme Court in *Wilkinson*, the "OSP's harsh conditions may well be necessary and appropriate in light of the danger that high-risk inmates pose both to prison officials and to other prisoners…That necessity, however, does not diminish our conclusions that the conditions give rise to a liberty interest in their avoidance."  545 U.S. at 224.  In other words, while an asserted penological justification may be pertinent to the sufficiency of the *process* ultimately accorded to the Plaintiffs, it *does not* bear upon a determination as to whether Plaintiffs' conditions of confinement themselves impose an "atypical and significant hardship." Defendants' alleged penological interest should be considered only during the actual due process hearing or other review procedures where it is determined whether Plaintiffs should be housed at the ADX and whether their SAMs should be imposed, continued, or modified. *See Wilkinson*, 545 U.S. at 224-27.

Other circuits have been mindful of this consideration in the wake of *Wilkinson*. *See,e.g., Orr v. Larkins*, 610 F.3d 1032, 1034 (8th Cir. 2010); *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 699 (7th Cir. 2009); *Harden-Bey v. Rutter*, 524 F.3d 789, 792-93 (6th Cir. 2008); *Iqbal v. Hasty*, 490 F.3d 143, 161 (2d Cir. 2007), *overruled on other grounds by Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009); and *Richardson v. Joslin*, 501 F.3d 415, 419 (5th Cir. 2007).  This precise question is presently before a panel of the Tenth Circuit in *Rezaq v. Nalley, et al*, Case No. 11-1069 (10th Cir.)

**b.**     **There Are Multiple Factual Disputes About the Legitimacy of Defendants' Asserted Interests in Imprisoning Plaintiffs at the ADX and Under SAMs.**

Even if the "legitimate penological interest" factor is considered in the liberty interest inquiry, there are genuine issues of material fact as to whether the interests asserted by Defendants are "legitimate" with respect to Plaintiffs.  At base, Defendants offer two reasons for Plaintiffs' confinement at the ADX and the subsequent imposition of the SAMs:  Plaintiffs' crimes of conviction and their correspondence with the Spanish prisoners.  There are, at a minimum, genuine issues of material fact as to whether each of these constitutes "a legitimate penological interest" for keeping Plaintiffs in the most restrictive prison conditions available in the federal system.

First, the evidence at a trial would show that Plaintiffs were [successfully] serving their sentences in federal penitentiaries for seven years prior to September 11, 2001.  AF-4, 8-12. They were placed in segregation immediately after the 9/11 attacks, and were ultimately transferred to ADX where they have been held in solitary confinement for almost a decade, though Defendants have never asserted that Plaintiffs had any involvement in or knowledge about the events of that day.  Plaintiffs' transfers to ADX were ordered by Defendants, even though they did not meet the criteria for placement in ADX in effect at the time of their transfers, and they were not transferred pursuant to the BOP's own procedures.  R-XI.1-8. Pursuant to BOP policy in effect at the time, Program Statement 5100.07, transfer to ADX was warranted only when a prisoner had demonstrated an inability to function in a less restrictive environment "without being a threat to others, or to the secure and orderly operation of the institution."  XI.2; R-XI.2.

That was not the case for either Mr. Ayyad or Mr. Abouhalima, both of whom were successfully serving their sentences at high-security federal penitentiaries.  AF-4, 8-12.

As for the reasons Defendants have asserted for the imposition of the SAMs – "preventing terrorist attacks," "preserving resources to fight terrorism," "inhibit[ing] communications that could threaten national security [or] prison security," and "promot[ing] security" through "SAMs review by counterterrorism professionals" (Motion at 14-20)[11] – the legitimacy of those interests *as to Plaintiffs* is undermined by Defendants' own documents and admissions. *Mohammed*, 2011 WL 4501959 at *8 ("…the question is not whether SAMs, generally, are rationally related to a penological objective, but instead whether the Government has shown that there is a rational connection between the particular SAMs applied to [plaintiff] and a penological objective").

The "legitimate penological interests" offered by Defendants for the renewals of Plaintiffs' SAMs are similarly in dispute.  In addition to continuing to rely on their crimes of conviction, Defendants also rely on what they have deemed "SAMs violations" to warrant renewal of Plaintiffs' SAMs for the past six years.  Yet a review of these alleged "violations" reveals important facts [and omissions] that call into question the conclusions reached by the FBI and adopted by the OEO, the entity that ultimately recommends renewal of the SAMs.  *See, e.g*., AF-60, 64-70, 82.

---

[11] In addition, the justifications provided by the Defendants are more problematic in the present case, at least since imposition of the SAMs in March 2005, as those justifications have been primarily non-penological and controlled by authorities outside of the Bureau of Prisons.

