IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.   05-cv-02342-WYD-MJW
(consolidated with Civil Action No. 05-cv-02653-WYD-MJW)

NIDAL A. AYYAD and
MAHMUD ABOUHALIMA,

      Plaintiffs,

v.

ERIC H. HOLDER, JR., Attorney General of the United States,
CHARLES E. SAMUELS, JR., Director of the Federal Bureau of Prisons,
PAUL M. LAIRD, Regional Director, North Central Region,
DAVID BERKBILE, Warden, United States Penitentiary - Administrative Maximum, and
JOHN DOES 1 THROUGH 5, sued in their official capacities,

      Defendants.

---

**ORDER ON MOTION TO DISMISS**

---

I.    INTRODUCTION

THIS MATTER is before the Court on Defendants' Motion to Dismiss Ayyad's Claims as Moot.[1] A response was filed by Plaintiff on June 29, 2012 and a reply was filed on July 23, 2012. For the reasons discussed below, I grant in part, deny in part and defer in part the Motion to Dismiss.

II.    BACKGROUND

Plaintiff Nidal A. Ayyad ["Ayyad"] is a convicted terrorist who commenced suit while incarcerated at the United States Penitentiary - Administrative Maximum ["ADX"]. He asserts claims under the First and Fifth Amendments to the Constitution regarding

---

[1] The motion is filed only on behalf of the named Defendants in Case No. 05-cv-02342, and not on behalf of the John Doe Defendants.

(1) restrictions upon his incoming and outgoing communications at ADX, including restrictions imposed by the Special Administrative Measures [hereinafter "SAMs"] against Ayyad, and (2) the imposition and maintenance of extreme conditions of confinement at the ADX without constitutionally mandated access to due process of law.[2] The Third Amended Complaint seeks injunctive relief asking for, among other things: (1) removal of the restrictions upon Ayyad's ability to send and receive correspondence and publications except to the degree Defendants are able to show that such restrictions are in fact reasonably necessary to protect one or more governmental interests, and (2) a transfer from the ADX to a less restrictive environment.  Ayyad also seeks a declaration that he has been and is being deprived by Defendants of his liberty interest in avoiding indefinite confinement under conditions constituting an atypical and significant hardship, such deprivation being without due process of law in violation of the Fifth Amendment.

Defendants allege in the Motion to Dismiss that two significant events have occurred that have rendered all of Ayyad's claims moot.  First, the SAMS that are alleged to restrict Ayyad's communications have expired and not been renewed. Second, Ayyad has been transferred from ADX to another, less restrictive Federal Bureau of Prisons ["BOP"] facility.  In addition, Defendants argue that the SAMS could not be reimposed by the government absent new, significant processes based on a new

---

[2] Plaintiff Mahmud Abouhalima, another convicted terrorist housed at ADX, filed a similar suit challenging the constitutionality of the SAMS in 05-cv-02389-WYD-MJW, which suit has been consolidated with Ayyad's case.  A Third Amended and Consolidated Complaint was filed by both Plaintiffs on April 16, 2009.  The Motion to Dismiss at issue is filed only as to Ayyad's claims.

set of facts. With these changes in his conditions of confinement, Defendants assert that Ayyad no longer needs the relief he sought in this case, and that his claims should be dismissed as moot. Accordingly, Defendants move to dismiss Ayyad's claims pursuant to Fed. R. Civ. P. 12(b)(1) and 12(h)(3) for lack of subject matter jurisdiction.

In response, Ayyad notes that in the time since Plaintiffs filed their response to Defendants' Motion for Summary Judgment (ECF Nos. 285 & 305), Defendants allowed Ayyad's SAMs to expire without renewing them, and subsequently transferred him out of ADX and into a "Communications Management Unit" ["CMU"]. This facility has been described by the Tenth Circuit as the most restrictive facility in the federal system aside from ADX. *See Rezaq v. Nalley*, 677 F.3d 1001, 1009 (10th Cir. 2012).

