IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No.   05-cv-02342-WYD-MJW
(consolidated with Civil Action No. 05-cv-02653-WYD-MJW)

NIDAL A. AYYAD and
MAHMUD ABOUHALIMA,

       Plaintiffs,

v.

ERIC H. HOLDER, JR., Attorney General of the United States,
CHARLES E. SAMUELS, JR., Director of the Federal Bureau of Prisons,
PAUL M. LAIRD, Regional Director, North Central Region,
DAVID BERKBILE, Warden, United States Penitentiary - Administrative Maximum, and
JOHN DOES 1 THROUGH 5, sued in their official capacities,

       Defendants.

---

## ORDER ON DISPOSITIVE MOTIONS

---

I.    <u>INTRODUCTION</u>

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment and Defendants' motion to reconsider a portion of my Order of October 10, 2012 ["October 2012 Order"] on Defendants' Motion to Dismiss Ayyad's Claims as Moot.  A hearing was held on these motions on Thursday, September 4, 2014.

Plaintiffs Nidal Ayyad [Ayyad"] and Mahmud Abouhalima ["Abouhalima"] [collectively "Plaintiffs"] are federal inmates who are or were until fairly recently incarcerated at the United States Penitentiary ["USP"]-Administrative Maximum ["ADX"] in Florence, Colorado.  Their cases were consolidated, and they asserted claims under the First and Fifth Amendments to the Constitution regarding (1) restrictions upon their

incoming and outgoing communications under Special Administrative Measures ["SAMs"] imposed upon them in 2005; and (2) the imposition and maintenance of extreme conditions of confinement at the ADX under the SAMs without due process of law.  SAMs are imposed upon direction of the Attorney General when they are determined to be "reasonably necessary to protect persons against the risk of death or serious bodily injury." 28 C.F.R. § 501.3(a).

Defendants filed their Motion for Summary judgment on March 25, 2011.  While this motion has been pending for some time, it was not fully briefed until July 2014.  Thus, Plaintiffs' consolidated response was filed on January 9, 2012, and a revised response reflecting certain restrictions, redactions and modifications was filed on May 17, 2012.  Defendants filed a reply as to the portion of the motion regarding Abouhalima's claims in September 2012.  Abouhalima filed a supplemental response in October 2013, and Defendants filed a supplemental reply in November 2013.

As to Ayyad, the filing of Defendants' reply brief was stayed pending a ruling on Defendants' Motion to Dismiss Ayyad's Claims as Moot ["motion to dismiss"].  After completion of the jurisdictional discovery, Defendants' reply to the summary judgment motion as to Ayyad was filed on July 1, 2014.  Ayyad filed a surreply on July 18, 2014.

Defendants' motion to dismiss argued that Ayyad's claims were moot because his SAMs had expired and because he was transferred from ADX to another, less restrictive, Bureau of Prisons ["BOP"] facility—the Communications Management Unit ["CMU"] at Terre Haute, Indiana.  In the October 2012 Order, I granted the motion to dismiss as to Ayyad's due process claim challenging his ongoing confinement in ADX

and his request for injunctive relief for a transfer to a facility with less restrictive conditions of confinement.  With the dismissal of the ongoing confinement claim, Ayyad no longer asserts a challenge to the SAMs.  I denied the motion to dismiss as to Ayyad's due process claim regarding his transfer to ADX, and deferred ruling as to Ayyad's First Amendment claims so that jurisdictional discovery could be taken.

Ayyad later conceded in his Surreply in Opposition to Defendants' Motion for Summary Judgment that his First Amendment claims were moot, and those claims were dismissed on August 19, 2014.  Since Ayyad's only remaining claim is his due process claim challenging his transfer to ADX, I deny as moot the Motion for Summary Judgment as to Ayyad's due process claim as to his ongoing confinement in ADX, his request for injunctive relief for a transfer from ADX, and his First Amendment claims.

After jurisdictional discovery was completed, the parties filed supplemental pleadings as to the motion to dismiss.  Defendants argued that Ayyad's remaining due process claim should be dismissed based on that discovery.  Because I had previously denied the motion to dismiss as to that claim, I ruled by Order of June 10, 2014, that I would treat Defendants' argument as a motion for reconsideration of that ruling.  Ayyad addressed whether reconsideration of that ruling is appropriate in a document filed in June 2014, and a reply was filed in July 2014.  I now address that issue.

II.   MOTION TO RECONSIDER REGARDING AYYAD'S DUE PROCESS CLAIM

A.   Background and Standard of Review

Ayyad alleges that his "transfer to the ADX without notice and an opportunity to be heard constituted a deprivation of a liberty interest without due process of law in

violation of the Fifth Amendment to the United States Constitution." (Third Amended Complaint, ¶ 131.) Ayyad seeks a declaration that he "has been and is being deprived by Defendants of his liberty interest in avoiding indefinite confinement under conditions constituting an atypical and significant hardship, such deprivation being without due process of law in violation and contravention of the Fifth Amendment to the United States Constitution." (*Id.*, Prayer for Relief ¶ A.)

Defendants ask that I reconsider that portion of my October 2012 Order denying the motion to dismiss as to this claim. This request "invok[es] the district court's general discretionary authority to review and revise interlocutory rulings prior to entry of final judgment.'" *Fye v. Okla. Corp. Com'n*, 516 F.3d 1217, 1224 n. 2 (10th Cir. 2008) (quotation omitted). In deciding such a request, a court is not bound by the requirements of Rule 59(e) and 60(b). *Id.* "'A motion to reconsider ... should be denied unless it clearly demonstrates manifest error of law or presents newly discovered evidence.'" *Id.*; *see also Fye*, 516 F.3d at 1224 (district court did not abuse discretion in denying motion to reconsider when the decision "was not 'a clear error of judgment' and did not 'exceed[ ] the bounds of permissible choice in the  circumstances'") (quotation omitted). "[A]s a practical matter, '[t]o succeed in a motion to reconsider, a party must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision.'" *Nat'l Bus. Brokers, Ltd. v. Jim Williamson Productions, Inc.*, 115 F. Supp. 2d 1250, 1256 (D. Colo. 2000) (quotation omitted).

Defendants' mootness argument raises a jurisdictional dispute under Fed. R. Civ. P. 12(b)(1). Accordingly, I am "free to weigh the evidence and satisfy [myself] as to the

existence of [the court's] power to hear the case. . . ." *Osborn v. United* States, 918 F.2d 724, 730 (8th Cir. 1990).  I "must decide the jurisdictional issue, not simply rule that there is or is not enough evidence to have a trial on the issue." *Id.*; *see also Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001).

B.   Analysis

"'Under the constitutional mootness doctrine, the suit must present a real and substantial controversy with respect to which relief may be fashioned.'" *Jordan v. Sosa*, 654 F.3d 1012, 1023-24 (10th Cir. 2011) (quotation omitted).  The doctrine focuses on "whether 'a definite controversy exists throughout the litigation and whether conclusive relief may still be conferred by the court despite the lapse of time and any change of circumstances that may have occurred since the commencement of the action.'" *Id.* at 1024 (quotation omitted).   "'The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed.'" *Unified Sch. Dist. No. 259 v. Disability Rights Ctr. Of Kan.*, 491 F.3d 1143, 1150 (10th Cir. 2007) (quotation omitted).

In deciding that Ayyad's due process claim was not mooted by his transfer from the ADX to the CMU and the termination of his SAMs, I found in the October 2012 Order that the Tenth Circuit's opinion in *Rezaq v. Nalley*, 677 F.3d 1001 (10th Cir. 2012), was controlling.  I stated, "[e]ven though Ayyad has been transferred out of ADX, he is still in a CMU—a very restrictive facility as noted by the Tenth Circuit." (October 2012 Order at 10.)  "Defendants have not shown that new hearings with the due process that Ayyad claims he was entitled to could not result in Ayyad's return to general population conditions." (*Id.* at 10-11) (citing *Rezaq*, 677 F.3d at 1009.)

While Defendants argued that Ayyad's claim that he could obtain a different placement if new hearings were held was speculative or highly unlikely I disagreed, stating that even if the relief granted "is unlikely to result in transfers to less restrictive conditions, it is relief nonetheless and the case is not moot.'" (October 2012 Order at 11) (quoting *Rezaq*, 677 F.3d at 1009-10). I also rejected the argument that Ayyad obtained the relief he requested through his transfer to the CMU, *i.e.*, transfer to a less restrictive environment, as I found it was possible that some remedy could still be fashioned. (*Id.* at 11.) Finally, I rejected Defendants' argument that the claim should be dismissed on grounds of prudential mootness.

Defendants argue that I should reconsider the above ruling based on newly discovered evidence, *i.e.*, the jurisdictional discovery. I first reject their argument that I reconsider my ruling regarding prudential mootness. Defendants have not cited any new facts or evidence that persuade me that dismissal is appropriate on this ground.

As to constitutional mootness, Defendants assert that Ayyad's case is moot under both prongs of the test. The first—whether there are ongoing, long-term consequences— requires a causal connection between the original injury and the inmate's current conditions. Ongoing, long-term consequences are present when the record shows that the inmate's current conditions are a "byproduct" of the original conditions or policy that is the subject of the inmate's lawsuit. *Rezaq*, 677 F.3d at 1009 (noting that if an inmate's "current conditions are a byproduct of their initial transfers to ADX, then long-term consequences may persist and an injunction may serve to 'eradicate the effects of [the BOP's] past conduct.'" *Id.* (quotation omitted).

Even if there is evidence that the inmate's new conditions are a byproduct of the alleged violation, the case may still be moot unless there is an existing remedy that will "mitigate" the byproduct or consequences of the defendants' original actions. *Rezaq*, 677 F.3d at 1009. A remedy that has the potential to "mitigate" an injury "will have some effect in the real world." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1110 (10th Cir. 2010). I now turn to my analysis of these issues.

1.   Whether Ayyad's Transfer is a Byproduct of his ADX Placement

Defendants note that Ayyad's due process claim is the same claim brought by his co-conspirators in *Rezaq*. However, in *Rezaq*, the court *assumed* as to a motion to dismiss that the inmates' CMU designations were a consequence or byproduct of their initial transfers to the ADX. *See Rezaq*, 677 F.3d at 1009. Here, this assumption is disputed based on the jurisdictional discovery, and Defendants argue that I should rely on this new evidence and dismiss the due process claim as moot.

Defendants argue that the discovery fills in the evidentiary record and establishes that "new hearings with the due process that Ayyad claims he was entitled to could not result in Ayyad's return to general population conditions." (*See* October 2012 Order at 10-11.) They contend that *Rezaq* compels the conclusion that Ayyad's claim is moot because the evidence establishes that Ayyad's transfer to the CMU is not a byproduct of his ADX placement, but the result of an independent evaluation process in which prior ADX placement plays no role. They further argue that the decision to place Ayyad in the CMU was based entirely on Ayyad's conduct, as shown by the Declaration of David Schiavone, attached as Exhibit 1 to Defendants' Supplemental Pleading in

Support of Motion to Dismiss ["Schiavone Decl."], ¶¶ 11-25.  Ayyad asserts in response

that the argument that his ADX placement was not considered in the CMU is

contradicted by Defendants' own witness and documentation provided in discovery.

I agree with Ayyad that the jurisdictional discovery shows that while his conduct

was considered in connection with his transfer to the CMU (*see, e.g.,* ECF No. 344-

2—Notice to Inmate of a Transfer to a Communications Management Unit), his transfer

to the CMU was at least in part a byproduct of his incarceration at ADX under SAMs.

Several of the documents produced in discovery support this finding.

Thus, the "Rationale for Re-designation", recommending to the Regional Director

that Ayyad be sent to a CMU, states that, "*Since the SAM was not renewed*, the

Warden at [ADX] has recommended inmate Ayyad be transferred from the institution to

a CMU since *the inmate no longer requires the level of physical security and controls*

*afforded by the institution.*"  (Ayyad's Supplemental. Resp. to Defs.' Mot. to Dismiss

["Pl.'s Supplemental Resp."], Ex. 9) (emphasis added).  It further states that Ayyad

"requires increased monitoring of communications with persons in the community" and

that "[t]he CMU is more appropriate to monitor this inmate than typical placement in the

Pre-Transfer Unit of the Step-Down Program" at ADX.  (*Id.*)

Similarly, in the "Comments" section of Ayyad's CMU Referral form, the

Correctional Programs Division and the Executive Assistant recommend that Ayyad be

transferred to a CMU pending his placement in the general population of a federal

penitentiary:  "AYYAD has been housed in the H-unit (SAM) of the ADX, and has more

recently progressed to the J-Unit, still with SAMs restrictions. *Recently, SAMs was not*

renewed.  *CTU staff recommend placement in a CMU to allow staff the opportunity to assess his behavior in a less restrictive environment before placement in an open population.*"  (Pl.'s Supp. Resp., Ex. 10) (emphasis added.)  I find from these documents that the nature of Ayyad's incarceration at ADX, where he was under restrictions related to his communications, played a part or contributed to his transfer to CMU where the restrictions on his communications could continue.

### 2.   Whether There Is a Real World Remedy

Defendants also assert that Ayyad's claims are moot because ordering additional process to address his transfer to the ADX will have no effect on the BOP's decision to designate him to a CMU, even if the conclusion of the new ADX process was that Ayyad should not have been transferred to the ADX.  That is because the designation was the result of an entirely separate, independent process unrelated to the ADX designation.  (*See* Schiavone Decl. at ¶¶ 13-18.)  Defendant argue that more process about Ayyad's transfer to the ADX would not override the BOP's assessment that his communications may still pose risks to institutional security and public safety.  (*Id.* ¶ 29.)  Thus, Defendants assert there is thus no effectual relief for the Court to award.

I reject Defendants' argument.  The CMU designation criteria they rely on would only come into play upon a recommendation for a transfer to a CMU.  No evidence is offered to suggest that there ever would have been, or would be, a CMU designation process or evaluation absent the intervening assignment to and recommendation from the ADX.  In other words, if Ayyad had received adequate process in the first place, he may not have been placed in ADX and there may have been no recommendation that

he ever be transferred to the CMU (as it was the ADX warden that made that recommendation based on the fact that the SAMs were being terminated as to him and there was a need for increased monitoring of his communications).  The fact that other wardens in other institutions *could* have made that recommendation, as Defendants assert, does not mean that they *would* have made that recommendation.  Even the possibility of a partial remedy is sufficient to prevent a case from being moot.

Based on the foregoing, I deny Defendants' request that I reconsider my October 2012 Order denying Defendants' motion to dismiss.

III.     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

A.     Facts

Due to the voluminous nature of this record, I cite only an abbreviated recitation of the facts.[1]  I have, however, considered all the facts and evidence cited by the parties, "'view[ing] the evidence and draw[ing] all reasonable inferences therefrom in the light most favorable'" to the Plaintiffs.  *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted).  I cite to the record only when the facts are disputed or when I deem it necessary.

I also note that responses disputing or denying a fact that are not supported by evidence in the record raise no genuine dispute of a material fact.  *See* Practice Standards, III.B.4 ("Any denial shall be accompanied by . . . a specific reference to material in the record supporting the denial"); Fed. R. Civ. P. 56(c)(1)(A) (a party must

---

[1] For example, the summary judgment motion contains 55 pages of facts.  Plaintiffs' consolidated response to these facts and their statement of additional facts is 105 pages.

"cit[e] to particular parts of materials in the record" in order to show a genuine dispute). To the extent a party has disputed a fact but does not cite facts or evidence to support the dispute (but rather other additional facts), I have deemed these non-responsive statements that raise no genuine dispute of a material fact.  *See Gooden v. Timpte, Inc.*, No. 99 N 795, 2000 WL 34507333, *3 n.3 (D. Colo. June 29, 2000) (when party denies a fact but only offers a "citation to evidence in the record which is unresponsive to the factual assertion," the "undisputed fact is deemed admitted").

Self-serving statements, opinions, and personal views raise no genuine dispute where they relate to facts that are supported by competent evidence.  *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991).  Speculation, legal argument, and conclusory statements also raise no genuine dispute.  *See Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).  Finally, disputed facts that are based on inadmissible evidence, such as hearsay or testimony not based on personal knowledge, has been disregarded.  *See* Fed. R. Civ. P. 56(c)(2).  I now turn to the facts alleged by the parties.