> **2.    There are genuine issues of material fact about whether Plaintiffs' conditions are "extreme."**

The second *DiMarco* factor in the liberty interest inquiry – whether the challenged prison conditions are "extreme" – is also very genuinely and materially in dispute in this case. R-X.1-28; AF-43-53.  What is undisputed is that the Plaintiffs have been confined since 2005 in one of the most restrictive units (H-Unit) of the ADX – itself the most restrictive prison in the federal system. And these conditions have been rendered both (1) more atypical and significantly restrictive and (2) for all practical purposes indefinite by the imposition of the SAMs.

Defendants argue that the appropriate baseline by which to judge the extremeness of the Plaintiffs' confinement in H-Unit is an ADX general population unit, such as those in which the Plaintiffs were confined after September 11th but before imposition of the SAMs in March 2005. *See* Motion at 73.  Alternatively, Defendants appear to argue that the appropriate baseline is the set of conditions at the Ohio State Penitentiary at issue in *Wilkinson*. Motion at 78-79.[12]  Neither of Defendants' suggested comparators is consistent with those used by the Supreme Court.

In *Sandin***Error! Bookmark not defined.**, the Supreme Court specifically compared the challenged conditions to others in the Hawaii system, *see* 515 U.S. at 486, and in *Wilkinson*, the Court assumed that the conditions for comparison would be "in any particular prison system," and compared the conditions at issue in the OSP to those in other prisons in the Ohio system. 545 U.S. at 214, 223.  The conditions at the OSP were in no way "ordinary;" the Supreme Court found them to be so extreme that they were "an

---

[12] This is despite the remarkable similarity between H-Unit (even without the SAMs) and OSP – see p._, below.

atypical and significant hardship *under any plausible baseline*." *Wilkinson*, 545 U.S. at 223 (emphasis added).   Here, it is difficult to envision an actual, existing condition of federal confinement that would be "atypical and significant" with respect to the ordinary incidents of federal prisoners' lives, if the Plaintiffs' conditions in H-Unit are not.

Following the Supreme Court's approach, the relevant baseline comparator here could be either U.S. Penitentiaries, where Plaintiffs were housed prior to their transfers to ADX in the wake of the 9/11 attacks (and where, pursuant to their classification scores, they would be housed today), or the Federal Correctional Institutions, which house the largest number of federal prisoners.  AF-4-7.  In either of those types of federal prisons, Plaintiffs' conditions of confinement would be vastly less restrictive than the conditions under which they are housed at the ADX under the SAMs.  For example, at a USP, Plaintiffs would have the ability to have contact with other prisoners for approximately sixteen hours each day, the opportunity to work at prison jobs and participate in group sports and prison education programs, the ability to walk free of restraints to dining areas and to have communal meals, the opportunity to participate in group religious practices important to their Islamic faith, the ability to correspond with family, friends, and the general public and to receive mail and publications in accordance with generally applicable Bureau policies, the opportunity to have 300 minutes of telephone time per month, and to receive regular, contact visits from family and friends in accordance with generally applicable Bureau policies. AF-4-6.

Even if this Court were to consider a comparison between the conditions at the ADX and those at the OSP proper, it is clear that the ADX conditions (even without

consideration of the impact of the SAMs) are "extreme" as defined by *Wilkinson* and

illustrated by a full comparison of the conditions at both prisons:

| OSP Conditions[13] | ADX Conditions (H Unit)[14] |
|---|---|
| Cell size is 108 square feet. | Cell size is 87 square feet. |
| Cells have a small window that can't be opened. | Same. |
| Confined in cells 23/24 hours per day, five days per week. | Confined in cells 22/24 hours per day, five days per week. |
| 1 hour of recreation per day, five days per week (5 hours per week). | 2 hours of recreation 5 days per week (10 hours per week). |
| Recreation is indoors in a room "with a small screen opening to the outdoors." | Recreation is both indoors and outdoors. When outdoors, recreation is in cages with concrete walls and a partial view of the sky. |
| Most recreation is alone, but a "limited number of inmates at the OSP may have recreation with one other prisoner." | Recreation is alone, but may occur for up to five inmates at once in separately secured cages on the same yard. Motion at 78. |
| Solid metal cell front door with metal strips along their sides and bottoms which prevent communication with other inmates. | Solid metal door and thick concrete walls designed to limit communication between inmates. |
| No communication between inmates is permitted. | The only contact between inmates is attempted conversations (by shouting) through the walls of adjacent cells. |
| Group counseling sessions with other prisoners. | No group counseling sessions. |
| Lights are on 24/7, though they can be dimmed by the prisoner. | Lights can be turned off by the prisoner, though lights just outside the door keep the cell illuminated. Motion at 78. |
| All meals in cell. | Same. |
| Social visits "rare" (unclear number allowed). | Social visits allowed 5 times per month, but are also rare in practice.  Appellants had few social visits during their tenure at ADX. |
| Non-contact visits. | Same. |
| Two 10-minute calls per month. | Two 15-minute calls per month, with the potential for one or two more at subsequent stages of the H-Unit Program. Motion at |