As to the mootness argument, Ayyad acknowledges that his due process claim challenging his *ongoing* confinement in ADX is now moot (Claim 2), but asserts that both his due process claim challenging his *transfer* to ADX (Claim 1) and his First Amendment claims (Claims 5 & 6) remain viable. Ayyad argues that Defendants' Motion to Dismiss with regard to these claims should be denied for three reasons. First, Ayyad asserts that his claims are not moot because he has not been returned to his pre-violation conditions and is still suffering the effects of Defendants' violations of his constitutional rights. Accordingly, Ayyad argues that he retains a legally cognizable interest in the outcome of his claims. Second, Ayyad contends that the doctrine of voluntary cessation applies to Ayyad's due process/transfer claim (Claim 1), and Defendants have not met their "heavy burden" of persuading the Court that Ayyad could not be returned to ADX at any time and without sufficient process. Finally, Ayyad has

not been provided with the supplemental discovery necessary to address some of the assertions Defendants make in their motion. Thus, if the Court determines that the evidence presented in Ayyad's Response is not sufficient to refute Defendants' contention that his claims are moot, Ayyad requests an order requiring Defendants to supplement their discovery responses pursuant to Fed. R. Civ. P. 26(e)(1).

III. ANALYSIS

A. The Legal Standard for Mootness

Whether a case is moot is a threshold inquiry the Court must address before addressing the merits of the case "because the existence of a live case or controversy is a constitutional prerequisite to the jurisdiction of the federal courts." *Beattie v. United States*, 949 F.2d 1092, 1093 (10th Cir. 1991). The mootness doctrine relates to both '[t]he constitutional case or controversy requirement of Article III..., as well as the prudential considerations underlying justiciability.'" *Jordan v. Sosa*, 654 F.3d 1012, 1023 (10th Cir. 2011) (quotation omitted). "Accordingly, '[c]ourts recognize two kinds of mootness: constitutional mootness and prudential mootness.'" *Id.* (quoting *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1023 (10th Cir.2010)). Defendants assert that the case should be dismissed as moot based on both types of mootness.

"'Under the constitutional mootness doctrine, the suit must present a real and substantial controversy with respect to which relief may be fashioned.'" *Sosa*, 654 F.3d at 1023-24 (quoting *Fletcher v. United States*, 116 F.3d 1315, 1321 (10th Cir. 1997)). "Constitutional mootness is grounded in the requirement that 'any case or dispute that is

presented to a federal court be definite, concrete, and amenable to specific relief.'" *Sosa*, 654 F.3d at 1024 (quotation omitted). "Consequently, the constitutional mootness doctrine focuses upon whether 'a definite controversy exists throughout the litigation and whether conclusive relief may still be conferred by the court despite the lapse of time and any change of circumstances that may have occurred since the commencement of the action.'" *Id.* (quotation omitted).

"[A] justiciable case or controversy must remain 'extant at all stages of review, not merely at the time the complaint is filed.'" *United States v. Juvenile Male*, 131 S. Ct. 2860, 2864 (2011) (quotation omitted). Thus, mootness can be caused by events occurring after the complaint has been filed. *S. Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 729 (10th Cir. 1997). According to the Tenth Circuit, "'[t]he hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed.'" *Unified Sch. Dist. No. 259 v. Disability Rights Ctr. of Kan.*, 491 F.3d 1143, 1150 (10th Cir. 2007) (quoting *N.M. Env't Dep't v. Foulston*, 4 F.3d 887, 889 (10th Cir. 1993)). The burden of demonstrating mootness "'is a heavy one.'" *Rezaq v. Nalley*, 677 F.3d 1001, 1008 (10th Cir. 2012) (quotations and internal quotation marks omitted).