<u>Plaintiffs' Crimes of Convictions, Affiliations, and Prior Incarceration</u>

Plaintiffs were part of the group of criminal associates who were convicted in connection with a plot to bomb the World Trade Center in 1993.  The attack killed six people, injured more than a thousand others, and caused hundreds of millions of dollars in damage.  Plaintiffs were each convicted after a jury trial of multiple felonies in connection with the bombing and are each serving sentences of more than 100 years. They are not eligible for parole, as there is no federal parole.  They are serving sentences in excess of their remaining years, and will die in prison.

The FBI has information showing that both Plaintiffs were associated with an Egyptian terrorist organization, al-Gama'a al-Islamiyya, also known as the Islamic Group.  (Ex. A-1, Decl. of FBI Agent Donald R. Shannon, Jr. ["Shannon Decl."], ¶ 6.)[2] Based on Plaintiffs' conviction for their participation in the World Trade Center bombing, FBI Agent Shannon testified that the government considers them to have been important Islamic Group operatives.  (Shannon Decl., ¶ 8.)  Plaintiffs deny their association with the Islamic Group, and note that at no time during their prosecutions did the government ever assert that either of them was an "Islamic Group operative", let alone "important" ones.  (Ex. 7, Shannon Dep., 74:4-10; Ex. 1, Abouhalima Decl., ¶ 27); Ex. 2, Ayyad Decl., ¶ 21.)  Additionally, they assert that Defendants' own documents demonstrate that the government does not consider them to be "important Islamic Group operatives."  (Exs. 8 and 9—H-Unit Classification Summarys for Plaintiffs.)

Plaintiffs spent eight years, from 1994 to 2001, in general population housing units at United States Penitentiaries, which are high-security prisons.  During this time, they held laundry, orderly, and other jobs alongside other inmates; ate their meals with other inmates; were able to walk freely in their housing units and on the prison yard; and were allowed to play sports with other inmates.  They also were allowed to communicate with family in the United States and abroad on a daily basis using phones that were available at any time, without prior permission; experienced delays of only a few days for prison staff to read, translate, and release incoming and outgoing mail,

---

[2] Defendants' exhibits are cited in reference to letters and numbers, *e.g.*, "Ex. A-1", whereas Plaintiffs' exhibits are cited in reference only to numbers, *e.g.*, "Ex. 25."  Unless otherwise noted, the reference to Defendants' exhibits are those attached to the motion for summary judgment.  The reference to Plaintiffs' exhibits are those attached to the response brief.

whether in English or Arabic; prayed in congregation; had contact visits with their families at tables in the visiting room with other inmates; were allowed to communicate with the news media; and were given approximately twenty phone calls per month.

On September 11, 2001, Plaintiffs were removed from their open population units and put into Special Housing Units. (Ex. 96 —"Following the tragic events of September 11, 2001, all inmates in the . . . (BOP) who were convicted of, charged with, associated with, or in any way linked to terrorist activities were placed in Administrative Detention as part of an immediate national security endeavor.")

<u>Transfers to ADX and Imposition of SAMS</u>

On October 4, 2002, Ayyad was transferred to the ADX.  SAMs were imposed on him in 2005, but they expired in March 2012.  He was transferred from the ADX to the CMU at Terre Haute, Indiana, where he has been incarcerated since May 15, 2012.

Abouhalima was transferred to the ADX on March 23, 2003.  SAMs were imposed on him in March 2005 and he was placed in the H Unit, and remain imposed today.  Although the government contemplated imposing SAMs earlier, after the September 11th attacks, it did not do so at that time.  (Ex. 96—"[w]e anticipate that some or all of these inmates will have SAMs approved in the near future.")

It is undisputed that neither Plaintiff was given notice, nor an opportunity to be heard, prior to his transfer to the ADX.  Plaintiffs assert they were not provided with hearings regarding their transfers to the ADX until seven years after those transfers occurred, and the hearings did not address the SAMs or Plaintiffs' later placement in the H Unit of the ADX.  Defendants acknowledge that Plaintiffs had "retroactive" ADX

-13-

placement hearings.  Also, it is undisputed that neither of the Plaintiffs was given notice, nor an opportunity to be heard, prior to the imposition of SAMs.

Upon arrival at the ADX, Defendants contend that Plaintiffs had the opportunity to raise challenges to their transfers, both during Program Reviews and through the BOP's administrative remedy program.  (Ex. E-1, Decl of Warden Jeffery Keller ["Keller Decl."], ¶ 28.)  Both Plaintiffs challenged their transfers via the BOP's administrative program and asked at every opportunity about the reason for the transfers.  Plaintiffs assert they were not given any reason other than their convictions for being sent to ADX, and were not told of any way to be transferred back to their pre-9/11 statuses.  (Abouhalima Decl., ¶¶ 104-105;  Ayyad Decl., ¶¶ 63-64, 197-198; *see also* Ex. 99.)

Ayyad's H Unit Classification Summary states, "[W]e recommend he be housed in an ADX-GP Unit for an indeterminate period of time."  (Ex. 9.)  While in the general population unit ["ADX-GP"], Plaintiffs were housed in single cells containing a shower, a cement bed, and two gates at the front.  The inner gate had a slot for meal trays.  Meals were consumed in the cells.  When both doors were closed, it was almost impossible for Plaintiffs to communicate with other inmates.  Outside recreation occurred in groups, two or three times per week, and inside recreation was provided on the other days.

Defendants assert that the decision to place an inmate at ADX is made using the BOP's classification system, which provides criteria for assessing the security needs of each inmate.  (Keller Decl., ¶ 9.)  When Plaintiffs were designated to ADX, Program Statement 5100.07 governed the transfer to ADX, which lists the ADX and USP Marion as "Exceptions" to the normal Central Inmate Monitoring procedures.  (Ex. 98, at

US015032.)  Plaintiffs dispute that their transfers to ADX were effectuated via the classification system or Program Statement 5100.07.  They assert their transfers occurred pursuant to a memorandum issued after the September 11th attacks ordering all federal prisoners convicted of terrorism-related crimes to be put in solitary confinement and then to be considered for transfer to the ADX.  (Exs. 96, 97; Abouhalima Decl., ¶ 102.)

According to Defendants, the BOP conducted multi-level regional reviews before transferring Plaintiffs to the ADX.  (Keller Decl., ¶¶ 13, 16, 22.)[3]  In Ayyad's case, the process involved an evaluation by the institution, the BOP's Regional Office for Ayyad's institution, and the North Central Regional Office where the ADX is located.  (Keller Decl., ¶¶ 13.a., 16-21; *see also* Ex. E-3—referral packet for Ayyad.)  Following that review, the North Central Regional Director determined that placement in the ADX was appropriate, and Ayyad was transferred to the ADX.  (Keller Decl., ¶ 21.)  Ayyad disputes that placement in ADX was appropriate.[4]

In Abouhalima's case, the review process involved an evaluation by the institution and the North Central Regional Office.  (Keller Decl., ¶¶ 13.b., 22-28; *see also* Ex. E-4—referral packet for Abouhalima.)  Following this review, the North Central

---

[3] Plaintiffs assert that these reviews did not follow the guidelines and procedures required by Program Statement 5100.07.  (Ex. E-2, 98.)

[4] He notes that the "Proposed Transfer Code" for him was 323 ("Close Supervision Transfer").  (Ex. 99.)  He had already been transferred to USP Lewisburg as a "Close Supervision Transfer."  (*Id.*)  Close Supervision Transfers are part of the standard Central Inmate Monitoring transfers, not within the "Exceptions" for ADX Florence and USP Marion.  (Ex. 98.)  Also, there is no indication in the Transfer Packet that "redesignation to another high security institution" was considered.  In fact, "Institution Recommended" is "ADX Florence *or* USP Marion."  (Ex. 99.)  Finally, Ayyad asserts that nothing in the Transfer Packet suggests that he had "demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution."

Regional Director determined that placement in the ADX was appropriate, and Abouhalima was transferred to the ADX.  (Keller Decl., ¶ 27.)  Abouhalima also disputes that his placement was appropriate.[5]

In December 2011 and 2012, before renewal of the SAMs for the upcoming years, Abouhalima met with ADX and FBI representatives.  An FBI memo documenting the 2011 meeting stated that "the SAM renewal justification EC will be submitted via separate correspondence."  It also stated that "the inmate asked, several times, what he could do to be removed from SAM monitoring, to which the investigator responded, 'cooperation with BOP staff and adherence to inmate protocols as outlined by BOP staff.'"  (Abouhalima Supp. Resp., Ex. 3.)  In the December 2012 meeting, Abouhalima was told that the SAMs would be renewed, but not the reason for the renewal. Abouhalima then asked whether the original basis for the imposition of the SAMs still existed.  The ADX/FBI staff stated they could not tell him the answer to his question. Abouhalima's SAMs were also renewed in March 2013 and March 2014.   (*See* Defs.' Notice Regarding Renewal of Special Administrative Measures for Pl. Abouhalima filed August 28, 2014 and Ex. 1 thereto.)  Thus, he remains under SAMs at this time.

---

[5] He asserts that there is nothing in the Transfer Packet to suggest that he had "demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution."  To the contrary, the referral memo recites that, "He receives above average work reports and relates well with staff and inmates.  Abouhalima has made a favorable institutional adjustment."  (Ex. 24; Ex. 101—Progress Report).  Instead, the rationale for referral is that, due to the nature of his crime of conviction, "he requires greater security than afforded at USP Leavenworth," and transfer was recommended to USP Marion, *not* ADX, "for his safety and the safety of others at this institution."  (Ex. 24.)

There is no fixed end date to Abouhalima's ADX confinement or the number of time SAMs, which expire at the end of the year, can be renewed.  Defendants acknowledge that there is not a check-list of specific conduct that ensures transfer from ADX or the removal of SAMs, both of which are decisions based on the professional judgment of counterterrorism and correctional professionals.  A March 19, 2009 memorandum to the FBI counterterrorism section states, "Due to the gravity of the offenses and length of sentences regarding ADX SAMs inmates, it is likely that SAMs measures will be in place for many of them for a number of years."  (Ex. 127.)

<u>Communications Before SAMs were Imposed</u>

Defendants have information showing that, as recently as 2004, while incarcerated at the ADX, Plaintiffs were in contact with Spanish prisoners.  (Shannon Decl., ¶ 9.)  When this was discovered in February 2004, they were told to stop this correspondence and they complied.  Plaintiffs did not receive an incident report for this.

 In August 2004, an FBI investigation revealed that Plaintiffs had corresponded with Mohamed Achraf ["Achraf"], the leader of the Salafist Spanish terrorist cell known as the "Martyrs for Morocco" ["Martyrs"], and other persons who were linked to the Martyrs and were incarcerated in Spanish prisons.  (*Id.*, ¶ 10.)  The government did not learn until the investigation began that the Spanish prisoners with whom Plaintiffs had been corresponding, as well as Achraf, were affiliated with international terrorism.[6]  The FBI also learned that Mohammed Salameh ["Salameh"], one of the convicted co-

---

[6] Plaintiffs assert that they did not know these prisoners were members of a terrorist cell or of their crimes of convictions.

conspirators in the 1993 World Trade Center bombing, had corresponded with Achraf. The information obtained by the FBI indicated that Achraf was planning to execute a terrorist attack.  (Ex. A-3; Shannon Decl., ¶ 11.)  The FBI determined that Plaintiffs should not be alerted to the ongoing investigation, a part of which involved monitoring their incoming and outgoing communications.  (Shannon Decl., ¶ 13; *see also* Ex. A-8.) Plaintiffs point out, however, that no terrorist acts occurred as a result of this correspondence.  To the contrary, the documentation states that the FBI "does not believe operational or other guidance on the part of the '93 TRADEBOM inmates was involved" in Plaintiffs' correspondence with the Spanish prisoners.  (Ex. 26.)

The investigation was ongoing when, in January 2005, the FBI received information that MSNBC planned to air a report about Plaintiffs' and Salameh's correspondence with Achraf and other terrorists.  (Shannon Decl., ¶ 14.)  The FBI was concerned that this broadcast would jeopardize the progress of the investigations in that it would alert the inmates and their correspondents that authorities were analyzing the correspondence.  (*Id.*; *see also* Ex. A-9 at USAB 670.)  They also assert that the FBI determined that any benefit from not alerting Plaintiffs to the existence of the investigations was lost once the MSNBC report aired in February 2005.  (*Id.*, ¶ 15.)

Plaintiffs do not dispute the substance of the facts in the previous paragraph, but dispute the credibility of same.  They point out that by January 2005, correspondence with the Spanish prisoners had been halted at the BOP's request for nearly a year.  They assert that the FBI could not credibly have been concerned that the MSNBC report would alert them that authorities were reviewing their correspondence as they were already aware of

this fact.  (Exs. 11, 118).  Indeed, Plaintiffs point to an October 2004 Arabic newspaper report that they read which stated that authorities who had arrested Achraf found letters indicating that he had corresponded with some of the men from the World Trade Center bombing.  (*See* Abouhalima Decl., ¶ 128.)

Prior to airing of the broadcast, the FBI stated that Plaintiffs' correspondence "should be handled in accordance with established" Department of Justice ["DOJ"] and BOP policies.  (Exs. 28, 29; *see also* Ex. 119—MSNBC News Report stating, "Federal officials tell NBC that the Justice Department failed to restrict communications to and from the three bombers because key officials didn't consider them all that dangerous.").  Also prior to the broadcast, the FBI saw no need to impose SAMs on Plaintiffs, noting that "though SAMs are not in place on these . . . inmates, this particular facility [ADX] houses many high priority international terrorism subjects and restricts their communication; consequently, the opportunities that they would have to recruit other inmates is limited."  (Ex. 126.)

Plaintiffs contend that the SAMs were imposed on them because of political pressure resulting from embarrassment at the NBC broadcast, rather than any actual security concerns relating to their correspondence.  (*See* Abouhalima Decl., ¶ 132—ADX warden stated to Plaintiff that "he knew" that he had already ceased writing letters at the staff's direction, "but that he was told to impose these restrictions on me, and there were a lot of politicians involved"; Ex. 27—noting that the need for the SAMs "may have been influenced by the broadcast, but it was not in retaliation for it.") Plaintiffs note an FBI email regarding the news report which states, "Among the key points of the proposed NBC story will be 'how could the BOP let this happen?'" (Ex. 12 at US4820.)

The government has determined that Abouhalima's letters to the Martyrs conveyed his respect for individuals associated with violent jihad.  (Shannon Decl., ¶¶ 28-30; Exs. A-21, A-23, Ex. G—Abouhalima Dep. at 93:25-94:9.)[7]  The government also has determined that Plaintiffs corresponded with other individuals linked to terrorism.  (Shannon Decl., ¶¶ 30-31; Exs. A-12, A-7, A-24, A-25.)    Defendants further assert that some of Abouhalima's post-SAMs correspondence were intended to radicalize the recipient.  (Shannon Decl., ¶¶ 48-53; Ex. A-30.)  Abouhalima disputes these assertions, stating he has refuted the incorrect characterizations of his correspondence and that the FBI struggles with training personnel to understand the distinction between an observant Muslim and a "radical" one.[8]

<u>Communications Within ADX Before SAMS Were Imposed</u>

Defendants assert that the government has determined that prior to the imposition of SAMs, Abouhalima promoted the conversion of BOP inmates to a radical interpretation of Islam.  (Shannon Decl., ¶ 35; Ex. A-29 —Translation of July 16, 2002 letter from Abouhalima.)  Abouhalima disputes the characterization of this letter.

Abouhalima was identified by the government as an influential member of the Sunni Muslim community while he was incarcerated at USP Lompoc.  (Shannon Decl., ¶ 35; Exs. A-7, A-10, A-12.)  While Abouhalima disputes this, it is undisputed that he was known as an inmate with knowledge of Islam who answered questions about Islam for other inmates.

---

[7] Abouhalima objects to the phrase "[t]he government has determined", which Defendants use throughout their statement of facts, asserting that it is so vague that no part of the determination can be relied upon as a material undisputed fact.

[8] *See* "FBI Chided for Training That Was Critical of Islam," *New York Times*, Sept. 16, 2011, available at http://www.nytimes.com/2011/09/17/us/fbi--chided-for-training-that-was-critical-of-islam.html.)