[13] This information is derived from both *Wilkinson v. Austin*, 545 U.S. at 213, and the district court's opinion in *Wilkinson v. Austin,* 189 F.Supp.2d 719, 724-26 (N.D. Ohio 2002), to which the Supreme Court refers in describing the conditions in the OSP.  *See Wilkinson*, 545 U.S. at 213 (referring to district court opinion).
[14] Except where indicated otherwise, this information is taken from the SOF.

|  | 81. |
|---|---|
| Instructional programs only through closed-circuit TV in cell. | Same. |
| No prison-based work, except that "one inmate per cellblock is responsible for keeping the area tidy." | Same. Motion at 79 (inmates "may work as Unit orderlies"). |

As this chart illustrates, the differences between the conditions at the OSP (which were found to be "atypical and significant" by the Supreme Court) and the conditions at the ADX are minimal. In some aspects, the conditions are worse in the OSP (slightly less recreation time; lights could not be completely turned off), and in some aspects they are worse in the ADX (smaller cells; always recreated alone; no group counseling), especially given the SAMs and their communication prohibitions. The Defendants' efforts to paint a picture of the ADX as materially different from the OSP for the purposes of the Motion should be rejected. *See, e.g., Toevs*, 646 F.3d at 756 (finding genuine issue of material fact on second *DiMarco* factor where the plaintiff "provided evidence that the conditions at all levels of the QLLP were similar to the conditions described in *Wilkinson*").

Finally, the extreme nature of the Plaintiffs' conditions is exacerbated by the long duration of their confinement in those conditions. The Tenth Circuit has considered the amount of time a prisoner is segregated to be a central factor in determining whether a deprivation is atypical and significant. *See Payne v. Friel*, 266 Fed. Appx. 724, 728 (10th Cir. 2008) ("When a prisoner makes such an allegation based on his confinement in segregation, the district court must conduct an evidentiary analysis to determine whether the duration of the confinement was itself atypical and significant.") (citing *Trujillo v. Williams*, 465 F.3d 1210, 1225 (10th Cir. 2006) (where "the prisoner is subjected to a

lengthy period of segregation, the duration of that confinement may itself be atypical and

significant")).  Duration of conditions is also considered by other circuits in determining

whether a liberty interest exists; as held by the Second Circuit, "[b]oth the conditions and

their duration must be considered since especially harsh conditions endured for a brief

interval and somewhat harsh conditions endured for a prolonged interval might both be

atypical."  *Sealey v. Giltner*, 197 F.3d 578, 586 (2nd Cir. 1999). *See also Harden-Bey v.*

*Rutter*, 524 F.3d 789, 793 (6th Cir. 2008) ("Consistent with [*Sandin* and *Wilkinson*], most

(if not all) of our sister circuits have considered the nature of the more-restrictive

confinement *and* its duration in determining whether it imposes an 'atypical and

significant hardship'") (emphasis in original, citations omitted); *Stephens v. Cottey*, 145

Fed. Appx. 179, 181 (7th Cir. 2005) ("In determining whether prison conditions meet

[the *Sandin*] standard, courts place a premium on the duration of the deprivation.")

(citation omitted).[15]

### 3. The length of Plaintiffs' sentences, coupled with the elimination of federal parole, renders the third *DiMarco* factor irrelevant.

As both of the Plaintiffs are serving the equivalent of life sentences (Mr. Ayyad –

117 years; Mr. Abouhalima – 108 years), the third suggested *DiMarco* factor does not

bear on this case.  Their placement will not increase the term of their confinement.

Motion at 82.  Conversely, however, the potential duration of their conditions of

confinement (*i.e.,* for the rest of their natural lives) is truly frightening, and it becomes all

---

[15] *See also Williams v. Norris*, 277 F. App'x 647, 648 (8th Cir. 2008) (twelve years in segregation "constitutes an atypical and significant hardship"); *Iqbal*, 490 F.3d at 161 (2d Cir. 2007) ("[s]egregation of longer than 305 days ... is sufficiently atypical to require procedural due process protection under *Sandin*"); *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000) ("[W]e have no difficulty concluding that eight years in administrative custody ... is 'atypical' in relation to the ordinary incidents of prison life").

the more critical for a factfinder to determine at trial whether these conditions are indeed indefinite.