"'Even if a case is not constitutionally moot, a court may dismiss [a] case under the prudential-mootness doctrine if the case is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant.'" *Sosa*, 654 F.3d at 1024 (quoting *Silvery Minnow*, 601 F.3d at 1023) (further quotation and internal quotation marks omitted)). "Prudential mootness therefore 'addresses not the *power* to grant

relief[,] but the court's *discretion* in the exercise of that power.'" *Id.* (quoting *S. Utah Wilderness Alliance*, 110 F.3d at 727 (emphasis added) (further quotation and internal quotation marks omitted)). "In general, the prudential mootness doctrine only applies where, as here, a plaintiff seeks injunctive or declaratory relief." *Id.* (citing *Silvery Minnow*, 601 F.3d at 1122; *Bldg. & Constr. Dep't v. Rockwell Int'l Corp.*, 7 F.3d 1487, 1492 (10th Cir.1993) ("All the cases in which the prudential mootness concept has been applied have involved a request for prospective equitable relief by declaratory judgment or injunction.")).

"'Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief.'" *Rezaq*, 677 F.3d at 1008 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). Thus, when an injunction is sought, the plaintiff must show a continued susceptibility to injury. *Sosa*, 654 F.3d at 1024. "'Similarly, in the context of an action for declaratory relief, a plaintiff must be seeking more than a retrospective opinion that he was wrongly harmed by the defendant.'" *Rezaq*, 677 F.3d at 1008 (quotation omitted). "'[W]hat makes a declaratory judgment action a proper judicial resolution of a case or controversy rather than an advisory opinion is the settling of some dispute which affects the behavior of the defendant toward the plaintiff.'" *Silvery Minnow*, 601 F.3d at 1109-1110 (quotation omitted).

    B.    <u>Whether Ayyad's Claims Should Be Dismissed as Moot</u>

        1.    <u>The Claims that Are Moot</u>

In the case at hand, I first grant Defendants' Motion to Dismiss as to Ayyad's due process claim challenging his ongoing confinement in ADX (Claim 2 of the Third

Amended Complaint). Ayyad concedes that this claim is moot as he is no longer at that facility. Indeed, "[w]here [a] prisoner's claims for declaratory or injunctive relief relate solely to the conditions of confinement at the penal institution at which the prisoner is no longer incarcerated, courts have concluded that they are unable to provide the prisoner with effective relief." *Sosa*, 654 F.3d at 1027.

I also grant the Motion to Dismiss as to Ayyad's request for injunctive relief in the form of an order requiring Defendants to immediately transfer Ayyad from the ADX to another facility with less restrictive and severe conditions of confinement, or, alternatively, to a step down or other program through which he will have a reasonable prospect of earning and advancing to less restrictive conditions of confinement. Again, that relief has already been effectuated. As noted by the Tenth Circuit, "[b]ecause a prisoner's transfer or release signals the end of the alleged deprivation of his constitutional rights, an entry of equitable relief in his favor would amount to nothing more than a declaration that he was wronged, and would have no effect on the defendants' behavior towards him." *Sosa*, 654 F.3d at 1027.

Ayyad asserts, however, that his due process claim challenging his transfer into ADX (Claim 1) and his First Amendment Claims (Claims 5 and 6) remain viable. Thus, I turn to those claims.

        2.     <u>Ayyad's Due Process Claim Challenging His Transfer to ADX</u>

Ayyad alleges in Claim 1 that his "transfer to the ADX without notice and an opportunity to be heard constituted a deprivation of a liberty interest without due process of law in violation of the Fifth Amendment to the United States Constitution."

-7-

(Third Am. Compl. ¶ 131.) Ayyad also alleges, among other things, that he was not "provided any meaningful information regarding the reasons for [his] transfer to the ADX" and that he was not "provided prior notice, a hearing or other opportunity to address [his] transfer to the ADX prior to such transfer." (*Id.* ¶¶ 42-43.) Ayyad seeks a declaration that he "has been and is being deprived by Defendants of his liberty interest in avoiding indefinite confinement under conditions constituting an atypical and significant hardship, such deprivation being without due process of law in violation and contravention of the Fifth Amendment to the United States Constitution." (*Id.*, Prayer for Relief ¶ A.)