Finally, the government has information showing that Abouhalima played a role in the 1997 murder of a correctional officer at USP Lompoc carried out by another inmate. (Shannon Decl., ¶ 35; Exs. A-7, A-10, Ex. A-12.)  The BOP investigation following the murder concluded that "Abouhalima's defined leadership role and responsibility among the inmates in the Muslim Community and his ability to plan and execute violent acts presents a significant threat to the staff."  (Shannon Decl., ¶ 35; Ex. A-26—Request for Redesignation.)  The BOP determined that the safety and security of staff at USP Lompoc required that Abouhalima be transferred to another institution following the murder.  (*Id.*; Ex. A-27—Recommendation for Transfer; Ex. A-28—Close Supervision Transfer Request.)

Abouhalima disputes that he played a role in the attack of the correctional officer. (Abouhalima Decl., ¶¶ 74-85.)  He was not given an incident report or criminally charged for involvement in the killing of the officer.  (Ex. 23—Disciplinary History Report.) Abouhalima also asserts that notwithstanding the existence of the BOP paperwork, he never presented a threat to institutional staff warranting ADX placement, and was treated accordingly, until 9/11.  (Abouhalima Decl., ¶¶ 51-65, 783-103; Ex. 23; Ex. 24.)

As to Ayyad, Defendants presented evidence that after an inmate assaulted Ayyad while he was incarcerated at USP Terre Haute, that inmate had to be placed in protective custody at his next four institutions because of threats from Muslim inmates.  (Shannon Decl., ¶ 35; *see also* Ex. A-10 at USAB 644; Ex. A-6 at US 5560; Ex. A-11 at US 14626.)

How the SAMs Promote the Government's Interests

It is undisputed that the government has an interest in protecting national security, including preventing acts of terrorism against the United States and its interests.  It also has

an interest in promoting the security of its prisons and the safety of correctional personnel and inmates.  Finally, the government has an interest in promoting the effective operation of its law enforcement agencies by establishing practices designed to efficiently allocate resources for fighting terrorism, including resources necessary to ensure the integrity of review of communications for SAMs inmates and resources required for counterterrorism operations that extend beyond the ADX.

    1. <u>National Security</u>

   The government determined that Abouhalima's SAMs help to ensure that he does not engage in communications that could jeopardize national security, and that without SAMs, there would be an increased risk that his communications could jeopardize national security.  (Shannon Decl., ¶¶ 36, 58.)  In response, Abouhalima asserts that there is a dispute within the government about whether the SAMs were warranted or appropriate, citing to an email from a New York FBI Agent regarding the types of reading materials Plaintiffs could receive while under the SAMs which states, "When it comes to the books . . . again, I have no objection to these guys reading what they want.  *The fact that they were all put under these SAMs based on those bullshit letters is bothersome enough.*  That said, they are under SAMs, and if that reading material falls outside what is allowed in the SAMs. . . then they should not get it."  (Ex. 25) (emphasis added.)  Further, the SAMs origination memo for Abouhalima concludes that, "upon initial review of the brief summaries of the letters, the FBI does not believe operational planning or guidance on the part of the 1993 TRADEBOM inmates was involved."  (Ex. 26.)

Abouhalima also asserts that the SAMs were actually imposed on him because of embarrassing coverage in the media relating to the letters (the NBC report). (Ex. 27—BOP grievance response to 2008 SAMs renewal stating that "the [NBC] broadcast highlighted the Department's need to closely monitor your communications . . .The need for the SAM may have been influenced by the broadcast, but it was not in retaliation for it").

Defendants assert that Abouhalima is in a position to inspire and radicalize others to carry out a terrorist agenda because he is among only a handful of people who have executed and survived a high profile terrorist attack, elevating him to hero status and the top rank of the Sunni extremist hierarchy. (Shannon Decl., ¶¶ 37-39.) This is disputed by Abouhalima, again noting that the documentation supporting the SAMs states that "the FBI does not believe operational or guidance on the part of '93 TRADEBOM inmates was involved." (Ex. 26.) There is additionally no demonstration of Abouhalima "inspiring" or "radicalizing" others. The fact of Abouhalima's conviction and sentence was known since 1994, and the 8 ½ years he spent in high-security, open-population prisons did not radicalize or inspire anyone to commit any acts of terror, and he was treated accordingly by the BOP. Finally, he asserts that the government has presented no undisputed factual evidence that anyone, including "Sunni extremist[s]," regards Abouhalima as a "hero," and even if this Court were to find this to be a material undisputed fact, it is a factual situation over which he has no influence.

The government has also determined that communications from terrorists of Abouhalima's reputation can reinforce an aspiring terrorist's resolve and assuage doubts about carrying out an attack, even where the communications themselves do not discuss

operational planning for a specific attack and might appear superficially benign. (Shannon Decl., ¶¶ 41-43.) Abouhalima disputes this, arguing that the government is not entitled to deference on this factual question which must be established at trial. Further, he asserts that Defendants have presented no undisputed factual evidence in support of this assertion. To the contrary, after the government discovered the correspondence between Abouhalima and the Spanish prisoners, the FBI determined that the communications "should be handled in accordance with established DOJ and BOP policies." (Exs. 28, 29.)

The government has also determined that Abouhalima's ability to connect with the Martyrs and other terrorists demonstrates that he retains the ability to attract the attention of and to motivate other terrorists, and that without SAMs, his connections to the terrorist network may be resurrected. (Shannon Decl., ¶¶ 40, 44.) Abouhalima disputes this, and disclaims any alleged desire to have connections to terrorists. He has testified as to his actual, benign motivations for engaging in the correspondence in question, and argues that he engaged in correspondence and had access to media without SAMs for 12 years without "resurrect[ing]" any "connections to the terrorist network". The FBI's own documentation states that it "does not believe operational or other guidance on the part of the '93 TRADEBOM inmates was involved" in Abouhalima's correspondence. (Ex. 26.)

Abouhalima's SAMs facilitate the government's interest in protecting national security, according to Defendants, because they sever his connections to the jihadist network and deprive other terrorists and would-be terrorists from the affirmation derived from communicating with terrorists of Abouhalima's status. (Shannon Decl., ¶¶ 44, 60.) Abouhalima disputes this, asserting this is a core fact in dispute. He contends that no

security interest is facilitated by prohibiting him from calling his brother in Egypt at his work, but being permitted to speak with that brother if present where a call to a permitted number is made. (Abouhalima Decl., ¶ 171.) Nor is any national security interest facilitated by the other communication restrictions imposed upon him. (*Id.*, ¶¶ 147-175.)

Defendants assert that the possibility of active terrorists connecting with Abouhalima is of heightened concern because he has previously communicated with other terrorists from prison. (Shannon Decl. ¶ 45.) Abouhalima asserts in response that the BOP has other mechanisms available to it to ensure this does not occur. Further, the "possibility" that "active terrorists" might connect with Abouhalima is belied by his history of confinement and treatment by the government prior to the airing of the NBC report.

The government has determined that individuals like Abouhalima, who have a history of committing terrorist acts or who have expressed adherence to a radical Islamic ideology that manifests itself in acts of violence, are likely to attempt to engage in future acts that advance the goals of jihad and threaten the security of the United States and the safety of individuals outside the prison. (Shannon Decl., ¶ 46.) Abouhalima asserts that this is disputed by the actual, innocuous contents of his correspondence.

Finally, Defendants assert that incarceration provides no guarantee that a terrorist will be unable to continue to participate in terrorist plots. (Shannon Decl., ¶ 47.) Abouhalima disputes this, again disclaiming the motives that Defendants ascribe to him.

2.    Prison Security

The government has determined that Abouhalima's SAMs help to ensure that he does not engage in communications that could jeopardize institutional security, and that

without SAMs, there would be an increased risk that his communications may jeopardize prison security.  (Shannon Decl., ¶¶ 54, 58.)   It has also determined that institutional practices of jihad that threaten prison security include attacks against personnel and other inmates, and manipulation of resources by activities such as concerted hunger strikes.  (*Id.*, ¶¶ 55, 80.)  Additionally, the government has determined that Abouhalima has the ability to exert influence among the prison population and has done so in a manner that has compromised the security of inmates and personnel.  (*Id.*, ¶ 56.)  Abouhalima disputes this, arguing that this is rebutted by his Declaration, institutional conduct, and treatment until 9/11.  He has not attacked prison personnel or other inmates (Exs. 23, 33)[9], and there is no evidence that his correspondence posed a risk to security or caused a disruption.

Defendants assert that Abouhalima's SAMs promote institutional security by lowering the risk of dissemination of communications to him that could lead to violence or disruption within the prison.  (Shannon Decl., ¶ 60.)  Abouhalima disputes this, and notes that this type of communication would be rejected by the BOP's existing policies.

The government has determined that Abouhalima, having successfully executed the 1993 World Trade Center bombing, has a significant status within the network of terrorists.  Abouhalima disputes this, arguing that the only evidence on this is that Defendants accorded him such status following the events of 9/11, and imposed greater security restrictions on him as a result.  His conduct since incarceration belies the assertion of such status.  Additionally, he has been characterized as a "low-level operative[]."  (Exs. 3 & 5.)

---

[9] While Abouhalima has engaged in hunger strikes to protest his conditions of confinement, these were not "concerted."  (Abouhalima Decl., ¶ 138.)  He notes that hunger strikes are recognized as protected activity under the First Amendment, and are regulated by BOP policy.

Finally, Defendants assert that convicted terrorists have continued to collaborate in ways that endanger security in the prison. (Shannon Decl., ¶ 57.) Abouhalima disputes this as to him, arguing that no evidence was presented that he ever "collaborate[d] in ways that endanger security in the prison", and notes again that this is rebutted by his testimony, records of institutional conduct, and treatment until 9/11.

3.   SAMs Review by Counterterrorism Professionals

According to Defendants, the government has determined that analyzing the communications of terrorists of Abouhalima's stature requires different tools than would be sufficient for analyzing the communications of non-terrorist inmates. (Shannon Decl., ¶ 59.) Abouhalima disputes this, noting that Defendants admit that not all prisoners convicted of terrorist-related crimes are under SAMs. (Ex. 35—Resp. to Question No. 26.)

In the absence of a specialized review of Abouhalima's communications designed to detect terrorist connections, FBI Agent Shannon testified that Abouhalima could more readily make additional connections with other terrorists. (Shannon Decl., ¶ 64.) Abouhalima disputes this, asserting that in the 12 years he was incarcerated prior to the SAMs he never intentionally made a "terrorist connection" and disclaims any interest in ever doing so. Additionally, the BOP and FBI provided responses to the OIG Report: *BOP Monitoring of Mail for High-Risk Inmates*, in which they documented multiple strategies put in place between 2006-2008 to ensure careful monitoring of communications of all prisoners convicted of terrorist crimes. (Ex. 31 at 98-99.)[10]

---

[10] Additionally, Abouhalima asserts that the BOP has translators on staff at the ADX and at other BOP facilities who are capable of monitoring and translating his mail and telephone calls. This is not, however, necessarily supported by the evidence cited by him.

One aspect of monitoring communications of terrorists of Abouhalima's stature is the evaluation of his communications by FBI counterterrorism personnel, including FBI case agents and translators. (Shannon Decl., ¶¶ 61, 62.)[11] Abouhalima's communications were not reviewed by FBI agents with training in counterterrorism and FBI translators during the period when he successfully connected with other terrorists without the government's knowledge. (*Id.*, ¶ 63.) Abouhalima notes, however, that his mail during this period was submitted to ADX staff, open and unsealed, for inspection and that in February 2004, the BOP stopped the correspondence after determining that it was with prisoners.

The government has determined that, in order to prevent transmittal of communications that could jeopardize its interests in national and prison security, due diligence requires a piece-by-piece review of all communications generated by SAMs inmates. (Shannon Decl., ¶ 61.) Abouhalima notes, however, that the BOP's policies call for the very type of review that Defendants argue is unavailable absent the SAMs.

Defendants assert that the government has determined that reasonable limitations on the quantity of communications for the 21 terrorism SAMs inmates at ADX and USP Florence are necessary to assure the effectiveness and integrity of the SAMs review and to ensure that the FBI has sufficient resources to staff all components of the mission of combating terrorism. (Shannon Decl., ¶¶ 65-66.) Abouhalima disputes this, arguing that the limitation on quantity of communication is not "reasonable," and Defendants have presented no undisputed evidence in support of a contrary finding.

---

[11] Abouhalima notes in response that his "stature" was not given as a reason for imposing SAMs, and it is not in fact the reason. (Ex. 25—SAMs imposed because of "those bullshit letters").

Expanding the scope of communications currently permitted under the SAMs would decease the amount of time case agents/translators could dedicate to their analysis and increase the potential for missing dangerous messages.  (Shannon Decl., ¶ 65.) Abouhalima states that this is speculative and conclusory, especially in light of the fact that he has not communicated dangerous messages and that ADX staff already review all correspondence and monitor calls and visits. (Ex. 31.)  Additionally, he argues there  is a high potential for misinterpreting his correspondence, as demonstrated by mistranslations that have occurred to date.  (Abouhalima Decl., ¶¶ 73, 97, 126, 177, 191, 194, 197.)

<u>Whether the Specific SAMs Promote These Interests</u>

Defendants assert that limiting approved non-legal contacts for correspondence to immediate family members lessens the risk that Abouhalima could connect with other members of the terrorist network or act as a conduit in that network.  (Shannon Decl., ¶¶ 68, 69, 71, 75, 79, 81.)  Abouhalima disputes this, asserting that the family members and close friends with whom he seeks to communicate are not members of a terrorist network.  (See Ex. 18, Fatmeh Badra Decl., ¶ 32.)  Also, anyone who wishes to visit him or speak with him via phone must clear a security background check.  (Exs. 37, 38.)

The government has determined, according to Defendants, that Abouhalima is subject to being inspired and further radicalized by incoming communications from devotees outside the prison.  (Shannon Decl., ¶ 79.)  Abouhalima disputes this, asserting that this "determination" is speculative and conclusory, and disputed by his testimony.

Defendants assert that limiting approved non-legal contacts to immediate family members reduces the potential for "fan mail" from terrorists that could encourage

Abouhalima to engage in acts of jihad within the prison, including hunger strikes or attacks against correctional officers or inmates. (Shannon Decl., ¶¶ 79, 80.) Abouhalima disputes this as speculative and unsupported. He has never received "fan mail" from devotees outside the prison, much less mail that influenced him in his behavior or beliefs. He further notes he engaged in his longest hunger strikes *after* the imposition of the SAMs, illustrating that the SAMs are not effective at reducing the likelihood of him engaging in future strikes.

Defendants assert that limiting approved non-legal contacts to immediate family members helps to maintain quality analysis of Abouhalima's communications, by taking into account limits on the FBI's resources for review, translation and threat assessment. (Shannon Decl., ¶¶ 68, 75.) Abouhalima disputes this, arguing that the FBI's analysis of his communications while under the SAMs has been incomplete and inaccurate. (Abouhalima Decl., ¶¶ 73, 97, 126, 177, 191, 194, and 197.) He asserts that there is no evidence that the FBI's "quality analysis" is better in any meaningful way than the analysis that would be available with BOP resources, and that what evidence does exist supports the opposite conclusion. For example, he points to the fact that Ayyad was corresponding with his half-sister and the Jordanian embassy after the imposition of the SAMs; later, the FBI realized that he "was not allowed" such correspondence and required him to stop. (Compare Exs. 39 and 40.)

The 14-business-day (English) and 60-business-day (foreign language) review periods for review of correspondence by the FBI allow sufficient time, according to Defendants, to thoroughly translate and analyze the large volume of correspondence generated by SAMs inmates and their correspondents. (Shannon Decl., ¶ 70.) While

Defendants assert that the FBI is in compliance with these time frames with respect to Abouhalima's correspondence (Milusnic Decl., ¶ 70), Abouhalima denies this.  He asserts that due to excessive delays in translating their mail, even those family members with whom he has been approved to communicate with have dramatically curtailed their writing. (Abouhalima Decl., ¶¶ 147, 152—noting that after the imposition of the SAMs, correspondence in Arabic took more than three months to process), *see also* Ex. 52—FBI document noting "delay of inmate mail beyond 14/60 days imposed under SAMs which led to a hunger strike by several of the inmates".)