### 4.       Plaintiffs' Conditions of Confinement Are Indefinite.

As the Defendants themselves recognize in the Motion, one of the "two factors that tipped the balance in favor of the [Supreme] Court finding a liberty interest" in the conditions of confinement at the Ohio State Penitentiary was that "transfer to the facility resulted in indefinite placement." Motion at 74 (citing *Wilkinson*, 545 U.S. at 224).[16]

The Tenth Circuit this past year re-affirmed the importance of indefinite placement in ascertaining whether a prisoner has a liberty interest in his conditions of confinement, in *Toevs*, 646 F. 3d 752, when it held "the fourth *DiMarco* factor to be determinative" in a situation where the inmate's placement in the conditions at issue was "indefinite." *Id.* at 757. The court so held because it found "there is no maximum [time to complete the program], and there is no restriction on how many times a prisoner may be regressed to lower levels." It further noted that, "[w]hen Mr. Toevs was placed in the QLLP he had no knowledge of any end date, and as it turned out, he was in the QLLP for nearly seven years." The Tenth Circuit accordingly held that this "indefinite placement" in such conditions "established a protected liberty interest." *Id.* (citing *Fogle v. Pierson*, 435 F.3d 1252, 1259 (10th Cir. 2006) ("The district court abused its discretion in concluding that there was no *arguable* basis that a three-year period of administrative segregation—during which time Fogle was confined to his cell for all but five hours each week and denied access to any outdoor recreation—is not 'atypical'"); *Shoats v. Horn*,

---

[16] The second of the two factors, "disqualification from parole eligibility," is not implicated here, due to the elimination of parole for all federal prisoners sentenced after 1987, which includes both Plaintiffs.

213 F.3d 140, 144 (3d Cir. 2000) ("Based on this record, we have no difficulty concluding that eight years in administrative custody, with no prospect of immediate release in the near future, is 'atypical' in relation to the ordinary incidents of prison life"); and *McClary v. Coughlin*, 87 F.Supp.2d 205, 208 n.2, 209 (W.D.N.Y. 2000) (finding that four-year placement in administrative segregation, in the same harsh conditions as punitive segregation, created a liberty interest)).

Here, the Plaintiffs' placement in segregation is not tied to the duration of a predictably finite process such as a criminal investigation. *See, e.g., Jordan v. Fed. Bur. of Prisons*, 191 Fed. Appx. 639, 652-653 (10th Cir. 2006) (declining to find a liberty interest in ADX general-population inmate's confinement conditions because, *inter alia*, "his confinement was not indefinite but instead limited to the duration of [a] pending murder investigation," and "[i]t is not 'atypical' for a prisoner to be in segregation while his or her participation in violent conduct inside the prison wall is investigated.") (citation omitted). The Defendants argue that the mere existence of periodic reviews of the Plaintiffs' SAMs defeats the finding of a liberty interest. Motion at 83-85. But in *Wilkinson*, the Supreme Court found that the OSP prisoners had been indefinitely confined, *even though they received periodic annual reviews. Wilkinson*, 545 U.S. at 224. The Supreme Court considered the import of periodic reviews only in its analysis of the *sufficiency of process prong* of the Due Process analysis – after it had already established that the prisoners had a liberty interest in avoiding OSP. *Id.* at 228-29.

This same point critically distinguishes the Plaintiffs in the instant case from those in other recent cases regarding confinement at the ADX that have come before this Court. Prior to the Tenth Circuit's decision in *Toevs* – and relying upon *DiMarco* and *Jordan* –

three members of this Court considered whether a liberty interest was posed by the conditions of confinement in the "general population" units (as distinguished from the more restrictive Special Security Unit) of the ADX.  Each found the conditions to not pose an "atypical and significant hardship," though each emphasized that a critical factor in this finding was that these conditions were *not* indefinite. The reason the court held so, in each case, was the existence of the ADX Step-Down Unit Program, which is unavailable to either of the Plaintiffs in this case so long as the SAMs (themselves indefinite) remain imposed on them by the Defendants. AF-74-76.

In *Georgacarakos v. Wiley*, No. 07-cv-01712-MSK-MEH, 2010 WL 1291833 (D. Colo., March 30, 2010), the Court referred to "the allegedly 'indefinite' assignment of the Plaintiff to ADX" as "a distinction without a difference" from the situation of the plaintiff in *Jordan*, since

> there is ample evidence in the record that he can obtain a transfer out of ADX upon completing the "step down program." In short, the Plaintiff "holds the keys" to his own release from ADX, and thus, one can hardly call his assignment there "indefinite."