In connection with this claim, Ayyad asserts that, prior to his placement in ADX, the BOP had designated him to general population units in two United States Penitentiaries ["USP-GPs"], where he lived for more than eight years. (Ayyad Decl. ¶¶ 27-63, Ex. 2 to Pls.' Resp. to Defs.' Mot. Summ. J., ECF No 305). In the USP-GPs, Ayyad was out of his cell for more than twelve hours per day, held jobs, ate communally in the mess hall, recreated with other prisoners, was in frequent contact with his family, and was able to engage in congregate prayer. (*Id.* at ¶¶ 31-40, 55.) As set forth in Plaintiffs' Response to Defendants' Motion for Summary Judgment and in Ayyad's Declaration, Ayyad's conditions of confinement in ADX were exponentially more restrictive than at the USP-GPs. Over the course of the ten years following his removal from USP-Lewisburg, Ayyad asserts that he was never told why he was put in segregation or transferred to ADX, why he was kept there, or if and when he would ever get out. (Pls.' Resp. to Mot. Summ. J. at 95-97.)

Ayyad further notes that he was transferred in May 2012 from the ADX to the CMU at Terre Haute. (Resp. to Defs.' Mot. Dismiss, Ex. 1.) He asserts that there are only two such units in the United States and that they are highly restrictive—housing fewer than one hundred prisoners. Although Ayyad now has more human contact with other prisoners and is not confined to his cell for 23 hours a day as he was at ADX, he contends that he continues to be subject to a host of other restrictions that are not present at the USP-GPs, including limited phone access, non-contact visits, limited family visits, strict limitations on religious practices, very few job and educational opportunities, and significant restrictions on communications. *See Aref v. Holder*, 774 F. Supp. 2d 147, 153-54 (D.D.C. 2011) (describing conditions at the CMUs).

The question is whether Ayyad's transfer from ADX to the CMU renders this claim moot. I find the Tenth Circuit's opinion in *Rezaq* instructive on this issue. In *Rezaq*, as here, inmates who were convicted of terrorism-related offenses and were transferred to ADX brought suit contending that they had a liberty interest in avoiding transfer without due process to ADX. As here, the inmates claimed that they did not have due process before their transfer to ADX. All of the inmate were later transferred out of ADX, and the Tenth Circuit addressed whether their due process claims were moot. The Tenth Circuit found that the case would not be moot "if the BOP made decisions under the old policies [regarding due process] that have ongoing, long-term consequences for the plaintiffs that could be mitigated by an award of prospective relief." *Id.* at 1009. The court then found that the case was not moot for two reasons. *Id.* First, it found that "the plaintiffs' transfers to CMUs did not 'completely and

irrevocably eradicate [ ] the effects of the alleged violation' because they have never been returned to their pre-ADX placements in USP–GPs." *Id*.  It then held that "[i]f the inmates' current conditions are a byproduct of their initial transfers to ADX, then long-term consequences may persist and an injunction may serve to 'eradicate the effects of [the BOP's] past conduct.'" *Id.* (quotation omitted).

The Tenth Circuit also found in *Rezaq* that "some prospective relief remains available." 677 F.3d at 1009.  It stated, "[a]ssuming, only for purposes of deciding whether the cases are moot, that the plaintiffs have a liberty interest in avoiding transfer to ADX without due process *and* their retroactive transfer hearings were constitutionally deficient, this court could award meaningful relief in the form of additional process." *Id*. (emphasis in original).  It further found that the "BOP has failed to show that new due process hearings could not result in the plaintiffs' return to general population conditions." *Id*.  The Tenth Circuit agreed with the magistrate judge's finding that "'the heart of Plaintiff's request for relief is for transfer to a less-restrictive facility.  This remedy has not been provided to him and therefore, prospective relief remains available.'" *Id*. at 1010 (quotation omitted).  Further, the *Rezaq* court held that "[e]ven the possibility of a 'partial remedy' is 'sufficient to prevent [a] case from being moot.'" *Id*. (quoting *Church of Scientology of Cal. v. United States,* 506 U.S. 9, 13 (1992)).