With the gradual lessening of emotions attendant to the passage of time since 9/11, the government determined that SAMs restrictions could be revised to allow extensive access to mass communications, including periodicals, books and television.  (Shannon Decl., ¶¶ 82-83.)  Abouhalima disputes that his access to mass communications is now "extensive".  For printed mass communications, Abouhalima is not aware of what is prohibited until he orders a publication that the government subsequently deems objectionable. (see Ex. 47).  Additionally, he is not allowed any Arabic channels or stations, unlike Spanish-speaking prisoners who have four channels.  (Ex. 43.)

Defendants assert that the government has determined that national and institutional security interests could be jeopardized if SAMs inmates are allowed access to critically-timed or coded information through the medium of mass communications.  (Shannon Decl., ¶ 83.)[12]  Under the SAMs, Defendants state that classified advertisements and letters to the

---

[12] Abouhalima notes that Defendants have not shown that he possesses the ability, knowledge, or desire to pass "coded information" through mass communication.

editor are removed from periodicals to eliminate outside agents' ability to transmit messages that could pose a threat to national or institutional security, such as messages concerning terrorist plots, coordinated hunger strikes or attacks against correctional officers or other inmates.  (Ex. B-1, Milusnic Decl., ¶ 57.)

Procedures for Imposing and Renewing SAMs

The Director of the Office of Enforcement Operations ["OEO"], part of the Criminal Division of the DOJ, testified that the decision whether SAMs are warranted to limit and monitor the communications of a convicted terrorist implicates national security and the security of the institution where the inmate is housed.  (Ex. C-1, Paul M. O'Brien Decl. ["O'Brien Decl."], ¶ 5.)  The decision involves an analysis that draws on the multi-faceted knowledge base of DOJ personnel, including the expertise of the Counterterrorism Section of the National Security Division ["CTS/NSD"] and the FBI, and the in-depth knowledge of the inmate's criminal activity of the United States Attorney's Office ["USAO"] that prosecuted the criminal action.  (*Id.*, ¶¶ 5-6, 17.)

The evaluation takes into account the totality of the circumstances related to the inmate and the potential dangers associated with his communications.  (O'Brien Decl., ¶ 7; *see also* Shannon Decl., ¶ 32.)  Abouhalima received such a review prior to the initial imposition of his SAMs in March 2005 and the subsequent renewals.  (O'Brien Decl., ¶¶ 5, 18.)  Abouhalima asserts that O'Brien's testimony belies the perfunctory, pre-ordained nature of his actual SAMs reviews, and that this is an area of extensive factual dispute.

The deliberative process preceding the imposition of SAMs begins with the USAO consulting with CTS/NSD and the FBI.  (O'Brien Decl., ¶ 16.)  The inmate has no input in

this process.  The FBI makes the initial assessment as to whether SAMs should be imposed, considering numerous factors.  (*Id.*, ¶¶ 7, 9.)  The FBI prepares and forwards to the prosecuting USAO an initial written assessment.  (*See* Ex. A-10—2005 Origination of SAMs for Plaintiffs and  Salameh.)

If it is determined that SAMs are warranted, a memorandum is prepared and directed to the OEO.  In Abouhalima's case, the memorandum reflected a collaborative effort between the prosecuting USAO and CTS/NSD.  (O'Brien Decl., ¶ 10; Exs. C-2, C-3.)  The OEO evaluates the written memorandum and can request additional information it deems necessary. (O'Brien Decl., ¶ 11.)  Based on that information, the Assistant Attorney General makes a formal written recommendation to the Attorney General.  If the Attorney General decides to proceed with the imposition of SAMs, a memorandum is forwarded to the BOP directing that SAMs be imposed and stating the measures to be implemented.

According to O'Brien, notice of the basis for the SAMs is provided to the inmate by the BOP.  The notice of SAMs to the inmate may be limited, in the interest of preserving prison security or safety, national security, or to protect against acts of violence or terrorism (O'Brien Decl., ¶ 15). *See also* 28 C.F.R. § 501.3(b).  Abouhalima disputes that any meaningful notice of the basis for the SAMs was ever provided to him.  (Abouhalima Decl., ¶¶ 134, 203-212.)  He asserts that the "notice of the basis for the SAMs" was simply a recitation of the SAMs regulation.  (*See, e.g.*, Ex. 73—stating SAMs imposed "based on your proclivity for violence.")  Additionally, Abouhalima asserts that the notice is provided only after the SAMs have already been imposed, without giving him the opportunity to see the allegations motivating the SAMs.  (Abouhalima Decl., ¶ 134.)  The inmate has no input

in the process before this point, and his only recourse after notice is to challenge the SAMs through the BOP's administrative remedy program (which does not involve the OEO or other agencies involved in the imposition of the SAMs.) (Ex. 72, O'Brien Dep., 90:10-91:12.)

O'Brien testified that another review process, involving the USAO, FBI, OEO and BOP, precedes the expiration of an inmate's SAMs to determine whether SAMs continue to be warranted and should be renewed. (O'Brien Decl., ¶¶ 18, 19.) Defendants assert that inmate input is solicited and considered in connection with the pre-renewal review. (*Id.*, ¶ 8; (Ex. D-1, Decl. of Mark Collins ["Collins Decl."], ¶ 16.) Plaintiffs disputes that inmates are able to provide "input" in connection with the review because they are not told about the concerns implicating the SAMs so they can explain or respond to those concerns. (Abouhalima Decl., ¶¶ 203-212; Ex. 74—Ayyad's 2011 SAMs input form; Ex. 75.)

Since 2010, the annual SAMs renewal review also includes an in-person meeting with the inmate approximately 90 days prior to the expiration date. (Collins Decl., ¶¶ 18-19.) Defendants assert that this meeting gives the inmate an additional opportunity to provide information concerning possible renewal and/or modification of the SAMs. (Collins Decl., ¶ 19.) Abouhalima asserts that nothing is told to the prisoner at this meeting about the reasons why the SAMs may be renewed. According to Defendants, information obtained from the meeting is then forwarded to the USAO, the FBI and the OEO for evaluation. (*Id.*, ¶ 21.) An in-person meeting with Abouhalima was held on January 6, 2011. Abouhalima asserts that he was not permitted to meaningfully participate, and was not permitted to give information on relevant topics related to renewal of his SAMs. (Abouhalima Decl., ¶¶ 207-12.)

45 days prior to expiration of the SAMs, the USAO, in consultation with the FBI, determines whether continued imposition of SAMs is warranted. The USAO provides a written recommendation to the OEO. If the decision is to renew the SAMs, renewals are approved by the Assistant Attorney General. Notice of the basis for the renewal of SAMs is provided to the inmate. (O'Brien Decl., ¶ 22.) Abouhalima again disputes that any meaningful notice of the basis for renewal of the SAMs was provided to him. (Abouhalima Decl., ¶¶ 134, 203-212). He asserts the notices are vague. (*See, e.g.,* Exs. 78, 79.)

The SAMs of eleven inmates who have been incarcerated at the ADX have been removed, with six of those non-renewals occurring since January 1, 2009. (Collins Decl., ¶ 24.) Defendants assert that information provided by the inmates during the annual pre-renewal review process was taken into account in the non-renewal decisions for those inmates. (*Id.*, ¶ 25.) Inmates whose SAMs are removed may be placed in any BOP institution consistent with their security and custody classification level (*id.,* ¶ 24), although Abouhalima notes that some of them remain at ADX or are in CMUs.

<u>The BOP'S Administrative Remedy Program Relevant to the SAMs</u>

The SAMs regulation, 28 C.F.R. § 501.3(e)), designates the BOP's administrative remedy program as the means for inmates to challenge decisions concerning SAMs. When this process is used, Defendants assert that steps are taken to ensure that the inmate's challenge reaches all entities involved in the SAMs decision. (Collins Decl., ¶ 10.) The process operates in much the same way as when the inmate challenges the imposition or renewals of SAMs. (*Id.*) ADX personnel forward the inmate's request to the USAO and FBI for them to determine if the information submitted by the inmate alters the decision

concerning the imposition or renewal of SAMs.  (*Id.* at ¶¶ 10, 11.)  Abouhalima notes, however, that the OEO is not involved in the process.  (Ex. 72, O'Brien Dep., 91:6-8.)  He also asserts that because he is not told the reasons for the SAMs' imposition/renewal, he cannot meaningfully address the government's concerns.  (Abouhalima Decl., ¶¶ 203-12.)

The Director of the OEO also has the authority to modify an existing SAM subject to certain limitations.  (O'Brien Decl., ¶ 23.)  ADX staff provide information to the USAO and FBI regarding requested modifications to the SAMs just as with imposition or renewal of the SAMs.  (Collins Decl., ¶ 13.)  Modification requests in which the USAO, FBI and CTS/NSD concur are forwarded to OEO.  (O'Brien Decl., ¶ 25.)  All relevant information is considered in evaluating a modification request, including that submitted by the inmate.  (*Id.*)

O'Brien testified that modifications that relax an inmate's SAMs are made frequently.  (O'Brien Decl., ¶ 24.)  Inmates with SAMs have used the administrative remedy process to achieve modifications permitting the inmate to engage in communications with a larger group of individuals, allowing the inmate to communicate with prospective attorneys with whom he has no attorney-client relationship, facilitating faster receipt of periodicals and books, and modifying the mass communications provisions of SAMs.  (Collins Decl., ¶ 14.)

Abouhalima questions whether requests for modifications are appropriately acted upon.  He has been told to request modifications by submitting names and information via a form (eventually) created by the BOP.  He has submitted these names over and over and has either had them rejected or received no response.  (Abouhalima Decl., ¶¶ 204-205; Ex. 85—Abouhalima request—"I am submitting this list for the third time"); Ex. 86.)

Communications Permitted by the SAMS

Defendants note that Abouhalima is allowed a broad variety of communications under the SAMS, including written correspondence to members of his family.  There is no limitation on the number or length of letters to or from approved non-legal correspondents and attorneys.  (Milusnic Decl., ¶ 31 and Att. 3 and 4; Shannon Decl., ¶¶ 67, 72.)  Abouhalima notes, however, that the SAMS authorized a *limit* of one letter per week, which was done in 2006 (Ex. 36) and which could be done again at the warden's discretion.   (Ex. 47.) Further, he asserts that the SAMs authorize limitations on the number and length of letters a SAMs inmate can send to his approved non-legal correspondents (Milusnic Decl., ¶ 31), and that these limitations could be imposed in the future.

Abouhalima also notes in his response that since imposition of the SAMs, he has requested permission to communicate with approximately 30 total individuals, and (as of the time of Plaintiffs' response) four of those requests had been granted.   He asserts that months or years elapsed between the dates when he made these requests and when he was notified that they had been approved or denied.  (Abouhalima Decl., ¶ 247; Abouhalima Supp. Resp., Ex. 17, Supplemental Decl. of Abouhalima ["Abouhalima Supp. Decl."], ¶ 5; *see also* Ex. 85—letter from Abouhalima enclosing for the third time a list of names, phone numbers and addresses of family members he wishes to correspond with, "especially after a couple of my family members died within one month.")  These facts are undisputed, although Defendants note in their reply that Abouhalima is currently allowed to communicate with 15 members of his immediate and extended family.  In Defendants' Surreply, they note

-37-

that since Abouhalima was moved to Phase Three, his group of social contacts has been expanded to include six more members of his extended family.

Further, Abouhalima asserts that Defendants' decision-making regarding his approved correspondents does not seem to include an assessment of their particular security risk.   (Abouhalima Decl., ¶¶ 159-75—describing inexplicable rejections of correspondence and individual correspondence.)   He notes that letters have been rejected from approved correspondents for a variety of idiosyncratic reasons, reducing the total amount of correspondence he receives.   (*Id.*, ¶¶ 147-169; Exs. 56, 57.)  Student attorneys who signed affirmations acknowledging receipt of the SAMs were denied the opportunity to correspond with him.  (Ex. 58.)  Further, Abouhalima asserts that Defendants have made, and continue to make, significant errors in the translation of his correspondence, and that there is no effective mechanism by which he can learn of these errors in a timely fashion and potentially address them.  (Abouhalima Decl.,  ¶¶ 73, 97, 126, 177, 191, 194, and 197.)

The SAMs also allow Abouhalima to receive visits from his approved family members and attorneys who have signed a SAMs affirmation.  (Milusnic Decl., Att. 3 and 4.)  The SAMs place no limits on the number of legal or non-legal visits Abouhalima may receive. Abouhalima does not dispute this, but notes that the SAMs require that non-legal visits occur in English and that ADX policy only allows SAMs prisoners to have visits on certain days. (Ex. 61.)  He further notes that ADX policy permits there to be only one SAMs prisoner in the visiting area at a time, meaning that no visits can occur as to other SAMs inmates.  This results in the need for visitors to wait for weeks for an "open" slot, which has resulted in a

near-total decline in family visits for Abouhalima who had been receiving regular visits prior to his placement in the ADX.  (Abouhalima Decl., ¶¶ 68, 91, 228-232.)

As to telephone calls to approved non-legal contacts, Abouhalima is currently in Phase Three of the Program, where he receives four telephone calls every month, two more than inmates in the ADX-GP according to Defendants.

The SAMs afford Abouhalima access to any periodical and newspaper "determined not to facilitate criminal activity or be detrimental to: national security; the security, good order, or discipline of the institution; or the protection of the public."  (Milusnic Decl., Att. 3.) Abouhalima notes, however, that periodicals and newspapers that have rejected do not meet these criteria, and Defendants' decision-making on this issue seems to at least in part be driven by external scrutiny rather than consistent application of these criteria. (Abouhalima Decl., ¶¶ 155-158; Ex. 2—response to grievance challenging rejection of *Harpers*, *the Nation* and *Atlantic Monthly*.)  Under the SAMs, sections of periodicals and newspapers "which offer a forum for information to be passed by unknown and/or unverified individuals," including classified advertisements and letters to the editor, are removed prior to distribution.  (Milusnic Decl., Att. 3.)

The SAMs also afford Abouhalima access to "all books which do not facilitate criminal activity or present a substantial threat to national security or the security, discipline, or good order of the institution."  (Milusnic Decl., Att. 3 and 4.)  Defendants assert that SAMs inmates are permitted to read an almost unlimited number of books, newspapers and periodicals, including either the *Denver Post* or *USA Today*.  (*Id.*,¶¶ 27, 56; Shannon Decl., ¶ 85.)  Abouhalima again notes that rejected books do not meet the above criteria, such as

the World Almanac, and Defendants' decision-making on this issue seems to be driven by external scrutiny rather than the consistent application of these criteria. (*See* Exs. 63, 65.)[13]

Defendants also contend that the SAMs allow Abouhalima to communicate with others on a daily basis. Thus, he can communicate with other SAMs inmates during "certain predesignated times. . .the place and duration to be set" by the BOP. (Milusnic Decl., Att. 3.) Other than in Phase Three of the H-Unit Program, however, communication between SAMs prisoners is never directly face-to-face. (Ex. 69, Milusnic Dep. at 23-24.) SAMs inmates also have contact with staff and correctional officers throughout the day. (Milusnic Decl., ¶ 23.) Abouhalima notes, however, that the brief interactions with staff are limited to perfunctory, impersonal exchanges made as part of institutional routines, and that sometimes no words are exchanged at all.

H Unit cells are side-by-side and Defendants assert that they allow communication between inmates by speaking in moderate tones, or using the air ventilation. (Milusnic Decl., ¶ 13.) Abouhalima disputes this, stating that inmates must shout in order to be heard by one another, rendering conversation impossible. Defendants also assert that H Unit inmates may speak with one another while at indoor or outdoor recreation. (Milusnic Decl., ¶¶ 13, 19-20.) Abouhalima partially disputes this, stating that when he was taken to indoor

---

[13] SAMs inmates are also permitted time in a computerized law library that includes access to LexisNexis (although Abouhalima asserts it has limited features and limits the ability to do legal research). Further, the BOP provides access to sixty television networks, closed circuit institutional programming, and five FM radio stations and digital music channels. It is undisputed that Abouhalima watches television, including news, sports, and movies, and listens to the programming broadcast by ADX Religious Services (although most of the tapes are in English and have been played repeatedly since 2002). Further, the SAMs allow Abouhalima to receive information from the media, but do not permit him to contact the media. Further, they allow Abouhalima to participate in the same education courses offered to other inmates at ADX.

recreation while in Phase Two, he exercised alone with no other prisoners nearby.  Other

prisoners were also sometimes not present at outside recreation.  (Abouhalima Supp. Decl.,

¶ 7.)  When he was with other Muslim prisoners, they were not permitted to pray together.