*Id.* at *13. In *Rezaq v. Nalley*, No. 07-cv-02483-LTB-KLM, 2010 WL 5157317  (D. Colo. August 17, 2010) (adopted by 2010 WL 5157313 (Dec. 14, 2010)), the Court, after noting that "the existence of the Step-Down Unit Program was a key consideration to the court in *Georgacarakos*," held that, "[a]lthough Defendants arguably could have admitted Plaintiff to the Program long before they did, this option was never foreclosed to Plaintiff," and therefore his thirteen-year confinement in the ADX general population was not indefinite. *Id.* at *13. *See also Saleh v. Fed. Bur. of Prisons*, No. 05-cv-02467-PAB-KLM, 2010 WL 5464294, at *5 (D. Colo. Dec. 29, 2010) ("Although plaintiffs may not have held the keys to their release when admission to Step-Down required them to

mitigate the reasons for their original placement, that is no longer the case.") (citing *Georgacarakos*); and *Silverstein v. Fed. Bur. of Prisons*, No. 07-cv-02471-PAB-KMT, 2011 WL 4552540, at *15 (D. Colo. Sept. 30, 2011) ("Other courts that have addressed this issue have found that incarceration in ADX's general population is not indeterminate because inmates receive periodic reviews.") (citing *Georgacarakos* and *Rezaq*).

Here, Plaintiffs do not have access to the Step-Down Unit Program so long as the SAMs remain imposed on them. The Defendants, in the last few years, after the inception of this litigation, have offered to the Plaintiffs what is referred to as the "H-Unit Program," through which it is impossible to fully progress without removal of the SAMs. Even progression to Phase III of the "H-Unit Program" cannot occur unless the prisoner's SAMs are modified, which cannot happen absent the approval of the FBI, the prosecuting USAO, and the OEO – and may indeed never happen. R-IX.19, 25; AF-81.  While the SAMs must be reviewed annually, and while Plaintiffs have very recently been afforded the opportunity to provide input to the review process, the renewal criteria cited by the Defendants dictate a predetermined outcome and are completely beyond the ability of the Plaintiffs to affect. See discussion below. Indeed, these reviews embody the indefinite nature of the Plaintiffs' confinement, rather than ameliorate it. *See, e.g., Horton*, 2010 WL 3341259, at *9 (holding at motion to dismiss stage that "there is certainly a colorable argument that Defendants' provision of periodic, but meaningless, reviews of [the plaintiff's] status should not weigh against a conclusion that his segregation was indeterminate").

As in *Toevs*, *Jordan*, and each of the cases decided by this Court, the fourth *DiMarco* factor – the indefinite nature of the Plaintiffs' conditions of confinement – is

critical and, under the facts of this case, every bit as determinative of the presence of a liberty interest as it was in *Toevs*.  As discussed in Section B.2.a, below, the Plaintiffs were transferred to the ADX in 2003-04 with no notice or hearing and based upon immutable criteria wholly inconsistent with the Bureau of Prisons' own directives.  A hearing was provided, seven years later, which sustained the transfers based upon similar immutable criteria.  In 2005, the Plaintiffs were moved to the even more restrictive Special Security Unit at the ADX in conjunction with the imposition of SAMs. The Plaintiffs' ability to advance through the "Step-Down" program that would enable them to move out of these highly restrictive conditions of confinement is dependent upon nonrenewal or substantial modification of the SAMs; in fact they cannot even access the ADX step-down program until they complete the separate H-Unit Program, which they are prevented from accomplishing by virtue of the SAMs. R-IX.19, 25; AF-74-76, 81. While the SAMs themselves are submitted for review annually, they have consistently been renewed upon historical and status criteria that the Plaintiffs have absolutely no ability to change, mitigate, or affect. AF-62.

In sum, there is no evidentiary indication that the Plaintiffs' current restrictive conditions of confinement are other than indeterminate, and perhaps permanent.  Far from "holding the keys" to their own advancement, the Plaintiffs are effectively blocked from advancement by historical circumstances no longer remotely within their control. And there is no evidentiary indication that this can or will ever change.  At the very least, the indefinite nature of their confinement is a genuine and material disputed fact. In reality, the indefinite nature of their confinement is virtually indisputable.

**B.** **The Plaintiffs Have Not Been and Are Not Being Accorded Due Process**

Once a liberty interest is implicated, as it is under the facts of this case, the next question is what process is due to people seeking to avoid, or at least limit, the deprivation of that liberty. The Supreme Court has "embraced a framework" to address this question that requires consideration of three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Wilkinson*, 545 U.S. at 224-25 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). These factors act as a guide rather than a set of rigid rules, "[b]ecause the requirements of due process are 'flexible and cal[l] for such procedural protections as the particular situation demands.'" *Wilkinson*, 545 U.S. at 224 (citing *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). *See also DiMarco*, 473 F.3d at 1344 (due process is satisfied as long as an inmate is accorded "(1) a sufficient initial level of process, *i.e.*, a reasoned examination of the assignment; (2) the opportunity for the inmate to receive notice and respond to the decision; and (3) safety and security concerns to be weighed as part of the placement decision").