I find that *Rezaq* is controlling and dictates a finding that Ayyad's due process claim is not moot.  Even though Ayyad has been transferred out of ADX, he is still in a CMU—a very restrictive facility as noted by the Tenth Circuit.  For purposes of the Motion to Dismiss, Defendants have not shown that new hearings with the due process

-10-

that Ayyad claims he was entitled to could not result in Ayyad's return to general population conditions.  *Rezaq*, 677 F.3d at 1009.  Thus, as in *Rezaq*, "this new process could result in a finding that [Ayyad was] not properly placed in ADX in the first place and thus should be restored to [his] pre-ADX status and corresponding placements.'" *Id.*, 677 F.3d at 1009-10 (quotation omitted).

While Defendants argue that Ayyad's claim that he could obtain a different placement if new hearings were held is speculative or highly unlikely, I disagree.  As noted in *Rezaq*, even if the relief granted by the Court "such as new retroactive transfer hearings with adequate procedural protections—is unlikely to result in transfers to less-restrictive conditions, it is relief nonetheless" and the case is not moot.  *Id.*

Defendants also argue, however, that Ayyad's complaint did not seek a transfer to his pre-ADX status and placement in the USP–GPs.  Instead, he only requested transfer to a less restrictive environment, which has happened.  Since Ayyad has obtained all the relief he requested, Defendants assert that this case is moot.  I disagree.  The Tenth Circuit made clear in *Rezaq* that a case is not moot when there is some possible remedy, "*even . . . one not requested by the plaintiff.*"  (*Id.*) (emphasis added) (citing *Church of Scientology,* 506 U.S. at 12–13) ("While a court may not be able to return the parties to the *status quo ante* [,] ... a court can fashion *some* form of meaningful relief in circumstances such as these.")).  Here, it is possible that the Court can still fashion some possible remedy for Ayyad through either injunctive or declaratory relief, even though he may not have made a specific request for same, and the due process claim is thus not moot.  *Id.*; *see also Chicago United Indus., Ltd. V. City of*

*Chicago*, 445 F.3d 940 (7th Cir. 2006) (prevailing plaintiff is entitled to relief proper to his claim even if he did not request that relief because circumstances bearing on feasibility of particular forms of relief often change between initiation of suit and rendition of final judgment); *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1312 (10th Cir. 2010) (claims were not moot because judgment "may require [correctional department] to modify" policies).

I also reject Defendants' argument that this claim should be dismissed on grounds of prudential mootness. Defendants assert that Ayyad does not have a liberty interest in connection with his transfer to and confinement in ADX. However, resolution of that issue requires a "fact-driven assessment that accounts for the totality of the conditions presented by a given inmates' sentence and confinement." *Rezaq*, 677 F.3d at 1012. Accordingly, this is not an appropriate issue to decide on a motion to dismiss. Instead, this issue will be addressed by the Court in connection with Defendants' Motion for Summary Judgment where this issue was also raised and is being briefed.

Based on the foregoing, Defendants' Motion to Dismiss is denied as to Ayyad's due process claim to the extent it challenges his transfer to ADX.[3]

### 3. Ayyad's First Amendment Claims

Defendants also argue that Ayyad's First Amendment claims (Claims 5 and 6), which they contend address only the SAMs and removal of same, are moot as Ayyad

---

[3] Since I find that the due process claim is not moot, I need not reach Ayyad's alternative argument that the doctrine of voluntary cessation applies to this claim. I also need not reach Defendants' argument that Ayyad's transfer ensures that he cannot be reassigned to the ADX without significant procedural safeguards, as that is part of the voluntary cessation analysis. *See Friends of the Earth, Inc. v. Laidlaw*, 528 U.S. 167, 189 (2000) (a party asserting that a case is not moot due to voluntary cessation must persuade the court "that the challenged conduct cannot reasonably be expected to start up again").