(*Id.*; Ex. 69, Milusnic Dep. at 28.)

In October 2013, Abouhalima was moved to Phase Three of the H-Unit Program,

which Program is discussed in more detail below.  In Phase Three, SAMs inmates are

permitted to have physical contact with others.  (Milusnic Decl., ¶ 39.)  They are permitted

a minimum of 1 ½ hours per day on the range in a group of as many as four inmates, five

days a week, where they are not restrained.  They eat one meal together and engage in

recreational activities, and may shower at any time they are on the range.  They receive a

minimum of 10.5 hours of out-of-cell recreation per week and approximately 20 hours per

week total of out-of-cell time.  (*Id.*, ¶ 41.)[14]

Communications Limitations and Monitoring of All BOP Inmates

All BOP inmates are subject to communications limitations and monitoring.  BOP

policy authorizes the agency to monitor the non-legal mail of federal prisoners, without

SAMs restrictions.  Each piece of incoming general correspondence and each piece of

outgoing general mail from an inmate in a medium or high security institution is subject to

reading and inspection by BOP staff.  A warden is authorized to reject correspondence or

---

[14] By contrast, in Phase One inmates are permitted two non-legal telephone calls per month, escorted
shower time on the inmate's range three times each week, and access to a minimum of ten hours of out-
of-cell recreation per week.  In Phase Two, inmates are allowed three non-legal telephone calls per month,
unescorted showers five times each week, and access to a minimum of ten hours of out-of-cell recreation
per week.  (*Id.*, ¶ 38.)

a publication "if it is determined detrimental to the security, good order, or discipline of the institution, to the protection of the public, or if it might facilitate criminal activity."[15]

BOP inmates may also be subject to limitations and conditions on telephone privileges, and their calls are subject to monitoring. Also, ADX-GP inmates are limited to five social visits per month. However, Plaintiffs note that ADX-GP prisoners may receive visits from family members every weekend and on holidays, unlike prisoners under SAMs who may only receive visits on certain weekdays and when no other inmate is having a visit. Additionally, if for any reason an FBI translator is not available, even for a visit that has been scheduled months in advance, the visit to a SAMs inmate may be cancelled without notice. (Ex. 108.)

The ADX H-Unit Program

SAMs inmates incarcerated in H Unit have the opportunity to participate in a three-phase program called the Special Security Unit Program ["the H-Unit Program"], designed specifically for SAMs inmates to ensure that national and institutional security are protected. (Milusnic Decl., ¶¶ 33, 34.) Defendants assert that the success of the inmate's participation in the Program provides information that is considered in the evaluation of whether SAMs continue to be warranted for that inmate. (*Id.*, ¶ 33.)[16] The H-Unit Program is, according to Defendants, the counterpart to the Step-Down Program for ADX-GP inmates. (*Id.*)

---

[15] A warden may also place an inmate on Restricted General Correspondence Status, which may limit the inmate's incoming and outgoing communications.

[16] Abouhalima disputes this, asserting that there is nothing to suggest that a prisoner's success in the Program has any impact on the decision of whether to renew an inmate's SAMs, and much that suggests otherwise. (*See, e.g.*, Ex. 91—letter from warden to Shannon recommending *against* SAMs modification for Phase Three but stating that Abouhalima's "behavior and programming have been excellent").

Abouhalima disputes this, asserting that the programs differ in their influence on conditions of confinement.  Upon completion of the Step-Down Program, inmates may be transferred out of ADX to an open-population institution.  (Ex. 92, 5-6.)  Inmates who complete the H-Unit Program receive only increased privileges.  (Ex. 63.)

Abouhalima was told that while SAMs are imposed on him, he is not eligible for transfer to an open facility.  (Ex. 69—Milusnic Dep at 97:4-20; Ex. 130—"you have a SAM; accordingly, you are not eligible for transfer at this time); Ex. 132.)  Thus, Abouhalima asserts that he could spend the rest of his sentence in the H Unit if the SAMs are not removed.  Defendants state in response that the Step-Down Program is not the only means of transferring to a less restrictive environment, as Ayyad's recent transfer indicates.

An inmate's advancement to the next phase of the H-Unit Program is a classification decision as to whether he can function with additional privileges without posing a risk to institutional security and good order; posing a risk to the safety and security of staff, inmates or others or the inmate himself; and/or posing a risk to public safety.  (Milusnic Decl., ¶ 36.)  The government has determined that, because of the national and institutional security concerns associated with communications of SAMs inmates, there must be a careful assessment of whether a SAMs inmate can function in a less-restrictive setting that permits physical contact with other inmates and correctional staff (as in Phase Three).  (*Id.*, ¶ 47.)

In September 2010, the first group of SAMs inmates was selected to advance to Phase Three.  Abouhalima was not included in that group because, according to Defendants, there were concerns related to certain communications between Abouhalima

and his immediate family members that the government determined evidenced Abouhalima encouraging radicalized behavior in one of those family members. (Milusnic Decl., ¶ 51.)

A SAMs inmate is evaluated for advancement in the H-Unit Program at least twice per year, at his six-month program reviews where he may present concerns. (Milusnic Decl., ¶ 42.)[17] If an inmate is not advanced following a review, Defendants assert that ADX staff communicate the reasons for that decision to the inmate. (*Id.*, ¶ 52.) Abouhalima disputes that this has occurred as to him. (Abouhalima Decl., ¶¶ 216, 220-23.) Appeals may be made by inmates through the BOP's Administrative Remedy Program. (Milusnic Decl., ¶ 52.)[18]

Living Conditions in H Unit

The ADX is the most secure prison in the federal system with special security procedures to control inmates and to enhance the safety of staff, inmates, and visitors. ADX Inmates under SAMs are housed together in the H Unit to ensure they are not able to transmit unauthorized communications through other inmates who are not subject to such restrictions. An inmate's placement at ADX or in H Unit under SAMs does not impact the duration of his sentence; his parole eligibility, if applicable; or his good-time credits.

---

[17] Abouhalima disputes that these are "reviews" in the sense of a meeting or discussion. Inmates do not know when the reviews are going to occur, and they do not have the opportunity to present information demonstrating that they should be entitled to progress to the next phase. They also do not know about and thus cannot address any concerns the BOP may have related to the decision to progress them. Abouhalima also asserts that these reviews determine eligibility for advancement, not whether advancement is actually appropriate.

[18] Abouhalima notes, however, that this appeal is considered only by the BOP, not by the FBI, USAO, or OEO (Ex. 72, O'Brien Dep., 90:16 – 91:12), rendering the appeal meaningless. Indeed, during the December 2012 meeting regarding the renewal of his SAMs, Abouhalima states he was told that the decision of whether to progress him to Phase Three belongs to the USAO.

Like all ADX inmates, H Unit inmates are single-celled (one inmate per cell).  Each cell in H Unit has 75.5 square feet of living space, identical in size to the cells for inmates in the ADX Step-Down Program.  H Unit cells are slightly smaller than ADX-GP cells, but Defendants assert these cells have approximately the same amount of living space as the ADX-GP cells.  Showers for H Unit and the Step-Down Program are located on the range. ADX-GP units have in-cell showers, which accounts for the slightly larger cell size.[19]

Like the cells in the ADX Step-Down Program units, each cell in H Unit has a solid outer door with a window that looks out onto the range (Plaintiffs note that an inmate can only see a wall and the floor when looking through the window).  Also like the Step-Down Program units, Defendants assert that the cell doors in H Unit are configured in a manner that allows sound to travel, permitting inmates to converse with passers by.  (Milusnic Decl., ¶ 15.)[20]  Like the cells in other units, each cell in H Unit has a window that looks outside, providing the inmate with natural lighting, although the window allows Abouhalima to see only a brick wall and some exercise cages.  Also like cells in other units, cells in H Unit have a light with three settings which the inmate controls and may turn on and off as needed.[21]

Like in the ADX-GP units, H Unit inmates consume their meals in their cells (unless inmates are in Phase Three of the H-Unit Program).  The cells allow inmates a walking

---

[19] Plaintiffs assert that the lack of a shower has a significant impact on H Unit inmates, especially during lockdowns as prisoners are denied the opportunity to shower for days at a time.  (Abouhalima Decl., ¶ 137.)  They assert that the inability to shower is a hardship because cleansing oneself is important to performing certain acts of worship in Islam.

[20] This is partially disputed by Plaintiffs, who note that on the limited occasions that staff seek to "converse" with H-Unit inmates, Plaintiffs need to speak loudly in order to be heard.

[21] Plaintiffs dispute this last fact as to the implication that the light switch allows inmates to escape artificial light.  Lights in front of the cell are on 24 hours per day which makes the cell very bright, regardless of the ability to turn off the cell light.  (Ayyad Decl., ¶ 119.)

distance of eight feet, within which they must read, write, sleep, walk, and go to the bathroom, except when they are permitted to walk around in a comparably-sized outdoor cage or indoor recreation room.  (Abouhalima Decl., ¶ 235, and Supp. Decl., ¶ 7.)

H Unit inmates, like all ADX inmates, can participate in both indoor and outdoor recreation with access to sunlight and fresh air.  Recreation is scheduled up to seven days per week.  Inmates in Phase One and Two of the H-Unit Program receive the same amount of recreation as ADX-GP inmates, *i.e.*, a minimum of ten hours of out-of-cell recreation per week.  Out-of-cell outdoor recreation for H Unit and ADX-GP inmates occurs with up to five other inmates in secure, single recreation areas that measure 10 feet by 20 feet.  (Milusnic Decl., ¶ 20; Ex. D-1 at ¶ 33.)[22]  Inmates in these recreation areas can only take a few steps in either direction and thus cannot run or walk quickly.  Recreation logs for H Unit from August 2009 through March 2011 show that recreation was cancelled only three times, once for weather conditions and twice for security reasons.  (Milusnic Decl., ¶ 22.)

According to Defendants, H Unit inmates, like all ADX inmates, may talk with each other while in their cells or during out-of-cell recreation.  (Milusnic Decl., ¶ 24; Ex. D-1 at ¶¶ 33a-b.)  Plaintiffs dispute this, asserting that the configuration of the cells makes it difficult, if not impossible, for inmates to "talk" with each other.  Yelling through the cement walls enables only brief exchanges and is not akin to conversation.  While a prisoner can also put his face into the toilet and yell through the plumbing, Abouhalima is unwilling to do.

---

[22] Plaintiffs assert, however, that sometimes inmates are placed in the cages by themselves or with only one other prisoner.  They further assert that when in the cages, an inmate can see nothing beyond the cement walls of the enclosure—no grass, trees, or surrounding landscape.

Defendants assert that like other ADX inmates, H Unit inmates have individual black-and-white televisions in their cells.  Abouhalima now has access to the same approximately 60 television and radio networks as the other ADX inmates.  H Unit inmates may also participate in the same education courses, wellness programs, and reading materials offered to other inmates at ADX.  Finally, H Unit inmates, like all ADX inmates, may hold paid jobs as Unit Orderlies, and Abouhalima has been an orderly for several years.

Abouhalima notes that the psychological effects of his confinement at ADX and in H Unit include depression, anxiety, fear, paranoia, loss of sleep, and loss of appetite. (Abouhalima Decl., ¶¶ 147-150—describing "devastating" effects of initial SAMs imposition—and ¶¶ 233-240—describing ongoing effects.)

B.    ANALYSIS

1.    Summary Judgment Standard

Summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit."  *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).  "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented."  *Id.*

The burden of showing that no genuine issue of material fact exists is borne by the moving party. *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1190.  "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment.'" *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted).  When applying the summary judgment standard, the court must "'view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.'" *Id.* (quotation omitted).  In other words, "'[t]he evidence of the nonmovant is to be believed, and all justifiable inferences to be drawn in his favor.'" *Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861, 1863 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  "All doubts must be resolved in favor of the existence of triable issues of fact.  *Boren v. Sw. Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

## 2. The Merits of the Motion

### a. Abouhalima's First Amendment Claims

#### i. Introduction and Standard of Review

Abouhalima asserts that the SAMs infringe on his First Amendment rights of speech and association.  (Third Am. Compl., at 30-31.)[23]  These claims do not involve a facial attack upon the validity of the SAMs; rather, Abouhalima challenges the extreme nature of the specific SAMs imposed on him in light of the alleged absence of a reasonable relationship between these restrictions and Defendants' asserted justifications.

Abouhalima asserts he would present evidence at trial to demonstrate that the imposition and maintenance of the SAMs—especially at the level of severity involved—was and is both unwarranted by the facts particular to him and was motivated in large part by

---

[23] As noted previously, Ayyad's First Amendment claims have been dismissed as moot.

political embarrassment of various public officials.  Abouhalima contends that this resulted

in a violation of his First Amendment rights with regard to both incoming correspondence

and publications and outgoing correspondence while in prison, and that this has effectively

blocked his ability to earn his way out of the extreme conditions of confinement to which he

is being improperly and indeterminately subjected.

Defendants argue that Abouhalima's First Amendment claims fail because the SAMs

bear a rational nexus to legitimate government interests, including its important interests in

national and institutional security.  The SAMs are, according to Defendants, a rational

means to limit Abouhalima's communications given that he is a convicted terrorist whose

actions culminated in a high-profile, successful strike against the United States.  Under the

SAMs, Abouhalima is provided a wide range of opportunities to communicate with others

and to access information.  Abouhalima may dislike the SAMs, but Defendants assert that

there is no genuine dispute that the SAMs bear a rational nexus to governmental interests.

Turning to my analysis, I first generally note that "[t]he fact of confinement and the

needs of the penal institution impose limitations on constitutional rights, including those

derived from the First Amendment, which are implicit in incarceration." *Jones v. North

Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977).  However, "prisoners do

not forfeit all constitutional protections by reason of their conviction and confinement in

prison. *Bell v. Wolfish*, 441 U.S. 520, 545 (1979).  Thus, "a prison inmate retains those First

Amendment rights that are not inconsistent with his status as a prisoner or with the

legitimate penological objectives of the corrections system." *O'Lone v. Estate of Shabazz*,

482 U.S. 342, 348 (1987).

The first case that decided "the appropriate standard of review for prison regulations restricting freedom of speech" was *Procunier v. Martinez*, 416 U.S. 396 (1974). It dealt with the constitutionality of censorship rules restricting inmate correspondence. *Id.* at 398. *Martinez* noted that "[w]hatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech." *Id.* at 408. It also stated, however, that "the legitimate governmental interest in the order and security of penal institutions justifies the imposition of certain restrictions on inmate correspondence. *Id.* at 413. Thus, the *Martinez* court was called upon to "determine the proper standard for deciding whether a particular regulation or practice relating to inmate correspondence constitutes an impermissible restraint of First Amendment liberties." *Id.* It held that a regulation or practice censoring prisoner mail is justified" if it "further[s] an important or substantial governmental interest unrelated to the suppression of expression" and is "no greater than is necessary or essential to the protection of the particular governmental interest involved." *Id.*

Next came *Turner v. Safley*, 482 U.S. 78 (1987), which dealt with a prison regulation limiting "correspondence between inmates at different institutions." *Id.* at 81. *Turner* found that the *Martinez* standard did not apply in that circumstance, distinguishing *Martinez* as striking prison regulations that "caused a 'consequential restriction on the First and Fourteenth Amendment rights of those who are *not* prisoners.'" *Id.* at 85 (quoting *Martinez*, 416 U.S. at 409). *Turner* held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. It found that "such a standard is necessary if 'prison administrators ...,

and not the courts, [are] to make the difficult judgments concerning institutional operations.'" *Id.* (quotation omitted).

Finally, the Supreme Court in *Thornburgh v. Abbott*, 490 U.S. 401 (1989), addressed the standard of review applicable to incoming correspondence from outsiders to prisoners. It found a significant distinction between incoming and outgoing correspondence, noting that "the implications for security [for outgoing mail] are far more predictable", as "[d]angerous outgoing correspondence is more likely to fall within readily identifiable categories, including "escape plans, plans relating to ongoing criminal activity, and threats of blackmail or extortion." *Id.* at 412.   On the other hand, it found that incoming letters or publications to the prison "may be expected to circulate among prisoners, with the concomitant potential for coordinated disruptive conduct." *Id.*   Thus, recognizing that "[t]he implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implication of incoming materials", *Thornburgh* limited *Martinez* "to regulations concerning outgoing correspondence".   *Id.* at 413.   It held that *Turner's* more deferential standard should be applied to incoming mail and publications.   *Id.*

The first question I must address is what test applies to determine the constitutionality of the SAMS restrictions on communications under the First Amendment.   Defendants argue that the *Turner*  test applies to the claims involving both incoming and outgoing correspondence.   Abouhalima acknowledges that the *Turner* standard applies to incoming correspondence, but asserts that the less deferential standard stated in *Martinez* applies as to restrictions on outgoing correspondence.