**1.** **The Private Interest Being Affected**

Regarding the first *Mathews* factor, the private interest, the District of Colorado has held that when a prisoner has established a liberty interest, he also has made a showing of a private interest that is sufficient to satisfy the first of the three *Mathews* factors. *See Stine*, 2009 WL 103659, at *11. While this private interest exists as a result

of placement in atypical or harsh conditions, "the possible length of wrongful deprivation...is an important factor in assessing the impact of official action on the private interests." *Mathews,* 424 U.S. at 341 (quoting *Fusari v. Steinberg*, 419 U.S. 379 (1975)). Based on the facts set forth above, Plaintiffs have a liberty interest.  Consequently and correspondingly, they also have a significant private interest in avoiding their conditions of confinement at the ADX for purposes of the first *Mathews* factor.

### 2.      Risk of Erroneous Deprivation and Value of Substitute Procedures

The second *Mathews* factor examines what particular processes are employed against the risk of an erroneous deprivation of the private interest.  *Mathews,* 424 U.S. at 335. This factor scrutinizes the reliability and fairness of the current procedures used "and the probable value, if any, of additional or substitute procedural safeguards." *Id*. In the context of a prisoner being placed into segregation, the Supreme Court held that the following procedures were necessary to satisfy the Constitution: (1) a prisoner must receive notice of the factual basis relied upon for his placement; (2) he must be given the opportunity to object and be heard before the decision is made; (3) he must receive multiple levels of review; and (4) he must receive periodic reviews assessing the on-going basis for his placement. *Wilkinson*, 545 U.S. at 226-27. Implicit in all of these requirements is that "the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'" *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  When these factors are applied to the facts of this case, there are genuine issues of material fact as to whether the procedures employed by Defendants provide Plaintiffs with any meaningful process, thus rendering summary judgment inappropriate as a matter of law.

### a.   The Plaintiffs' Original Transfers to the ADX

Both Plaintiffs have been in the custody of the Bureau of Prisons since 1993, and both are serving life sentences for their crimes of conviction. I.2; R-I.2. As set forth above, both Mr. Ayyad and Mr. Abouhalima were incarcerated in high security federal penitentiaries until September 11, 2001, when they were removed from the open population units at their respective facilities and placed in administrative detention "under the tightest restrictions allowed by our Administrative Detention policy." AF-13. Neither Plaintiff was informed of the bases for these actions, nor were they provided any opportunity to respond. AF-14. In October 2002 and March 2003, respectively, Mr. Ayyad and Mr. Abouhalima were transferred from administrative segregation at their respective institutions to "general population" at the ADX, a total segregation facility reserved by BOP policy for inmates who have "demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution." R-XI.1-2, 6-7; AF-17.

Neither Plaintiff was informed of the bases for these transfers, nor were they provided any opportunity to respond. AF-18, 21. Neither Plaintiff had received any incident reports or other complaints or admonitions that demonstrated "an inability to function in a less restrictive environment" or that they posed a threat "to the secure and orderly operation" of the facilities where they had been housed. R-XI.4-7. There is nothing in the transfer documentation to suggest that alternative placement options would not have been sufficient or preferable, despite Bureau policy requiring consideration of such alternatives prior to placement at the ADX. R-XI.2, 4-7. The Transfer Packets for both Plaintiffs recite justifying factors inconsistent with the Bureau's own official

policies and applicable Program Statement, irrelevant to official placement criteria, and largely dependent upon factors related to the Plaintiffs' crimes of conviction that had not changed since their initial incarceration ten years earlier. R-XI.1, 4-7, 25.

In December 2009 – approximately *seven years* after their transfers to the ADX – the BOP decided to conduct "hearings" for Plaintiffs on their referrals for transfer to that facility.  These retroactive "transfer hearings" were not governed by official BOP policy, but by procedures delineated in a memo by Regional Director Nalley ("Nalley Memo") which, among other things, recites different criteria for ADX placement than the BOP's official policy. R-XI.9-19, 25, 47-48; AF-21.

Plaintiffs were given approximately 48 hours notice of the 15-25 minute retroactive telephonic "hearings" and were not allowed to present witnesses or have any assistance of legal counsel or prison staff. R-XI.26. There was no transcription. R-XI.27. The hearing notices recited criteria wholly unrelated to and inconsistent with Bureau policy for transfers to the ADX, focusing instead upon the Plaintiffs' crimes of conviction seventeen years earlier, long outdated incident reports not contemporaneously thought to merit ADX confinement and inconsistent with the Defendants' own staff evaluations, and (with regard to Mr. Ayyad) the imposition of SAMs (which were not imposed until two years *after* the transfers). R-XI.32, 35. The Hearing Administrator's "findings" simply mirrored the notices, concluded that the Plaintiffs' should "remain" at the ADX, and were followed by perfunctory higher-level approval reflecting the complete absence of any meaningful review. R-XI.56. In sum, the retroactive "hearings" were, and would be shown upon the evidence presented at a trial to be, a manifest  untimely and inexplicable sham.