-12-

has been transferred from ADX and is no longer subject to SAMs. He is in a new, less restrictive institution, where he is subject to different communications restrictions implemented by BOP staff under the rules applicable in that jurisdiction. Defendants assert that those restrictions allow Ayyad more expansive communications than he had under the SAMs. Defendants further argue that if Ayyad is ever subject in the future to SAMs, he will have "ample opportunity" at that time to contest imposition of the SAMs in the specific factual context in which the issue arises.

      I reject Defendants' argument as Ayyad's First Amendment claims are not limited to the SAMs and the restriction of communications under same. Instead, Ayyad alleges in Claims 5 and 6 that Defendants are censoring and restricting his "outgoing correspondence" and his "incoming correspondence and publication" to a degree "not consistent with the restrictions applicable to other high security inmates not placed under SAMs", "greater than is necessary or essential to the protection of the governmental interests of security, order, and rehabilitation", "not reasonably related to legitimate related to legitimate penological interests", and "greater than is reasonably necessary to protect persons against the risk of acts of violence or terrorism." (Third Am. Compl. ¶¶ 150-152, 156-58.) Ayyad seeks "immediate restoration of [his] First Amendment rights to engage in outgoing correspondence" and to "receive incoming correspondence and publications" "except to the extent that the Defendants are able to show that restrictions upon those rights are necessary to protect one or more of the governmental interests" described in the Claims. (*Id.* ¶¶ 153, 159.)

Ayyad also argues that despite Defendants' recent decision not to renew the SAMs against him for a seventh consecutive year, the First Amendment claims are not moot as the fact he was under SAMs continues to impact his First Amendment rights on an ongoing basis. If Ayyad continues to suffer the effects of the violations of his First Amendment rights caused by Defendants' imposition of the SAMs on him, I agree with Ayyad that his First Amendment claims are not moot. The recent *Rezaq* case decided by the Tenth Circuit supports Ayyad's argument. Under the principles articulated in that case, the case would not be moot if the SAMS and the decisions made as to communications under those measures "have ongoing, long-term consequences for [Ayyad] that could be mitigated by an award of prospective relief." *Id.* at 1009. Thus, Ayyad asserts that the elimination of the SAMs has not completely and irrevocably eradicated the effects of the alleged First Amendment violations as he has never been returned to his pre-SAMs level of incoming and outgoing communications.

Defendants rely, however, on two cases from this Court that were issued prior to the *Rezaq* decision. They argue that these cases found under identical circumstances that First Amendment claims challenging SAMs were moot by removal of the measures, citing *Hale v. Ashcroft*, 683 F. Supp. 2d 1189, 1193-94 (D. Colo. 2009) (PAB-KLM) and *Reid v. Wiley*, No. 07-cv-01855-PAB-KMT, Order, ECF No. 216 at 2 (attached to the Motion to Dismiss as Ex. B.) I reject Defendants' argument that these cases require a finding that Ayyad's First Amendment claims are moot.

First, it is unclear whether these cases would have been decided the same way post-*Rezaq.* Even if they would have been, I find that they are distinguishable from this

-14-

case.  In *Hale*, the claims were found to be moot because the original claims, pled before the SAMs were lifted and before different BOP restrictions were placed on the inmate, "could not be fairly read to challenge the effect of new BOP restrictions placed on him." 683 F. Supp. 2d at 1191.  While the plaintiffs argued that the complaint "attacked the nature of the restrictions rather than the SAMs that created them and that therefore the BOP cannot render his claims moot by removing the SAMs but reimposing similar restrictions in a different guise. . . .", Judge Philip J. Brimmer rejected that argument.  *Id.* at 1192-93.  He found that the complaint "explicitly tie[d] the alleged constitutional violation to the imposition of the SAMs." *Id.* at 1193.  Thus, the complaint "did not put the BOP on notice that plaintiff was objecting to any restrictions on his claimed right to receive mail, have visits, or receive newspapers." *Id*.  That is not the situation in this case.  As noted previously, Claims Five and Six of the complaint allege First Amendment violations that are not tied to the SAMs but to the general restrictions on Plaintiffs' incoming and outgoing correspondence.  Thus, the complaint puts Defendants on notice of objections to any constitutionally prohibited restrictions on mail.