I agree with Defendants that the Tenth Circuit's decision in *Al-Owhali v. Holder*, 687 F.3d 1236 (10th Cir. 2012) is instructive on this issue.  There, as here, an ADX inmate convicted of terrorist-related offenses brought a First Amendment claim challenging SAMs imposed on him.  *Id.* at 1239.  The Tenth Circuit applied *Turner* to the restrictions on both incoming and outgoing correspondence, without distinguishing between the two.  *Id.* at 1239-40.  This is consistent with *Gee v. Pacheco*, 627 F.3d 1178, 1187 (10th Cir. 2010), where *Turner* was applied to a prisoner's First Amendment challenges to outgoing correspondence.  Similarly, Judge Krieger applied *Turner* on summary judgment to SAMs regulations regarding incoming and outgoing correspondence in *Mohammed v. Holder*, No. 07-cv-02697-MSK-BNB, 2011 WL 4501959, at 7 (D. Colo. Sep. 29, 2011).

While the above cases did not cite *Martinez* or explain why the court  applied *Turner* instead of *Martinez* to the restrictions on outgoing correspondence, I find that application of the *Turner* test to both types of communications makes sense in the situation here where SAMs are imposed to prevent a convicted terrorist from participating in communications that could jeopardize national security.  In this context, as indicated by the evidence adduced by Defendants, including the Declaration of FBI Agent Shannon, the risks and implications associated with the inmate's outgoing communications cannot be deemed "of a categorically lesser magnitude than the implications of incoming materials." *Thornburgh*, 490 U.S. at 413.

Based on the foregoing, I will apply the *Turner* test to the limitations on both incoming and outgoing correspondence.  Four factors are used to guide the *Turner* inquiry at the summary judgment stage, which I address below.  *Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002).  *Turner* does not necessarily require that all four factors favor the

government to find that a restriction is rationally imposed.  *See Beard v. Banks*, 548 U.S. 521, 532-33 (2006) (prison policy upheld as reasonable, even though prisoners had no alternative means of exercising the right).  I now turn to those factors.

ii.    Analysis of the *Turner* Factors

Rational Connection

The first *Turner* factor is "whether a rational connection exists between the prison policy regulation and a legitimate governmental interest advanced as its justification." *Beerheide*, 286 F.3d at 1185.  This factor has been held to be "the most important;. . .it is 'not simply a consideration to be weighed but rather an essential requirement.'"  *Al-Owhali*, 687 F.3d at 1240 (quotation omitted).  It is Abouhalima's "burden to demonstrate that there is no legitimate, rational basis for the increased communications restrictions."  *Id.* at 1241.

Defendants assert that the first and most critical interest at issue is the preservation of national security by preventing acts of terrorism. They note that the evidence establishes that Plaintiffs are not only terrorists, but "singularly dangerous ones who have demonstrated appeal to others in the global terrorist network and whose communications outside the prison raise significant security concerns."  (Mot. Summ. J., at 62.)  Plaintiffs were successful participants in one of the most significant terrorist attacks carried out on American soil, have connections with the Islamic Group and other terrorists, and communicated from ADX with, among others, members of the Martyrs terrorist cell that was planning to execute a bombing of the National Justice Building in Madrid.

Defendants also point to the government's strong interest in maintaining the security of its prisons, including the safety of staff and inmates, and its interest in efficiently operating

its law enforcement agencies and allocating its resources. They assert that Abouhalima exerted dangerous influence within the prison, particularly in connection with his role in inciting another inmate to murder a correctional officer at USP Lompoc. An investigation concluded that his "defined leadership role and responsibility among the inmates in the Muslim Community and his ability to plan and execute violent acts presents a significant threat to the staff" at USP Lompoc, and resulted in his transfer to another institution. Further, since imposition of SAMs, Abouhalima has engaged in communications that the government has determined have been intended to radicalize the recipient. Based on these concerns, the government has determined that, without SAMs, Abouhalima's communications could continue to compromise national security and the safety of others. The SAMs allow the FBI to conduct a comprehensive review of Abouhalima's communications that maximizes the government's ability to reduce these risks.

I find that the concerns articulated above are legitimate governmental interests. While Abouhalima disagrees with the government's characterization of his communications as dangerous and/or a threat to national security, and argues that his intentions are benign, I do not find that this creates an issue of fact regarding the arbitrariness or illegitimacy of the governmental interests articulated by Defendants. *See Beard*, 548 U.S. at 530 (noting that a court "must distinguish between evidence of disputed facts and disputed matters of professional judgment" and, with respect to the latter, the court's "inferences must accord deference to the views of prison authorities.").

Indeed, I must afford deference to the Executive Branch's evaluation of the facts in assessing risks to national security as an exercise of its "informed judgment." *Holder v.*

*Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010). This is because "when it comes to collecting evidence and drawing factual inferences in this area, 'the lack of competence on the part of the courts is marked. . .and respect for the Government's conclusions is appropriate.'" *Id.* (quotation omitted). Nonetheless, "concerns of national security and foreign relations do not warrant abdication of the judicial role", and I do "not defer to the Government's reading of the First Amendment, even when such interests are at stake. *Id.*

I also find that a rational connection exists between imposition of the SAMs on Abouhalima and the governmental interests articulated above. Defendants assert, and I agree, that the government did not act irrationally when it concluded that limits on Abouhalima's communications are warranted as the SAMs reduce the risk that his communications could inspire future acts of terrorism. The government has information that other terrorists wish to communicate with him. Further, it has concluded that, even if Abouhalima was unaware of the Martyrs' plot or the content of the communications he exchanged with them appears superficially benign, the danger to national security remains significant. Communications with successful terrorists can reinforce an aspiring terrorist's resolve. Incarceration provides no guarantee that an inmate will be unable to continue to participate in terrorist plots—a conspirator in the 1993 World Trade Center bombing helped orchestrate that attack from prison. *United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998).

Executive Branch officials relied on their accumulated knowledge about terrorist threats to make an informed judgment about Abouhalima and the effect of his communications on others. This is appropriate. As noted by FBI Agent Shannon:

> The government must make informed predictions about future conduct based on past behavior. Persons, *like Plaintiffs*, who have a history of terrorist acts

> or who have expressed adherence to a radical Islamic ideology that manifests itself in acts of violence, are likely to attempt to engage in acts that advance the goals of jihad, including conduct that would threaten the security of the United States and the safety of individuals outside the institution.

(Shannon Decl., ¶ 46.)  Defendants assert that the SAMs promote institutional security in Abouhalima's case by inhibiting his ability to exert a radicalizing influence on other inmates. And diminishing the risk that he will himself be further radicalized.   Without these restrictions, he would have easier access to communications from terrorist devotees that could encourage him to engage in acts of institutional jihad.

While Abouhalima disputes that many of these risks apply to him, and argues  that the severity of the restrictions imposed upon him is driven by the nature and notoriety of his crimes of conviction and the government's embarrassment from adverse media attention, again I find that deference is warranted to these disputed matters of professional judgment. *Beard*, 548 U.S. at 530.  As noted in a case in this court decided by Judge Krieger, "[t]he Plaintiff does not directly challenge any of [the government's] representations; he simply places a slightly different gloss on them."  *Georgacarakos v. Wiley*, No. 07-cv-01712-MSK-MEH, 2010 WL 1291833, at *12 (D. Colo. March 30, 2010).  This is not sufficient to demonstrate a genuine issue of material fact.[24]

However, while Defendants have generally shown that the imposition of SAMs on Abouhalima was rationally related to legitimate penological objectives, that is not the issue.

---

[24] As to the email by an FBI agent that Abouhalima argues supports an inference that the impetus for the SAMs was "those bullshit letters" or the embarrassing MSNBC media report related to same rather than any national or institutional security interest, Defendants have shown that the agent was not involved in the FBI's investigation of the letters to the Martyrs terrorist cell and I find this creates no genuine, material dispute.  A single comment expressed by an agent who was not involved in the investigation does not refute the overwhelming, undisputed evidence establishing the rationality of the SAMs decision in Abouhalima's case.

"[T]he question is not whether SAMs, generally, are rationally related to a penological objective, but instead whether the Government has shown that there is a rational connection between the particular SAMs applied to [plaintiff] and a penological objective." *Mohammed*, 2011 WL 4501959, at *8.   Thus, I turn to the specific restrictions at issue under the SAMs.

The primary restriction relates to limits on the number of family or friends that Abouhalima can communicate with both through outgoing and incoming correspondence. At the time the motion was filed Abouhalima was limited to 15 family members; he can now communicate with more family members.  Abouhalima, however, wishes to communicate with additional family members and/or close friends.

Defendants first argue as a justification that limiting correspondence to immediate family members and other approved persons lessens the risks that Abouhalima can connect with other terrorists.  This limitation promotes institutional security, according to Defendants, by severing Abouhalima's connection with terrorists outside the institution, particularly those who may be inclined to forward radicalizing "fan mail" that could encourage prison violence. I find that the restrictions are not, however, rationally related to these justifications.  There is no evidence that the family members or other people Abouhalima has requested contact with are associated with terrorism or are threats in any manner or that any "fan mail" has been sent through family.  *See Mohammed*, 2011 WL 4501959, at *8; *Sattar v. Holder*, No. 07-cv-02698-PAB-KLM, 2012 WL 882401, at *5 (D. Colo. March 15, 2012).

Defendants also assert, however, that the limitation on the number of people that Abouhalima communicates with ensures that the quality of analysis can be maintained, giving FBI personnel the opportunity to develop an in-depth familiarity with the inmate and

the persons with whom he communicates.  They contend that such restrictions reflect constraints on the FBI's review, translation and threat assessment resources, which must be allocated among all SAMs inmates and the war on terrorism generally.  I find that Abouhalima has not shown that this is arbitrary; instead, Defendants have shown that the restrictions on the number of people Abouhalima is permitted to communicate with is rationally related to this legitimate governmental interest.

In so finding, I reject Abouhalima's argument that this justification is conclusory and unsupported.  FBI Agent Shannon provided testimony on this point.  While he did not give specific details regarding the FBI resources or how they would be impacted if additional family members were added, citing national security concerns about divulging further details about allocation of resources, I find that he was not required to.  As noted by the Supreme Court, "conclusions must often be based on informed judgment rather than concrete evidence, and that reality affects what we may reasonably insist on from the Government. . . .The Government, when seeking to prevent imminent harms in the context of . . . national security, is not required to conclusively link all the pieces in the puzzle before we grant weight to its empirical conclusions." *Humanitarian Law Project*, 561 U.S. at 34-35.

The SAMs also prohibit publications that are determined to facilitate criminal activity or be detrimental to "national security; the security, good order, or discipline of the institution; or the protection of the public."  Further, they require the removal of classified advertisements and letters to the editor.  I find that there is a rational relationship between these restrictions and legitimate governmental interests.  It is undisputed that the SAMs permit broad access to mass communications, and prohibiting publications that could

facilitate criminal activity or be detrimental to "national security; the security, good order, or discipline of the institution; or the protection of the public" is undisputedly a legitimate governmental interest. While Abouhalima asserts that some periodicals have been rejected on grounds that do not meet these criteria, this is merely his unsupported opinion. As to the removal of classified advertisements and letters to the editor, Defendants assert that this diminishes Abouhalima's opportunity to receive messages from other terrorists. Plaintiff has not met his burden of showing that this is not legitimate or rational.

The final restriction at issue relates to the time frame for review and translation of the correspondence (14 days for English mail and 60 days for foreign language mail). In practice, Abouhalima asserts that there are delays of up to four months in connection with his mail. Defendants assert that as to these time frames that a specialized review of inmate communications by counterterrorism professionals is warranted for sophisticated terrorists like Abouhalima. They contend that the government needs sufficient time to thoroughly translate and analyze the large volume of SAMs communications. Translation and analysis of the communications of convicted terrorists can be complicated, and the government needs time to ensure that dangerous communications are not missed. Again, Abouhalima has not shown that this interest is not served by the time restrictions, even taking into account purported delays. He has also not show that this justification is irrational.

In conclusion, I find that the first *Turner* factor favors the Defendants.

<u>Alternative Means of Exercising the Right</u>

The second *Turner* factor is "whether alternative means of exercising the right are available notwithstanding the policy or regulation." *Beerheide*, 286 F.3d at 1185. Resolution

of this factor turns on whether the law requires that Abouhalima have alternate expressions of communication with the family members he is not allowed to communicate with or whether he just has to have alternate means of expression generally.  Thus, Defendants have shown that Abouhalima has many forms of expression under the First Amendment. However, he has no other means of expression with family members whom the government has not approved contact with under the SAMs.

Turning to the law on this issue, in *Turner* the Supreme Court found that a regulation prohibiting certain types of correspondence between inmates at different institutions did not deprive "prisoners of all means of expression" but "only with a limited class of other people with whom prison officials have particular cause to be concerned."  *Id.* at 92.  Similarly, in *O'Lone*, a First Amendment suit involving policies prevented inmates from attending a Muslim service, there were no alternative means of attending this service.  482 U.S. at 351. However, the Supreme Court stated:

> In *Turner,* we did not look to see whether prisoners had *other means of communicating with fellow inmates*, but instead examined whether the inmates were deprived of *"all means of expression."* Here ... [t]he record establishes that respondents are not *deprived of all forms of religious exercise*, but instead freely observe a number of their religious obligations .... [T]his ability on the part of respondents to participate in other religious observances of their faith supports the conclusion that the restrictions at issue here were reasonable.

*Id.* at 352 (emphasis added); *cf. Mohammed*, 2011 WL 4501959, at *9 (finding that the plaintiff's "evidence may be sufficient to show that alternative means of exercising his First Amendment rights are not available for maintaining his familial associations" because he could not "communicate by telephone, writing, or personal visit with anyone other than the ... persons approved by his SAMs").

I find that the test that should be adopted is not whether the SAMs allow Abouhalima the means to communicate with all family members he wishes to communicate with, but whether he is deprived of all means of expression in connection with his ability to communicate with family and maintain his familial associations.  *See, e.g., Parkhurst v. Lampert*, 418 F. App'x 712, 714-15 (10th Cir. 2011) (right at issue was the right to have newspapers delivered; the court looked at whether there were alternate means of expressing the right and found that there were).  I find that Abouhalima is not deprived of all means of expression in connection with that right, as he has been permitted under the SAMs to communicate with over 15 members of his family.  Further, he can communicate with approved family members through visits and telephone calls.  Thus, I find that the second factor also favors Defendants.

<u>The Effect of Accommodating the Exercise of the Right</u>

The third factor is "what effect accommodating the right would have on guards, other prisoners, and prison resources generally."  *Beerheide*, 286 F.3d at 1185.  Defendants argue that removing the SAMs would have a negative impact on the guards and other inmates in immediate proximity to Abouhalima at ADX as well as persons outside the institution.  Unlike most inmates, he has the ability to transmit inspiring communications far beyond the prison that could impel aspiring terrorists to carry out an attack that could affect victims both in the United States and abroad.  The government has determined that SAMs are necessary in Abouhalima's case to diminish the potential for such errors.

I agree with Abouhalima that Defendants have offered no evidence in support of their argument that allowing him to receive correspondence from a broader selection of his

relatives would have any realistic, negative impact upon prison staff, inmates, or persons outside the institution.   Again, Defendants have not demonstrated that Abouhalima's correspondence with family members, even those who have not yet been approved, pose any threats or that his family is associated in any way with terrorist groups.

However, Defendants have also presented evidence through FBI Agent Shannon that allowing broader correspondence to Abouhalima would impact government resources in connection with the monitoring of his communications, as more resources would be expended in translating the letters.  This evidence shows that the review and translation of Abouhalima's communications is conducted by persons with specialized knowledge of the operation of international terrorism networks and violent extremist ideology and radicalization, and that time is needed to ensure the quality of review necessary to prevent a repeat of the Martyrs scenario.  Defendants assert that these limitations ensure that the government has sufficient resources to staff counterterrorism operations that extend beyond the ADX.  I find that this justification is rational and legitimate, and that Abouhalima has not shown otherwise.[25]  Accordingly, the third factor also favors the Defendants.