To date, there has been no "reasoned examination" of Plaintiffs' assignment to the

ADX; the Plaintiffs have been given no meaningful opportunity to respond to those

decisions (indeed no opportunity at all for seven years); and no demonstration of "safety

and security concerns" has been offered in the mix.  *See DiMarco*, 473 F.3d at 1344.  The

2002-03 transfers were simply imposed by fiat.  No due process was made available then.

And, as discussed below, no such process is available now.

### b. The Absence of Process For the Imposition of the SAMs.

In March 2005, over two years after their transfer to the ADX and with no

intervening reviews, the Plaintiffs were removed from the ADX "general population"

segregation units and placed in H-Unit, the "Special Security Unit" within the ADX.

Neither Mr. Ayyad nor Mr. Abouhalima was provided notice or an opportunity to address

the reasons for this transfer. AF-18, 21. On the same day, both Mr. Ayyad and Mr.

Abouhalima were informed that they had been placed under SAMs.  Neither was

provided notice or an opportunity to address the reasons for the imposition of the SAMs.

R-VII.6; AF-33. While the Defendants have recited a litany of justifications for

imposition of the SAMs in 2005, Motion at 18-20, neither of the Plaintiffs was provided

any opportunity, let alone a "meaningful" opportunity, to be heard regarding those

justifications. R-VII.6; AF-33.

Finally, while the Defendants have invoked the availability of post-deprivation

review under the Bureau's Administrative Remedy Program, Motion at 34-37, this too

provides no meaningful avenue for addressing or contesting the substance of the

justifications for imposition of the SAMs. SOF.  Plaintiffs were not told the reasons for

the imposition of the SAMs, nor were they provided the opportunity to rebut those

reasons. R-VIII.3-4. Additionally, when they challenged the imposition of the SAMs (and the subsequent renewals) through the BOP's administrative remedy program, they were told that the BOP didn't impose the SAMs, the Attorney General did, and there was nothing the BOP could do. R-VIII.1.

> **c.      The Absence of Meaningful Periodic Review of Either ADX Placement or the SAMs.**

The implications of the Defendants' actions in 2005 are that the Plaintiffs have been placed in the Special Security Unit of the most restrictive facility in the federal prison system.  Irrespective of the merit of the justifications offered for their placement in these conditions of confinement in 2005, neither Mr. Ayyad nor Mr. Abouhalima has any way to move out of these conditions without a meaningful periodic review of their placement.  And while the ADX has instituted a "step-down" program which in theory provides a route by which inmates may advance through appropriate actions and proper behavior into less severely restrictive conditions of confinement, that route is blocked for Mr. Ayyad and Mr. Abouhalima by the presence of the SAMs.  By the BOP's own admission, Plaintiffs are not eligible even to be *considered* for participation in the Step-Down Program because of their SAMs. R-IX.19, 25; AF-74-76, 8.1 While Defendants suggest that the H-Unit program is the equivalent of a "step-down" program for those with SAMs, these programs are not analogous in the most important possible way – that is, the H-Unit Program does not, by its terms, contemplate progression out of the program and, by extension, the ADX.  A prisoner at the ADX with SAMs could serve his entire sentence – indeed, the rest of his life – in the H-Unit at ADX if his SAMs are not removed. AF-72-76.

The annual review required for renewal of the SAMs is thus the key to a meaningful review of the Plaintiffs' retention in their conditions of confinement.  Only to the degree that the SAMs are removed or modified do Mr. Ayyad and Mr. Abouhalima have any realistic prospect of *ever* moving out of H-Unit, let alone out of the ADX.  Only to that degree do they have any prospect for advancement to less severely restrictive and atypical conditions of confinement.  And while annual review of the SAMs is mandated – and while the Plaintiffs are now allowed to provide a measure of input to the review and renewal process – *the review is meaningful only if it is dependent upon criteria that the Plaintiffs have any ability to affect*.  If the review is dependent upon and determined by immutable pre-existing circumstances and preconceptions that cannot be changed, there is nothing the Plaintiffs can ever do, and there is no input they can ever provide, to change or mitigate those circumstances.  The review thus becomes meaningless and a sham.