In *Reid*, the plaintiff argued that his claims challenging the SAMs were not moot because the prison continued to withhold mail even after the SAMs had expired.  Judge Brimmer rejected that argument because "Defendants have made clear that the mail in question is not being withheld under the provisions of the SAMs" and that "[o]nce the SAMs expired, those restrictions had no ongoing effect."  (Mot. to Dismiss, Ex. B at 4.)  Here, Ayyad argues to the contrary.

Accordingly, I find that Ayyad's First Amendment claims are not moot if he can show that the SAMs or his detention at ADX before his transfer to the CMU are still impacting his communications. Ayyad points to two examples in support of this argument. First, Ayyad asserted that he was still not able to communicate with Annie Smoorenburg, a family friend. That problem has, however, been resolved per Ayyad's Supplement to his Response filed on July 18, 2012, and he is now permitted to communicate with her. Accordingly, this example does not support Ayyad's argument that the SAMs have any continuing negative effect.

Ayyad also points to the Government Defendants' Motion for Order to Restrict Access to Certain Information in Plaintiffs' Response to Defendants' Motion for Summary Judgment and Exhibits filed in February 2012. That motion sought and obtained an order restricting certain portions of a declaration of Ayyad about the SAMs that was filed in this case while Ayyad was still on the SAMs. Before his response to that motion was filed, Ayyad was notified that the SAMs would not be renewed. Thus, Ayyad's response asserted that because he "is no longer subject to the SAMs' communication restrictions, the government's concern that public access to the challenged paragraphs would allow Mr. Ayyad to disseminate information to people he is barred from contacting by the SAMs is moot." (Pls.' Resp. to Defs.' Mot. for Order to Restrict Access, ECF No. 300 at 4.) Nonetheless, in the Reply, the Government Defendants continued to assert that the fact Ayyad had been under SAMs in the past was a basis for continuing to restrict his communications.

Defendants argue that this does not show any current issue in connection with the SAMS limiting Ayyad's communications, and that Ayyad has not identified any post-SAMs communication that has been stopped or restricted because of the expired SAMs. I agree. While Ayyad argues that "Defendants should not be permitted to assert that the SAMs constitute a basis for continuing to restrict Mr. Ayyad's communications, while at the same time claiming that the removal of the SAMs renders Mr. Ayyad's First Amendment claims moot" (Resp. at 9), he goes on to state that "[i]t is not at all clear whether the Defendants would object to dissemination of precisely the same statements in the context of a current post-SAMs communication." (Resp. to Mot. to Dismiss at 9.) He then states, "[i]f they would, the SAMS are continuing to have a very real effect upon Mr. Ayyad despite their formal nonrenewal." (*Id.*)

Mere speculation about what *could* happen in the future does not reasonably show any "continued susceptibility to injury" that warrants injunctive relief. *Sosa*, 654 F.3d at 1024. Indeed, "a federal court has neither the power to render advisory opinions nor 'to decide questions that cannot affect the rights of litigants before them.'" *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (quotation omitted). Thus, it would appear on the basis of Ayyad's Response to the Motion to Dismiss that his First Amendment claims may be moot.

Ayyad also argues, however, that if the Court finds he has not presented sufficient evidence to demonstrate he continues to suffer from Defendants' violations of his constitutional rights, it should also find that he is entitled to discovery regarding the jurisdictional issue raised by Defendants. He notes that while Defendants assert that

Ayyad is no longer suffering harm from the violations of his constitutional rights (relying on the declaration of ADX Associate Warden Stamper, who does not appear to have personal knowledge of Ayyad's current conditions of confinement at the CMU), Ayyad is without the discovery to which he is entitled in order to rebut some of Defendants' factual assertions.  The last production of documents by Defendants was October 5, 2011, prior to the date Plaintiffs filed their response to Defendants' Motion for Summary Judgment and prior to the removal of Ayyad's SAMs and his transfer to the CMU.