<u>Alternatives That Would Accommodate Abouhalima's Rights</u>

The final factor is "whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights."  *Beerheide*, 286 F.3d at 1185.  As *Turner* notes, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns."  482 U.S. at 90.  "This is

---

[25] Again, I reject Abouhalima's argument that this justification is conclusory and unsupported for the reasons discussed above in connection with the first *Turner* factor.

not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.*

Defendants argue as to this factor that the SAMs monitoring regimen bears a direct relationship to the harms it seeks to prevent, and no ready alternatives promote the interests. Thus, they assert that the government—utilizing the national security and counterterrorism expertise of DOJ personnel—has engaged in a comprehensive review of Abouhalima's circumstances. Following that review, it concluded that SAMs monitoring promotes the government's critical interests, including its compelling interest in national security. Defendants argue that this conclusion should be afforded substantial deference.

I find that this factor also favors the Defendants. Abouhalima has not presented evidence sufficient to create a genuine issue of material fact that there are ready, easy-to-implement alternatives that would accommodate his rights. While he points to the fact that the BOP monitored his conversations before the SAMs were implemented, Defendants presented evidence that during this monitoring period Plaintiffs were able to successfully transmit correspondence from the ADX to terrorists located abroad. I agree with Defendants that the fact that under BOP review, Plaintiffs were able to communicate with the Martyrs for nearly two years supports the assessment that SAMs are warranted to prevent such communications. Evidence also has been presented that the FBI has an in-depth understanding of Islamic extremism and worldwide terrorism networks that the BOP lacks.[26]

---

[26] Abouhalima refers to a statement by Les Smith, Director of the BOP's Counterterrorism Unit, that "Yes, I believe the Federal Bureau of Prisons has the ability to effectively manage Mr. Abouhalima." (Ex. 32, p. 8.) However, his reference to being able to "manage" Abouhalima is vague. Importantly, it does not state that the BOP alone can successfully monitor his communications, and I believe that such an

Abouhalima also relies on September 2006 responses from the BOP and the FBI to the recommendations in the OIG report: *BOP Monitoring of Mail for High-Risk Inmates*, in which they documented multiple strategies put in place between 2006-2008 devoted to ensuring careful monitoring of communications of all prisoners convicted of terrorist crimes. (Ex. 31.)  Abouhalima asserts that such strategies could be implemented here as an easy alternative to SAMs monitoring.  I agree with Defendants that this is not sufficient to create a genuine issue of material fact.

First, there is no evidence that the new and sophisticated set of interagency procedures that Abouhalima thinks could be substituted for the SAMs were actually created or were ever implemented.  Nor is there any evidence that this unidentified monitoring scheme would have enabled the government to identify significant security information in a manner equal to that of the FBI—intensive monitoring under Abouhalima's SAMs.  And there is no evidence demonstrating that any government official—from the BOP, the FBI or elsewhere—shares Abouhalima's view that some form of "interagency" monitoring would have been as effective as the social contacts limits in the SAMs, a view that is notably at odds with the considered judgment of the Executive Branch counterterrorism personnel who assessed his risks and determined that FBI monitoring was necessary in his case.[27]

Most critically, I agree with Defendants that Abouhalima has not presented evidence showing that the alternative monitoring structure he posits could be implemented "at *de*

inference from Mr. Smith's statement is too broad.

[27] There is also no evidence as to how the monitoring scheme would work—which government personnel would be responsible for monitoring his communications, what training such personnel would need, what level of language and skill set would be required, and if it would match those of the FBI Joint Terrorism Task Force case agents, analysts and translators.

*minimis* cost to valid penological interests." *Turner*, 482 U.S. at 91.  His "evidence" reduces

to his speculation that there are other forms of available monitoring that equal the

effectiveness of the SAMs.  This speculation is not evidence of sufficient "quality and

quantity" to show that there are alternative monitoring structures that are as effective as the

SAMS and which can be implemented at *de minimis* cost to valid governmental/penological

interests.  Thus, I find that the fourth factor also favors Defendants.

iii.     Conclusion as to First Amendment Claims

Based on the foregoing, I find that all four *Turner* factors weigh against Abouhalima

and in favor of the Defendants.  Accordingly, I find that the SAMs regulation at issue is valid

under *Turner* as it is reasonably related to legitimate penological interests.  Defendants'

Motion for Summary Judgment is therefore granted as to Abouhalima's First Amendment

claims.

b.     The Procedural Due Process Claims

Both Plaintiffs assert a procedural due process claim relating to their initial transfer

to ADX.  Abouhalima also asserts a due process claim related to his conditions of

confinement in the ADX, asserting that these constitute an atypical and significant hardship.

He argues that this confinement, which includes his transfer to the H Unit in the ADX and

the imposition of the SAMs, blocks his entry to the ADX Step-Down program for ADX-GP

inmates and impacts his ability to transfer out of the ADX to a less restrictive facility.

i.     Statute of Limitations

I first address Defendants' argument that Ayyad's due process claim relating to his

transfer to ADX is time-barred.  The statute of limitations for any civil action against the

-65-

United States is six years from when the "right of action first accrues." 28 U.S.C. § 2401(a).

"The statute of limitations in section 2401(a) is jurisdictional and not subject to waiver." *Al-Owhali v. Mukasey*, No. 07-cv-02214-LTB-BNB, 2010 WL 5651033, at *7 (D. Colo. June 17, 2010). Ayyad did not assert a due process claim challenging his transfer until the Third Amended Complaint filed on April 16, 2009, which was more than six years after his transfer to ADX on October 4, 2002.

The issue is whether this claim relates back to Ayyad's previous complaints which were filed within the applicable six-year time period. "An amendment to a pleading relates back to the date of the original pleading when ... the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading...." Fed. R. Civ P. 15(c)(1)(B). The purpose of relation back is "to balance the interests of the defendant protected by the statute of limitations with the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits." *Krupski v. Costa Crociere S.p.A.,* 560 U.S. 538, 550 (2010). "'The rationale of Rule 15(c) is that a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide.'" *McClelland v. Deluxe Fin. Servs.*, 431 F. App'x 718, 725 (10th Cir. 2011) (quotation omitted).

I find that Ayyad's due process claim related to his transfer to ADX relates back to his earlier complaints and is not time barred. Ayyad alleged in his earlier filings that before his transfer to ADX he was in open general population receiving all privileges and rights offered to other inmates. (Ayyad's Second Am. Compl. at 5.) He further alleged that upon

his transfer to ADX, he was initially housed in a general population unit receiving the same treatment and privileges as other inmates in that unit but that he lost some of these privileges when SAMs were imposed.  (*Id.* at 5-8.)  While the due process claim referred primarily to the SAMs, the reference to the transfer to ADX provided Defendants sufficient notice that this may be at issue in this litigation.  Accordingly, summary judgment is denied as to this issue.

ii.    The Merits of the Due Process Claims

The Due Process Clause "shields from arbitrary or capricious deprivation those facets of a convicted criminal's existence that qualify as 'liberty interests.'"  *Harper v. Young*, 64 F.3d 563, 564 (10th Cir. 1995).  To sustain a procedural due process claim, the plaintiff must establish that (1) he has been deprived of a liberty interest; and (2) that the procedures employed by the defendants in depriving him of that interest were constitutionally insufficient.  *Swarthout v. Cooke*, 562 U.S. 216, 131 S. Ct. 859, 861  (2011).

Thus, the first issue is whether Plaintiffs have a liberty interest in connection with this claim.  This requires me to assess the "nature" of the interest and whether Plaintiffs deprivation of it has caused them to suffer "a 'grievous loss' of liberty retained even after ··· imprisonment."  *Sandin v. Conner*, 515 U.S. at 480, 481 (1995).  *Sandin* looked at whether the prison's actions constituted a "dramatic departure from the basic conditions of [the prisoner's] indeterminate sentence."  *Id.* at 485.  It also looked to whether the action at issue presented "the type of atypical, significant deprivation in which a State might conceivably create a liberty interest."  *Id.* at 486.  Thus, *Sandin* held that liberty interests are "generally

limited to freedom from restraint which imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484.

*Sandin* was applied in *Wilkinson v. Austin*, 545 U.S. 209 (2005), which addressed whether inmates had a protected liberty interest in avoiding incarceration at the Ohio supermax facility. The inmates there were subject to extremely restrictive conditions of confinement consisting of a prohibition on all human contact, 24-hour illumination of cells, no outdoor exercise and one hour per day of indoor exercise. *Id.* at 223. *Wilkinson* found that these conditions, along with the fact that transfer to the facility resulted in indefinite placement and disqualification from parole eligibility, created a liberty interest. *Id.* at 224.

The liberty interest issue was also addressed by the Tenth Circuit in *Estate of DiMarco v. Wyo. Dep't of Corrections*, 473 F.3d 1334 (10th Cir. 2007). The *DiMarco* court noted two issues that arise in determining whether a liberty interest exists: "what is the appropriate baseline comparison?" and "how significant must the conditions of confinement deviate from the baseline to create a liberty interest in additional procedural protections?" *Id.* at 1341. The court declined to adopt a baseline for the liberty interest inquiry, stating that there was no "no rigid either/or assessment", but found that a few key factors were relevant. These include whether "(1) the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) the conditions of placement are extreme; (3) the placement increases the duration of confinement, as it did in *Wilkinson*; and (4) the placement is indeterminate (in *Wilkinson* the placement was reviewed only annually)." *Id.*

Finally, in the *Rezaq* case, the Tenth Circuit clarified that the *DiMarco* factors are not dispositive and do not "serve as a constitutional touchstone." *Rezaq v. Nalley*, 677 F.3d

1001, 1012 and n. 5 (2012). Rather, the proper approach to the baseline question in assessing conditions in segregated confinement "is a fact-driven assessment that accounts for the totality of conditions presented by a given inmate's sentence and confinement." *Id.* at 1012. *Rezaq* noted that while the *Wilkinson* conditions can be instructive, they "may not serve as helpful comparator evidence in *all* cases." *Id.* (emphasis in original). "The 'ordinary incidents of prison life' will differ depending on a particular inmate's conviction and the nature of nonpunitive confinement routinely imposed on inmates serving comparable sentences." *Id.* Finally, *Rezaq* "read *Wilkinson* to say that extreme conditions in administrative segregation do not, on their own, constitute an 'atypical and significant hardship' when compared to 'the ordinary incidents of prison life.'" *Id.* at 1013 (quoting *Sandin*, 515 U.S. at 484).

The Tenth Circuit in *Rezaq* found that, even though the conditions at ADX "are undeniably harsh", convicted terrorists in the ADX general population unit had no liberty interest in avoiding confinement in the ADX. 677 F.3d at 1012-17. Consistent with this, no court in this Circuit has found that conditions in any ADX housing unit implicate a liberty interest. *See Jordan v. Fed. Bureau of Prisons*, 191 F. App'x 639, 652 (10th Cir. 2006)*; Muhammad v. Hood*, 100 F. App'x 782, 783 (10th Cir. 2004); *Muhammad v. Finley*, 74 F. App'x 847, 849 (10th Cir. 2003); *Gowardia v. Stearns*, No. 13-cv-00777-KMT, 2014 WL 959487, at 9 (D. Colo. March 12, 2014); *McMillan v. Wiley*, 813 F. Supp. 2d 1238, 1248 (D. Colo. 2011); *Saleh v. Fed. Bureau of Prisons*, Nos. 05-cv-02467, 06-cv-01747, 07-cv-00021, 2010 WL 5464295, at *7 (D. Colo. Nov. 23, 2010); *Matthews v. Wiley*, 744 F. Supp.

2d 1159, *8-10 (D. Colo. 2010); *Georgacarakos v. Wiley*, No. 07-cv-01712, 2010 WL 1291833, *11-13 (D. Colo. Mar. 30, 2010).

Further, Judge Brimmer of this Court found that an inmate housed in the H Unit of ADX under SAMs did not have a liberty interest in connection with his conditions of confinement. *Sattar v. Holder*, No. 07-cv-02698-PAB-KLM, 2012 WL 882401, at *11 (D. Colo. March 15, 2012). Similarly, Judge Matsch of this Court recently found that the conditions in the H Unit do not give rise to a liberty interest. *Yousef v. United States*, No. 12-cv-2585-RPM, 2014 WL 1908711, at *5 (D. Colo. May 13, 2014); *see also Allmon v. Wiley*, 2011 WL 4501941, at *15 (D. Colo. Aug. 25, 2011) ("The evidence shows that the conditions of confinement in H Unit do not differ in any meaningful way from those in other ADX units and do not implicate a liberty interest."), *adopted* by 2011 WL 4501937 (D. Colo. Sep. 27, 2011).

Nonetheless, as this is a fact driven assessment, I turn to the relevant factors to determine whether Plaintiffs have shown a liberty interest in connection with their claims. As in *Rezaq,* I find that the four factors recited in *DiMarco* are appropriate in this case.

Legitimate Penological Interest

The first factor is whether Plaintiffs' transfer to ADX and the conditions of confinement there, including placement in the H Unit and imposition and renewal of the SAMs, further a legitimate penological interest. I find that they do. Defendants have asserted an interest in protecting national security, including preventing acts of terrorism; promoting the security of its prisons, correctional personnel and inmates; and in promoting the effective operation of its law enforcement agencies by establishing practices designed to efficiently allocate

resources for fighting terrorism, including resources necessary to ensure the integrity of the review of communications for SAMs inmates.

Defendants have further shown that these interests are reasonably related to their decisions to transfer Plaintiffs to the ADX and impose SAMs based on Plaintiffs' past terrorist activity, communications with other terrorists, and conduct prior to their transfer to the ADX.[28] FBI Agent Shannon described the nature of Plaintiffs' crimes and affiliations with other terrorists; the information on which the government based its evaluation of the continuing risks of their communications, including the FBI's investigation of Plaintiffs and the members of the Martyrs terrorist cell; Plaintiffs' pre-SAMs communications with other terrorists and associates of terrorists; and information explaining the basis for the conclusion that Plaintiffs can inspire terrorism both within and outside the institution, even years after the bombing of the World Trade Center.  (Shannon Decl., ¶¶ 6-9, 10-17, 26-31, 35-57.)  I find that these conclusions made as matter of professional judgment are entitled to deference.  *Humanitarian Law Project*, 561 U.S. at 33-34.

Indeed, the Tenth Circuit found that addressing national security risks posed by inmates with terrorist ties and sympathies is a legitimate, "uniquely federal penological interest."  *Rezaq,* 677 F.3d at 1014; *see also Yousef v. United States*, 2014 WL 1908711, at *2. *Rezaq* further noted that the court "has upheld an inmate's placement in segregation, even for an extended period of time, for safety reasons."  677 F.3d at 1013 (citing *DiMarco*, 473 F.3d at 1342).

---

[28] On the latter issue, for example, Defendants point to the fact that the government has information showing that Abouhalima played a role in the 1997 murder of a correctional officer at USP Lompoc, and that after an inmate assaulted Ayyad while he was incarcerated at USP Terre Haute, that inmate had to be placed in protective custody at his next four institutions because of threats from Muslim inmates.

Plaintiffs argue, however, that there are genuine issues of material fact as to whether those interests are "legitimate" with respect to them.  For example, while Defendants refer to their crimes of conviction and their correspondence with the Spanish prisoners as justifications, Plaintiffs assert that the evidence at trial would show that they successfully served their sentences in USPs for seven years prior to September 11, 2001, when they were transferred to ADX.  Those transfers were ordered by Defendants, even though Plaintiffs assert they did not meet the criteria for placement in ADX in effect at the time of their transfers and they were not transferred pursuant to the BOP's own procedures. Plaintiffs further assert that the legitimacy of the government's interests in connection with its actions as to them is undermined by Defendants' own documents that call into question the FBI's conclusions, particularly as to the renewal of the SAMs.

While I recognize that there are disputes about the justifications for imposition or renewal of the SAMs and other actions as they relate to Plaintiffs, I still find that the first factor has been satisfied.  First,  the fact that Plaintiffs were safely able to function in less restrictive environments prior to their transfer to ADX is not dispositive.  As Judge Brimmer noted in a similar case, "the threat posed by plaintiffs was not that they might act out in prison, but that, following September 11, they might contact individuals on the outside and therefore posed a threat to national security."  *Saleh*, 2010 WL 5464294, at *4.

Second, regardless of whether Plaintiffs met the criteria for placement in ADX in effect at the time of their transfers and/or were transferred pursuant to the BOP's procedures, it is undisputed that in deciding to place Plaintiffs at ADX, the government properly relied on their underlying criminal conduct involving blowing up the World Trade

Center and institutional conduct while at the USPs. (Exs. E-3 and E-4.) *See McMillan v. Wiley*, 813 F. Supp. 2d 1238, 1241 (D. Colo. 2011) ("Plaintiff's criminal history supports his placement at the ADX based on a legitimate penological interest.").

Similarly, the government relied on Plaintiffs' underlying conduct in connection with their crimes in imposing the SAMs. (*See* Abouhalima Supp. Resp., Ex. 1.) Magistrate Judge Mix of this Court rejected a similar argument as to the SAMs in the *Sattar* case, where the plaintiff argued that there was no legitimate penological interest supporting the SAMs restrictions because there was no nexus between the SAMs and any behavior by plaintiff since his incarceration. 2012 WL 882401, at *7. She noted that "the penological interest need not be related only to post-incarceration conduct" and "[p]rison officials are permitted to consider the nature of the underlying crime for which a prisoner was convicted." *Id.*

Moreover, as discussed previously, courts are cautioned to distinguish between evidence of disputed facts and disputed matters of professional judgment that are entitled to deference. *Beard*, 548 U.S. at 529. Regardless of how Plaintiffs characterize or view the matters of judgments by the Defendants, they have not pointed to sufficient evidence regarding such matters to allow them to prevail on the merits. *Id.*

For example, Abouhalima points to the 2011 renewal notice which states that the SAMs are necessary because of the government's belief that "inmates *like you* have demonstrated the ability to remain operational" (emphasis added), and that Abouhalima's crime of conviction "carries with it the *potential* for other inmates to not only see you as a source of guidance and inspiration, but also to radicalize others who may be inclined to

commit acts of terrorism." (Abouhalima Supp. Resp., Ex. 1 at 2) (emphasis added.) Whether or not these actual events have transpired, Plaintiffs present no evidence to refute that these beliefs were part of the government's professional judgment. As Judge Matsch stated in the *Yousef* case, "Yousef may be frustrated that he remains a motivating force for extremists, that is not. . . out of his control; no one forced Yousef to bomb the World Trade Center." *Id*. This sentiment applies equally here.

Indeed, the government is not required to "prove" that its information about Abouhalima shows that his confinement in the ADX under SAMs "is essential" to protect its interests. *Rezaq*, 677 F.3d at 1014 (emphasis added). The government's "conclusions must often be based on informed judgment rather than concrete evidence." *Humanitarian Law Project*, 561 U.S. at 34-35. In this case, however benign Plaintiffs' actions may have been while in ADX, their crimes "remain[] one of the most infamous terrorist attacks on United States soil, and. . .the threat of Islamic extremism is clear and present." *Yousef*, 2014 WL 2892251, at *2. The government must be given some deference as to its professional judgment about the threat Plaintiffs pose and how to address it.

Plaintiffs contend, however, that findings in the Government Accounting Office's ["GAO"] Report entitled, *Improvements Needed in Bureau of Prisons' Monitoring and Evaluation of Impact of Segregated Housing*, support their assertion that there is a genuine issue of material fact as to whether the conditions of confinement in the ADX and under the SAMs serve Defendants' articulated governmental interests. The Report noted that "BOP has not assessed the extent" to which ADX and other segregated housing units "impact institutional safety for inmates and staff." (Abouhalima Supp. Resp., Ex. 6 at 33.) It further

observed, "without an assessment of the impact of segregated housing, BOP cannot determine the extent to which placement of inmates in segregation contributes to institutional safety and security." (*Id.* at 36.)  I reject Plaintiffs' argument.

As Defendants note in their Supplemental Reply (ECF No. 371), the GAO report makes no factual findings that are material to Plaintiffs' claims, *i.e.*, it does not include facts that would enable Plaintiffs to show that their transfers to or confinement in the ADX under SAMs fail to promote security.  It merely recommends that the BOP undertake studies to obtain statistical data.  As such, it has no bearing on decisions by Executive Branch security professionals about how to manage Plaintiffs' particular confinement to protect security interests, especially the government's preeminent interest in preserving national security.

Finally as to the first factor, Plaintiffs argue that while an asserted penological justification may be pertinent to the sufficiency of the process ultimately accorded to them, it does not bear upon a determination as to whether their conditions of confinement themselves impose an "atypical and significant hardship."  They argue the alleged penological interest should be considered only during the actual due process hearing or other review procedures accorded to them.  This argument was specifically rejected in *Rezaq*, 677 F.3d at 1013, and I reject it here.

Based on the foregoing, I find that the first factor weighs against finding a liberty interest.

<u>Conditions of Confinement</u>

The second factor addresses whether the conditions of confinement are extreme. In determining this issue, the Tenth Circuit stated "it is appropriate to compare the nature

-75-

of the challenged conditions to the type of nonpunitive confinement routinely imposed on inmates serving comparable sentences." *Rezaq*, 677 F.3d at 1014. It further noted that a comparison to the conditions at the Ohio supermax facility at issue in *Wilkinson* can be instructive when considering conditions in segregated confinement. *Id*.

Applying this analysis to Plaintiffs, while the conditions at ADX "are undeniably harsh", *Rezaq*, 677 F.3d at 1014, I find they are not extreme, even under the additional conditions that Abouhalima is under in connection with the SAMs and H Unit. I first note that Plaintiffs, convicted terrorists, are the very types of inmate who are routinely subject to nonpunitive restrictive confinement and who can reasonably expect to find themselves in such conditions at some point during their incarceration. The limitations on communications imposed by the SAMs are also a type of non-punitive restriction an inmate with Abouhalima's history should expect to have. Indeed, limitations on unfettered communications between inmates and the outside world are a hallmark of prison life, not a "dramatic departure" from it. *See Sandin*, 515 U.S. at 485.

I also agree with Defendants that there are important differences between the conditions at the Ohio supermax prison found to be extreme in *Wilkinson* and Plaintiffs' conditions at ADX. These differences include ADX inmates' ability to communicate with other inmates during recreation and through their cells (even though Plaintiffs assert that such communications are very difficult) and to have five "no contact" social visits and two fifteen-minute phone calls per month. *Id.* at 1015 and n.6. Further, in the H Unit in ADX, unlike the conditions in *Wilkinson*, inmates have control over the lights in the cell, a window in the cell, opportunity for outdoor exercise (even if recreation is occasionally cancelled due

to weather or institutional issues), the opportunity for social visits and the ability to communicate with approved family members, and regular contact with staff and other inmates (even if very brief).  *See Rezaq*, 677 F.3d at 1014-15.[29]  Inmates in Phase One and Phase Two of the H-Unit Program receive the same amount of recreation as ADX-GP inmates, and inmates in Phase Three receive more .  Moreover, the conditions in H Unit are nearly identical to those in the ADX-GP and Step-Down Program units, which no court has found to deprive an inmate of a liberty interest.[30]  As in *Allmon*, Abouhalima's "complaints about H Unit are minor matters of degree.  He does not show any significant conditions between the conditions of confinement in H Unit and other ADX units that courts have considered in finding no protected liberty interest."  2011 WL 4501941, at *15.[31]

In short, Plaintiffs have not provided evidence that the conditions they experience(d) at ADX, even in H Unit and under the SAMs, are extreme or that they differ materially from the conditions experienced by the plaintiffs in *Rezaq*, *Jordan*, *Georgacarakos*, or *Allmon*. "These conditions are common to many high-security prisons around the country, and can hardly be said to violate contemporary standards of decency."  *Georgacarakos*, 2010 WL

---

[29] Defendants present evidence that the same or similar type of inmate-to-inmate communications and recreation opportunities are available for SAMs inmates in H Unit as those in the ADX-GP, and that SAMs inmates have access to even *more* visits and telephone calls than inmates in the ADX-GP.  This is particularly true now that Abouhalima has been moved into Phase Three of the H-Unit Program.

[30] As to the length of Abouhalima's confinement, it appears to be similar to that in *Georgacarakos*, 2010 WL 1291833, at *11 n. 13.  Abouhalima has not cited any authority that the duration of his confinement is, alone, an atypical and significant hardship.  Instead, the Tenth Circuit has indicated that duration is to be "considered in tandem with indeterminacy."  *Rezaq*, 677 F.3d at 1016.

[31] Although Plaintiffs did present evidence regarding less restrictive conditions at USPs in which they were housed prior to their transfer to ADX, I find that is not the appropriate baseline.  *See DiMarco*, 473 F.3d at 1341-42; *Yousef*, 2014 WL 2892251, at *2.

1291833, at *12.  Accordingly, I find that the second factor favors Defendants and weighs against finding a liberty interest.

### Duration of Confinement

The third factor is whether the placement increases the duration of the confinement. *DiMarco*, 473 F.3d at 1342.  Here, it is undisputed that neither the SAMs nor incarceration in ADX and the H Unit deprives Plaintiffs of parole eligibility.  Accordingly, they do not (or did not as to Ayyad) extend the length of their incarceration. While Plaintiffs argue that this factor is not pertinent in this case given the length of their  sentences coupled with the elimination of federal parole, I disagree.  *Rezaq* rejected that argument, finding the fact that confinement in the ADX did not lengthen the plaintiffs' sentences was a crucial factor in the liberty interest analysis—one that strongly supported the finding that no liberty interest exists. *Rezaq*, 677 F.3d at 1016.   Accordingly, I find that this factor also weighs against finding a liberty interest.  *See also Saleh*, 2010 WL 5464295, at *13; *DiMarco*, 473 F.3d at 1342.

### Indeterminate Placement

The fourth factor, whether the placement is indeterminate, is "a critical consideration in liberty interest analysis." *Rezaq*, 677 F.3d at 1016.  Defendants recognize that if an inmate's deprivation is indeterminate or legally indefinite, that factor can support a finding that the inmate has been deprived of a liberty interest.  But they assert, and I agree, that the Tenth Circuit has indicated that the availability of regular reviews suggests that the confinement was not legally "indefinite" or indeterminate. *Rezaq*, 677 F.3d at 1016 (holding that status at ADX not indeterminate where inmate received twice-yearly program reviews,

-78-

even when those conditions are not of a "predictably finite" length); *DiMarco*, 473 F.3d at 1343-44 (confinement not indefinite where inmate had regular evaluations with team who interviewed her); *Saleh*, 2010 WL 5464295, at *14 (same); *cf. Wilkinson*, 545 U.S. at 224 (finding that placement at Ohio supermax prison was indefinite because, after an initial 30-day review, placement was reviewed just annually).

Defendants present evidence that before Plaintiffs' transfer to ADX, the BOP conducted multi-level regional reviews as to their placement in ADX. They further present evidence that upon arrival at the ADX, Plaintiffs had the opportunity to raise challenges to their transfers during program reviews and through the BOP's administrative remedy program. (Ex. E-1, Keller Decl., ¶ 28.) Their "opportunity to respond" to the transfer did not have to occur in advance of the transfer to satisfy due process. *See Mathews v. Eldridge*, 424 U.S. 319, 339-40 (1976) (holding that evidentiary hearing was not required prior to termination of social security disability benefits); *see also DiMarco*, 473 F.3d at 1344-45 (no due process violation where inmate placed in administrative segregation without notice and hearing upon intake, but prison subsequently provided periodic reviews of the inmate's status). More recently, Plaintiffs received retroactive hearings regarding their placement at ADX, including notice of the factual basis for ADX placement, an opportunity for rebuttal in the form of a hearing, and the opportunity for further review by BOP officials.

As to the SAMs, Defendants have presented evidence that a comprehensive, multi-level review precedes the imposition and annual renewals of the SAMs, and has yielded information considered in decisions not to renew SAMs as to some inmates. Abouhalima participates in this review by submitting written comments and meeting in person with

government officials.  Abouhalima also receives program reviews, which occur at least two times each year and determine his level of placement in the H-Unit Program.  Defendants assert that this additional review gives Abouhalima an opportunity to demonstrate positive behavior that officials can take into account in the SAMs assessment.  I find that "[t]hese periodic reviews include[] procedural protections, including the chance to appeal decisions through an administrative process."  *Rezaq*, 677 F.3d at 1016.

While Plaintiffs argue that these reviews are meaningless as the process is linked to historical or status criteria that they have no ability to change and/or assert that they cannot meaningfully participate in the reviews, this is not dispositive.  "The Tenth Circuit has said that 'it is not necessary[,]' in considering the fourth *DiMarco* factor, 'to closely review the process. . . .'"  *Yousef*, 2014 WL 2892251, at *3 (quoting *Rezaq*, 677 F.3d at 1016).  How an inmate's "confinement conditions are reviewed is a separate question from the frequency with which they are reviewed."  *Id.*; *see also Rezaq v. Nalley*, No. 07-cv-02483-LTB-KLM, 2010 WL 5157317, at *12 ("[a]though Plaintiff contends that these reviews are meaningless, he does not dispute that they occurred and that he had some opportunity to participate").

Abouhalima also argues that his confinement is indeterminate because without the termination of the SAMs (which are themselves indefinite), he cannot participate in the ADX Step-Down Unit and thus, cannot be transferred out of ADX.   He cites cases that, while finding that the conditions at ADX did not pose an atypical and significant hardship, emphasized that the critical factor was that the conditions were not indefinite because the inmates had access to the Step-Down program.  *See Georgacarakos*, 2010 WL 1291833, at *13 (noting the plaintiff could transfer out of ADX upon completing the step down

program, and that he "holds the keys" to his own release from the ADX); *Rezaq*, 2010 WL

5157317, at * 13 (noting that the option of the step down program was not foreclosed to

plaintiff and thus his confinement was not indefinite); *Saleh*, 2010 WL 5464294, at *5.  At

the very least, Abouhalima argues this raises a genuine issue of fact as to the indefinite

nature of his confinement.  Again, I reject this argument.

According to Abouhalima, the only thing preventing him from entering into the Step-

Down Program is the imposition of his SAMs.  I reject this argument, as the SAMs are not

indeterminate.  They are reviewed annually, with Abouhalima's input, to determine if they

are still appropriate.  Defendants can decide at any of these annual reviews to terminate the

SAMs, at which time Abouhalima would be eligible to participate in the Step Down Program.

Moreover, Ayyad's SAMs were terminated and he was transferred out of ADX in a matter

of weeks without participation in the Step-Down Program.  Thus, Abouhalima's argument

that the ADX Step Down Program for general population inmates is the only route out of the

ADX is belied by the history of this case.

Based on the foregoing, I find that the fourth factor favors the Defendants.

<u>Summary of Liberty Interest Factors</u>

In conclusion, I find that all four factors weigh against Plaintiffs.  Accordingly, I find

that Plaintiffs have not demonstrated a protected liberty interest in connection with their

transfer to ADX and/or conditions of confinement in ADX in the H Unit and under SAMs.

Having found that there is no protected liberty interest, I need not determine whether

Plaintiffs were afforded the appropriate procedural protections.  Defendants' Motion for

Summary Judgment is granted as to Plaintiffs' due process claims.

IV.   <u>CONCLUSION</u>

Based on the foregoing, it is

ORDERED that Defendant's request for reconsideration of my Order of October 10, 2012, denying Defendants' Motion to Dismiss Ayyad's Claims as Moot as to Ayyad's due process related to his transfer to ADX is **DENIED**.  It is

FURTHER ORDERED that Defendants' Motion for Summary Judgment (ECF No. 259) is **DENIED AS MOOT** as to Ayyad's due process claim as to his ongoing confinement in ADX, his request for injunctive relief for a transfer from the ADX to another less restrictive facility, and his First Amendment claims as these claims were previously dismissed.  It is **GRANTED** as to all remaining claims in this case, including Abouhalima's First Amendment claims and Plaintiffs' procedural due process claims.  Judgment shall enter in favor of Defendants and against Plaintiffs on their remaining claims in this consolidated action.

Dated:  September 24, 2014

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior United States District Judge