That, in fact, is the case here.  Each renewal of Mr. Ayyad's and Mr. Abouhalima's SAMs since 2006 has recited, in identical terms drawn from 28 C.F.R. §501.3, that based on their "proclivity for violence…there is a substantial risk that his communications or contacts with persons could result in death or serious bodily injury to persons or substantial damage to property that would entail the risk of serious bodily injury to persons." R-VII.42.  This conclusion has been grounded on each occasion upon the nature of Mr. Ayyad's and Mr. Abouhalima's 1993 crimes of conviction, their perceived notoriety among unknown persons who may be disposed to conduct future acts of terrorism (such notoriety arising solely from the Plaintiffs' 1993 crimes of conviction), organizational affiliations predating their 1993 crimes of conviction, approved (and

subsequently criticized) and government-monitored communications with overseas inmates prior to 2005 (which communications the Plaintiffs ceased immediately upon direction of the Bureau), and (in Mr. Abouhalima's case) an isolated instance of approved correspondence to an approved family member subjected to a wholly inaccurate retrospective reinterpretation. Ex. 1, ¶¶176-191. Notwithstanding both Mr. Ayyad's and Mr. Abouhalima's expressed beliefs in nonviolence and efforts toward good and productive behavior, AF-2, there is nothing either of them will ever be able to do to change or mitigate the circumstances repeatedly tendered by the Defendants as justifications for repeatedly renewing the SAMs, year after year.  There is nothing, therefore, that either of them will ever be able to do to change or mitigate the circumstances dictating their confinement under the most restrictive conditions in the federal prison system.

Plaintiffs are entitled to meaningful periodic reviews of their retention in such restricted and segregated conditions of confinement. *Toevs*, 646 F.3d at 757-58 (citing *Hewitt v. Helms*, 459 U.S. 460, 477 (1983)); *DiMarco*, 473 F.3d at 1344-45. "[A]dminstrative segregation may not be used as a pretext for indefinite confinement of an inmate." *Hewitt*, 459 U.S. at 477.  While the periodic review need not permit the submission of additional evidence or statements, it "must be meaningful; it cannot be a sham or a pretext." *Toevs*, 646 F.3d at 758.  It is a review "that evaluates the prisoner's current circumstances and future prospects and, considering the reason(s) for his confinement to segregation, determines, *without preconception*, whether that placement remains warranted." *Id.* (emphasis added).  *See also McClary v. Kelly*, 4 F. Supp. 2d 195, 213 (W.D.N.Y. 1998) ("Due process is not satisfied where the periodic reviews are a

sham; the reviews must be meaningful and not simply perfunctory."); and *Rhinehart v. Gomez*, No. C-95-0434-VRW, 1998 WL 118179, at *4 (N.D. Cal. Mar. 2, 1998) ("reviews of indeterminate placements in administrative segregation must amount to more than 'meaningless gestures' because of the potentially unlimited span of confinement").

### 3. The Government's Interest Does Not Outweigh the First Two *Mathews* Factors.

The third *Mathews* factor analyzes the government's interest in not adding additional procedures. *Mathews*, 424 U.S. at 335. This factor requires the government to demonstrate a public interest in not increasing the processes provided to an individual, which will then be weighed against the private interest and risk of erroneous deprivation. *Id*. at 347. However, even if the government can clearly articulate an interest in not providing additional process (which it has not done here), the government's interest may be overcome when the first two *Mathews* factors weigh in favor of the plaintiff. *See Stine*, 2009 WL 103659, at *11.

The government must clearly articulate its interest in avoiding each potential additional process and then the Court can weigh the public cost of additional process against the individual's private interest to determine the correct balance of procedures. *Mathews*, 424 U.S. at 348-49. The government cannot satisfy its burden merely by stating that it has a safety or a budgetary interest. *See Mathews*, 424 U.S. at 347-49 ("Financial cost alone is not a controlling weight in determining whether due process requires a particular procedural safeguard"); *see also Wilkinson*, 545 U.S. at 228-29 (weighing specific, articulated safety risks of procedures). Here, Defendants have failed to identify why other procedural protections cannot be put in place, except to assert "security"

concerns. In theory, every individual housed at the ADX—and indeed every prisoner—presents some level of security risk. Simply to allow invocation of "security" *per se* to trump basic procedural protections would allow the government to thwart the due process requirements entirely. *See generally Mathews*, 424 U.S. at 348 (finding that while evidentiary hearing may not be required, "the essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'"). Thus, Defendants have articulated no clear basis to outweigh the requirement of basic due process.

## **CONCLUSION**

For the reasons addressed above, Plaintiffs respectfully request that Defendants' Motion for Summary Judgment be denied.

Dated January 9, 2012.

Respectfully submitted,

_____s/_____

Edward T. Ramey
Heizer Paul Grueskin LLP
2401 15th Street, Suite 300
Denver, Colorado 80202
Phone:  303-595-4747
Fax:  303-595-4750
Email:  eramey@hpgfirm.com

Laura A. Rovner
Rajasimha Raghunath
2255 East Evans Avenue
Denver, CO 80208
303-871-6140
Fax: 303-871-6847
Email: lrovner@law.du.edu
        rraghunath@law.du.edu

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of January, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

**Susan Prose**
Assistant United States Attorney
susan.prose@usdoj.gov

_____s/_____
Edward T.Ramey

149