I find that Ayyad should be allowed to conduct discovery on the disputed jurisdictional facts at issue regarding his First Amendment claims.  The Tenth Circuit holds that "'[w]hen a defendant moves to dismiss for lack of jurisdiction, either party should be allowed discovery on the factual issues raised by that motion.'"  *Sizova v. Nat'l Inst. of Standards & Tech*, 282 F.3d 1320, 1326 (10th Cir. 2002) (quoting *Budde v. Ling-Temco Vought, Inc.*, 511 F.2d 1033, 1035 (10th Cir. 1975)).  "[A] refusal to grant discovery constitutes an abuse of discretion if the denial results in prejudice to a litigant."  *Id.*  Here, I find that Ayyad would be prejudiced if discovery is not allowed as "'pertinent facts bearing on the question of jurisdiction are controverted" or "a more satisfactory showing of the facts is necessary.'"  *Id.* (quotation omitted).

As to the scope of discovery, I believe that Ayyad should be entitled to discovery regarding whether and to what degree Defendants are still relying on Ayyad's prior SAMs and/or confinement in ADX in regulating his current communications and on any other jurisdictional issues he can identify that impact his First Amendment claims.  While Ayyad also seeks discovery as to other issues, such as whether the prior SAMs and/or

his ADX confinement impacted Defendants' decision to send him to a CMU and other information related to Ayyad's transfer to the CMU, I am not sure that discovery is necessary on these issues given the fact that I have denied the motion to dismiss as to the due process claim.  However, I believe that Magistrate Judge Watanabe should ultimately be in charge of discovery, including the scope and timing of same.  Accordingly, I direct the parties to promptly contact Magistrate Judge Watanabe's Chambers to set a status conference regarding discovery.  I also direct the parties to inform Magistrate Judge Watanabe that discovery should be expedited, given the age of this case and the pending summary judgment motion that will not be fully briefed as to Ayyad until the Motion to Dismiss is decided.

In light of this ruling, I defer resolution of Defendants' Motion to Dismiss as to the First Amendment claims until jurisdictional discovery has been conducted.  Within twenty (20) days after completion of this discovery, each party shall file a supplemental pleading addressing how the jurisdictional discovery impacts the motion to dismiss.

IV.     CONCLUSION

Based upon the foregoing, it is

ORDERED that Defendants' Motion to Dismiss Ayyad's Claims as Moot filed June 8, 2012 (ECF No. 307) is **GRANTED IN PART, DENIED IN PART, AND DEFERRED IN PART**.  Specifically, it is

ORDERED that Defendants' Motion to Dismiss Ayyad's Claims as Moot is **GRANTED** as to Ayyad's due process claim challenging his ongoing confinement in ADX (Claim 2 of the Third Amended Complaint) and his request for injunctive relief in

the form of an order requiring Defendants to immediately transfer Ayyad from the ADX to another facility with less restrictive and severe conditions of confinement.  It is **DENIED** as to Ayyad's due process claim challenging his transfer into ADX (Claim 1).  It is **DEFERRED** as to Ayyad's First Amendment Claims (Claims 5 and 6).  It is

FURTHER ORDERED that Ayyad may conduct discovery on the jurisdictional issues raised by Defendants as to the First Amendment claims and any other jurisdictional issues approved by Magistrate Judge Watanabe.  It is

FURTHER ORDERED that the parties shall contact Magistrate Judge Watanabe's Chambers to set a status conference regarding the scope and timing of the jurisdictional discovery.  Finally, it is

ORDERED that within **twenty (20) days** of completion of jurisdictional discovery, each party shall file a supplemental pleading addressing how the jurisdictional discovery impacts Defendants' Motion to Dismiss.

Dated:  October 10, 2012

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge